Timothy A. Scott (SBN 215074)
E: TScott@McKenzieScott.com
Marcus S. Bourassa (SBN 316125)
E: MBourassa@McKenzieScott.com
Brett T. Diehl (SBN 339686)
E: BDiehl@McKenzieScott.com
McKENZIE SCOTT, PC
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone: (619) 794-0451
Facsimile: (619) 202-7461

*Attorneys for Defendant*
*Carlos Manuel Da Silva Santos*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>CARLOS   MANUEL   DA   SILVA SANTOS (1),<br><br>        Defendant. | Case No.: 3:23-cr-02507-RSH<br><br>**APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER**<br><br>Hon. Robert S. Huie |

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................1

II.    PROCEDURAL HISTORY ......................................................2

III.   STATEMENT OF FACTS .......................................................3

   A.   An Entrepreneur Eager to Fund Worthy Projects.........................3

   B.   Paloma Allen and Sean Winston's Cooperation ...........................5

   C.   Investigation Expands to Mr. Santos's Digital Accounts............6

   D.   Seizure or Freezing of Mr. Santos's Bank Accounts .................7

   E.   Pretrial Services Report ...............................................................7

   F.   Mr. Santos and Defense Team's Efforts to Review Discovery.................8

   G.   Everlaw ........................................................................................9

   H.   Inability to Access Everlaw in the Federal Jails.........................9

   I.   Mr. Santos's Lack of Personal Enrichment .................................9

   J.   Mr. Santos's Family Support and $250,000 Cash Bond Offer ................10

   K.   Mr. Santos's Mother's Willingness to Reside in San Diego and Act as a Third-Party Custodian ...............................................11

   L.   Mr. Santos's Plan to Reside in San Diego and Willingness to Comply with Location-Monitoring.........................................12

IV.   STANDARD OF REVIEW .....................................................12

V.   BAIL REFORM ACT FRAMEWORK ......................................12

   A.   Presumption of Release Under the Bail Reform Act..................12

   B.   Factors to Be Considered...........................................................13

VI.   ARGUMENT..........................................................................15

APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER

A.    The Bail Reform Act's Factors Favor Mr. Santos's Release ...................15

    1.    Nature and Circumstances of the Offense Charged: There Are No Allegations of Violence and the Loss Amount Is Contested ...............15

    2.    Weight of the Evidence: The Evidence Presented is Contested by Mr. Santos....................................................................................................17

    3.    History and Characteristics: Mr. Santos is Well Respected, Has Strong Ties to his Home Communities, and Lacks the Financial Means to Flee ....................................................................................................18

    4.    Dangerousness: Mr. Santos Poses No Threat........................................21

    5.    Mr. Santos Should Be Released on Bond................................................22

B.    Mr. Santos's Release from Custody Would Significantly Improve His Ability to Assist in the Preparation of His Defense ..................................22

C.    The Proposed $250,000 Cash Deposit and Plan for Mr. Santos's Mother to Live Alongside Him in San Diego Should Assuage Any Concerns About Mr. Santos's Compliance................................................................24

VII.    CONCLUSION........................................................................................25

APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER

## I.      INTRODUCTION

Since December 2023, Mr. Santos has been detained at the Metropolitan Correctional Center (MCC) in San Diego. Mr. Santos has continued to plead not guilty to the various non-violent, fraud-related charges he faces. He has worked alongside defense counsel to prepare for his pending January 2025 trial. MCC's prohibition on detainees' access to internet-connected e-discovery platforms, however, has rendered discovery review difficult and excessively burdensome.

Mr. Santos brings this appeal of the magistrate judge's detention order in hopes that he may be released on bond and allowed to assist most effectively the preparation of his defense.[1] His parents are willing to deposit a $250,000 cash bond with the Court to assuage any concerns the Court might have. Furthermore, alongside this motion, Mr. Santos presents a declaration from a forensic accountant. The accountant has reconstructed from scratch, using data directly received from financial institutions, all banking transactions carried out by Mr. Santos and Ethos Asset Management (Ethos), the company he headed. The forensic accountant's declaration makes clear two important facts: Firstly, there are no indications Mr. Santos personally enriched himself to a significant degree from Ethos's accounts. Secondly, the forensic accountant has not observed any bank transactions that lead him to believe Mr. Santos transferred money to accounts he or his family control that have not been identified and seized or frozen by the government. Therefore, Mr. Santos is not a flight risk. The other Bail Reform Act factors also favor release.

Mr. Santos requests that the Court release him on a personal appearance bond secured by a $250,000 cash deposit. Doing so will allow Mr. Santos to assist his counsel most effectively as they prepare for his trial in four months.

---

[1] Mr. Santos brings this appeal before the District Court both because the information presented here is an amplification of arguments made in the original detention hearing and because this motion is brought alongside other time-sensitive motions. If the Court prefers, this motion can be heard first by the magistrate judge as a Motion for Reconsideration.

APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER

## II.    PROCEDURAL HISTORY

Mr. Santos was arrested based on a sealed complaint in the District of New Jersey on November 13, 2023. In that district, on the day of his arrest, he consented to detention pending a hearing upon arrival in this district. *See* Waiver of Rule 5 & 5.1 Hearings, United States v. Carlos M. DaSilva Santos, No. 2:23-mj-11193-AME (D.N.J. Nov. 13, 2023), ECF No. 3. It took a month for him to be transported from New Jersey to San Diego. During that time, the government entered an indictment against Mr. Santos. ECF No. 7.

Mr. Santos's initial appearance in the Southern District of California and arraignment on the indictment occurred on December 12, 2023 before Magistrate Judge Michael S. Berg. On the government's oral motion to detain Mr. Santos based on risk of flight and risk of obstruction of justice, a detention hearing was set for December 19, 2023. Prior to that hearing, Mr. Santos's previous counsel, Jeremy D. Warren, submitted a motion for the court's consideration. ECF No. 16. The government did not enter any written pleadings regarding their motion to detain. At the detention hearing, Assistant U.S. Attorney Christopher Beeler proffered that "Mr. Santos and his unindicted conspirators orchestrated an international Ponzi scheme" in which collateral was collected in exchange for the promise of loans that were never paid out. *See* Ex. A at 4-5 (transcript of the detention hearing). Mr. Beeler cited a loss amount at $86.7 million dollars. *Id.* at 5. Mr. Beeler also argued that Mr. Santos was a Portuguese citizen who had lived in Turkey for multiple years, whose only ties to San Diego were his company's virtual office, and whose only ties to the United States were unindicted co-conspirators and victims. *Id.* at 6.

Regarding the government's obstruction of justice arguments, the prosecution proffered that Ethos Asset Management (hereinafter "Ethos"), via email, had been "intimidating customers into doing nothing" and argued Mr. Santos was "seemingly still acting as the CEO" of Ethos and directing others "to intimidate victims and telling them not to talk to law enforcement." *Id.* at 6-7. Finally, the

prosecution cited Ethos bank accounts about which Mr. Santos had told Pretrial Services as well as a personal savings account as proof of Mr. Santos's means to flee. *Id.* at 7.

At the conclusion of the December 19, 2023, detention hearing, Judge Berg granted the government's motion to detain Mr. Santos. Ex. A at 15-17. His written detention order cited four factors for his decision:

- The defendant is not a citizen of the United States or lawfully admitted for permanent residence.
- The defendant faces removal or deportation proceedings regardless of the outcome of this case.
- Weight of the evidence is strong but the least important factor.
- Loss to victims is over $87 million and growing.

ECF No. 21. Based on these factors, Judge Berg found "a serious risk that the defendant will flee" and thus no conditions could be set to ensure Mr. Santos's appearance. *Id.* Judge Berg made no finding—either oral or in writing—that obstruction of justice weighed in favor of detention. *See* Ex. A. 15-16; ECF No. 21 (neither ruling broaches the risk of obstruction of justice).

Mr. Santos's substantive motion hearing is set for November 22, 2024. His jury trial is set to begin January 6, 2024. To date, 1.19 terabytes of discovery have been turned over. Mr. Santos remains in custody at the MCC.

## III.   STATEMENT OF FACTS

Mr. Santos's case encompasses millions of pages of documents, emails, spreadsheets, and other financial data. The Superseding Indictment alleges various non-time-bound charges and overt acts spanning from 2019 to 2023. ECF No. 29.

### A. An Entrepreneur Eager to Fund Worthy Projects

Mr. Santos is a thirty-year-old Portuguese citizen. Pretrial Services Report, ECF No. 51 at 2. Born and raised a couple hours outside of Lisbon, he obtained a bachelor's degree in economics and a master's degree in accounting, taxation, and corporate finance, both from the Lisbon School of Economics & Management.

Ex. E (copies of his diplomas). In his master's program, he won the award for best student. Ex. E at 43. Through his studies, Mr. Santos became interested in corporate finance. After his graduation, Mr. Santos served as an adjunct professor at his alma mater. Through contacts at the university and in Lisbon, he developed a consultancy business, helping to design and finance infrastructure projects in various international countries. Eventually, Mr. Santos realized the opportunity to identify worthy projects in underfunded markets. Ethos Asset Management was born.

Ethos's mission was to provide project finance to communities and corporations that might otherwise not receive funding. Ethos was able to finance such projects via the pledging (but not collection) of collateral held in lendees' accounts via a standby letter of credit or other, similar Society for Worldwide Interbank Financial Telecommunications-recognized banking transaction. Pledged collateral represented a fraction (roughly between one-fourth and one-fifth) of the loan amount and enabled banks to issue margin loans to Ethos. Like any corporation disbursing loans, Ethos invested the loan funds it received as a result of collateral pledges by lendees while also ensuring that it could meet its obligations to pay loans as they became due. Ethos's compliance process aimed to ensure that Ethos only lent to solvent, well-planned projects; Ethos's value proposition was that a shorter-term capital investment would allow projects to be built, from which lendees could then repay the loaned money, with interest, over a longer (normally ten- to twelve-year) time horizon. Ethos would recoup its original investment back with interest while also generating returns from margin loans on the capital pledged by lendees.

Between 2018 and 2023, Ethos financed projects across the world. Mr. Santos travelled frequently to meet with employees, banks, and borrowers. Mr. Santos was first based out of Portugal, but as he began to develop contacts in the United States, he decided to incorporate Ethos in the United States. Specifically, he based Ethos out of a virtual office with co-working space in La Jolla, California, an arrangement that permitted Mr. Santos to work and hold meetings in-person when

needed while avoiding the overhead costs of a permanent office. Many of Ethos's employees and customers were based outside of San Diego or the United States, so Mr. Santos was often on the road. Subsequently, as Ethos found additional opportunities in Europe, Asia, and Africa, Mr. Santos increasingly spent time in Turkey, a business and finance hub nearly centered between the three regions. Mr. Santos opened an Ethos affiliate in Turkey, Ethos Ticari Danismanlik, and Ethos maintained a dual-purpose office/residence in Istanbul.[2] Through his work in Turkey, Mr. Santos met Eylem Bas; they wed in 2023 and lived together in Istanbul.

When not on the road, Mr. Santos spent his time in Portugal and Turkey. Mr. Santos's many friends, family members, and business connections drew him back to Portugal. *See* Ex. C ⁋ 3 ("My husband and I have remained close with Carlos. Even after he moved out of our house, we were in frequent contact with him. He visited us regularly."). His expanding business and new wife helped him build ties in Turkey. Indeed, after his arrest on these charges, Mr. Santos told the Pretrial Services Officer that he had travelled between the United States, Portugal, and Turkey for business meetings during the preceding week. Pretrial Services Report, ECF No. 51 at 3.

### B. Paloma Allen and Sean Winston's Cooperation

The government's investigation into Mr. Santos began in 2020. Little was done, however, until investigators began speaking with Paloma Allen, Mr. Santos's ex-girlfriend, in 2022. The previous year, Ms. Allen had sold her shares of Ethos to Mr. Santos. Ms. Allen identified other individuals with whom she and Mr. Santos had worked to grow Ethos. She identified to investigators Ethos's main employees, partners, and bank accounts. Based on Ms. Allen's information, investigators began to contact other witnesses to the alleged crimes. They also began to subpoena

---

[2] Ethos also created a Brazilian subsidiary, Ethos Capital Brasil Ltda. The controlling shareholder of that entity is Mayra Couto. She controls Ethos Capital Brasil's bank accounts and operations and recently sued Mr. Santos in Brazil.

APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER

banking records for Ethos, Mr. Santos, and related entities.

Mr. Santos understands that Ms. Allen will be a cooperating government witness at Mr. Santos's trial. To date, Mr. Santos is not aware of Ms. Allen being charged with any crimes related to her multi-year involvement with Ethos.

Based on information provided by Ms. Allen and others, the government began to investigate Sean Winston. Subsequently, Mr. Winston pled guilty to five counts of wire fraud under 18 U.S.C. § 1343. Plea Agreement, No. 23-cr-2441 (S.D.C.A. Nov. 30, 2023), ECF No. 8 at 1-2.

These wire fraud convictions are unrelated to Mr. Santos or Ethos. They derive from Mr. Winston's fraudulent representations to obtain and spend Paycheck Protection Program loans and an Economic Injury Disaster Loan from the U.S. Small Business Administration. *See id.* at 2-6 (factual basis of Mr. Winston's plea). Mr. Winston's plea includes the admission that Atlas Capital Management, an entity held out to be engaged in project management and project finance, and of which he was the owner and chief executive officer, had in fact never undertaken such work. *Id.* at 4. Instead of bona fide business expenses, Mr. Winston's fraudulently obtained loans were spent on personal expenses, including luxury automobiles. *Id.* at 5. The government has not produced reports or other discovery alleging Mr. Santos knew Atlas Capital Management was fraudulently operated by Mr. Winston.

During the government's investigation into Mr. Winston's unrelated acts, Mr. Winston claimed information about acts he alleged Mr. Santos fraudulently committed. Now, in their case against Mr. Santos, the government plans to call Mr. Winston as a cooperating witness. *See* Joint Motion to Continue Sentencing, No. 23-cr-2441 (S.D.C.A. Nov. 30, 2023), ECF No. 27 at 1 (requesting a sentencing continuance because of Mr. Winston's anticipated testimony).

**C. Investigation Expands to Mr. Santos's Digital Accounts**

Beginning with files provided by Ms. Allen and Mr. Winston and expanding outwards through series of subpoenas, searched digital accounts, and seized devices,

APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER

the government identified digital accounts over which they believed Mr. Santos, coconspirators, or Ethos had control.

The evidence seized from these accounts is voluminous, multifaceted, and often encoded in hard-to-process digital formats. The contents of digital storage drives, email accounts, text/WhatsApp messages, bank records, calendars, and investigatory files have all been turned over. Information is interlinked between emails, documents, bank records, and other sources. Many of these records are in their original format and require specialized software, large hard drives, and high-powered hardware to open.

### D. Seizure or Freezing of Mr. Santos's Bank Accounts

In the Superseding Indictment, ECF No. 29, and Bill of Particulars for Forfeiture of Property, ECF No. 19, the prosecution lays out various bank accounts across several countries that it seeks to seize. The list encompasses accounts in Mr. Santos's own name as well as under Ethos's name. It is Mr. Santos's understanding that the government has identified every account over which they believe Mr. Santos or Ethos exercised control.

Authorities have seized or frozen all accounts they have identified. It is Mr. Santos's understanding that the identified accounts that have not been seized have been frozen. Consequently, every financial account identified by the government as under Mr. Santos or Ethos's control is now inaccessible to Mr. Santos.

### E. Pretrial Services Report

After Mr. Santos was arrested at Newark Airport when he arrived on an international commercial flight, a Pretrial Services Report was prepared by the District of New Jersey. ECF No. 51. The information in the Pretrial Services Report derived solely from Mr. Santos's own statements. *See id.* at 2 (no corroborating information was collected).

In the interview shortly after his initial arrest, Mr. Santos described his monthly income as $16,666.67. ECF No. 51 at 2. He detailed having $25,000 in a

personal checking account as well as $700,000 in a personal savings account. Mr. Santos also described his business's assets and liabilities. He did not know then that his personal accounts and Ethos's accounts were being frozen by federal authorities.

### F. Mr. Santos and Defense Team's Efforts to Review Discovery

Over the past eight months, Mr. Santos has met at the MCC with his defense team multiples times per week for multiple hours. He has reviewed the warrants underlying the case. He has digested the specific acts alleged. But he has been unable to review most of records produced in discovery due to the MCC's restrictions on internet access. He has only been given access to MCC's antiquated discovery computer a handful of times during his nine months in custody.[3] Thus, he must rely on his defense team to identify, print out, and provide him with documents from discovery for his review.

Upon taking over the case in mid-May, defense counsel dove into the records in Mr. Santos's case, eager to begin to make sense of the case and identify critical documents. Over the intervening months, however, it became increasingly clear that preparing Mr. Santos's defense required tailored electronic discovery software.

---

[3] A recent Department of Justice study voiced concerns with MCC San Diego's infrastructure for clients to review digital discovery. Specifically, "[d]efense counsel raised three overarching concerns regarding their clients' access to e-discovery through the workstations. First, the attorneys stated that discovery productions frequently contain files that are incompatible with BOP computers. . . . Second, defense counsel shared that the hours for their clients to review discovery are insufficient in facilities that have time and place restrictions on discovery review. Likewise, even in facilities without time and place restrictions, attorneys shared that some facilities have too few computers (or those computers are too slow) for their clients to have sufficient access. And third, defense counsel expressed concern that discovery computers are in communal areas, making it difficult for their clients to confidentially review materials." ADVISORY GROUP OF DEP'T OF JUST. COMPONENTS, REPORT AND RECOMMENDATIONS CONCERNING ACCESS TO COUNSEL AT THE FEDERAL BUREAU OF PRISONS' PRETRIAL FACILITIES, 42 (2023), https://www.justice.gov/d9/202307/2023.07.20_atj_bop_access_to_counsel_report.pdf.

### G. Everlaw

To meet the formatting, software, and hardware requirements necessitated by the voluminous, complex records, Mr. Santos's defense team reviewed multiple e-discovery platforms and decided to enter into a contract with Everlaw. A Motion for Supervised, Remote Access to Discovery and Evidence During Legal Visitation, which contains additional information about Everlaw's capabilities, is presented to the Court by Mr. Santos simultaneous with this bond appeal.

Because it relies on high-powered servers to process, link, and render discovery, Everlaw requires internet. Consequently, Mr. Santos is not currently able to use the product alongside defense counsel. Instead, a time-consuming, multi-step process is required when Mr. Santos identifies a document or communication chain he wishes to review. Additionally, a member of the defense team must be alongside Mr. Santos whenever he wishes to review discovery. The result is the defense team spending ten or more hours a week just downloading and reviewing items alongside Mr. Santos. Such arrangements are only necessary because Mr. Santos is in custody and unable to access Everlaw or any other internet-based e-discovery portal.

### H. Inability to Access Everlaw in the Federal Jails

The policies of the U.S. Marshals Service and the Bureau of Prisons prohibit legal visitors from accessing the internet while visiting clients. Only recently did the MCC permit users to enter with laptops. Within the MCC as well as all other facilities, however, legal visitors are banned from connecting to the internet. Therefore, Mr. Santos is not able to use Everlaw to understand the evidence against him so long as he is held in custody.

### I. Mr. Santos's Lack of Personal Enrichment

Because the government has called into question Ethos's internal recordkeeping and Mr. Santos's proceeds from the company, Mr. Santos has retained a forensic accountant, Joshua Teeple, to reconstruct Mr. Santos's and Ethos's financial records from scratch. *See* Ex. D (Mr. Teeple's declaration). Mr.

APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER

Teeple and his team created their financial database directly from records provided by banking institutions. *Id.* ¶¶ 3-7. They do not rely on Mr. Santos's or Ethos's internal records or accounting ledgers. *Id.* ¶ 7. To understand the basics of the case, Ethos's operations, and details of transactions in his forensically reconstructed financial database, Mr. Teeple spoke with Mr. Santos and his defense team. Ex. D ¶¶ 8-9. From there, Mr. Teeple examined all bank accounts that have been identified in discovery as having been controlled by Mr. Santos and/or Ethos.

Mr. Teeple made several factual conclusions based on his analysis of Mr. Santos and Ethos's banking transactions:

- "Ethos's banking transactions appear to be consistent with a business making payments on secured loans, investing in financial instruments, and paying business operating expenses." Ex. D ¶ 13.

- "There do not appear to be transfers from Mr. Santos's personal accounts to other accounts controlled by him that are beyond the scope of the banking records GT has analyzed." Ex. D ¶ 19.

- "Based on the banking transactions analyzed by GT, it does not appear that Mr. Santos personally enriched himself to a significant degree from Ethos Asset Management or Ethos Ticari Danismanlik." Ex. D ¶ 20.

- "GT has not seen evidence of transfers from Ethos Asset Management, beyond those discussed [in this declaration], to accounts that appear to be controlled by Mr. Santos or his family members." Ex. D ¶ 21.

### J.  Mr. Santos's Family Support and $250,000 Cash Bond Offer

Mr. Santos's parents reside in Portugal. They have built up a modest amount of wealth. Because all of Mr. Santos's assets are currently frozen, Mr. Santos's parents are paying the legal fees for undersigned counsel. Ex. B ¶ 3.

Recently, Mr. Santos's parents received approximately $250,000 from proceeds of the restructuring of an automotive dealership in which they have partial

APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER

ownership. *See* Ex. B ¶¶ 4 (describing origin of these funds).[4] They did not previously have these funds. *Id.* They are willing to post this amount of money as a personal appearance bond for Mr. Santos's release. *Id.* ¶ 5. Mr. Santos's parents inform the court in their declaration submitted alongside this motion that they are paying his legal fees and offering to post this $250,000 bond for him because of their "certainty that he would not jeopardize our savings by violating any of his conditions of release." *Id.* ¶ 6. They are certain that their son has no other funds on which to rely, and "they are doubly certain he would never put our $250,000 at risk by violating any conditions of his release." *Id.* ¶ 8.

### K. Mr. Santos's Mother's Willingness to Reside in San Diego and Act as a Third-Party Custodian

Mr. Santos's parents are eager to support their son as he prepares for trial. To assuage potential concerns about Mr. Santos's flight, Mr. Santos's mother, Manuela Santos, is prepared to move temporarily to San Diego. She would plan to live alongside her son in a rented apartment. *See* Ex. C (declaration of Manuela Santos).

Mr. Santos's mother is also prepared to act as a third-party custodian. She recognizes that she would have a duty to report to Pretrial Services any violations by her son of his conditions of release. Ex. C at ¶ 8. Her offer to be a third-party custodian is grounded in her desire to help her son best assist his defense team in preparing for trial. *Id.* ¶ 9.

---

[4] The declarations submitted alongside this motion by Mr. Santos's parents and, independently, by his mother, were translated from English to Portuguese by a certified translator. Because this translator was a Brazilian Portuguese speaker, Mr. Santos's sister, Carla Santos, who is bilingual and lives and works in the United Kingdom, made minor edits to facilitate her parents review of the declarations in European Portuguese, the dialect of Portuguese best understood by them (as natives of Portugal). *See generally Brazilian vs. European Portuguese: How Different Are They?*, Middlebury Language Schools (Feb. 7, 2023), https://www.middlebury.edu/language-schools/blog/brazilian-vs-european-portuguese.

APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER

### L. Mr. Santos's Plan to Reside in San Diego and Willingness to Comply with Location-Monitoring

Mr. Santos's plan if released on bond is to reside in a rented residence in San Diego. He is willing to have his location monitored by ankle monitor, phone calls, or whatever other method the Court and pretrial sees fit. He is eager to assuage any concerns the Court may have about his flight.

Mr. Santos's focus if released from custody will be to prepare his defense. Because his banking accounts are frozen, Mr. Santos would rely on his parents for financial support. He would plan to spend his time reviewing the discovery and assisting in the preparation of his defense.

## IV.   STANDARD OF REVIEW

The Court's review of the findings and order of the magistrate judge is reviewed *de novo*. *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990) ("[The district court] should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference. If the performance of that function makes it necessary or desirable for the district judge to hold additional evidentiary hearings, it may do so, and its power to do so is not limited to occasions when evidence is offered that was not presented to the magistrate."). Under 18 U.S.C. § 3145(b), such an appeal "shall be determined promptly." *See United States v. Fernandez-Alfonso*, 813 F.2d 1571, 1572 (9th Cir. 1987) (holding that a thirty-day delay in reviewing the magistrate judge's detention order violates the statute).

## V.   BAIL REFORM ACT FRAMEWORK

### A. Presumption of Release Under the Bail Reform Act

The Bail Reform Act (BRA) requires the pretrial release of any person charged with an offense unless the Court finds that no conditions of release would "reasonably assure" the person's appearance or the safety of the community. 18 U.S.C. § 3142(e). The government bears the burden of proving by "a clear

APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER

preponderance of the evidence" that a defendant poses a "serious" risk of flight. *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990); *see also United States v. Motamedi*, 767 F.2d 1403, 1410 (9th Cir. 1985) (Boochever, J., dissenting in part) (arguing a clear and convincing standard is appropriate to detain a pretrial defendant based on risk of flight because the interest at stake is more than mere loss of money). This presumption in favor of release reflects that "[i]n our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

Built on the presumption of release, the Ninth Circuit's three guiding bail principles are: (1) federal law has traditionally provided that a person arrested for a non-capital offense shall be admitted to bail; (2) only in rare cases should release be denied; and (3) doubts regarding the propriety of release are to be resolved in favor of defendants. *Towsend*, 897 F.2d at 993-994 (citations omitted).

### B. Factors to Be Considered

The four BRA factors that courts must consider for bond are: the nature and circumstances of the offense charged; the weight of the evidence; the history and characteristics of the defendant; and the nature and seriousness of the danger to any person or the community.

The Ninth Circuit has made clear, under § 3142(g) of the BRA, that the nature of the offense and evidence of guilt "may be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community" *Motamedi*, 767 F.2d at 1408. The weight of the evidence of the defendant is "the least important" of the BRA's bond factors. *Id.*

As to the defendant's characteristics, "[a]lienage may be taken into account, but it is not dispositive." *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015). Thus, when "both parties present strong arguments on the implications of [the defendant]'s alienage" and access to foreign funds, alienage "does not tip the balance either for or against detention." *Motamedi*, 767 F.2d at 1408.

APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER

The Ninth Circuit has emphasized that foreigners' roots and reputation in their home countries should be considered. In *Townsend*, the court examined the ties of defendants to their home communities abroad in Canada and India. 897 F.2d at 995. There, ties to the foreign communities weighed towards release, as did a defendant's good reputation as a businessman in his home community. *Id.*

In considering a defendant's characteristics, their financial situation can be considered. In *Townsend*, the defendants' access to significant sums of cash was considered. 897 F.2d at 996. There, a Swiss friend of one of the defendants promised to post his $1 million bail without meaningful inquiry into the trial specifics or the defendant's ability to repay him. The Ninth Circuit examined the motives of this potential surety in its inquiry into the defendant's characteristics. *Id.*

By contrast, in *Motamedi*, which "authoritatively interpreted" the BRA, *Townsend*, 897 F.2d at 993, then-Circuit Judge Anthony M. Kennedy examined the risk of flight of an Iranian national charged with illegal arms exportation. The government argued that Mr. Motamedi had means to flee abroad with impunity and that he maintained large bank accounts in foreign countries. 767 F.2d at 1408. Defense counsel countered by emphasizing the lack of any tangible evidence regarding large foreign bank accounts that Mr. Motamedi could access. *Id.* Because "both parties present[ed] strong arguments on the implications of Motamedi's alienage," the court concluded the risk of flight factor did not tip for or against detention. *Id.* Ultimately in *Motamedi*, the Ninth Circuit overturned, under a clearly erroneous standard of review, the district court's detention of Mr. Motamedi.

The final factor to be considered is danger to other persons or to the community. When there is no or insufficient evidence of dangerousness, this factor weighs towards the defendant's release. *See Townsend*, 897 F.2d at 996 (in which the district court found no dangerousness posed by the defendant). To hold the defendant on dangerousness grounds, "clear and convincing evidence" is required. 18 U.S.C. § 3142(f)(2).

## VI.   ARGUMENT

This case presents a presumption of release. This is not one of those "rare cases" where detention is warranted. *Towsend*, 897 F.2d at 994. The government's investigation into Mr. Santos has spanned over four years. They have identified and seized or frozen dozens of bank accounts. There is no indication Mr. Santos has the means or desire to free from the United States while he awaits trial. To do so would mean a life on the run, which would require significant independent wealth. On the other side of the ledger is a respected, educated Mr. Santos. If kept behind bars by the Court, Mr. Santos's ability to assist his counsel in digesting discovery and preparing his case will be substantially impeded by his incarceration. Therefore, this Court should grant Mr. Santos the right to be released on a pretrial bond.

### A. The Bail Reform Act's Factors Favor Mr. Santos's Release

The BRA's three most important factors weigh towards release: the nature and circumstances of the offense are non-violent; Mr. Santos has no previous convictions or personal characteristics that indicate risk of flight; and there is no reason to believe he is a danger. The fourth factor, the weight of the evidence is a toss-up: the government is relying on self-interested cooperating witnesses to allege specific acts of fraud whereas forensic accountant Josh Teeple's report makes clear that the allegations regarding Ethos operating as a Ponzi scheme are false. Thus, this Court should set bond for Mr. Santos.

### 1. Nature and Circumstances of the Offense Charged: There Are No Allegations of Violence and the Loss Amount Is Contested

Because the nature of the offense and evidence of guilt "may be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community," *Motamedi*, 767 F.2d at 1408, the Court should only evaluate the allegations against Mr. Santos insofar as they indicate the threat he poses of flight or danger. There are no allegations that Mr. Santos used violence or the threat of violence in any of the allegations. Additionally, Mr. Santos

contests the government's allegations regarding victims who suffered loss in this case. Accordingly, there is insufficient evidence for the Court to approximate a loss amount and factor in possible sentencing exposure in its bond consideration.

The allegations against Mr. Santos relate to financial activities and identity theft. There are no allegations that violence or coercion were employed to commit the crimes. The two identity theft counts (Counts 6-7), relate to having placed the copied signature on two documents, one of which was sent to a financial institution and the other to a lendee's employee.  In sum, none of the conduct alleged weighs towards detention.

Similarly, the charged crimes' international nature does not weigh in favor of detention. The Court should only consider the global nature of Ethos and the charged offenses insomuch as the alleged actions factor into "the likelihood that [Mr. Santos] will fail to appear." *Motamedi*, 767 F.2d at 1408. While Mr. Santos is not a U.S. citizen or permanent resident, none of the allegations should lead the Court to believe that he might flee the United States. In fact, to the contrary, Mr. Santos was arrested at Newark Airport on an inbound international flight. Nothing about the charged offense indicates that Mr. Santos has previously used flight across borders to avoid liability. To the contrary, previous to his arrest, Mr. Santos travelled regularly throughout the world, including to the countries where his customers were based. *See, e.g.*, Pretrial Services Report, ECF No. 51 at 3 ("He reported frequent travel outside of the United States and to many foreign countries. Before the defendant was apprehended by federal agents on 11/12/23, he was flying from Turkey to attend some business meetings in Virginia. The defendant also reported travel to Portugal the week of 11/6/23, London, England in October 2023, and Virginia again in September 2023, all for employment purposes.").

The Court's analysis of the nature and circumstances of the offense charged should also not rely on the government's unsupported assertions regarding loss amount. Because the loss amount alleged in this case is unknown, Mr. Santos's

-16-
APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER

potential Sentencing Guidelines exposure is difficult to calculate. The prosecution claimed at the original detention hearing that actual loss was $86.7 million, Ex. A at 5, and have slightly increased their estimate subsequently. However, corroborating evidence to back up those figures is lacking. Furthermore, the Court should take into account the fact that much of that loss was caused by the government itself: when it arrested Mr. Santos and froze Ethos's bank accounts, it prevented Ethos from continuing to make loan payments. Indeed, by the government's own accounting based on interviews they have done with corporations that borrowed money from Ethos, many, if not most, of the alleged victims actually made money from their relationship with Ethos. Thus, loss amount and corresponding guidelines alleged by the government should not be weighed by the Court in its bond determination.

In conclusion, nothing about the nature and circumstances of the charged offenses points towards the need to detain Mr. Santos pretrial. Mr. Santos is charged with non-violent financial and fraud crimes, and the loss amount, if he were to be convicted, is uncertain and contested. Thus, he should be released on bond as he works to prepare his defense.

## 2. Weight of the Evidence: The Evidence Presented is Contested by Mr. Santos

The government's case against Mr. Santos centers around two allegations: 1.) that Ethos was a Ponzi scheme, and 2.) that Mr. Santos committed various fraudulent acts to induce companies to seek loans from Ethos. The first area of allegations is disproved by forensic accountant Joshua Teeple's finding that Ethos's banking activity is "consistent with a business making payments on secured loans, investing in financial instruments, and paying business operating expenses." Ex. D ¶ 13. Mr. Santos contests the second area of allegations on factual and legal grounds.

Because the factual and legal theories underlying the government's

APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER

allegations are disputed, the BRA's weight-of-the-evidence factor is neutral. Moreover, the weight of the evidence against the defendant is "the least important" of the BRA's factors. *Motamedi*, 767 F.2d at 1408. Therefore, the Court should not take the weight of the evidence into account in determining whether to set bail.

### 3. History and Characteristics: Mr. Santos is Well Respected, Has Strong Ties to his Home Communities, and Lacks the Financial Means to Flee

Mr. Santos is a university-educated businessman. He has never before faced criminal charges. Prior to his arrest, he spent the previous decade between school and developing his companies. Through his business and personal life, he has strong ties in both Portugal and Turkey. He has a strong reputation in both communities.

Attached to this motion as Exhibit E are forty-two letters of support provided by family, friends, and business contacts from across Mr. Santos's life. The letters come from people who have known Mr. Santos throughout each of his life's stages. His parents tell the Court how Mr. Santos was a "friendly," "caring," "diligent" son of a "hardworking, thrifty, humble, and honest family." Ex. F at 45. His older sister, Carla, shares how Mr. Santos grew from a curious child to a sensitive teenager to a compassionate adult. *Id.* at 46. His wife reflects on Mr. Santos's combination of honesty, responsibleness, and modesty. *Id.* at 47. Whether through corporate philanthropy or paying out of his pocket for the care of stray animals, Mr. Santos is eager to support others. *Id.* Beyond his parents, sister, and wife, others also line up to sing Mr. Santos's praises. *Id.* at 48-93. Whether clients, employees, family friends, or former professors, the letters of support universally describe Mr. Santos as a man of integrity, someone recognized to be trustworthy. *Id.* He is someone they respect, know, and trust to do the right thing.

The Ninth Circuit's emphasis on foreigners' ties to their home communities is critical in analyzing Mr. Santos's history and characteristics. The appellate court in *Townsend* emphasized that foreign defendants' strong ties and good reputation weigh towards release on bond. 897 F.2d at 995. For "[i]f a foreigner in the United

States cannot refer to his roots in his home country, he is in a prejudiced position when bail is considered." *Id.* Consideration of Mr. Santos's strong, positive reputation in his home countries is necessary here to understand why bond is appropriate. Mr. Santos does not currently enjoy status in the United States, as he was travelling on an Electronic System for Travel Authorization, which is the norm for travelers from European and other authorized countries. *See About ESTA and The Visa Waiver Program*, U.S. CUSTOMS AND BORDER PROTECTION (last visited August 26, 2024), https://esta.cbp.dhs.gov/faq (describing the program). It is clear, however, that his ties to both of his home communities are strong. In Portugal, he enjoys the support of his parents, who are eager to see him released and have promised to support him, if released on bond, and keep in daily contact with him. *See* Ex. B, Ex. C, & Ex. F at 45 (details of their support and close bond). He also has friends and mentors who have written letters showing their support of him. Similarly, in Turkey, Mr. Santos has the support of his wife, who has travelled to San Diego to visit Mr. Santos in jail,[5] as well as employees and friends who have written to the Court to voice their support.

If the Court is concerned Mr. Santos might be tempted to flee justice, it is unclear where he could go. Notably, both Portugal and Turkey have extradition treaties with the United States. Instrument Amending the Convention of May 7, 1908 Between the United States of America and Portugal, July 14, 2005, 35 Stat. 2071, 11 Bevans 314; Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of America and the Republic of Turkey, 32 U.S.T. 3111, 1979 U.S.T. LEXIS 42. As discussed below, the forensic accountant's declaration makes clear that Mr. Santos does not have substantial independent funds. Ex. D. Mr. Santos's lack of accessible funds is also confirmed by his parents'

---

[5] Mr. Santos's wife, Ms. Bas, was detained for various hours and questioned by investigators when she arrived to the United States en route to visit Mr. Santos.

declaration, which voices how his parents are confident Mr. Santos would only ask them to pay his legal fees if he had no funds of his own. Ex. B. This is not a situation where an extraordinary wealthy individual can flee and seek refuge in a country far from the reach of U.S. law enforcement, living their life out based on their stored-away millions. Mr. Santos has no independent wealth and relies on his parents, who are also of limited means. Were he to try to enter his home nation or his wife's home nation, he would face arrest and extradition upon arrival. Furthermore, Mr. Santos would have little to no ability to return to his career field. Thus, any concerns about Mr. Santos's ability to flee justice are unsupported.

Finally, for this prong of the BRA analysis, there is the question of Mr. Santos's financial resources. Mr. Santos does not have the financial resources to flee. The government has frozen all accounts that belong to him. There is no evidence that he gained great personal enrichment from his role in Ethos. Ex. D ⁋ 20. Similarly, there is no indication from Ethos's financials or Mr. Santos's personal accounts that Mr. Santos stowed away funds in secret bank accounts unknown to government investigators. Ex. D ⁋ 19.

The financial support of Mr. Santos's parents in this case reveals Mr. Santos's lack of independent personal funds. Because Mr. Santos has no personal funds, he is relying on his parents to pay his legal fees. *See* Ex. B. ⁋ 3 (revealing privileged fact that Mr. Santos's parents are paying his legal fees). Mr. Santos's parents are not high-class retirees for whom these costs are trivial; to the contrary, paying for their son's legal team has "depleted [their] savings." *Id.* Similarly, Mr. Santos's parents are willing to put up $250,000 for his bond because they trust him. *Id.* ⁋ 4-6. Their decision to offer to put up a quarter-million dollars for their son's bond is driven by their "certainty that he would not jeopardize our savings by violating any of his conditions of release." *Id.* ⁋ 6.

Mr. Santos's parents' willingness to pay his legal fees and post bond derive from their trust in their son and, critically for the Court's analysis, their knowledge

APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER

that "he would only ask us to pay these costs and post this bond if he did not have his own personal funds available." Ex. B ⁋ 7. Dipping into their own retirement savings is Mr. Santos's "last and only resort" because he does not have access to any funds of his own. *Id.*

In summary, Mr. Santos's history and characteristics weigh towards release. The primary factor that, at first glance, may concern the Court is Mr. Santos's foreign ties. However, the reality of this situation lays bare Mr. Santos's lack of options were he to flee: Mr. Santos lacks the financial ability to live a life on the run and he would face near-certain arrest and extradition were he to attempt to enter Portugal or Turkey, the two countries where he has resided during his life. At worst, this case presents a situation like that in *Motamedi*, in which "both parties present strong arguments on the implications of [the defendant]'s alienage" and access to foreign funds. 767 F.2d at 1408. Thus, at a minimum, Mr. Santos's foreign nationality "does not tip the balance either for or against detention." *Id.*

Simultaneously, most of the § 3142(g)(3) subfactors weigh in favor of release: Mr. Santos is a respected businessman with no criminal history or past conduct that casts doubt on his ability to comply with court orders. Accordingly, Mr. Santos's history and characteristics, taken together, weigh in favor of release.

### 4. Dangerousness: Mr. Santos Poses No Threat

The government has presented no evidence that Mr. Santos poses a threat of dangerousness. Should the prosecution again speculate regarding Mr. Santos possibly obstructing justice, a factor which falls under the dangerousness inquiry per § 3142(e)(2)(B), this Court should, as Judge Berg did, disregard such conjecture. For, indeed, any such arguments must be proven by the prosecution by clear and convincing evidence. *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991)

The government argued at the original detention hearing that Ethos was "intimidating customers" via email after Mr. Santos's arrest and insinuated (without proof) that Mr. Santos, from his jail cell, immediately after his arrest, had directed

such emails be sent. Ex. A at 4-5. Apparently, the government was referring to a series of emails sent by Ethos's other leaders updating borrowers and employees regarding the charges brought against Mr. Santos. These charges were unsealed upon Mr. Santos's arrest; no indications were given to Mr. Santos or Ethos regarding a pending investigation. Immediately after Mr. Santos's arrest, the Department of Justice released a press release alleging Mr. Santos had "manipulated Ethos' balance sheets and real financial account statements" to induce lendees and banks. *CEO of San Diego Financial Firm Charged in Loan Scam*, U.S. Att'y's Off., S.D.Ca., https://www.justice.gov/usao-sdca/pr/ceo-san-diego-financial-firm-charged-loan-scam. To address concerned lendees and employees, Ethos's leadership apparently decided to respond. Mr. Santos, however, was in custody at that time and played no role in the wording of such communications. Additionally, nine months have now passed since Mr. Santos's original arrest, and any concerns regarding Mr. Santos's ability to influence the Department of Justice's investigation are attenuated by that passage of time. Therefore, there is no evidence, let alone clear and convincing evidence, that Mr. Santos poses a danger or is a risk to obstruct justice if on bond.

### 5.  Mr. Santos Should Be Released on Bond

Because of the non-violent nature of the accusations, the contested weight of the evidence, Mr. Santos's crime-free background filled with education and colored in by those who know him best, his family's willingness to support his release, and the absence of indications of dangerousness, he should be released on bond so that he may best prepare his defense to the complex charges he faces.

### B.  Mr. Santos's Release from Custody Would Significantly Improve His Ability to Assist in the Preparation of His Defense

Beyond just the contours of the Bail Reform Act, the Supreme Court has made clear the value of pretrial release in permitting a defendant to prepare their defense. In *Stack v. Boyle,* a 1951 case that originated from this district regarding

the setting of excessive pretrial bail, the Supreme Court emphasized that "traditional right to freedom before conviction permits the unhampered preparation of a defense." 342 U.S. 1, 4 (1951). That pretrial release is important to allow defendants to prepare properly with their counsel has been echoed across the decades. *See, e.g.*, *Gerstein v. Pugh*, 420 U.S. 103, 123 (1975) ("pretrial custody may affect to some extent the defendant's ability to assist in preparation of his defense"); *Faheem-El v. Klincar*, 841 F.2d 712, 719 (7th Cir. 1988) ("pretrial detention lessens the defendant's ability to assist in preparing his or her defense for trial.").

The Ninth Circuit has emphasized that "regardless of whether an arrestee is a citizen, a lawful resident or an undocumented immigrant, the costs to the arrestee of pretrial detention are profound." *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 781 (9th Cir. 2014). Earlier this year, the appellate court recognized that "confinement pretrial does affect trial outcomes." *Betschart v. Oregon*, 103 F.4th 607, 621 n.19 (9th Cir. 2024). Empirical research bears out as much. One study of all Delaware criminal cases from 2012 through 2014 found, controlling for relevant case facts and criminal history, that "[p]retrial detention increases a defendant's likelihood of conviction by 55%." Ellen A. Donnelly & John M. MacDonald, *The Downstream Effects of Bail and Pretrial Detention on Racial Disparities in Incarceration*, 108 J. CRIM. L. & CRIMINOLOGY 775, 804-05 (2019). Similar findings result from other large datasets. *E.g.*, Mark Gius, *The Determinants of Pretrial Detention and Its Effect on Conviction and Sentencing Outcomes*, 16 JUST. POL'Y J. 2 (2018) (data from twenty-five states from 1992-2009); Will Dobbie et al., *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108 AM. ECON. REV. 201, 234–35 (2018) (data from over 420,000 defendants in 2 large counties); *ABA Standards for Criminal Justice: Pretrial Release* 29 (3d. ed. 2007) ("There is "considerable evidence that pretrial custody status is associated with the ultimate outcomes of cases, with released defendants consistently faring better than defendants in detention.").

1   Mr. Santos's case is precisely the type of case in which a chasm emerges
2   between in-custody and out-of-custody preparation. Discovery runs well over a
3   terabyte, with a million items therein. Mr. Santos has spent considerable money to
4   purchase the Everlaw software to allow his defense team to being to make sense of
5   discovery. However, Mr. Santos himself can only review that discovery when it is
6   downloaded from the Everlaw platform into its native or PDF format. He is not able
7   to search across documents alongside defense counsel. Absent extraordinarily time-
8   consuming curation efforts by his defense team, Mr. Santos is not able to work
9   through communication threads or take advantage of the interlacing of
10  communications facilitated by Everlaw. In short, while in custody, Mr. Santos is
11  fighting a digital case with analog means.

### C. The Proposed $250,000 Cash Deposit and Plan for Mr. Santos's Mother to Live Alongside Him in San Diego Should Assuage Any Concerns About Mr. Santos's Compliance

14  Under the BRA, a defendant's release can be conditioned on agreement to
15  forfeit a certain quantity of money should the defendant fail to appear.
16  18 U.S.C. § 3142 (c)(1)(B)(xi). Such a financial condition should only be set if the
17  Court determines that, in addition to the other conditions of release, that the
18  monetary requirement is "the least restrictive further condition" that "will
19  reasonably assure the appearance of the person as required and the safety of any
20  other person and the community." 18 U.S.C. § 3142 (c)(1)(B).

21  Mr. Santos's parents' offer to post a $250,000 cash bond is made to assuage
22  any concerns held by the Court. This sum is a significant amount for them. Paying
23  their son's legal fees has already "placed a strain on [their] planned retirement" and
24  loss of the bond amount would decimate their savings. Ex. B ¶¶ 7-8.

25  Alongside the monetary commitment, Ms. Santos's mother, Manuela Santos,
26  plans to live alongside her son in San Diego if he is released on bond and wishes to
27  act as a third-party custodian. Ex. C ¶¶ 6-7. Doing so would uproot her life in
28  Portugal and bring her to a city far from her home. Ms. Santos understands that, as

APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER

a third-party custodian, she would have to inform Pretrial Services if she became aware of any missteps by her son. *Id.* ¶¶ 7-8. These steps demonstrate Ms. Santos and her entire family's commitment to ensuring her son can be "released on bond so that he can best assist his attorneys as they prepare for his trial" in this complex case. *Id* ¶ 9. The proposed $250,000 cash deposit and Ms. Santos's promise to act as a third-party custodian living alongside her son are sufficient conditions under the BRA to ensure Mr. Santos's compliance with the Court's orders.

## VII.  CONCLUSION

Mr. Santos faces non-violent charges of financial fraud. His case is a particularly complex one, for which it will provide difficult, if not impossible, to prepare an adequate defense from behind bars. Under the Bail Reform Act, there is a presumption of his release. While Mr. Santos is a foreign national, all his bank accounts are seized or frozen. He lacks the means to live a life on the run, away from the reach of extradition treaties. Nothing in his background, which is filled with academic acolytes and many who trust him deeply, indicates he is a flight risk.

Therefore, Mr. Santos should be given the opportunity to be released on bond. The Court should set conditions of release that he be released on a personal appearance bond secured by a $250,000 cash deposit made by his parents. The large deposit, the loss of which would significantly handicap Mr. Santos's parents' financial wellbeing, will ensure his appearance at future court proceedings and compliance with the Court's orders as he prepares for his fast-approaching trial.

Respectfully submitted,

McKENZIE SCOTT, PC

Dated: August 29, 2024          By:   *s/Brett T. Diehl*
                                       BRETT T. DIEHL
                                       MARCUS S. BOURASSA
                                       TIMOTHY A. SCOTT
                                       *Attorneys for Defendant*
                                       *Carlos Manuel Da Silva Santos*