TARA K. MCGRATH
United States Attorney
E. CHRISTOPHER BEELER
California Bar No. 330496
New York Bar No. 5422068
CARL F. BROOKER IV
Washington D.C. Bar No. 1022908
Assistant U.S. Attorneys
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-7748
Email: carl.brooker@usdoj.gov

Attorneys for United States

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> CARLOS MANUEL DA SILVA SANTOS (1), <br><br> Defendant. | Case No. 23-CR-2507-RSH <br><br> **THE UNITED STATES OF AMERICA'S OPPOSITION TO APPEAL OF MAGISRATE JUDGE'S DETENTION ORDDER** |

*WhatsApp Message from Defendant CARLOS SANTOS to co-defendant ELIAS ACHILLEOS*

## I. Introduction

Defendant Carlos Santos, the CEO and owner of Ethos Asset Management, Inc. ("Ethos"), is charged with committing various federal crimes related to his orchestration of a multi-million-dollar advance fee loan scam. These crimes are wire fraud conspiracy, wire fraud, bank fraud, aggravated identity theft, and unlicensed money transmission.

Defendant is a Portuguese citizen with no meaningful ties to the United States, other than the fact that his fraudulent business empire is headquartered in a virtual office in La Jolla, California, and 21 of the 53 identified victims in this case are American. He faces a sentence – as recommended by the U.S. Sentencing Guidelines –of 188-235 months in prison for wire fraud conspiracy alone, and two two-year consecutive sentences for aggravated identity theft.

If Defendant is given the opportunity, Defendant will flee the country. Without hyperbole, Defendant has no reason to stay here – his wife is in Turkey, his parents are in Portugal, his sister is in England, his indicted co-conspirators are on the lam, and as of this brief, he owes his victims $100,841,298.01 in restitution. If any person in this district needs to be detained as a flight risk, it is Defendant.

Defendant's filing highlights much of Defendant's history and characteristics, but it only offers two insufficient assurances of Defendant's non-flight; a $250,000 cash bond paid by Defendant's parents, and his non-resident mother's offer to live with him in San Diego. For the reasons below, neither of these assurances are adequate to keep a prolific fraudster in our district pending trial.

As Magistrate Judge Michael S. Berg alluded to during the December 19, 2023 detention hearing, Defendant has 87 million reasons to flee:

> I'm looking at a case of $87 million in restitution. And, quite frankly, I don't think there's much incentive to post 50 or $100,000 and then stay here. Why would he? Quite frankly, he doesn't have a home here. He has no family here. He has no life here. Everything is in Europe. His family is in Europe, or around Europe. So it would be a very -- it wouldn't be a big task to -- to walk over the border and go.

*See* ECF 23, Tr. at 14: 6-13.

Since the December 19, 2023 detention hearing, additional victims have contacted the Government and identified an additional $13 million in actual losses. For the Defendant the case is getting worse, not better, and the incentives to flee are growing, not shrinking.

## II. Statement of the Case

### A. Current Status

Defendant is currently incarcerated at the Western Regional Detention Center ("GEO") pending his trial on January 6, 2025. The next hearing is a motions hearing on this instant matter set for September 20, 2024.

### B. Government Account Seizures

In comparison to the over $100 million in actual victim loss discussed below, the Government has only been able to seize $2,612,049.73 from accounts controlled by Defendant or Ethos.[1]  *See* Ex. 1, Holerud Decl.[2]  Contrary to Defendant's hyperbolic statements in his appeal, the Government has not seized or frozen bank accounts around the world.  The Government has only seized money from two Ethos accounts in two U.S.-based financial institutions and restrained assets in Defendant's personal account located in the Isle of Man.[3]

### C. Bond Hearing

On November 13, 2023, Defendant was arrested via complaint when he arrived on a flight into Newark International Airport. Defendant was then transported to the

---

[1] $2,611,999.73 from Flagstar Bank and $50.00 from East-West Bank. The Government has also restrained, but not yet been able to seize, 713,734.75 Euros from a Defendant controlled bank account in the Isle of Man.

[2] The Government was also able to seize $6,021,897.82 in accounts owned by Atlas Capital Management, an entity controlled by a cooperating co-conspirator charged elsewhere.

[3] Tellingly, Defendant fraudulently told Barclay's bank in Isle of Man that he was doctor when in fact he is not.  Defendant just cannot tell the truth.

1 Southern District of California and made his initial appearance on December 13, 2023. At this appearance, the Government moved to detain based on risk of flight.

On December 18, 2023, Defendant submitted a bond packet in which Defendant proffered a $250,000 bond secured by a 10% deposited provided by his sister, home confinement with GPS monitoring, and a third-party custodian. *See* ECF 16.

At the December 19, 2023, detention hearing, Magistrate Judge Michael S. Berg agreed with the Government's position that the Defendant was a risk of flight, explaining that the court:

> look[ed] at the amount of restitution in this case. It's over 87 million and growing. And any bond [the Court] would set at this point in time -- whether it's 50 or 100,000, even half-a-million dollars, would be a pittance to walk away from and -- and not look back on, with that much restitution owing to those many people.

ECF 23, Tr. at 13: 19-24.

The court ordered Defendant detained, *see* ECF 17, on the basis that Defendant was not a U.S. Citizen, faced deportation consequences, the strength and weight of the evidence, and that the "loss to victims is over 87 million and growing." *See* ECF 21.

### III.   Legal Standard

The Bail Reform Act provides for detention where "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). "On a motion for pretrial detention, the United States bears the burden of showing by a preponderance of the evidence that the defendant poses a flight risk, or by clear and convincing evidence, that the defendant poses a danger to the community." *United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990) (citation omitted and emphasis added).

When a request for reconsideration of bond or detention is filed, the reviewing district court should apply a de novo standard in reviewing the release order. *See*

*United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990). This Court "is not required to start over . . . and proceed as if the magistrate's decision and findings did not exist," but should "review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference. If the performance of that function makes it necessary or desirable for the district judge to hold additional evidentiary hearings, it may do so." *Id*. at 1193.

Here, the Defendant is detained as a risk of flight only, and the preponderance standard applies.

## IV.   Statement of Relevant Facts

### A. Ethos

In 2018, Defendant started Ethos Asset Management, LLC in San Diego, California and soon converted it to Ethos Asset Management, Inc ("Ethos"). Through Ethos, Defendant held himself out to the public as a self-made billionaire who made his money by creating a securities trading algorithm that he rented out to the largest investment banks in the world.[4] Having made his alleged billions, Defendant contends he created Ethos to finance business projects around the world, including in the United States.

The victim-companies are generally those that require financing to further their operations and business projects. To obtain a loan, Defendant required prospective borrowers to deposit an upfront fee as a "pledge" or "collateral" for the loan.  This upfront fee was usually 20-25% of the total loan value sought by the victim-company.  Defendant required the victim-companies to transmit the upfront fee either directly into an Ethos bank account controlled exclusively by Defendant or into a brokerage account through which Ethos would receive the upfront fee from a margin on the securities.

---

[4] There is no evidence of this.  For example, Defendant told employees at East West Bank that he rented his algorithm to Bridgewater Associates.  However, Bridgewater Associates confirmed it has never done business with Defendant or one of his entities.

Financial tracing shows that Defendant used the upfront fees to disburse loans to other borrowers, to repay upfront fees to borrowers to whom Ethos failed to disburse loans, pay commissions to co-conspirators, and for personal expenses.

To induce victim-companies to deposit these upfront fees and to obtain lines of credit from banks (both needed to have money available to keep the fraudulent scheme alive), Defendant created and sent fake documents that inflated Ethos's net worth and available capital to disburse loans. For example, he emailed prospective borrowers with annual financial statements, bank statements, and brokerage statements showing hundreds of millions of dollars in available capital for Ethos. But evidence obtained from subpoenaed financial records, co-conspirator testimony, and seized communications prove that these luring documents were fake and grossly misrepresented Ethos's true assets.

For example, in just one instance of dozens, the Defendant fraudulently modified a bank statement to reflect a checking balance of $98,161,350.62 which he used to induce a victim-company to invest in Ethos. However, the Government received the true bank account statement pursuant to a grand jury subpoena showing an actual balance of $161,350.62.

/
/
/
/
/
/
/
/
/
/
/
/



*Fraudulent bank statement sent to victim-company*

*True bank statement balance of $161 thousand dollars*

B. "The Ethos Model"

Defendant twists himself into knots trying to explain the Ethos business model. Fortunately, on June 29, 2020 the Defendant sent WhatsApp messages to co-defendant Achilleos explaining the <u>true</u> "Ethos Model".

Defendant explained that "If someone issue 20 M" "And we need to give in three tranches 33 M" "Until the 100 M" "In three months" "It is impossible with trading" "But if we have the funds from one last trading we know that the 20 M will give us something like 1 [billion]" "we advance" "and after we recover" "in the first the client will stay crazy" "but he will survive" "Worst case scenario when he go against us in the court" "we pay them" "because this take time" "or we give them less than agreed but we give them something" "this will stop[p]ed them" "[and] delay" "we only need the first" "In my opinion friend we cannot stay worried" "**It is the Ethos Model**".[5] [Errors in original, emphasis added].

## C. Actual Victim Losses

Victim-companies who put money into Defendant's advance fee scam scheme are out an actual loss of $100,841,298.01. *See* Holerud Decl. Defendant argues in his brief that "much of [the] loss was caused by the government itself; when it arrested Mr. Santos and froze Ethos's bank accounts it prevented Ethos from continuing to make loan payments." ECF 53 at 20. This is false. Defendant and Ethos were already not disbursing loans to its borrowers who Defendant induced into deals with fake documents.

For example, prior to Defendant's arrest, victim borrowers had initiated various civil actions against Defendant for his fraud. *See Sector Capital Corp. v. Carlos Santos*, 1:23-CV-9728-ER, ECF 1 (S.D.N.Y. Nov. 3, 2023); *Beyond Limits, Inc. v. Ethos Asset Management and Carlos Santos*, No. 655379/2023, Dkt. 1 (N.Y. Sup. Ct. Oct. 30, 2023)   Indeed, the Government has not seized or frozen all of Defendant's and Ethos' bank accounts around the world. The Government has only

---

[5] This string of text messages is uninterrupted from Defendant Santos to Defendant Achilleos with emphasis added. The string of consciousness by Defendant Santos is only concluded by a text from Defendant Achilleos where Achilleos notes "Totally. Nuff Said. Basically the first client will be hell but bring us heaven."

seized money from two Ethos accounts in two U.S.-based financial institutions and restrained assets in Defendant's personal account located in the Isle of Man.

At current exchange rates, the Government has been able to seize or restrain $3,325,738 total from all of Defendant's accounts. As it stands now, the government will only be able to pay a 3% pro rata share to each victim-company who were ensnared by Defendant's fraudulent scheme – a pittance compared to the size of Defendant's fraud. If money seized from Defendant's unindicted co-conspirator is added to the pot, this still gives an approximate $10 million dollar recovery. In other words, in a best-case scenario, each victim will recover $0.10 for every $1.00 sent to Defendant.[6]

**D. Prior Frauds**

i. *Queen's Letter*

To be sure, Defendant has refined his fraud over time. Previously, Defendant was preparing to induce investments with a "Top Secret" "Authorization Letter" from "The Committee of 300" of the World Bank—a committee that exists only in tin-foil hat conspiratorial circles.

/
/
/
/
/
/
/
/
/
/

---

[6] This also assumes that no other victim-companies come forward.



**The Committee of 300**
**The World Bank Group**
USA

## Authorization Letter
(Top Secret)

Know to all men these presents,

This Banking Institution, with fullest banking responsibilities, has Forever Re-certified, Reconsidered, Recognized, Declared, Re-approved and Reconfirmed; without furthermore protest and other negative means that:

Carlos Manuel da Silva Santos bearing Portugal Passport No. [REDACTED], can operate, together with Luxembourg and Lichtenstein to Finance government projects under Public or Public–Private Partnership (PPP) or to manage public funds in Private Placement Platforms and Private Placement Programs.

These Documents are hereby legally fabricated with clear from scam, fraud and other negative means and terms by the under personnel of the Committee of 300 and all information contained herewith are irrevocably Valid, Accurate and Authentic upon its record to inquiries2@un.org and is not for use in Solicitation and this paper is FINAL ISSUANCE of OFFSET STATEMENT and served as derivative Documentary Substance.

This instrument is valid for Corresponding Report and Serve as Protective Collateral and cannot be guaranteed and/or used for personal solicitation but collateral supplement warrant for the Development Projects and effective upon forward of this instrument, even in electronic signatures, to the International Agencies by the under-personnel of the Committee of 300 via inquiries2@un.org with and/or without acknowledgment of King ASM to this instrument.

Postal Address: 1818 H Street, NW Washington D.C. 20433, USA; Tel. no. (202) 473-1000; Fax: (202) 477-6391 or visit to www.worldbank.org

*Defendant's Fraudulent "Committee of 300" Letter*

This letter also bears signature page with the alleged signatures from representatives of the British Royal Family, International Monetary Fund, and The Council on Foreign Relations.




Sealed, Amended and Prepared by the Right Wing Parties of the Committee of 300 on this 06th day of January 2018 at the World Bank Headquarters, Washington D.C., USA.

**HM, Queen Elizabeth Windsor II**
The British Royal Family

**H.E. Man. Dir. Christine Lagarde**
The International Monetary Funds

**HE Pres. Richard Haass**
The Council on Foreign Relation

*Fraudulent Signature Page*

Unfortunately, Queen Elizabeth II passed of natural causes before the Government was able to confirm her signature on this document, but the authenticity of this entire document is suspect to say the least.

### ii. IHNCAM Advisory

Additionally suspect is Defendant's biography. Prior to Ethos, Defendant allegedly founded IHNCAM Advisory. According to investment pitch decks provided to victim-companies, before starting Ethos, Defendant founded IHNCAM Advisory in 2012.



**Defendant provided investment information from 2021**

IHNCAM allegedly had its first large set of deals in 2013 in Turkey ($98m), the Dominican Republic ($23m), and Libya ($68m).

/
/
/
/
/
/
/



**Defendant provided investment information from 2021 [emphasis added]**

In 2013, Defendant was a second-year student at the University of Lisbon and 18-19 years old. It offends common sense that while still a teenager, Defendant had closed $189 million dollars of deals.

E. Isbank, Brazil, and CPA Declaration

   i. Isbank

Defendant's accountant remains coy in his declaration, stating that "it does not appear that Mr. Santos personally enriched himself to a significant degree" without defining "significant" or stating how much Mr. Santos actually received.

As of August 2023, the Government's traced $26,584,922.00 deposited into the scheme from Ethos's U.S.-bank accounts to Ethos's account at Isbank in Turkey. On August 29, 2023, the Government sent a Mutual Legal Assistance Treaty (MLAT) request to Tukey for four of Defendant/Ethos controlled accounts at Isbank; x0551; x5471; x5485; and x5455. The Government received a response on January 31, 2024, relating to just two of these accounts.

Defendant attached a declaration by CPA Joshua Teeple to their motion. ECF 53 Ex. D. In this declaration, Mr. Teeple says he was able to analyze banking records from a number of accounts, many of which the Government has been attempting to review as well. Notably, Mr. Teeple has reviewed Turkiye Bankasi accounts; x4709; x4491; x4994; x4503; x5455; x5469; x7865; x7949; x8351; x9319; x 9360; x9612; and x9636.

The delta between the accounts identified in the Turkish MLAT and the declaration are 12 accounts – these are accounts of which the Government was unaware until Defendant filed his motion. The Government requests reciprocal discovery of these accounts and all underlying records in the Defendant's possession.

  ii. Brazil

Mr. Teeple's declaration also says that the Brazil-based Ethos accounts were not analyzed. The Government has performed that analysis and concluded that approximately $29,704,411.45 in Ethos/Defendant fraud proceeds flowed to Brazil. Mr. Teeple uses a self-serving statement by Defendant that a third-party controlled Ethos operations and accounts in Brazil. However, based on the investigation thus far, Defendant has always been in the driver's seat of this fraud and any contrary statements are just attempts to shield him from his worldwide scheme.

**F. Current Lies and Misrepresentations Since Arrest**

  i.  *Evading Jail Communication Monitoring*

Since his incarceration, Defendant has been a prolific user of the jail communications system, often calling his spouse. Additionally, the Government has produced, on a rolling basis, discovery which has included his jail communications. Therefore, Defendant has been on notice his jail calls and emails were being intercepted while in custody.

In Spring 2024, Agents with HSI became concerned because starting on May 14, 2024, Defendant's phone calls appeared to reduce in frequency. From May 14 to

May 26, 2024, only three calls were made using Defendant's account number to his spouse.

Agents then looked at <u>all</u> the times that Defendant's spouse's phone number was called from inside MCC, not only from Defendant's account, but from any other inmate's phone account. Based on subpoenaed records from MCC, between May 14, 2024 and August 9, 2024 (and believed to be into the present), Defendant used four other inmate's PIN numbers to contact his wife in circumvention of MCC policy and monitoring. Also, it appears the Defendant shared his PIN with other inmates in return – his monitoring now includes Spanish (not Portuguese) phone calls made by other inmates.[7]

What Agents have been able to surmise based on their investigation is that Defendant is befriending other inmates at MCC who have phone accounts and persuading them to use their accounts in a belief that these accounts will not be monitored as to him. Defendant cannot be trusted, even while incarcerated pending trial.

    *ii.*    *Defendant's Current Financial Status*

Defendant's purported current financial status is also either a lie or an incentive to flee. Defendant has self-reported he has a "hundred million dollars in an Ethos account." ECF 23, Tr.at 4:15-16. Despite its best efforts, the Government has been unable to locate this $100,000,000.00 Ethos account. The Government does not believe this account exists and it is merely a statement to perpetuate the fraud – Defendant cannot tell the truth of his financial situation because in truth the emperor has no clothes.   Defendant can't have it both ways; he can't declare to the court he has $100,000,000 while simultaneously claiming to have "no independent wealth and relies on his parents, who are also of limited means." ECF 53 at 23.

---

[7] This information is related to Defendant's time at MCC. It is still unknown if is engaging in the same subterfuge at GEO.

Regardless, the fact exists that there is either, (1) $100 million the Defendant can readily access to further his flight, or (2) Defendant yet again lied about his finances to further his own interests. Either fact cuts against Defendant's bond motion.

### G. Mother Lacks Visa or Status in the U.S. to Live Pending Trial.

Portuguese citizens enjoy a special visa waiver with the United States. No visa is required for stays of less than 90 days. However, a stay of more than 90 days require a visa. As of the date of this filing, Defendant's mother – and Defendant's proposed third-party jailer – has not applied for or been granted a visa to stay for longer than 90 days pursuant to the U.S. – Portugal visa rules.

### H. Jailhouse Friendship with Leonard Glenn Francis

While in custody at MCC, it appears that Defendant had become friends with a previous client of Attorney Jeremy Warren who Defendant described as 'the famous one' who was also incarcerated at the same time at MCC. It looks as if Defendant has befriended Leonard Glenn Francis.

The Government has no information on the conversations that may have occurred between Francis and Defendant. However, Francis and the Defendant very well know that the distance between San Diego and the Tijuana border is approximately 16 miles. Traveling the speed limit, Defendant could cross the border in about 15 minutes. Once in Mexico, with Defendant's financial resources, *see* ECF 51 at 4, he can purchase whatever travel documents he needs to go to a country of his choice, including a country that does not have an extradition treaty with the United States, a country whose officials can be bribed not to enforce its treaty, or a country that **has a constitution which prohibits the extradition of its own citizens like Portugal**.[8] Clearly, a GPS unit will not physically prevent Defendant from fleeing

---

[8] The Defendant states that Portugal will extradite their citizens to the U.S., but this misses the mark. (ECF 53 at 19). Per the Department of Justice's Office of International Affairs, the Portuguese Constitution prohibits the extradition of nationals, except for terrorist and international organized crime offenses, pursuant to the provisions of an international treaty, such as the

the country. Neither will a video camera or alarm. The only thing standing in the way of Defendant and his freedom – as opposed to decades in prison and a hundred-million-dollar restitution order – is Defendant's loving and caring mother in a house she will share with Defendant. For Defendant, who was able to convince sophisticated companies into investing millions into a Ponzi scheme, finding a way to buy 15 minutes to flee would be child's play.

The United States respectfully submits that a $250,000 cash bond, GPS monitoring, and asking Defendant's mother to function as warden is ineffectual and insufficient. Based on the severe risk of flight he presents the Bail Reform Act does not entitle Defendant to bond in this case.

DATED: September 13, 2024.

TARA K. MCGRATH
United States Attorney

s/ *Carl Brooker*
CARL F. BROOKER, IV
E. CHRISTOPHER BEELER
Assistant United States Attorneys

---

International Convention for the Suppression of Terrorist Bombings and the United Nations Convention Against Transnational Organized Crime. Neither of these treaties apply to Defendant.