UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>v.<br><br>CARLOS MANUEL DA SILVA SANTOS (1),<br><br>                             Defendant. | Case No.: 23-cr-2507-RSH<br><br>**ORDER DENYING MOTION FOR REVIEW**<br><br>[ECF No. 53] |

    On August 29, 2024, Defendant filed a motion to review the order of detention entered by U.S. Magistrate Judge Michael S. Berg on December 19, 2024. ECF Nos. 17 (detention order), 53 (motion for review). On September 20, 2024, the Court heard argument on the motion.

    The Court concludes that the government has established by a preponderance of the evidence that no condition or combination of conditions will reasonably assure Defendant's appearance for trial, and accordingly denies the motion for review.

    The Court incorporates herein the reasons given orally at the hearing. As to the nature and circumstances of the offenses charged (18 U.S.C. § 3142(g)(1)), the charged offenses do not involve a crime of violence or other aggravating factors identified in Section 3142(g)(1)(A). Nonetheless, the charged offenses are serious, and if convicted,

Defendant faces a custodial sentence for which the low end of the advisory guidelines exceeds 10 years, as well as criminal forfeiture and a restitution order exceeding $100,000,000. This factor favors detention.

As to the weight of the evidence (18 U.S.C. § 3142(g)(2)), the Superseding Indictment establishes probable cause to believe the charged offenses have been committed. Defendant contests these allegations. But Defendant's business model, even as described by Defendant, raises concerns about the potential for fraud. Under that model: (1) Ethos would agree to loan money at interest to borrowers, on the condition that a borrower in advance provide collateral of 20-25% of the future loan amount; (2) in advance of funding the loan, Ethos would use the borrower's collateral to secure a separate bank loan to Ethos; (3) Ethos would invest those loan proceeds; (4) Ethos—not Ethos's borrower whose collateral ultimately secured the loan—would keep any gains on the invested funds; but if Ethos defaulted on its bank loan, Ethos's borrower could lose its collateral to Ethos's bank. In other words, before the borrower receives any loan proceeds from Ethos, the borrower advances collateral to Ethos which Ethos invests for its own benefit; the only benefit to the borrower is the promise that Ethos will eventually fund a loan which the borrower must repay with interest. Such a model seems to be highly unfavorable to the borrower, although in theory, a borrower might agree to such a deal if the interest and repayment terms were sufficiently favorable—and if the borrower were convinced of Ethos's financial health, and Ethos's ability and intent to fund the loan as promised. The defense proffers that the transactions were reviewed and approved by legal counsel.

Even so, the government proffers evidence that Ethos agreed to accept collateral from borrowers while knowing that Ethos would not or could not timely fund the loan for which the collateral was being advanced. In a sequence of WhatsApp messages offered by the government, Defendant described "the Ethos model" in June 2020. ECF No. 63 at 8. Defendant's explanation appears to recognize that it is "impossible" to fund loans on the timeframe Ethos promises to borrowers; but in the "worst case" where the aggrieved borrower sues, Ethos uses the legal dispute to buy time to make the promised payment, or

"we give them less than agreed but we give them something." *Id.* Defendant stated, "It is the Ethos model." Although the defense does not concede that this is Ethos's actual model, and suggested at the hearing that these messages refer to a particular transaction rather than Ethos's model generally, Defendant's brief also suggests that Ethos's model is to fund loans using investment gains from the borrower's collateral. ECF No. 53 at 7 ("Ethos's mission was to provide project finance to communities and corporations that might not otherwise receive such funding. *Ethos was able to finance such projects via the pledging (but not collection) of collateral* held in lendees' accounts via a standby letter of credit or other, [SWIFT]-recognized banking transaction.") (emphasis added). How Ethos could reasonably expect to generate funds to loan by investing collateral amounting to 20-25% of the promised loan funds is difficult to fathom. For Ethos to accept and profit from collateral advanced by borrowers, knowing that Ethos could not timely fulfill its promises to fund the loans for which the collateral was being advanced, would be blatant fraud—even apart from the myriad other misrepresentations alleged in the Superseding Indictment.

The enormous losses in this case are also evidence that Ethos's model was a fraudulent one. The government proffers that losses to date exceed $100,000,000. Importantly, these losses are being measured by the amount of collateral put forward by dozens of Ethos's borrowers worldwide, less any amounts of loan proceeds those borrowers actually received from Ethos or any amount of collateral that was returned to those borrowers. In other words, this loss is but a fraction of the promised loan funds that borrowers did not receive. This figure is staggering, and a powerful indicator that Ethos intentionally took collateral from borrowers knowing that it could or would not fund the loans as promised. This does not appear to be a situation where a group of investors is unhappy with the market returns that their investment provided; instead, it involves a group of would-be borrowers who lost their collateral before even receiving their loan—akin to a homeowner who applies for a home equity loan, never receives any loan proceeds from the bank, but somehow loses his or her home in the process.

The defense has not meaningfully undermined the government's $100,000,000 loss estimate, nor has it explained how such a loss is possible absent massive fraud. The defense observes that some of these funds may not be lost in the sense of permanently unrecoverable, but may instead be temporarily tied up or detained by Ethos's bank. The defense also notes the disruption to Ethos's business operations posed by the government's seizure or restraint of Ethos accounts. To the extent that the government has frozen an Ethos bank account, Ethos cannot use the money in that account to fund a loan or return collateral; but the government has seized or restrained less than $2.8 million in Ethos-controlled accounts, a tiny fraction of the claimed losses. The defense also notes that, according to Ethos's business model, when Ethos would take out loans secured by investor collateral, these would only be in the amount of 65% of the value of the collateral—such that in theory, a default by Ethos would result in the lending bank taking most but not all of the borrower's collateral. Be that as it may, the result appears to be that Ethos's borrowers are at this moment out of $100,000,000 of their collateral—again, net of any loan proceeds received from Ethos. The weight of the evidence favors detention.

As to Defendant's personal history and characteristics (18 U.S.C. § 3142(g)(3)), as stated at the hearing, some sub-factors favor release on conditions while others favor detention. The character letters submitted by Defendant are, in a word, extraordinary. They are extensive and varied, attesting to Defendant's good character, integrity, goodwill, and generosity. At least two letters appear to be from persons employed by one of Ethos's borrowers in Mozambique. ECF No. 53-1 at 67, 88. Defendant's family support is also exemplary. He has no criminal history or history or substance abuse. At the same time, the Court is concerned by Defendant's lack of ties to the United States and his ability and incentive to flee the jurisdiction of the United States if released. Defendant maintains that he has insufficient personal funds to allow him to flee—indeed, the proposed bond of $250,000 is being offered by his parents based on a recent recapitalization of their business. Defendant has also offered an analysis by a CPA concluding, based on a review of bank records, that Defendant has not engaged in significant self-enrichment nor transferred

4

substantial Ethos funds to personal or family accounts. However, as stated by the defense at the hearing, Ethos USA is almost wholly owned by Defendant, and is controlled by Defendant. In listing his assets to Pretrial Services, Defendant gave the value of his business as $100,000,000. The defense was not able to provide detail about the elements of this valuation. The Court recognizes that some of these funds have been frozen or restrained by the government, and the defense contends that Defendant's valuation was also based in part on his being deceived by others at the company. Even so, the Court is not persuaded that Defendant lacks the ability and incentive to flee.

As Judge Berg noted, there is a vast disparity between the amount of security that Defendant proposes (now, $250,000) and the amount of criminal restitution he faces (now, over $100,000,000). This disparity creates a powerful incentive for Defendant to flee, and potentially avoid any custodial or financial consequences apart from the forfeiture of a bond. The defense contends that forfeiture of the bond would result in destitution to Defendants' parents who are putting forward the security, something that Defendant would avoid at all costs. However, the $250,000 bond, in addition to being a tiny fraction of the amount of losses in this case, also appears to be a fraction of the assets of the company that Defendant controls. On balance, the Court concludes that this factor favors detention.

As to any danger posed by Defendant's release (18 U.S.C. § 3142(g)(4)), the Court does not believe that Defendant's release would pose a risk of violence to any person. Given the scale of the alleged fraud and the associated losses, Defendant's release would result in some increased risk that he could effect financial harm through other fraudulent conduct. The Court considers this factor neutral here.

//
//
//
//
//
//

Although the weight of the evidence is the Section 3142(g) factor to be given the least weight, the evidence of fraud here is relevant not only to this factor, but also to the Court's evaluation of whether, like the borrowers, the Court can reasonably rely on Defendant's promises. The Court concludes that it cannot.

Defendant's motion for review is denied.

**IT IS SO ORDERED.**

Dated: September 23, 2024

*Robert S. Huie*
Hon. Robert S. Huie
United States District Judge