ADAM GORDON
United States Attorney
E. CHRISTOPHER BEELER
Assistant U.S. Attorney
California Bar No.: 330496
New York Bar No.: 5422068
CARL F. BROOKER
Washington DC Bar No.: 1022908
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7748
Fax: (619) 546-0510
Email: christopher.beeler@usdoj.gov

Attorneys for the United States

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> CARLOS MANUEL DA SILVA SANTOS, <br><br> Defendant. | Case No.: 23-CR-2507-RSH <br><br> **THE UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM** |

## INTRODUCTION

Defendant has admitted to orchestrating a sophisticated advance fee loan scam using his La Jolla-based company, Ethos Asset Management, through which he stole many millions of dollars from his victims using fabricated financial statements and deception. Defendant's guilty plea and acceptance of responsibility have brought finality within view on the horizon; instead of having to wait years following trial and appeal, Defendant's victims can put this chapter behind them sooner, rather than later. Defendant's criminal conduct, which occurred primarily in his late twenties, was not a one-time youthful transgression. It occurred after Defendant earned advanced degrees, and was calculated, international, and complex in size and scope. The conduct warrants 87 months in jail; 63

months on Count 1 (wire fraud conspiracy) followed by a mandatory consecutive 24 months on Count 7 (aggravated identity theft). This is a meaningful and appropriate sentence that balances Defendant's acceptance of responsibility with the need to punish Defendant, protect the public, promote the rule of law, and deter Defendant upon release.

## STATEMENT OF FACTS

### I. Overview of Criminal Conduct

Ethos Asset Management, Inc. (Ethos) was a La Jolla-based corporation with operations in the United States and various other countries, including Turkey and Brazil. Plea Agreement, ECF 121 at 3. Defendant was its founder and chief executive officer. *Id.*

Starting as early as November 6, 2019, when he opened a bank account in San Diego, California, Mr. Santos and his co-conspirators "held Ethos out to the public as a 'Full-service Project Financing" company that offered loans to companies in exchange for an upfront fee, usually in the form of money deposited into an Ethos bank account as collateral for the loan. *Id.* at 3-4.

Defendant and his co-conspirators engaged directly with their victims in person and by email, text message, phone, and Internet video meetings to induce them into entering project finance loan agreements with Ethos and transmitting the upfront collateral deposit. They induced these borrowers by creating a deceptive ecosystem of lies about Ethos's history of funding projects, the source of Ethos's money, the capital Ethos had at its disposal to fund loans, and the use of the upfront collateral fees.

In some circumstances, Defendant and his co-conspirators misled prospective borrowers by fabricating balances on Ethos's bank account statements, brokerage account statements, and annual financial statements. For example, on August 9, 2021, Defendant emailed a prospective borrower a fake bank statement inflating an Ethos account balance by approximately one hundred million dollars. Exs. 1 and 2. The statement sent by Defendant indicated a July 24, 2021 balance of $100,304,447.76 in a Citibank account ending in -1032, but the actual balance in Citibank account -1032 on July 24, 2021 was

$905,858.00. *Compare* Ex. 2 *with* Ex. 3. In reliance on this fake statement, this victim sent Defendant an upfront fee and did not receive funding as promised.[1]

To obtain lines of credit in furtherance of his criminal scheme, Defendant emailed more fabricated bank and brokerage account statements to a federally regulated financial institution. *See* Plea Agreement, ECF 121 at 5. On October 22, 2022, Defendant emailed over a dozen financial documents, including false annual financial statements and bank statements misstating the true account balances. Ex. 4. These false documents included altered Citibank account statements reflecting balances of $102,294,841.20 and $121,037,122.35 for the periods August 2021 and September 2021. In truth, the actual accounts had balances of $294,841.20 and $1,037,122.35, respectively. *Compare* Ex. 5 *with* Ex. 6. In reliance on these fake documents and others, the financial institution extended Defendant a line of credit.

In another example, on May 11, 2023, Defendant emailed a prospective borrower the 2022 "Annual Financial Statements" for Ethos. *See* Ex. 7; Plea Agreement, ECF 121 at 6. This statement falsely specified that it was "compiled" by a San Diego, California based bookkeeping firm, when in fact it was not. The document also contained a forged signature of a then employee of the San Diego, California bookkeeping firm, and a fabricated line item indicating total assets of over $2.2 billion. In reliance on this fake statement and others, this borrower-victim sent Defendant an upfront fee and did not receive funding as promised.[2]

Upon inducing borrowers with material misrepresentations, including with some of the false documents cited above, Defendant received upfront fees from these borrowers and others. However, loan funds frequently failed to materialize because Defendant used the upfront fees from more recent borrowers to repay the upfront fees of previous borrowers (i.e., "Santos used the money to effectuate the release of collateral pledges

---

[1] This victim never received loan disbursements as promised, but did receive its upfront fee back and additional non-standard disbursements.

[2] This victim never received loan disbursements as promised, but did receive its upfront fee back.

deposited by other borrowers," ECF 121 at 5), to disburse some loan funds, to pay for personal and business expenses, and to pay co-conspirators.

## II. Criminal Conduct Related to the U.S. Victims Identified in the Plea Agreement

The plea agreement identifies four victims: three companies who sustained multi-million-dollar losses and an individual who was the victim of Defendant's aggravated identity theft. Whether the harms were pecuniary in nature, emotionally distressful, or both, the court should consider the offense conduct and the resulting injury to each of these victims when it determines Mr. Santos's sentence.[3]

### A. Delphi Studios 1 LLC

On March 30, 2023, Ethos and Delphi Studios 1, LLC (Delphi) entered into a project finance agreement in which Ethos agreed to disburse a $100,000,000 loan in two phases, with $50,000,000 disbursed during Phase A and a second $50,000,000 disbursed during Phase B. *See* Ex. 8. In consideration for the loan, the agreement required Delphi to deposit $10,000,000 into a dedicated account as collateral. *Id.* ¶ 3.3. Defendant Carlos Santos signed this project finance agreement on behalf of Ethos thereby making the material representation to Delphi that Ethos would and could fund a $100,000,000 loan. *Id.* at 17.

That same day Ethos and Delphi executed a "Pledge Agreement" in which Delphi agreed to extend a margin value "equivalent to 73%" of the $10,000,000 collateral deposit to Ethos. *See* Ex. 9 ¶ 10. The project finance agreement required Ethos to disburse Phase A's $50,000,000 loan in five equal tranches of $10,000,000 starting 30 days after Ethos received the value of the margin. *See* Ex. 8 at 19. On April 24, 2023, a business record from Jeffries, a financial firm headquartered in New York, shows that Delphi wired $7,300,000 to an Ethos bank account. Ethos has not disbursed any money to Delphi.

---

[3] All except one of these victims has submitted a victim impact statement. All victim impact statements have been filed under seal as exhibits at ECF 140 and 147.

B. Terra Financing LLC

On October 12, 2023, Ethos and Terra Financing, LLC (Terra Financing) entered into a project finance agreement in which Ethos agreed to disburse a $10,000,000 loan to Terra Financing in exchange for Terra Financing depositing "Pledged Funds" in the amount of $2,500,000 as collateral. *See* Ex. 10 ¶¶ 3.1, 3.3. Defendant Carlos Santos signed this project finance agreement on behalf of Ethos thereby making the material representation to Terra Financing that Ethos would and could fund a $10,000,000 loan. *Id.* at 19.

That same day Ethos and Terra Financing executed a "Pledge Agreement" in which Terra Financing agreed to obtain a margin on the "Pledged Funds" at a "value equivalent to 65% of the Pledged Funds" and to send that amount of money to Ethos. *See* Ex. 11 at ¶ 14. The project finance agreement required Ethos to disburse the $10,000,000 loan in 12 equal tranches of $833,333.33 starting 30 days after Ethos received the value of the margin. Ex. 10 at 21. On October 20, 2023, a business record from Flagstar Bank shows a $1,625,000 deposit into an Ethos bank account from Terra Financing. Ethos has not disbursed any money to Terra Financing.

C. Sector Resources Group

After months of preliminary negotiations, on February 10, 2023, Defendant Carlos Santos sent an email to representatives of Sector Resources containing various attachments, including "a copy of Ethos' 2020 and 2021 financial statements that falsely inflated Ethos' assets, income, and misrepresented that the financial statement had been audited by an accounting firm when in fact it was not." ECF 121, Plea Agreement at 5-6. Sector Resources relied on these fabricated and falsely audited statements to enter into a loan agreement with Ethos. *See* ECF 140, Ex. 1 ¶ 17-20.

On March 29, 2023, Ethos and Sector Resources LTD (Sector Resources) entered into the project finance agreement in which Ethos agreed to disburse a $50,000,000 loan to Sector Resources in exchange for Sector Resources depositing collateral in the amount of $10,000,000 with a standby letter of credit. *See* Ex. 12. Sector Resources obtained a

$10,000,000 standby letter of credit and on April 5, 2023, delivered the standby letter of credit to Ethos's bank. *See* ECF 140, Ex. 1 ¶ 22. The parties engaged in negotiations to amend the collateral structure, resulting in a reduced value of the standby letter of credit equal to $5,050,760.82 and a $3.25 million deposit into an Ethos controlled bank account.

On June 30, 2023, a business record from East West Bank shows a $3,250,000 deposit into an Ethos bank account by Sector Capital Corporation. East West Bank records also show that Ethos used Sector Resource's standby letter of credit as collateral to draw cash advances on Ethos's line of credit, and eventually East West Bank reclaimed the losses on Ethos's line of credit by collecting on the $5,050,760.82 standby letter of credit. Ethos never disbursed any money to Sector Resources, and its principal owner has stated under oath that "this crime has had a devasting financial impact on the Sector Companies." ECF 140 Ex.1 ¶ 52.

D. <u>Aggravated Identity Theft Victim</u>

The victim of Defendant's aggravated identity theft is identified in the plea agreement as "C.T." *See* ECF 121 at 6. The plea agreement describes Defendant forging C.T.'s signature onto a fabricated annual financial statement for Ethos to make it appear that the victim had compiled and audited the financial statement when in fact the victim had not. This victim submitted a victim impact statement that the government filed under seal. *See* ECF 140 Ex. 2.

The victim reported "living in a constant state of fear and anxiety after discovering that [Mr. Santos] had stolen my identity and used by name to sign financial documents without my consent." *Id.* The victim described the "overwhelming" psychological toll this crime caused, including "fearing that [Mr. Santos's victims] might come after me in retribution for his deception" and noting "severe" impact to the victim's mental health "leading to heightened paranoia, persistent worry, and an inability to trust others." *Id.*

These harms resulted in tangible impacts to the victim's life beyond the mental anguish. C.T. is an accountant with 25 years in public accounting where "trust is the foundation" of the work. *Id.* Due to Mr. Santos's criminal conduct, the victim found "it

6

nearly impossible to engage with clients without feeling suspicious or fearing that they, too, might be capable of fraud." *Id.* As a result, C.T. made "the incredibly difficult decision to leave my career in public accounting." *Id.* This decision has impacted C.T.'s financial stability and C.T.'s ability to find "passion and fulfillment" in professional endeavors. *Id.* Defendant's identity theft "altered the course of [C.T.'s] life in ways [C.T.] could never have anticipated. The emotional distress, the loss of trust, and the necessity of changing my entire career path have been devasting. No one should have to endure the nightmare of having their identity stolen and their reputation put at risk through no fault of their own." *See* ECF 140 Ex. 2.

# LEGAL ANALYSIS

## I. Guidelines Calculation for Count 1 — Wire Fraud Conspiracy

### A. Base Offense Level

The parties agree that the court should start its calculation of the Base Offense Level for wire fraud using U.S. Sentencing Guideline (USSG) Section 2B1.1(a)(1)[4] because the USSG references wire fraud conspiracy to this section. The Base Offense Level is **7**.

### B. Specific Offense Characteristics

The court should add the following points to Defendant's Base Offense Level.

#### 1. *Loss*

The parties agree that the loss caused by Defendant's wire fraud conspiracy includes $17,125,000 to three U.S. based victims. This amount is the "actual loss" defined in the Guidelines. This loss results in a **20-level increase**. *See* Plea Agreement, ECF 121 at 7, 11; USSG § 2B1.1(b)(1)(K).

#### 2. *Sophisticated Means*

The parties also agree to an additional **2-level increase** for sophisticated means. USSG § 2B1.1(b)(10)(C). The Guidelines permit a two-level increase if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." *Id.* The application note explains

---

[4] All USSG references are cited to amendments effective November 1, 2024.

that "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense. . . . Conduct such as hiding assets or transactions, or both . . . indicates sophisticated means." *Id.* cmt. n.9

The Ninth Circuit has recognized "the enhancement properly applies to conduct less sophisticated than the list articulated in the application note." *United States v. Jennings*, 711 F.3d 1144, 1147 (9th Cir. 2013). In *Jennings*, the defendants "syphoned money" from their business into another bank account they gave a legitimate appearing name to, and then the defendants used the money for personal purposes without reporting the money as income. *Id.* at 1145-47. The Ninth Circuit held this conduct justified application of the sophisticated means enhancement. *Id.* at 1147.

The sophisticated nature of Defendant's criminal conduct is inherent in the scheme itself and the ways he perpetrated it. The complexity of the scheme involved sophisticated finance loan agreements and victims posting collateral to receive a loan (that almost never materialized as promised) by depositing money into a securities account or obtaining a standby letter of credit in an amount equal to the total loan amount. These loan agreements, investment accounts, and financial instruments made the criminal scheme inherently sophisticated. Mr. Santos also facilitated this independently sophisticated scheme by utilizing multiple U.S. and foreign bank accounts. The use of domestic and offshore accounts made it easier for Defendant to conceal criminal conduct and made it more difficult for law enforcement to trace victim funds and account for all the money borrowers deposited into the Ethos system.

C. Adjustments

1. *Acceptance of Responsibility*

In its Sentencing Summary Chart, the United States has moved this Court for a **three-level decrease** for Mr. Santos's acceptance of responsibility under Guideline Section 3E1.1. Defendant earned the additional point under Section 3E1.1(b) because he signed the plea agreement and pleaded guilty before the due date for motions in limine, and before

the government had to engage in more fulsome sessions of witness preparation, exhibit organization, and drafting jury instructions.

### 2. *Aggravated Role*

The parties agree to a **2-level increase** because Mr. Santos was "an organizer, leader, manager, or supervisor" in the criminal activity to which he pleaded guilty. *See* USSG § 3B1.1(c). The Guidelines provide various factors to consider, and the Ninth Circuit has held that to be an "organizer" or "leader," the defendant "must have exercised 'control over others.'" *United States v. Harris*, 999 F.3d 1233, 1236 (9th Cir. 2021) (quoting *United States v. Avila*, 95 F.3d 887, 892 (9th Cir. 1996)). The adjustment also applies if a "defendant exercises organizational authority over others" through a criminal organization or a company. *Id.* at n.1.

Mr. Santos was an organizational leader evidenced by his admission to being "the founder and chief executive officer" of Ethos. *See* ECF 121 at 3. In this position he exercised control over all Ethos employees, including those with knowledge of and participation in the criminal scheme Defendant and others perpetrated through Ethos. For example, seized communications from various cell phones and email accounts indicate Mr. Santos gave directives to his criminal co-conspirators, such as directing them about what lies to tell prospective borrowers, what false documents to review, and what to do with upfront fees received from borrowers. Such conduct falls squarely within the Section 3B1.1(c) adjustment.

## II. Guidelines Calculation for Count 7 — Aggravated Identity Theft

In addition to pleading guilty to a single count of wire fraud conspiracy, Defendant has pleaded guilty to an additional count for violating Title 18, United States Code, Section 1028A during the commission of his wire fraud conspiracy. Specifically, Defendant admitted that "on or about May 11, 2023," he "used a forged signature of C.T. — an employee at a bookkeeping and tax preparation company located in the Southern District of California—by affixing C.T.'s forged signature to Ethos's fabricated 2022 annual financial statement and sending it to a prospective borrower." *See* ECF 121 at 6.

9

The Sentencing Guidelines reference a violation of 18 U.S.C. § 1028A to USSG § 2B1.6, which in turn states that "the guidelines sentence is the term of imprisonment required by statute." USSG § 2B1.6(a). The statute states that a defendant "shall, in addition to the punishment provided for [wire fraud conspiracy], be sentenced to a term of imprisonment of 2 years." 18 U.S.C. § 1028A(A)(a)(1). The statute requires that the two-year term run in addition to any period of incarceration imposed for the wire fraud conspiracy. Specifically, "no term of imprisonment on a person under this section shall run concurrently with any other term of imprisonment imposed on the person under any other provision of law, including any term of imprisonment imposed for the felony during which the means of identification was transferred, possessed, or used." 18 U.S.C. § 1028A(b). "A violation of 18 U.S.C. § 1028A requires a two-year term for each conviction, consecutive to the underlying offense." *United States v. Goodwin*, 395 F. App'x 491, 493 (9th Cir. 2010).

Here, the "means of identification," was C.T.'s forged signature and Defendant "transferred" and "used" it on May 11, 2023, during the commission of his wire fraud conspiracy as stated in his plea agreement. This conduct requires a statutory two-year consecutive sentence to the term of imprisonment this Court imposes on Defendant for Count 1.

### III. Sentencing Factors

Pursuant to the Sentencing Reform Act, 18 U.S.C. § 3553, the Court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" Section 3553(a)(2), and, in so doing, the Court "shall consider," various factors enumerated in Section 3553(a). Given the nature of Defendant's crimes, the factors of particular importance in this case are the history and characteristics of Defendant, the need to promote deterrence, and the avoidance of sentencing disparities. A total sentence of 87 months is sufficient, but not greater than necessary, to comply with the sentencing guidelines. This sentence recommendation includes a downward variance under the Section 3553(a) factors equivalent to two-levels for Defendant's waiver of appeal for any

custodial sentence less than 102 months. The government offered this variance to encourage bringing finality to this case so that victims can start to receive restitution and put this chapter behind them.

### A. Nature and Circumstances of the Offense

Defendant's plea agreement outlines an extensive criminal scheme to defraud Ethos's clients by lying about Ethos's history of funding projects, its ability to fund loans, and among other lies, its source of funds, all to induce prospective borrowers to transmit collateral in the form of money to bank accounts controlled by Defendant. This deception included Defendant fabricating bank statements, brokerage account statements, and annual financial statements that painted a false picture of Ethos's wealth and available capital to fund loans. Instead of performing to finance multi-million dollars projects, Defendant used the upfront fees to release the collateral paid by previous borrowers, disburse some loans to other borrowers, pay for his personal and business expenses, and to issue commissions to his criminal co-conspirators. His actions were far from a momentary lapse of judgment or a one-time mistake. For years Defendant repeatedly created and executed a sophisticated criminal scheme to deceive others resulting in millions of dollars of actual loss to his victims

### B. Personal History and Characteristics

Defendant is a 30-year-old Portuguese citizen who experienced a "perfect childhood" with an "amazing" family that provided him "with everything." ECF 125 ¶¶ 107, 111. Mr. Santos attended "the best schools" in his youth and graduated from "one of the most prestigious universities in Portugal and Europe . . . where he earned both a bachelor's and master's degree" in "accounting, finance, and international taxation." ECF 125 ¶¶ 107, 108, 126. Prior to his arrest, Defendant "never suffered nor was diagnosed with any mental health ailment," *see id.* ¶ 118, meaning that Defendant conducted his crimes while clear headed and clear eyed. This personal history is aggravating because Defendant seemingly had every advantage handed to him, but used those privileges not for good, but

to cause harm to others through his sophisticated scheme to defraud. This type of aggravation should caution this Court away from giving a below guidelines sentence.

Countervailing these aggravating characteristics are Defendant's acceptance of accountability for his crimes, his apparent maturity to own up to his conduct and face consequences, and the fact that Defendant's future can be bright. He has the family support and educational background to recover from his past decisions and live a long law-abiding and productive life.

C. Deterrence

In addition to the need for specific deterrence, the need for general deterrence warrants a meaningful sentence. Put simply, there needs to be a real risk of incarceration to weigh against those incentives that motivate people to commit financial fraud. *See United States v. Martin,* 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that crimes that are "rational, cool, and calculated" rather than "crimes of passion or opportunity" are "prime candidates for general deterrence") (citation omitted). Defendant engaged in a multi-year, international, and complex financial fraud scheme causing millions of dollars of loss to his victims. A custodial sentence should meaningfully reflect this harm while also signaling to fraudsters that criminal conduct results in severe consequences.

## CONCLUSION

Defendant is appearing to be sentenced for an illegal advance fee loan scam that stole at least $17,125,000 from his victims. The sophistication and scope of Defendant's criminal conduct warrants a meaningful sentence of 87 total months custody; 63 months custody for Count 1 and 24 months, consecutive, for Count 7.

DATED: May 7, 2025

Respectfully submitted,

 ADAM GORDON
United States Attorney
/s/ *E. Christopher Beeler*
E. CHRISTOPHER BEELER
CARL F. BROOKER
Assistant United States Attorneys