1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3

4   UNITED STATES OF AMERICA,      )  CASE NO.: 3:23-cr-02507-RSH-1
                                   )
5           Plaintiff,             )  FRIDAY, MAY 16, 2025
                                   )  SAN DIEGO, CALIFORNIA
6   v.                             )
                                   )  SENTENCING HEARING
7   CARLOS MANUEL DA SILVA SANTOS, )
                                   )  HONORABLE ROBERT S. HUIE
8           Defendant.             )  UNITED STATES DISTRICT JUDGE
    _____)  SOUTHERN DISTRICT OF CALIFORNIA

9

10  APPEARANCES:

11  For the Plaintiff, UNITED STATES OF AMERICA:

12      UNITED STATES ATTORNEY'S OFFICE,
        SOUTHERN DISTRICT OF CALIFORNIA
13      880 Front Street, Room 6293
        San Diego, California  92101-8893
14      (619) 557-5610
        BY:  CARL BROOKER, ESQ.,      carl.brooker@usdoj.gov
15           CHRISTOPHER BEELER, ESQ.  christopher.beeler@usdoj.gov

16

    For the Defendant CARLOS MANUEL DA SILVA SANTOS:
17

18      McKENZIE SCOTT
        1350 Columbia Street, Suite 600
19      San Diego, California  92101
        (619) 794-0451
20      BY:  TIMOTHY A. SCOTT, ESQ.    tscott@mckenziescott.com
             MARCUS S. BOURASSA, ESQ.  mbourassa@mckenziescott.com

21

22  Also present:

23      KELLI SINGLETON, U.S. Probation Officer

24  _____
       Tricia Rosate, RDR, CRR, CSR No. 10891,    tricia_rosate@casd.uscourts.gov
25          333 West Broadway, Suite 420, San Diego, California  92101
                *Reported stenographically; Transcribed with CAT software*

```
 1              SAN DIEGO, CALIFORNIA; FRIDAY, MAY 16, 2025

 2                     9:40 a.m. - 12:16 p.m.

 3                         -  -  -  -

 4         THE CLERK:  Calling Matter No. 2 on the calendar,

 5   23-cr-2507, United States of America v. Carlos Manuel da Silva

 6   Santos.

 7         MR. BEELER:  Good morning, Your Honor.

 8         Christopher Beeler for the United States, accompanied

 9   by Carl Brooker, who has stepped out.

10         THE COURT:  All right.  Good morning, Mr. Beeler.

11         MR. BOURASSA:  Good morning, Your Honor.

12         Marcus Bourassa and Tim Scott here for Carlos Santos,

13   who's in custody, present with us.

14         THE COURT:  Mr. Bourassa, Mr. Scott, Mr. Santos, good

15   morning to all of you.

16         Good morning, Mr. Brooker.

17         MR. BROOKER:  Good morning, Your Honor.

18         THE COURT:  I'll start by addressing the defense's

19   second motion for finding of breach.  The first motion, as I

20   read it, addressed a theory of breach based on paragraph 61 of

21   the presentence report.  This was stated in page 4 of the first

22   breach motion and it was reflected in Exhibit B to that breach

23   motion, which was filed under seal but which highlighted the

24   precise lines in the presentence report which the defense

25   claimed were the basis of breach.  Those included paragraph 61.
```

1   They didn't include paragraph 62, 63, or 64, except for a

2   reference in paragraph 62 to the loss amount that had been

3   reflected in paragraph 61.

4           At the last hearing, I denied that motion for a

5   breach.  I gave the defense leave to file a second breach motion

6   addressing theories beyond paragraph 61.  The defense has filed

7   that motion.  The Government has opposed.

8           The second motion is based on two theories:  one, that

9   the agents breached the plea agreement by making comments to

10  Probation as reflected in paragraphs 62 through 64 of the

11  presentence report; and, second, that the U.S. Attorney's Office

12  breached the plea agreement in responding to the defense's PSR

13  objections and in not making their own objections.

14          At the last hearing, Mr. Scott argued both theories of

15  breach.

16          I recall those arguments, but, Mr. Scott or

17  Mr. Bourassa, if you have anything to add, I'm happy to hear

18  from you.  This is just as to the second breach motion.

19          MR. SCOTT:  Thank you very much, Your Honor.

20          I don't have a great deal to add, frankly.  The only

21  things that I wanted to comment on relatively quickly is

22  pertaining to the Government's response brief.

23          I note that the Government makes kind of a strong

24  argument from the bottom of page 3 to the top of page 7 in its

25  brief that the Government's arguments -- or excuse me -- that

1   the case agent's comments given to the Probation Office are not

2   attributable to the Government for purposes of breach and that

3   the Government's real recommendation is something different than

4   that.

5        I note, for starters, that there's no case law that

6   the Government supports or cites for that proposition, and

7   that's because, I would submit, there was not any.  The case law

8   is to the contrary.  If that were the law, that would be an

9   enormous loophole for the Government to not abide by the

10  obligations that it signed up for in the plea agreement, and it

11  would give rise to all sorts of potential mischief if the case

12  agent could essentially say whatever he or she wanted to,

13  unfettered by the strictures within the plea agreement.  It

14  would become almost a literal good-cop/bad-cop type of scenario.

15  So I just make that point.

16       Then, fundamentally, going back both to the last

17  hearing and to this hearing, if the Court is not inclined to

18  force the Government to share correspondence, to share -- to

19  have the probation officer or the case agent subject to

20  cross-examination on this topic, we still really don't know

21  fundamentally what I think is a fairly important premise, that

22  whatever it was that the case agent said was in

23  "direct response" to questions put to them by Probation.  The

24  Government has been fairly circumspect in what they have

25  described.  Their declaration is carefully, if not cagedly,

1    tailored to avoid saying too much.  So I think that --

2            I just don't believe, and we submit, that there is not

3    an adequate factual foundation to make a finding that the case

4    agent was simply responding to questions.  The record is opaque

5    on that topic.

6            But all of those things said, we are mindful of the

7    Court's ruling at the first hearing, so I don't want to continue

8    to belabor it and I will now submit the issue to the Court with

9    the thanks for allowing us to brief the additional issues

10   in addition to loss.

11           THE COURT:  Well, I appreciate the briefing and the

12   argument, Mr. Scott.

13           Mr. Beeler, Mr. Brooker?

14           MR. BEELER:  Your Honor, I don't think so.  The

15   Government submits on its filing unless the Court has specific

16   questions for us.

17           THE COURT:  Thank you, Mr. Beeler.

18           So the Court's considered the defense's second motion

19   for finding of breach.  That motion is denied for the following

20   reasons.  I'll start with the portion of the second motion

21   that's directed to the comments of the case agents as reflected

22   in paragraph 62 through 64.

23           Many of the considerations that I mentioned at the

24   last hearing apply to this motion, as well.  So, one, I consider

25   the Government's comments and recommendations as a whole,

1    including the U.S. Attorney's Office good faith advocacy for the

2    agreed-upon guidelines sentence.  So I'm not ruling that

3    statements by case agents don't count, but instead I'm

4    considering everything as a whole.

5            Second, I consider the context that a case agent would

6    expect that the Government's sentencing recommendation would be

7    made by the U.S. Attorney's Office and not by the case agents.

8            Third, I consider the fact that the comments were made

9    at the presentence report stage, allowing us in practical terms

10   to address and contextualize these statements in advance of

11   sentencing.  In that regard, I also consider the comments in

12   light of the Government's later-filed sentencing summary chart

13   and memo.  So these points are similar to ones I made at the

14   last hearing in relation to paragraph 61.

15           I construe the plea agreement here as not prohibiting

16   the comments at issue.  The defense's theory is that these

17   comments violate the Government's commitment to make a low-end

18   sentencing recommendation after incorporating a further

19   two-level downward variance for waiver of appeal.

20           I respectfully disagree with that construction of the

21   plea agreement.  In my view, the commitment to making a low-end

22   recommendation is not somehow a commitment to refrain from

23   offering facts in connection with the case or to refrain from

24   offering advocacy and support of the Government's recommended

25   sentence.

1          In this case, even a low-end recommendation with a

2     two-level variance is a very significant sentence.  Indeed, the

3     Government is recommending here a sentence of 87 months.  The

4     Government is permitted to offer facts, commentary, or advocacy

5     that would support such a sentence and is not required to remain

6     silent and simply point to the plea agreement at the time of

7     sentencing.

8          In my view, the Government is entitled to argue that

9     the Court should impose 87 months, because under the statutory

10    sentencing factors, that's the right sentence to impose based on

11    the nature and circumstances of the offense and so forth.

12         To be clear, I don't think that the case agents in

13    making the comments here were advocating for any particular

14    sentence at all.  They were providing facts and commentary.

15    That was within the scope of what the Government as a whole was

16    permitted to provide under the plea agreement here.

17         Also, as I noted at the last hearing, page 10 of the

18    plea agreement states, "Nothing in this plea agreement limits

19    the United States' duty to provide complete and accurate facts

20    to the District Court and the U.S. Probation Office.  The

21    Probation Office routinely elicits commentary in criminal cases

22    such as this one."

23         Reading the defense's motion carefully, the motion

24    does not appears to contend that any of the underlying facts set

25    forth in paragraph 62 through 64 are false as such.  The defense

1   does contest some of the conclusions or inferences.  The issue,

2   as I understand it, is that the statements were made, not that

3   they were false; thus, the defense doesn't contest the factual

4   proposition that Ethos borrowers claimed to have emotional

5   distress or even to have suffered a heart attack as a result of

6   not getting the funds they were promised.  Instead, the

7   defense's response in the PSR objections is effectively it

8   hasn't been established that these events were a result of the

9   defendant's fraud.

10          Even as to the inferences, there's no dispute that the

11  way the parties are measuring loss here is, in fact, very

12  conservative, and I put "very conservative" in quotes.  Those

13  are words that I used at the detention hearing, and it appears

14  that the loss amount is based on how much the victims advanced

15  less how much they eventually received back.  This method

16  doesn't take into account what the victims were promised, it

17  doesn't take into account how long it took them to get their

18  money back, or all the hardship they may have suffered from not

19  getting what they were promised.

20          So why do I question the subject of falsity here?

21  It's not -- it's not that statements by the Government must be

22  shown to be false in order for the Court to find breach, but I

23  want to be clear that if the allegation were that the

24  case agents were lying to Probation or misleading Probation,

25  effectively libeling Mr. Santos, that would be another inquiry

all together.  Instead, the commentary provided here was

consistent with page 10 of the plea agreement.

Under the Ninth Circuit's en banc decision in

*Farias-Contreras* and its predecessor cases, the Government may

not engage in advocacy that winks at the District Court to

implicitly request a sentence higher than the Government agrees

to recommend.  Here, 87 months.

Similarly, the Government may not make statements

whose sole purpose is to influence the Court to impose a

sentence higher than what the Government is recommending."

So this raises the question:  How much advocacy is

consistent with an 87-month sentence, and when does advocacy

exceed that permissible amount?

In *Farias-Contreras*, the Ninth Circuit ruled "Although

this case presents a close question, considering the record here

in toto, a majority of the panel finds that the Government's

conduct crossed the line from permissible advocacy to an

improper end-run of the plea agreement.  The prosecutor simply

went too far."

The determination in that case appears to have been

based on a number of factors taken in combination.  I'm going to

address now whether those factors from *Farias-Contreras* are

present here.

So, first, the Ninth Circuit noted that the Government

in that case spent five pages arguing for a "significant

1    sentence" where the plea agreement provide for a low-end

2    recommendation.  That factor bears some resemblance to this case

3    in that here the Government has agreed to a low-end

4    recommendation with a variance and has argued at length in

5    support of that recommendation.  At the same time, in the

6    context of this case, I don't find the length of the

7    Government's argument excessive nor its recommended sentence to

8    be ambiguous or equivocal;

9         Second, the, Ninth Circuit cited the Government's

10   "Inflammatory arguments, including in its sentencing memorandum,

11   'Statistics on Drug Overdose Deaths,' an excerpt from the book

12   'Dreamland' about drug users shapeshifting into lying, thieving,

13   slaves, and a comparison of drug dealers to the vampire of

14   fable, creating others in the owner's evil image."  There's no

15   similar rhetoric here.  The Government is also not aggregating

16   Mr. Santos with a larger social phenomenon of criminals and then

17   identifying harm caused by that larger group in some hyperbolic

18   fashion;

19        Third, the Ninth Circuit cited in that case the

20   Government's comments to the sentencing court that the

21   U.S. Attorney's Office had internally a difference of opinion as

22   to how to handle the sentence, suggesting that some prosecutors

23   in the office believed a higher sentence was appropriate.  This

24   factor, in my view, is most related to "winking," so to speak.

25   This factor is simply not present here.

1          Fourth, the Ninth Circuit cited the Government's

2     comments in that case, that the defendant was "at the top of the

3     food chain in terms of criminal culpability."  Here, in

4     contrast, the parties are jointly agreeing that Mr. Santos was

5     the CEO of Ethos and was an organizer or leader subject to an

6     aggravated role adjustment.

7          The Ninth Circuit also noted factors weighing against

8     the finding of breach in that case, including the fact that the

9     Government in that case actually recommended a low-end sentence

10    as promised.  The Government is actually recommending a low-end

11    sentence here, too, with the variance.

12         So I conclude that case law does not compel a finding

13    of breach here, and I conclude that there was no breach here in

14    connection with the case agent comments at issue.

15         I also want to note that I do not intend to rely on

16    those paragraphs for purposes of sentencing.  Now, this is a

17    separate question from breach, but I want to assure the defense

18    this is not because I find those paragraphs reflect a breach of

19    the plea agreement; instead, it's because, in the context of

20    this case, these comments are too generalized to be useful to

21    me.

22         I've reviewed the underlying victim impact statements.

23    I don't need a summary.  The comments about Mr. Santos's

24    lifestyle are fairly generalized.  The comments about the loss

25    methodology being conservative, those are words I previously

1   used.  As to Mr. Santos's remorse, I can make my own

2   determination in that regard.  I don't need other opinions on

3   that.

4        So with that, I'm going to turn to the defense's

5   second theory of breach, based on the Government's response to

6   the defendant's PSR objections and also based on the

7   Government's failure to make its own objections.

8        First, I don't see any basis in case law or in the

9   plea agreement that requires the Government to file objections

10  to the PSR guidelines calculations that are different from what

11  the Government agreed to recommend at the time of sentencing.

12       As to the Government's response to the defense's PSR

13  objections, the context here is different from the context of

14  the case agent comments.

15       Here, it's not a question of the Probation Office

16  soliciting comments.  Instead, the Government is responding

17  directly to the defense's PSR objections.  The Court directed

18  the Government to respond to these objections.  The Government's

19  responses reiterate the Government's position on the guideline

20  sentence to be imposed.  This is consistent with the

21  plea agreement.

22       The Government responses disagree with some of the

23  defense's assertions about a lack of evidence.

24       The Government's responses are factual in nature.

25  They're not explicitly or implicitly arguing, in my view, that

1    the Court should not apply the sentencing guidelines as jointly

2    recommended.  Reading the defendant's breach motion carefully,

3    the motion does not appear to contend that any of the statements

4    made by the Government in its response are factually false.  So

5    this type of response is contemplated by the plea agreement

6    itself on page 10, and it's also what the Court expects.

7            A few minutes ago in the context of discussing the

8    case agent comments, I distinguished *Farias-Contreras*.  That

9    discussion applies here, as well.  So I conclude that the

10   Government did not breach the plea agreement in connection with

11   its responses to the defense's PSR objections, and the motion is

12   therefore denied.

13           Again, I appreciate the briefing and argument on it.

14           MR. BOURASSA:  Thank you, Your Honor.

15           MR. SCOTT:  Thank you, Your Honor.

16           And I'm loath to interrupt --

17           THE COURT:  Go ahead.

18           MR. SCOTT:  We probably did this before, but in an

19   abundance of caution, we're always taught to constitutionalize

20   our arguments and objections, and I just want to make sure that

21   our arguments and our objections are sound in both substantive

22   and procedural due process as well as the contractual and other

23   legal bases that we set forward.

24           With that, I would submit.  Thank you, Your Honor.

25           THE COURT:  All right, Mr. Scott.

1          For the same reasons stated at the last hearing, the

2     defense's request for further discovery and an evidentiary

3     hearing is denied.

4          So, Mr. Scott, Mr. Bourassa, anything else before we

5     proceed to sentencing today?

6          MR. BOURASSA:  Your Honor, I think briefly on this

7     subject, just because given the Court's ruling, I think -- I

8     note what the Court's response would be, but I want to at least

9     complete our record some, because as we transition to talking

10    about PSR objections and calculations of the guidelines, I think

11    the Government's sentencing memo further breaches in relation to

12    how those should apply.  And, you know, I don't want to belabor

13    it too much, because in light of the Court's ruling, I know

14    where we are.

15         But, for example, on the subject of role, the

16    Government had agreed to recommend a plus 2.  That subsection of

17    the guidelines says that it only applies if the person's role

18    was other than as described in the plus 4 or plus 3 categories.

19    So the Government agreed in the plea agreement to justify why it

20    was other than the plus 3 or plus 4, and we still don't see that

21    here in the memorandum.

22         So I'm ready to argue the PSR objections, but I don't

23    want to have omitted the -- you know, it's sort of like we have

24    a trailing advocacy, from my perspective, on -- that is in

25    breach of the plea agreement.  Recognizing where the Court is, I

**1**   don't want to belabor us there, because I think we're going to

**2**   move to talking about PSR objections and their substance.

**3**         THE COURT:  All right.  Thank you, Mr. Bourassa.

**4**         Mr. Bourassa, as far as I can tell, the defense has

**5**   argued that there was a breach of the plea agreement but has not

**6**   moved to withdraw the guilty plea.

**7**         Is that a correct statement of your position?

**8**         MR. BOURASSA:  Yes, Your Honor.

**9**         THE COURT:  All right.  So, with that, let's turn to

**10**  the matter of sentencing.

**11**        I have a few preliminary questions.

**12**        Mr. Beeler, is there any third-party present, such as

**13**  a victim who wishes to be heard, in connection with the

**14**  sentencing today?

**15**        MR. BEELER:  Yes, Your Honor.  There's one.

**16**        THE COURT:  All right.  Can you identify that person

**17**  by name for the record, and we'll get to that person speaking

**18**  later.

**19**        MR. BEELER:  Your Honor, his name is David Katz,

**20**  K-a-t-z, and he's the owner of an entity called Plastic Bank.

**21**        THE COURT:  Which has submitted a victim impact

**22**  statement in this case?

**23**        MR. BEELER:  They did.  Yes.

**24**        THE COURT:  All right.  Anybody else?

**25**        MR. BEELER:  No, Your Honor.

1        THE COURT:  All right.  To your knowledge, Mr. Beeler,

2   are there any -- apart from Mr. Katz, are there any victims or

3   restitution claimants in the courtroom today?

4        You don't need to point them out at this time.  I just

5   want to know who's present.

6        MR. BEELER:  No, Your Honor.

7        THE COURT:  All right.  Mr. Bourassa, Mr. Scott, at

8   the last hearing, Mr. Bourassa referred to the possibility of

9   resolving the entirety of the restitution claims through some

10  sort of agreement.  I just want to check in.

11       Has there been some agreement in that regard?

12       MR. BOURASSA:  No, Your Honor.  I think --

13       At least my own belief about the plan was for the dust

14  to settle today on the other aspects of sentencing and then to

15  work with the Government on that component.

16       THE COURT:  Mr. Bourassa, does the defense have any

17  objection to Mr. Katz addressing the Court?  That's not the same

18  thing as agreeing with what he says.

19       MR. BOURASSA:  No, Your Honor.

20       THE COURT:  Thank you, Mr. Bourassa.

21       So let me make a preliminary statement with regard to

22  any victims or claimants who may be present today, including

23  Mr. Katz or anyone who may be reviewing this record at some

24  point in time.

25       I received over 700 pages of victim impact statements.

1    I've reviewed them.  The parties have asked to put off

2    restitution for a later date.  So what that means is that there

3    will be a discussion today of loss under the guidelines as well

4    as the nature and circumstances of the offense.  This discussion

5    today will not determine restitution.  That will be decided at a

6    later hearing.  The fact that someone's claim of losses does not

7    factor into the guidelines sentence does not mean that such a

8    claim is somehow invalid.  The restitution question will be

9    addressed at a later hearing.

10          Note, however, that receiving a victim impact

11   statement form from the U.S. Attorney's Office and completing

12   that form does not make somebody a victim entitled to

13   restitution.  Where there's no agreement and where restitution

14   is contested, then the Government must prove at the hearing that

15   somebody is a victim and must prove the amount of that person's

16   loss by evidence.

17          Let me state that again.  The Government must prove

18   entitlement to restitution, and that means prove it with

19   evidence and not simply with a proffer.  The fact that somebody

20   was mailed a victim impact statement form does not establish

21   that that party is entitled to restitution.

22          I also want to address one other preliminary matter

23   with regard to victims.  Mr. Beeler and Mr. Brooker, my chambers

24   received an e-mail earlier in the week.  It was appropriately

25   copied to the defense counsel, but it was asking about victims

1   or putative victims listening in and participating remotely.

2   The response that I believe was given was that this is a public

3   proceeding; it's open to the public.  Anyone is entitled to be

4   here.  If somebody is a victim or claims to be a victim, they're

5   entitled to be heard as to whether -- they can make a statement,

6   but the norm in this courtroom -- and I think it's the norm for

7   this courthouse in criminal matters -- is that criminal matters

8   are not broadcast.  They're not routinely streamed or made

9   available by phone to people that want to listen.

10          With regard to somebody appearing remotely to make a

11  statement, it's as if somebody were seeking leave to testify in

12  the sense that a motion has to be made, because fairness

13  requires that the defense get a chance to weigh in.  So that was

14  the direction, I believe, that we gave earlier in the week, but

15  I want that to be -- I want to ensure that that's communicated

16  to putative victims.  It's not a matter of the Court's

17  preferences or the Court not being interested in what people

18  have to say; simply that if we're going to deviate from the

19  norm -- and counsel know this -- if you want something, you need

20  to make a motion, and the other side needs to have a chance to

21  weigh in on it.

22          So, Mr. Bourassa or Mr. Scott, have you reviewed the

23  presentence report with Mr. Santos?

24          MR. BOURASSA:  Yes, Your Honor.

25          THE COURT:  Okay.  I'll invite any other comments from

1   you with regard to the sentence to be imposed or if you wish to

2   address specific PSR objections on that topic, as well.

3        MR. BOURASSA:  Thank you, Your Honor.  And I realize I

4   have an awkward request at the beginning, but given the context

5   of our breach motion and arguments, I think the Court may

6   understand why I'm asking.

7        I would ask that the Government go first in their

8   sentencing advocacy today, because what I'm concerned about is

9   that if they argue aggravating factors, it will be framed as

10  merely responding to me.  So if the Court would permit that,

11  that's my request; but, otherwise, I can proceed.

12       THE COURT:  Well, in a sentencing of this complexity,

13  I'm going to give each side a chance to respond to the other

14  side.  So it's not as if --

15       MR. BOURASSA:  Fair enough.

16       THE COURT:  -- the Government would speak and then

17  never speak again.

18       I also do have a number of questions for you,

19  Mr. Bourassa.  So I'd ask you to go first.  You can be heard, or

20  if you prefer for me to pose questions, I can begin that way.

21       MR. BOURASSA:  In light of the Court's proposed

22  process, I don't mind going first here.

23       THE COURT:  Okay.

24       MR. BOURASSA:  I will start with basically the

25  substantive legal objections about the calculation of the

1    guidelines, because I sense that that's sort of the starting

2    point of this process, and it's important.

3         I recognize the PSR addendum continues to add a

4    specific offense characteristic for substantial financial harm

5    to one victim, to Sector Resources.

6         We continue to oppose that, and here's why:  There's

7    no dispute Sector Resources was a victim.  They lost a

8    substantial sum of money.  I think they're the largest

9    recognized in the plea agreement.  They are also a significant

10   international mining conglomerate and interest, and they happen

11   to apparently be privately owned.  The owner happens to have

12   taken some of his personal funds, I think, to fund a project

13   that he saw as profitable for the company when the loan from

14   Ethos didn't come to fruition.  The submission doesn't say

15   anything about:  Was this a significant share of his personal

16   funds?  A small share of his personal funds?  Did he ultimately

17   profit from that or did he lose from that?

18        I think the substantial financial hardship enhancement

19   is designed to recognize when folks are financially ruined, they

20   lose work, they declare bankruptcy.  Those are the examples in

21   the guideline.  I would submit the use of personal funds in

22   connection with your business without some explanation of the

23   amount, how it affected your personal capacity doesn't qualify

24   for that offense characteristic under the guidelines.

25        THE COURT:  Mr. Bourassa, let me interject for a

1   moment.

2          It's my present intent with regard to the guidelines

3   to calculate those based on a plus 20 for loss in the range of

4   9.5 million to 25 million, a plus 2 for sophisticated means, a

5   plus 2 for leadership enhancement, and then a minus 3 for

6   acceptance.  So all that is consistent with the parties' joint

7   recommendation on sentencing.  It's consistent with the

8   plea agreement.

9          There are elements in the record that would

10  potentially warrant other enhancements.  If you want to be

11  heard, I'll give you the chance to be heard on that, but my

12  intent is, at this time, to calculate guidelines consistent with

13  the parties' joint recommendations on those points.

14         MR. BOURASSA:  I appreciate you offering that, because

15  it gives me a little guidance.  Obviously I'm not excited to

16  focus on the financial harm to Sector Resources today, because I

17  think there are significant other sentencing factors here.

18  Obviously we're asking the Court to vary well below the

19  guidelines in sentencing Mr. Santos.  So I'll move to sort of

20  more general 3553(a) factors in light of the Court's --

21         I think at this point, we know collectively how we got

22  here.  Carlos was an incredibly accomplished and successful

23  young man in his early 20s, teaching at his country's best

24  university in topics that were near and dear to him.  He set out

25  in the world hoping to found a company that would be successful

1    and grow the way that he thought would fulfill his potential and

2    the expectations of him and the expectations that he put on

3    himself.

4         Along the way, he made decision after decision after

5    decision to lie in service of that dream, but it remained his

6    dream and objective.  So it's a complicated case around his

7    intent, I think, because he's not receiving funds from clients

8    and then putting them in his personal bank account.  He's

9    reinjecting them into the company, to other clients, to

10   investment accounts, some real and some apparently imagined.

11   I'm referring there to Mr. Winston that I know the Court

12   sentenced recently and is familiar with.

13        At the same time, over the years, he is rejecting a

14   lot of applications for Ethos financing.  Rejecting

15   applications.  The reason that's so important is that there were

16   companies ready, with collateral in place, to give him more

17   money to use at Ethos in exchange for a promised loan, and he

18   was rejecting them in many, many instances, time after time

19   after time.  Those folks, because they didn't become clients,

20   they didn't become victims, they didn't submit victim impact

21   statements, but over the years, that was consistent.

22        That's why we submitted to Your Honor that pretty

23   lengthy investigative report, because -- at least one of the

24   employees who was involved in trying to bring these deals to

25   Ethos, he talked specifically in our interview about tens of

1  deals that he -- you know, dozens of deals that he brought that

2  were rejected.  And there was one in particular that he was

3  frustrated by, because he was on the verge of earning his

4  commission.  He has an incentive to try to get his deals

5  approved.  There are other brokers who have those same

6  incentives, who got themselves involved in this crime with their

7  own independent motivations too.  I'm talking about

8  Hans Kastensmith and other brokers who made a lot of money off

9  of the Ethos structure, acting independently like this broker

10  was.  And he's on the verge of making that commission and the

11  collateral is in place, and Carlos says, "This deal's not going

12  forward."  And that's because in Carlos's mind, he's thinking

13  about the long-term success of the loan, the 12-year term and

14  whether it's going to be repaid and how it's going to play out.

15  That's reflected in the fact that there were legitimate deals at

16  the company, and there were deals that were fully funded on

17  time.  I think I included service lists in my sentencing

18  submission.  There's another textile company in Turkey that was

19  fully funded.  There were deals that went forward pretty

20  successfully.

21          Meanwhile, Ethos is substantially overpromising, and

22  Carlos begins to lie.  I think the motive behind the lies varied

23  substantially depending on the context.  Sometimes it was just a

24  need to "not have my phone ringing off the hook the way that it

25  is so that I can focus, and I'm going to send an e-mail that

1    promises a tranche payment that's not coming."

2            And we have, you know, letters and people describing

3    what his life was like in that period who emphasized he's

4    working 20-hour days, he's sending -- more -- I think I put into

5    the memo, like, 90,000 e-mails or tens of thousands of e-mails

6    in a pretty short period of time.  He's just constantly working;

7    he's not sleeping.  He's trying to accomplish that dream that he

8    has in his head, and along the way, he's cutting corner after

9    corner after corner; he's lying consistently to clients.

10            But we have -- and I gave some examples to the Court

11   just because I think --

12            One of them in particular had been a passage of his

13   private correspondence with Elias that the Government had

14   referenced several times in their early pleadings in the case,

15   and it describes the Ethos model.  I included that because it

16   has from 2020 to much later, in 2023, Elias is one of the people

17   who Carlos trusts the most closely; you know, they're in this

18   together, they're partners in this.  And in those private

19   conversations, Carlos is repeatedly saying, "We just need to

20   perform.  We just -- we need to perform.  We've got to get the

21   tranches out the door to the clients."  That's his intent, but

22   the numbers aren't adding up, and he's lying in service of that

23   goal.  He's accepting more money, when the right thing to do was

24   to declare bankruptcy and try to settle the deals where he

25   could.

1           In late 2023 we see this is the period where Sean

2    Winston is sending him the dramatically inflated investment

3    account numbers showing that he's got this huge earning

4    potential, and Mr. Winston is promising him even higher returns.

5    I think he's saying this is sort of a low time where they're

6    earning $150 percent annually.  And Carlos's frantic e-mails to

7    him in the months before his arrest reflect him saying, "Look.

8    I need the collateral.  Send me my share," and it's because he

9    knows he needs to be performing these deals or he needs to  be

10   settling them.  If he can't perform them, he needs to settle

11   them, and he does that a lot over the years, too.

12           Sean Winston's sentencing, I think, was an important

13   one.  And we asked -- we sought the transcript so that we could

14   understand what the Court went through in sentencing him.  You

15   know, he pled guilty to an unrelated crime that he evidently had

16   going on, and then he simultaneously had a co-conspirator -- a

17   co-conspirator in the what I'll call sort of the Count 1, Carlos

18   Santos case, and then he has another fraud that's separate, that

19   is a fraud on Ethos.  I know the Government in earlier

20   proceedings had referred to this, I think -- maybe this is how I

21   characterize it.  I don't know if these were their words, but

22   it's kind of a den of thieves.  It's folks who are all a den of

23   thieves, reinforcing each other with bad instincts, and they're

24   also independently acting in service of their own interests,

25   too.  So Sean Winston wants to promote the Ethos model himself

1    so that he can get more funds from Ethos to steal.  So he's

2    participating and lying to folks out in the world and

3    encouraging them to go into business with Ethos so that he can

4    steal more money for himself.  It's not -- there's not a great

5    meeting of the minds here.

6          And Hans Kastensmith and other brokers are doing the

7    same thing, trying to accomplish their commissions, sending out

8    some of the fake bank statements that -- many are created by

9    Carlos, others are created by Leandro, others are created by

10   Elias.  And they take on a life of their own with some of these

11   other actors who are using them in service of their own

12   objectives, too.  But Sean Winston --

13          In this critical period in 2023 when the growth of the

14   company is out of control, it's largely out of control because

15   Carlos doesn't have a handle or access to the funds that he

16   thinks he has with Sean Winston.  And that doesn't explain all

17   of the behavior at all, but part of why the loss numbers are

18   where they are and why so many companies lost money undisputedly

19   is because Carlos believes he has this incredible opportunity to

20   earn investment returns.  I know we submitted our declaration

21   from Josh Teeple.  We've looked at the Turkish investment

22   accounts that are separate from what Sean Winston had, and those

23   accounts were earning substantial returns, too; not on the scale

24   of what Sean Winston was holding out to Carlos Santos.  But he

25   still has in his head this dream of the model where there were

investment returns and loans getting repaid and incoming new
loans, all of which provides capital to perform the tranches for
the clients.  But the investment side of things is fumbling, and
the repayment on the loans is too far out to rely on --
right? -- in this critical period, and to keep matters afloat,
he's lying.

The Court sentenced Sean Winston to approximately half
of what we're asking for today.  Mr. Santos has already been in
custody without the benefit of First Step Act credits or
anything in a local jail that's higher security than he'll
ultimately go to.  He's been in custody as long as Sean Winston
was sentenced, and he's going to be in custody longer, we
recognize.  But for Carlos --

I know we submitted a significant declaration from
Joel Sickler, because understanding how prison is going to be
different for Carlos really, I think, affects the 3553(a)
factors, because it's the kind of thing in the BOP regulations
and rules that aren't often discussed but for someone who is not
a U.S. citizen have a huge impact, because even though --

I'll keep using Sean Winston as an example, because
he's the only person in this enterprise who's been arrested and
charged other than Mr. Santos.  Sean Winston will do his time at
a minimum security camp where he walks freely, is visited by
family directly and easily.  And that will be very different
from Carlos's time at a low-security federal penitentiary

1    thousands of miles from his family, where he earns fewer credits

2    over time and just doesn't have the same access or ability to

3    return to his life that similarly-situated fraud defendants like

4    Sean Winston would have.

5         I know that since the Court has reviewed the, sort of,

6    hundreds of pages of victim impact statements --

7         And I appreciate the Court helping us navigate the

8    sort of restitution issues separate from sentencing, but I want

9    to talk a little bit about those, since I know the Court will

10   have them on its mind.  There's really -- there's no dispute

11   that if you just settle the numbers on people's balance sheets

12   today, many companies lost money, not just the companies who are

13   named in the plea agreement.  No question.  These were -- But

14   it's worth observing a little bit about those companies, because

15   by and large -- with exception here and there, but by and large,

16   they're extremely sophisticated companies with access to

17   significant capital, who negotiated these deals through their

18   own attorneys often over the course of a year or more.  They go

19   through many drafts of these deals.  And I know we've seen some

20   of the signed versions.  But they go back and forth with Ethos

21   about the terms, because everyone is cognizant of the risk that

22   their counterpart might not perform; that they're going to lose

23   control of the collateral.  They want to understand how the

24   standby letter of credit is going to be managed by their banks.

25   It is not a quick turnaround; you know, trick an individual into

1    giving money.  They're sophisticated parties.

2           And not all of them are induced by any sort of false

3    installment or bank statement or anything like that.  Many of

4    them just negotiated deals with the company in exchange for a

5    loan, and then Ethos was not able to perform, in many instances,

6    because Carlos was just arrested.  The company basically ceased

7    to exist when he got arrested, because the other folks didn't

8    have access to the bank accounts, couldn't manage it; the assets

9    were all frozen; Sean Winston's account turned out to be not

10   real.  Those legitimate deals weren't induced by fraud, many of

11   them.

12          Others, of course -- I know the Court has seen people

13   are asking for all of their opportunity costs, of what they

14   would have done if they had gotten the loan from Ethos.  You

15   know, there's like the claim for the $64 million property profit

16   that they might have had maybe if Ethos had performed.  But we

17   gave the Court our expert in the banking system and sort of the

18   structure of these deals when we were preparing for trial,

19   acknowledging that the business -- the structure of the deals is

20   novel; they're filling a niche.  But part of the niche is that

21   many of their customers would not be able to obtain financing in

22   other places, and they know that.  That's why they're

23   negotiating about the deals and remaining -- continuing to

24   negotiate over very extended periods with Ethos.

25          I want to have set out loud, at least, the big

1   picture, which is that the victim impact statements and the harm

2   to the companies that are not the named victims are, at a

3   minimum, extremely complex.  These were a lot of people with

4   individual lives, individual incentives, their own relationships

5   with brokers, and it is not all Carlos's fault.  It's not.

6        I know the Court will probably recognize them at this

7   point, but we do have Carlos's family here in the courtroom.

8   This is his sister, Carla; his wife, Eylem; and his parents, as

9   well.

10       THE COURT:  Good morning everyone.  Welcome.

11       ALL:  Good morning.

12       MR. BOURASSA:  It's awkward to talk about counsel's

13  arrangements with the defendant in representing him, but I think

14  it's important that --

15       Carlos's family are the ones paying us to be here

16  today, and they have paid an enormous amount of money to

17  attorneys dealing with this because Carlos doesn't have the

18  funds.  And I know he doesn't relish the huge financial impact

19  that just having us advocate for him has been for them.  And at

20  the same time, Carlos has asked them -- and they've been

21  willing -- to fund attorneys in other places to try to protect

22  the legitimate assets of Ethos.  So, for example, Ethos in

23  Turkey has attorneys, and there are companies in Turkey who

24  tried to seize assets in Turkey.  There are legitimate accounts

25  receivable in Turkey, and Carlos's family have been trying to

1   keep the legal fight to preserve those assets alive, and it's

2   because Carlos is trying to make this right with everybody as

3   best he can.  I mean, he can't wave a magic wand and make the

4   numbers add up and give everybody the money that they're owed,

5   but Ethos has real accounts receivable.  It has real loans and

6   people who owe it debts.  His hope, over time, is to try to

7   protect those assets in service of restitution.  And his own

8   family, at his request, have been paying to try to accomplish

9   that.

10          I know the woman who was sentenced earlier this

11  morning gave, like, what I think everybody recognized, an

12  incredibly powerful allocution based on her addiction and

13  things.  I know there's been some --

14          There was question in the PSR, and the Government has

15  listened to hundreds and hundreds of phone calls from Carlos

16  about this crime or lack of crime.  I know Carlos has prepared

17  allocution today.  He's written it out.  He's nervous; he wants

18  to plan.  The Government will agree, he's sort of this, like --

19  he has a frenetic energy that is 24/7 because he is so afraid.

20  And I mention his coming allocution because I want the Court to

21  know we did not write this.  I have seen it, and I encouraged

22  him to edit it down some, because he wants to talk about

23  everything.

24          But I think he's not the person being characterized in

25  the phone calls.  He knows -- he knows he did wrong.  The PSR

1  references some of his -- I don't think I'm speaking out of turn

2  to say it publicly -- his own thoughts about taking his own life

3  as a result of this.  He reads some of the victim impact

4  statements and reports, and he is affected by them, because he

5  has to live with knowing not only that he committed this crime

6  but that everybody in the world knows about it and will always

7  know about it.

8          He's doing what he can to try to make it right.  You

9  know, there's a footnote in our memorandum about, you know,

10  assisting in the forfeiture of the Isle of Man account.  I don't

11  think I've ever seen evidence that the funds in the Isle of Man

12  account came out of the Ethos enterprise.  I haven't seen any

13  bank transfers or anything corroborating that, but Carlos agreed

14  to abandon it because he's trying as best he can to make this

15  right.

16          I've reached out to the Government about trying to

17  cooperate with other investigations and other potential targets

18  and other people that Carlos knows who were involved in this and

19  other things, and we'll see where that goes.  We've consulted

20  with attorneys about trying to put Ethos into a receivership and

21  how to do that in a way that makes sense.  It's way outside of

22  my practice area; the family's funds are limited.  We're trying

23  to figure out how to do it.  And the attorneys we've talked to

24  about it basically indicate that the Government bringing a

25  motion for receivership is probably the best way to accomplish

1   it at this point.

2          But I know the Court can see from our memorandum that

3   even though there's this just years of lies and companies

4   affected coming forward, talking about how this hurt them;

5   there's been news coverage in Portugal about this case, and even

6   as I'm here, I'm, like, "Is this a journalist?  Is this a

7   journalist?"  Everybody is tracking Carlos's case, and he knows

8   that when he's released, he's never going to live it down; it's

9   going to follow him.

10         Even so, he has these incredible supports.  Half of

11  the length is because of the translations, but I don't think

12  I've had a case with so many letters to submit that I felt were

13  significant.  Usually we have letters from family, we have

14  letters from friends.  In this case, we have letters from former

15  Ethos employees.  That's not too much of a surprise, but they

16  know now that they were involved in a crime and they still, from

17  their relationships with Carlos, want to support him through

18  this.  And we have letters from former students; we have letters

19  from business partners who, notwithstanding the news coverage,

20  notwithstanding their knowledge that he has admitted to being

21  involved in a fraud, that Ethos was not what it was held out to

22  be, they still support him.

23         In his time in prison, he's had these incredibly dark

24  moments thinking about what his life is now if he comes to court

25  and he admits what he did, but at the same time, he's been

1    getting up and trying in the small way that he can from prison

2    to carve out a meaningful life.  And so I know it's unusual to

3    submit letters from other detainees in the jail, but it reflects

4    on Carlos; that he's in there giving classes on English.  The

5    Government, I think, will recognize his English is not perfect,

6    you know, but he's doing his best to help other people learn it

7    and he's supporting them in their dark time, too.  That takes a

8    lot, for someone in prison dealing with what he's dealing with,

9    facing what I think everyone acknowledges probably more time in

10   prison than most of the people he's housed along with.  He still

11   is finding the desire and energy to help other people there

12   through this dark time for them.  And the letters are

13   especially --

14         Sort of backing up a little bit, one of the things

15   that struck me about the letters was that not only do we have

16   business partners submitting letters, but there are people who

17   are putative victims and sort of undisputed companies that lost

18   money, people involved in companies that lost money, who are

19   also submitting letters basically acknowledging, either before

20   or now, that they don't think Carlos needs to be -- have the

21   anvil dropped on him.

22         You know, Pom Vattasingh's letter, I think, was

23   particularly important.  When we first were communicating with

24   her about that letter, she had said she would want to come and

25   make a statement herself.  I know she's had other obligations

1   get in the way of that, but she knew him for years and was

2   involved in multiple deals with him.  The Mozambique deal is one

3   that I know they're both really proud of.  The loan wasn't

4   performed to the full extent originally planned, but Ethos

5   invested a lot of money in a really important project in

6   Mozambique that they both continue to believe in and want to

7   help.  And then after that deal, she got other friends and

8   people that she knew, because she's a board member of this

9   company in Thailand, involved in yet another transaction, and

10  that company lost a lot of money.  As we sit here today, their

11  balance sheet is down millions.  But even she, from the years of

12  knowing Carlos, recognizes -- his intent, she thinks, wasn't to

13  steal from these people.  He had intent to lie, to deceive, to

14  get investments from them -- no doubt -- but he's not, in the

15  stealing sense, pocketing their money.  He believes in a dream

16  of this company that is going to become legitimate and fund

17  projects that are really good.  And she saw that in the

18  Thai Potash Singh deal, even though the deal lost money.

19          We submitted the more recent Sector Resources and

20  ST Properties letters.  Both of those companies lost money, but

21  Carlos has waived attorney-client privilege with his former

22  attorneys at multiple firms.  We've produced -- I have produced

23  to them hundreds -- if not thousands -- of e-mails,

24  correspondence from Ethos to try to help them accomplish what

25  Carlos wants me to help them accomplish, which is to recoup any

1    of the funds if it's possible that they can.

2         I brought with him -- and I can hand it to Your Honor

3    or I can read it.  I've given a copy to the Government.  But

4    just yesterday -- I've been going back and forth with an

5    attorney for Exsan de Mexico, another company whose balance

6    sheet is negative as we sit here today but to whom we have sent

7    hundreds of e-mails and records from Ethos to try to help them.

8    I'm not able to give them everything, because we have the

9    protective order and the discovery, and the grand jury materials

10   are not producible, but Carlos is doing what he can to help

11   them.

12        So their attorney has submitted a letter saying that,

13   While my client's firm and my client were deeply affected by the

14   fraud perpetrated by Mr. da Silva Santos, Mr. Enrique Sanchez

15   Navarro, on behalf of his company, Exsan de Mexico, wishes to

16   recognize Mr. da Silva Santos' efforts to assist Exsan and

17   Mr. Sanchez Navarro in their efforts to recover funds from

18   different parties that may be civilly liable and has pledged to

19   continue such assistance as necessary."

20        As an officer of the Court, I can represent to

21   Your Honor I spoke to Gustavo last Friday.  He read our

22   sentencing memorandum and about what we've tried to do with

23   Sector Resources and ST Properties and reached out because he

24   thought maybe Carlos could help him.  And we immediately signed

25   a release and got permission to send him whatever we could.  And

1    I spoke to him on the phone, and I told him, "Don't write a
2    letter.  If your client wants to come, they can come.  We're
3    just trying to send you the records."  And now that I have the
4    letter from him, of course I'm going to alert the Court, but I
5    think these folks recognize that Carlos is going out of his way
6    to help in a way that he's not required to and that is unusual.

7          No matter what the Court sentences him to today, he's
8    lost everything.  It's going to be immensely hard to rebuild a
9    life.  When he was arrested, now more than a year and a half
10   ago, he was a newlywed.  I know he and Eylem -- you know,
11   separate from his business and professional goals in his life,
12   he had a plan to have kids and build a family and settle down,
13   and all of that -- all of that is in doubt if not impossible
14   now.  Depending on the Court's sentence, there may be some
15   glimmer of hope that that can happen, that their marriage can
16   survive this, that they can build a family together, but
17   certainly it's in doubt.

18         His parents have been so supportive.  I know they have
19   cried in our meetings and have struggled with this and how to
20   navigate to support their son.  And, you know, time marches on.
21   When they're going to retire, whether the job will be waiting
22   for Carlos when he gets out to work with his dad in car sales in
23   Portugal, we don't know, depending on the Court's sentence.  So
24   his ability to re-enter society and still have this support
25   group who've stayed with him and the friends and business

1   contacts willing to support him when he gets released is going

2   to be affected by the Court's sentence.  No question.  If he has

3   to stay in prison for years more, those things are going to

4   start falling by the wayside.

5          The Court has to impose a minimum sentence for the

6   identity theft, and he's going to have to serve additional time

7   in custody, but regardless of the Court's sentence, there's

8   profound deterrence already in place.  Anyone Googling his name,

9   whether they were able to attend remotely today or just read

10  about it in the paper, anybody able to look him up is going to

11  know exactly what happened here.  He's not going to be able to

12  work in finance again; he's not going to be able to have that

13  dream he set out to have.  We're just hoping he has something,

14  to not let his family down, to be able to live a valuable life

15  and meaningfully for others.

16         So with that, I think I'll submit for now and request

17  the Court impose a custodial sentence of 30 months.

18         THE COURT:  Thank you, Mr. Bourassa.

19         I have a few questions, but let me start with at least

20  a couple points of agreement on the nature and circumstances of

21  the offense.  That's one factor to consider; it's not

22  everything.  So by dwelling on it, I don't want to give

23  short shrift to the other elements of Mr. Santos's history and

24  characteristics and other relevant factors.

25         I agree with you, from where I sit, that it's not as

1    if Ethos was conceived as a pure Ponzi scheme, something that

2    existed only to defraud, something that existed only to take

3    money from investors based on lies and put it into Mr. Santos's

4    pocket.  The Government agrees that there were some legitimate

5    transactions, as well.

6         It appears to me that what you've said is accurate

7    insofar as you've said that Mr. Santos's goal was for this

8    company to flourish, and up along the way, over a course of

9    years, he lied in order to get people's money.  So I suppose

10   it's mitigated compared to something where it's a pure,

11   thoroughgoing fraud, but it's still aggravated by the amount of

12   time, the loss, the pervasiveness.

13        In terms of Mr. Santos's enrichment, again, this is

14   not a situation that one might see in other Ponzi schemes where

15   the investors' money goes directly into his pocket and he spends

16   it on luxuries, but it is his company.  So the benefit to the

17   company is going to be of benefit to him.

18        Can you comment, Mr. Bourassa, on how it was that

19   Mr. Santos was, in fact, compensated by the company?  Was he

20   paid a salary?  Did he take a draw?  Because I assume some money

21   did go from Ethos to him, because that's his livelihood.

22        MR. BOURASSA:  It did, Your Honor.  And there were

23   personal accounts that were seized and subject to forfeiture at

24   the time of his arrest that had meaningful amounts of money.  I

25   don't remember off the top of my head, but hundreds of thousands

of dollars if not seven figures in them.  There were periods

when he was taking reductions of capital, basically paying

himself as the owner of the company certainly, but the scale of

those transactions and the compensation pales in comparison to

the scale of the business.

And I know Josh Teeple submitted in his declaration

that the expenses of the company --

I know the case agents made comments about, you know,

where he was living and he was flying first class and those kind

of things.  And Josh Teeple's observation as our forensic

accountant, was that those expenses seemed to be in line with a

company of this scale.  For Carlos, he was paying -- he was

accepting compensation from the company.  And a lot of funds

that were his own -- like money he's owed from former clients,

for example -- he's requesting that those former clients pay it

into Ethos accounts, and then he's wiring it out in tranches.

So he's simultaneously investing a lot of money that's sort of

his in the sense that it's his own accounts receivable in

consulting work.  I don't have the aggregated math for you to

compare how much he took out versus what he put in, but what we

know is the money that he's paying himself, he's not spending it

on luxuries.  He's not buying cars, he's not investing in

houses.  He's sort of, like, keeping that money available as

potential investments to use in service of the company, I think,

in most ways.  But there are accounts in his name where he's

1    paying himself, certainly.

2              THE COURT:  Do you have a ballpark?

3              And I understand the answer may be "no," but do you

4    have a ballpark of how much Mr. Santos received in compensation

5    or in ownership draws between when Ethos was founded in 2018 and

6    the time of his arrest?

7              And, again, if you don't have it, you don't have it.

8              MR. BOURASSA:  I don't have it, Your Honor.  We

9    have --

10             I know approximately the total number of wires from

11   Ethos accounts to personal accounts, and it's a little over a

12   million dollars, as I recall.  And the reason I hesitate to just

13   say that is the answer to the Court's question is that there

14   were also wires out of other accounts of his into Ethos.  He

15   should get basically credit for that, because he's not --

16             There are money flows in and out of all of these

17   accounts, and you can see just from Josh Teeple's declaration

18   there are unfortunately dozens of accounts.  It's complicated to

19   try to analyze.  Part of that is because Turkey had this system

20   of fixing assets and accounts, and they constantly are creating

21   new accounts.  And that was just Turkish law; that wasn't some

22   sort of money laundering scheme.  They just found a way to

23   invest and make more money that way.

24             But he was directing personal funds into the company

25   while simultaneously taking draws of a little over a million

1    dollars over the years.

2          THE COURT:  Is it fair to say that as CEO and owner,

3    he had the power to remove money from the company to pay

4    himself?

5          MR. BOURASSA:  Yes, Your Honor.  It's a little more

6    complicated with respect to Ethos Brazil, but Ethos Brazil's

7    ownership is sort of separate, and it wasn't holding capital as

8    far as we know.  So there are withdrawals from that.

9          THE COURT:  All right.  Do you have a sense --

10          So I accept and I've heard that there was some

11    legitimate deals and there were some fraudulent deals.  The

12    plea agreement, in some respects, has precisions.  We've talked

13    about paragraph 11.  That's the one that mentions the just over

14    17 million in loss to three U.S.-based clients who received

15    fraudulently altered documents, but there are also other aspects

16    of the plea agreement that are more open-ended about the types

17    of misrepresentations he made.  There are even some specific

18    victims who are mentioned that were not among those three.

19          Do you have anything to proffer about how I might

20    determine how much of the business was legitimate and how much

21    is not legitimate?  And, again, this may not be an analysis

22    you've done or that you're prepared to present, and if so, I

23    understand.  But is there anything you have to shape my thinking

24    on what the mix was between legitimate and illegitimate?

25          And it's not that I'm going to speculate that there

1    were other transactions, but the way the factual basis in the

2    plea agreement was drafted, it does certainly indicate that

3    there was more than, again, those three transactions in

4    paragraph 11 on page 7.

5            MR. BOURASSA:  It's a really hard question to answer,

6    Your Honor.  I know there were several deals that were fully

7    performed.  I know that's vague, but that's deals that were

8    fully performed.  And then a further complication is that there

9    were many deals that were not performed exactly as planned or to

10   the full loan amount but that settled amicably without fraud

11   involved.  So for --

12           Like, Thai Mozambique is a good example of that, where

13   the tranches substantially exceeded the client's collateral.

14   They didn't end up disbursing the full amount they had

15   originally planned, but it's a legitimate deal in the sense that

16   they continued to do business, they settled amicably, those kind

17   of things.  So it is a really hard question to answer for that

18   reason.

19           And I recognize there are folks who settled accounts

20   in much the same way that, I think, at the time Carlos would

21   have seen as, "Oh, this deal is settled, and we're okay."  And

22   now we have victim impact statements from them, and I haven't

23   gone through them and closely scrutinized them, but I was struck

24   that some of the PSR victim impact statements, the parties are

25   in agreement that they received more money than what was given

1    to Ethos.  And so just the balance sheet math is that they are

2    up, and now they're saying that they are down.  Some of those, I

3    think, we would characterize as having been legitimate.

4         Obviously I'm dancing around the Court's question

5    which I take to be, like, "What is the breakdown or percentage?"

6    And --

7         THE COURT:  Okay.  And, Mr. Bourassa, another point of

8    at least partial agreement I have with you is with regard to the

9    victim impact statements.  As I said earlier at the hearing,

10   just because somebody got a form and submitted it, it doesn't

11   make them a victim.  A creditor is not the same thing as a

12   victim.

13        At the same time, when someone has been harmed as a

14   result of a fraud, under 3553(a), I am entitled to consider not

15   just whether they received their collateral back.  I am entitled

16   to consider any aspect of harm that they claim.  How much weight

17   to be given to that will depend on the facts and circumstances,

18   but the fact that somebody advanced, let's say, a million

19   dollars, and then after a long court battle ended up getting

20   their million dollars back, didn't receive any actual funding --

21   this is hypothetically speaking -- and lost out on

22   opportunities, they might not suffer losses, they might not be

23   entitled to restitution, but I'm entitled to hear them on that

24   point.

25        A conceptual problem I have with --

1          I've used the difference between legitimate and

2   illegitimate transactions.  I think some transactions are

3   clearly illegitimate.  But a conceptual problem I have is this:

4   Let's say that you're a business and you engage in a number of

5   illegitimate transactions -- you lie to get money -- and then

6   you engage in other transactions where you don't lie and you get

7   money, for a lending institution, doesn't that turn the whole

8   institution into a bit of a house of cards?  Because if you're

9   pervasively lying, you're really exposing yourself to civil

10  lawsuits, to criminal enforcement actions, that can bring that

11  whole house of cards tumbling down.

12         So to the extent, for example, that you're making the

13  argument that some of these creditors, the reason they weren't

14  paid is because Mr. Santos was arrested, because accounts were

15  seized, well, isn't that kind of what goes with the territory?

16         So I'm not saying -- if somebody wasn't a victim of

17  fraud, I'm not saying this makes them a victim, but isn't there

18  a sense in which if you run your business this way, that you're

19  putting every borrower at risk?  You're putting the company at

20  risk of not being able to make good on any of its commitments.

21         Do you have any comment on that?

22         MR. BOURASSA:  Yes, Your Honor.  I can recognize the

23  sense in which the Court could think about that that way, but I

24  guess the countervailing way to think about it is that we have

25  sophisticated parties who are anticipating and mitigating

1   against the risk if the other doesn't perform.  There are

2   business deals all the time where you sign a contract expecting

3   to be able to perform -- and that's what I mean by the

4   legitimate deals in most senses -- and then for whatever reason,

5   you're not -- for another reason, you're not able to perform,

6   and the companies are planning around that.  When you think

7   about their, sort of, missed opportunity costs, I don't know of

8   a company that was choosing among different lenders and picked

9   Ethos.  They were filling a niche where lending wasn't generally

10  otherwise available, and if they ultimately were disbursed more

11  funds than they invested, I can see how they're disappointed

12  that Ethos didn't fully perform the way that they expected or

13  wanted, but they may well be better off today than they would

14  have been in the absence of Ethos and in the absence of that

15  deal, even if the loan didn't perform the way that they

16  expected.

17          So for Carlos, the loan repayments, the return on

18  assets being lent to clients, that's years out.  You know, they

19  have this extended grace period where they're not going to

20  receive funds back from clients.  So in the short-term, in

21  operating the business, he has to think about every deal

22  individually and whether he's going to be able to perform it

23  that way.  So they are kind of isolated deals in that sense.

24  It's not --

25          Yeah.  I think he's thinking about the deals in that

1   way.  You know, there's no lie in this deal.  "I want to

2   perform, I intend to perform.  I think I'm going to have assets

3   available to perform.  And we've signed a contract that our

4   lawyers negotiated for six months, and then I got arrested."

5           He imposed some risk on that company, I suppose, by

6   telling the lies that he did and committing the crime that

7   resulted in his arrest, but it's a pretty tenuous connection for

8   that victim, because anytime somebody gets arrested, it disrupts

9   their lives in significant ways.  When people spend two days in

10  jail, they miss their rent payments.  Their landlord is not now

11  a victim of the crime.  Of course if they hadn't committed the

12  crime and been arrested, they would have paid on time.  I think

13  that's an important distinction between -- from somebody who was

14  fraudulently induced to sign a deal, who got a bank statement

15  that held out assets that don't exist, that kind of thing.

16          THE COURT:  All right, Mr. Bourassa.

17          Among the 24 victims who submitted statements, a small

18  portion of them are reflected in the financial addendum, the

19  plea agreement.  Are there any other -- of those victims, are

20  there any of the victims that you believe received what they

21  bargained for?

22          MR. BOURASSA:  Among those two submitted victim impact

23  statements, Your Honor?

24          THE COURT:  Correct.

25          MR. BOURASSA:  I hadn't thought about analyzing them

1    with that question in mind.  So I --

2          THE COURT:  Okay.  Fair enough.

3          Could you walk me through, with a little more

4    particularity, your points about what Mr. Santos has done to

5    help victims?

6          So he's helping them identify assets, but I think what

7    the defense has proffered in its PSR objections is that

8    Mr. Santos has no assets.

9          The presentence report has a financial workup, and

10   what the author of the PSR said was that the defense hasn't

11   provided us any information, hasn't provided us a balance sheet.

12   They took the figures from right after Mr. Santos was arrested,

13   which we previously discussed those figures are not accurate.

14   They're not even close to being accurate.  So I'm at a bit of a

15   loss.

16          If it he has no assets, then what is he helping people

17   find?

18          MR. BOURASSA:  It's a fair question, Your Honor, and

19   I'm glad you asked, because I actually do have a fair amount to

20   say about this, because I've been involved in it directly.

21          Does the Court mind if I sit?

22          THE COURT:  No.  Please do.

23          MR. BOURASSA:  I realized my back was just starting to

24   hurt from standing.

25          So I've given Mr. Santos a financial affidavit to

1    qualify for a public defender if he ends up being able to and

2    deciding to appeal.  I don't have any doubt that he has no

3    personal assets.  None to speak of.  Maybe there are personal

4    property at his home or something, but no assets to speak of.

5    So what we have been doing is --

6            On the one hand, there are millions of dollars in what

7    I'll characterize really generally as Ethos accounts in Turkey.

8    They are, to my understanding, completely frozen right now in

9    the Turkish courts.  Soon after Carlos's arrest, some of his --

10   some of Ethos's creditors there filed lawsuits.  There's debate

11   about whether they properly served them or took the appropriate

12   steps, but under Turkish law, those accounts have been frozen.

13   So his family have been trying to have the lawyers there

14   litigate with those creditors, free up as much of those assets

15   as possible to bring in service of restitution.  We had hoped we

16   would have something to show for those efforts today, but the

17   attorneys in Turkey have not been successful so far.  So that's

18   one effort.  Candidly, that doesn't -- it's not specific to

19   victims.  That's just an attempt to free up assets.

20           Separately, Exsan de Mexico, ST Properties, and

21   Sector Resources have each indicated to me that they think they

22   can pursue civil liability from other parties that were involved

23   that do have assets.  And they understand that the money subject

24   to forfeiture here today is already substantially lower than the

25   restitution addendum calls for.  So everybody is sort of

1    fighting for some share of assets that will not cover the total

2    creditors of Ethos today, and so they're looking elsewhere.  One

3    litigant who they believe has some civil liability is Carlos'

4    former attorney, and that's why he waived attorney-client

5    privilege, to disclose all of his correspondence, WhatsApp,

6    e-mails with them.  I went through those e-mails and disclosed

7    hundreds and hundreds of e-mails for that firm and a predecessor

8    firm.  That relates specifically to ST Properties and

9    Sector Resources' efforts.  Sector Resources separately

10   believes -- their attorney has indicated to me, I should say --

11          I don't know what the merits of these claims are.

12   We've told them we're going to be an open book with them, and if

13   it works for them, great.  I think to date, it has not worked

14   candidly, but we're trying.  They believe that --

15   Sector Resources believes East West Bank may have some exposure

16   in the way that the standby letters of credit were handled or

17   not handled correctly and the way they were defaulted in the

18   weeks before Carlos' arrest.  So we've disclosed all the

19   correspondence with East West Bank about the standby letters of

20   credit and the arrangements and how it was supposed to happen in

21   the hope that they may find something.

22          Then Exsan de Mexico has been focused more on the

23   individuals tied to their deal, the broker who made a

24   commission; the -- I'll say somewhat intentionally vaguely the

25   other Ethos principals who made money in this period, who are

1    still at large, have not been arrested and who were intimately

2    involved in those deals and pitched those deals and are

3    responsible for many of the false statements that they made in

4    service of those deals.  So we have disclosed correspondence to

5    them.

6            We have our own independent investigator file that we

7    obtained when we were evaluating whether this was a trial case

8    or not.  So we're trying to treat that as essentially an open

9    book for these parties to try to find where their assets are.

10           Yeah.  If there's more specific --

11           Maybe I'm being too general still.  I'm not sure.

12           THE COURT:  No.  That's helpful.

13           So some of this relates to claims that creditors may

14   have against third parties or associated persons with Ethos, and

15   some of this relates to assets of Ethos Turkey.

16           But, Mr. Santos, among his assets are his ownership

17   interest in Ethos Turkey; correct?

18           MR. BOURASSA:  Right.

19           THE COURT:  And so do you have any valuation of his

20   actual assets at this time?

21           MR. BOURASSA:  If we're including the Ethos Turkey

22   accounts or --

23           THE COURT:  Well, if they're an asset.  The thing is I

24   don't know what he has, so I don't even have something to ask

25   you questions about.  I don't have anything.

1       MR. BOURASSA:  Sure.  Since I'm not a CPA or business

2  lawyer, I'm not sure they're his assets, candidly.  He certainly

3  doesn't have access or the ability to get them right now.  I

4  think the creditors in Turkey claim them as their own, and I

5  don't know -- I don't know who's right ultimately.

6       THE COURT:  All right.  Mr. Bourassa, let me ask you

7  about paragraph 44 in the presentence --

8       MR. BOURASSA:  Sorry, Your Honor.  One moment.

9       THE COURT:  That's all right.  Go ahead.

10       MR. BOURASSA:  I don't know that this matters to the

11  Court one way or another, but Mr. Santos did explain to me that

12  there was a personal account in Turkey in his name that had a

13  few hundred thousands dollars in it, and they immediately gave

14  it to the law firm in service of trying to protect the broader

15  Ethos assets and accounts receivable.  So he doesn't --

16       I don't know if it's in trust or if it's been paid or

17  what the status of it is.

18       THE COURT:  Okay.  Thank you, Mr. Bourassa.

19       MR. BOURASSA:  In fact, I do think it's been paid,

20  because I know his family are paying their bills now.  So it's

21  not his asset anymore.

22       THE COURT:  All right.  Thank you, Mr. Bourassa and

23  Mr. Santos.

24       Let me shift gears a little bit.

25       MR. BOURASSA:  Oh.  Your Honor, I misunderstood

1    Mr. Santos.  I'm sorry.

2              The funds in the personal account were paid to a

3    creditor already; not to his -- not to his lawyers.

4              THE COURT:  I see.  All right.

5              Paragraph 44 of the presentence report mentions that

6    on November 9th of 2023, in connection with the lawsuit that

7    Sector Resources brought in the Southern District of New York,

8    that Mr. Santos caused an attorney to file a false balance

9    sheet.  You haven't objected to this; you haven't conceded it.

10             For purposes of sentencing, does Mr. Santos accept

11   that he did this?

12             MR. BOURASSA:  I guess -- I'm not sure, Your Honor,

13   because when I read this, I was a little confused about what

14   they meant by "caused."  As -- I understood what happened was he

15   turned over a host of records to the attorney, and some of those

16   records were financial statements, and they had balance sheets.

17   I don't think we dispute that there were inaccuracies or

18   falsehoods in those balance sheets.

19             The attorney then -- it was a little odd and I think

20   just was their practice there.  They submitted a declaration

21   authenticating it, and I don't -- that surprised me.  I don't

22   think Carlos ever told them, like, "Authenticate this" or

23   "Submit it," but that was what happened, I think.

24             They were responding to Sector Resources TRO efforts,

25   and I think they exchanged several e-mails with Carlos very

1    quickly and then filed them, filed those financial statements.

2             THE COURT:  Well, so I went to the court's docket and

3    I pulled up the balance sheet, and it claims $699 million in

4    assets.  This is November 9, 2023.  So that's extravagantly

5    overstated.  Extravagantly overstated.  I mean, it's hundreds of

6    times more than what was seized.  This is a statement made to

7    the federal court in connection with that lawsuit, as you say,

8    opposing Sector Resources' -- a victim in the case -- attempt to

9    get a preliminary injunction.  So that's concerning to me.  I

10   mean, this is, I think, days before his arrest.

11            Do you have anything else in that regard?

12            MR. BOURASSA:  Is the Court looking at the financial

13   statement or the declaration?  Because one of the complicating

14   factors in the case was that there were internal financial

15   documents.  I have personally never fully understood what

16   exactly they represented, because it's sort of an internal,

17   unaudited financial statement.  It might value accounts

18   receivable and assets in crazy ways.  But I don't know exactly

19   what the Court has in front of it.

20            THE COURT:  Well, let me be more specific.

21            So this is Southern District of New York, District

22   Court Case No. 23-cv-9728, Docket No. 30.  It's a declaration of

23   Robin Nunn.  Paragraph 13 says, "Exhibit K is a true and correct

24   copy of Ethos Asset Management's balance sheet for the period

25   January 1st to September 30, 2023."

1    Then Exhibit K is a balance sheet -- it looks like

2    it's done in QuickBooks -- as of September 30, 2023.  There's a

3    listing of bank accounts, and if you add up the numbers for the

4    bank accounts, the total bank accounts are almost $700 million.

5    This is what I took that paragraph of the presentence report in

6    this case to be referring to.  And so this seems like a wild --

7    a wild, fraudulent statement.

8         MR. BOURASSA:  Your Honor, I think we agree that those

9    bank account- -- those bank accounts didn't have that cash in

10   them, if that's the Court's question.  Certainly.

11        THE COURT:  Well, yes.  I think that's been conceded.

12        But my question is:  Did Mr. Santos knowingly cause

13   this statement to be made to the federal court?  Because I think

14   that's the import of paragraph 44 of the presentence agreement

15   that says, "On November 9th, 2023, Ethos caused an attorney to

16   authenticate under oath a false balance sheet and file it in the

17   U.S. District Court for the Southern District of New York."

18        MR. BOURASSA:  Your Honor, I apologize.  I'm not in a

19   position to answer you because I didn't anticipate this question

20   and I haven't talked to him in detail about the correspondence

21   with Robin Nunn in that period.  I know we disclosed all the

22   correspondence to Robin Nunn in connection with Sector Resources

23   and their efforts to get assets, but I don't know those top of

24   mind.  I don't know whether she said, "Hey, Carlos, can you file

25   this" or "Can you give me to this file?"  I don't know what

1  happened.  She certainly obtained it from Ethos and I think

2  directly from Carlos.  So I agree with that.

3       THE COURT:  Well, I don't see you as having conceded

4  this, but it appears to me that Mr. Santos caused his attorney

5  to file an extravagantly false statement of Ethos's assets with

6  the Court in support of his position in civil litigation with

7  the victim in this case, Sector Resources.  In the same case --

8  this is Docket No. 32 -- the same day, he filed or there was a

9  declaration in his name with his signature that says, "For the

10  avoidance of doubt regarding Ethos's liquidity as of the date of

11  filing, Ethos has $699 million in cash and securities" and

12  that's paragraph 10.

13       So it appears to be that Sector sues Ethos, Sector

14  moves for a preliminary injunction, and Ethos opposes it in part

15  saying, "Look, it's not necessary.  We're good for it.  We have

16  assets.  You don't need to take preliminary injunctive relief,"

17  and in connection with that position, there's a false balance

18  sheet.  And it's not a typo.  It's a sum of a number of other

19  numbers, and then it's also reflected in a declaration by

20  Mr. Santos.

21       So I realize you don't have anything else to proffer

22  in that regard, but that is of significant concern to me.  It's

23  not that that would be the worst of the lies told, but it does

24  reflect a pattern that goes up to and including November of

25  2023.  This is within days of his arrest.  And it's a

1    qualitatively different lie.  It's a lie told to the Court.

2              But I recognize you don't have anything further on

3    that.

4              MR. BOURASSA:  One comment on that, Your Honor.  I do

5    know that for Carlos, he would not have understood, I don't

6    believe  -- and certainly Robin Nunn did not emphasize to him --

7              And part of the way she handled that case is why

8    Sector Resources believes that she may have or her law firm may

9    have some liability.  But he certainly didn't recognize the

10   gravity or distinction there.  You know, I think this

11   representation about the cash assets was part and parcel with

12   what had been going out of his e-mail at the time, and he didn't

13   recognize that as qualitatively different.  And he should have,

14   but --

15             THE COURT:  I'm sorry.  Qualitatively different

16   from --

17             MR. BOURASSA:  From the -- sending a bank statement to

18   a client that inflated cash assets.

19             THE COURT:  I see.  Okay.

20             I want to circle back to Sean Winston.  And, you're

21   right, he did receive a sentence of 18 months, which is less

22   than even the defense is recommending in this case.

23             Another way of looking at it, Mr. Bourassa, is that

24   Mr. Winston received a high-end guidelines sentence without any

25   variances.  So there are a couple different ways to look at the

1   sentence he received.  The sentence I imposed was higher than

2   what anybody was asking for in that case.

3         Can you be a little more specific about some of the

4   numbers here?  And I don't hear you saying Mr. Santos deserves

5   leniency because he's a crime victim.  I don't understand you to

6   be saying that.

7         What I understand is that Mr. Santos believed he had

8   more money than he did because he didn't think Sean Winston was

9   defrauding him and because he expected higher returns in the

10  future on the assets he had with Sean Winston.

11        My understanding is that Mr. Santos invested about

12  $10 million with Mr. Winston, and then the representations were

13  that that money grew over time.  So $10 million, even allowing

14  for some growth, on one hand, it's a significant amount of

15  money; on the other hand, that doesn't come close to bridging

16  the shortfall between the claims he made about Ethos's financial

17  position and the reality of it.

18        Are those the numbers you have, as well, that the

19  total amount invested was in the ballpark of 10 million?

20        MR. BOURASSA:  Yes, Your Honor.

21        THE COURT:  Okay.  Just a few other questions,

22  Mr. Bourassa.

23        There was a preliminary order of forfeiture filed on

24  Tuesday of this week.

25        Has the defense had a chance to review it and

1    determine if they have any objections?

2          MR. BOURASSA:  I haven't reviewed it with Mr. Santos,

3    but I have reviewed it and don't have any objections.

4          THE COURT:  Okay.

5          MR. BOURASSA:  And I understood that to be consistent

6    with the original plea agreement, too. I don't think there were

7    any unusual changes or anything.

8          I'm looking at my colleagues here to confirm, but --

9          THE COURT:  Also, the prosecution is recommending a

10   two-level downward variance for waiver of appeal.  You mentioned

11   the possibility of appeal.  As I read it, the defense's

12   sentencing papers are joining in that requested variance for

13   minus 2 based on waiver of appeal.

14          Is Mr. Santos, in fact, waiving appeal of any

15   custodial sentence of 102 months or below or not?

16          MR. BOURASSA:  I think his appellate waiver in the

17   plea agreement speaks for itself, and I don't want to extend it

18   beyond where it is.  The complication, I believe, is that he can

19   legitimately consider appealing our breach litigation and still

20   be waiving substantial rights in connection with his case

21   because he has waived his appeal as to his conviction.  He has

22   waived his appeal as to the calculation of the guidelines and

23   the handling of restitution and all of those matters, but I do

24   think there's a narrow sense in which we are considering an

25   appeal.  We have to.  At least as his lawyer, I'm advising him

1    that we have to consider it, but he has waived substantial

2    rights, and that waiver of appeal is significant.

3            THE COURT:  Well, what you appeal is you appeal a

4    conviction or sentence unless you're making an interlocutory

5    appeal.  So in order to appeal the denial of the breach motion,

6    he would be appealing his conviction.  He wouldn't be appealing

7    some interlocutory order.

8            I'm just trying to understand.

9            MR. BOURASSA:  I think he would be appealing the

10   sentence, Your Honor.  I hadn't thought much about this before

11   today, but I think he would be appealing his sentence in that

12   context, because our position has been -- in the breach

13   context -- that the matter had to be reassigned for sentencing.

14   So --

15           THE COURT:  So your position is that Mr. Santos isn't

16   seeking to withdraw from his plea agreement; he's joining in the

17   Government's recommendation for a two-level variance for waiver

18   of appeal, but he believes he's entitled to appeal the sentence

19   if he chooses.

20           MR. BOURASSA:  I don't know what Mr. Santos believes.

21   I -- that's been my advice to him.  My understanding -- and my

22   plan had been to look at this in the coming weeks, Your Honor --

23   was that he may still be able to appeal the sentence

24   notwithstanding the provision of his plea agreement.

25           But I do join the variance, because he has waived a

1    significant portion of his ability to appeal anything here.

2              But, you know, it's not common that we end up

3    litigating over breach, and certainly he waived those rights

4    never anticipating that we would be here.  But he's conceded

5    that he's guilty.  He can't appeal that.  He can't appeal, you

6    know, whether or not he should have had a plus 2 aggravated

7    role.  We agree there.

8              Maybe I'm not addressing the Court's question

9    directly.

10             THE COURT:  Well, I think you're articulating a

11   position, but it sounds like you're wanting to have it both

12   ways; that you're wanting to get a reduction for waiver of

13   appeal without waiving appeal or only partially waiving appeal.

14             It seems to me, for example, if the defense said,

15   "Look.  I don't like this plea agreement.  I want out," you

16   could move to withdraw from the plea agreement.  You wouldn't

17   have to show breach; you could move to withdraw in the interest

18   of justice, and the plea agreement would go away if the Court

19   granted the motion, and then we'd be headed for trial.  But if

20   you accept the plea agreement and you hold the Government to its

21   promises --

22             I mean, I think your expectation is that at sentencing

23   today, they're going to make a recommendation in accordance with

24   that plea agreement while reserving the right to appeal in a

25   manner inconsistent.

1      I'm not trying to talk you into or out of appealing,

2  but I'm trying to understand to what degree I ought to give

3  credence to the parties' joint recommendation of a downward

4  variance for waiver of appeal, which is the only joint variance

5  reflected in the plea agreement.

6      MR. BOURASSA:  I guess, Your Honor, the Government is

7  still appropriately recommending that variance based on the

8  provisions of the plea agreement that waive appeal, and

9  Mr. Santos has waived appeal to the same extent as every other

10  defendant who does so when the Government recommends that type

11  of variance.

12      My only quibble with that, which is my own as his

13  attorney -- I haven't talked to him at this length about it --

14  is that he's waived appeal to the same extent as everybody, but

15  I think breach of the plea agreement is the type of thing about

16  which that waiver may be unenforceable just like it is as to

17  ineffective assistance of counsel.  You just can't waive that

18  provision.

19      I need to research that more closely, but I don't want

20  to promise you and overwaive his right to appeal today, because

21  I think he may have the right to appeal that.

22      THE COURT:  Well, I'm not asking for a promise.  I'm

23  just asking for what the defense's position is.  But I won't

24  press any further on that.

25      All right.  Mr. Santos, you have the right to make a

1  statement if you'd like.  Is there anything that you want to
2  say?
3          MR. BOURASSA:  One sec, Your Honor.
4          THE DEFENDANT:  Hi, Your Honor.  During the last years
5  of Ethos, I decided to lie, to lie, and lie again.  I lied to
6  everyone by e-mail, by message, by talks, and even trying to
7  convince myself of my own lies.  I feel embarrassed by that, and
8  I feel ashamed of myself.  I despise myself, and I feel I'm not
9  honorable of the family that I have or the people's trust that
10  have crossed my life.
11          My dream was to make my family proud and honor their
12  name.  I'm now in jail for 18 months and four days.  I am
13  scared, surrounded by people with a different mentality of mine,
14  a different purpose, so far away from home with continents and
15  oceans of distance, being separated of my amazing wife that is
16  my reason to live.  We two were married two months before my
17  arrest.  It is to me a pain that I can't support much more.
18  With her, we have a dream to construct a family and to have a
19  baby, but due to my actions, also that dream is over.  I
20  destroyed our dream of a family and life.  But how could I dream
21  to be a father, being the person that I am?  Maybe that God
22  knows better and protect one.
23          To add to these thoughts, I cannot even pay my own
24  defense, and consequently I destroyed everything that my family
25  has.  Every single dollar of their whole life's work, their

1    name, their relations, and health is over.  Every single person

2    of my family is now sick because of me.

3         At my small, lonely, and insecure bed, lonely, without

4    any capacity to make amendments or to act, I realize that my

5    decision destroyed the lives of my beloved ones and deprived my

6    sense and reason to live.  To me, life lost its color.

7         But even worse than this conscience of having failed

8    and affected others really brought to me an extreme anguish and

9    dismay to live.  My professional dream was to transform ideas

10   and plans, to put plans in motion, and with that, create jobs,

11   impact entities, and grow economies, but with my disgusting

12   actions, Ethos was stopped.  And this contradictory reality has

13   make me sick and killing me inside.  My poor decisions not only

14   destroyed my professional life forever, but worse, affected

15   companies and people.  I failed my employees, failed clients; I

16   failed the suppliers.  I can't breathe, only of imagine the way

17   I managed to fail them so catastrophically, and I sincerely

18   regret the harm that I caused to so many people.

19        I lost everything.  I only have my family, and I also

20   fear that I will also lose them sooner or later.  Nevertheless,

21   I need to find a way to survive and to be able to compensate

22   them for the love and the eternal gratitude that I have for them

23   to don't let me die here.  I simply want to make amends and

24   follow the law, be an exemplary person that I was not.

25        After all this, my parents also put all their savings

1    to protect Ethos' assets of fraudsters.  Now I wish sincerely

2    that Ethos, that I am placing in a receivership, can recover all

3    these assets and with that make all whole of its liabilities.

4         And the only part in all of this, of my sins, of my

5    falls, my constant lies, even inside of this jail brought me

6    even more disgrace and to my beloved ones.  I denied the crime I

7    committed to many for so long.  To my family, my friends, to the

8    victims, and even to myself, including making the Government to

9    believe that I don't feel sorry for what I did, but that could

10   not be more wrong.  I hurt so many.  I did a fraud that is

11   beyond the plea agreement.

12        This year, I felt so many days that dying would be

13   better simplistically because the monster that I am is simply

14   still alive.  I don't know what value I can bring to the world

15   anymore.  I lost everything I have, all the money, all the trust

16   I have from people.  I depend on my family to have work; I

17   depend on their money to survive.  I am now simply a parasite

18   that not only destroyed them financially but also their

19   reputation.  I despise the person that I am.

20        Nevertheless, through all of this, my family believes

21   in giving me a second chance, and my father wants to try to work

22   with me; that, as well as being like my father was my childhood

23   dream.  Obviously I can't be like him, but for the respect, for

24   everything that my family did for me during this process, I need

25   to remain alive, not to live but simply to fight every day to

1    show I deserve their respect, mercy, and opportunity.

2              Thank you, Your Honor.

3              THE COURT:  All right, Mr. Santos.

4              Mr. Beeler or Mr. Brooker?

5              MR. BEELER:  Your Honor, do you want to hear from us

6    or Mr. Katz first?  I'm not sure how the Court wants to

7    proceed.

8              THE COURT:  Well, let's hear from Mr. Katz.

9              MR. BEELER:  Okay.

10             THE COURT:  Mr. Katz, could you please come forward.

11             Welcome, sir.  Please walk up to the podium.

12             As you may have observed, everything that's being said

13   in open court, it needs to be on a microphone because our

14   court reporter is taking it down.

15             So with that in mind, please proceed, sir.

16             MR. KATZ:  Good morning, Your Honor, and thank you for

17   the opportunity to be here.

18             THE COURT:  Good morning.

19             MR. KATZ:  I would like to set a vision of the impact

20   that has been fallen upon not just myself but the organization

21   and the people we affect.

22             For context, the organization is not a mineral mining

23   company that may be faceless, that works on speculation, but

24   we're an organization that works with the most vulnerable in the

25   world.  The organization that I've built called The Plastic Bank

1  works in the poorest communities of the world.  We work in the
2  slums and the favelas and the place where people have been
3  forgotten.  In those organizations and those places, we create
4  banks, ultimately stores, for the poor where plastic that would
5  otherwise flow into the ocean is used as money to pay for school
6  tuition, medical care, vision care, community, and connection.
7            We've transformed plastic, garbage, into money for the
8  world's poor.  We've operated in Haiti, the Philippines,
9  Indonesia, Brazil, and on and on as we continue to try to make
10  profound change for the world's poor.
11            Now, Mr. Santos, I sit here conflicted today because I
12  can see remorse, and I can maybe believe at some point he didn't
13  actually start out or set out to defraud the world's most
14  vulnerable, but it's what occurred.  The money that was lost was
15  my money.  I didn't raise it from someone else; I didn't find
16  it.  I worked.  I slaved for my life so that I could serve the
17  poor.
18            Along that journey, we invited Mr. Santos to come to
19  the slums of Cairo, to come and be with the people.  Mr. Santos
20  and Mr. Wilson, they thought it appropriate to stay at the
21  Four Seasons Hotel while we took them through the slums so they
22  could be with the poor, as they took money from my pocket to
23  give to the poor so he could see what was occurring.
24            He stayed with us, and in conversation together told
25  me of the billions of dollars that he had himself.

1        "Mr. Santos" -- "Carlos, how much money do you really

2    have?"

3        "Oh, the media says I have billions and billions and

4    billions, but around 6," he tells me.

5        The tangled web of lies, of course.

6        At the precipice -- at the precipice of our bankruptcy

7    came Carlos.  It wasn't just what we had lost, what we couldn't

8    do, what we didn't effect.  It was also the investments we had

9    made in advance; the money we had spent, understanding and being

10   promised that money was coming.  14 million was going to come to

11   the organization.  I hired a CEO.  We did so many different

12   things.  We staffed, we grew, we did, we promised to the world's

13   poor that we would come and we would serve them.

14       It's not what had occurred in the end.

15       In all of the phone calls I had made to Mr. Santos, to

16   get him on the phone, when he would begin berating me, screaming

17   at me, and telling me that it was our fault that they weren't

18   funding the money, I knew that it was fishy.  I knew that

19   something was occurring.  I tried to appease Carlos on the phone

20   so that he would maybe have some sense of morality and maybe

21   fund us the money before it would all be lost.

22       Now I sit here with his family behind me,

23   understanding the gravity.  And as a father myself, a son not

24   much younger than him, I can understand the enormity and I can

25   understand the plea of the convicted, but it has been my

1  experience of Carlos that that lie over lie over lie is a little

2  bit a part of him.

3      I'm not sure what else I could do to communicate the

4  gravity, the pain that it conflicted on my family, on the staff,

5  on the people that were fired.  The promises that we made.  What

6  was lost in the enormity of it.  Set aside the time, set aside

7  all those other things.  I'm not claiming anything that might

8  have been, some investment, some other future payoff.

9      To come to Cairo, to be with the poor, and to still

10  have that little bit of sinister, that little bit of evil inside

11  of him; to continue promising, to be lying, sitting in the

12  restaurant of the Four Seasons hotel.

13      Now, I've heard the defense of course.  I feel the

14  enormity of what he's trying to argue for, for Carlos.  I can

15  see, as well, and I can kind of try to conceive that at some

16  point he didn't set out with it and it became a tangled web of

17  lies and he was trying to convince himself and others, and maybe

18  if he invested, he could do this, this, the other --

19      I can forgive Carlos, of course.  I can understand

20  the -- I can understand the weight that he must have been

21  feeling.  I could understand that.  I don't see him to be

22  setting out to be evil, but there is something within the lies

23  and the enormity of it all.

24      I don't accept -- I don't accept -- that he was there

25  in the service of business and in others.  In the end, as he

1   took withdrawals from the company, however it was, he ultimately

2   was serving himself.  I don't accept that it was a prosperity

3   mindset by any means.  It was one of profit for himself.

4       Now, I can understand being guided by the Wilson

5   character who we met, as well, but I am here to speak for those

6   who don't have a voice and for every other victim who's not here

7   today as well.  And I've traveled from Canada, Vancouver.  I'm a

8   Canadian citizen.  I'm here in this court, and it is a great

9   honor to be here.  But I'm speaking on behalf of the hundreds of

10  thousands of people that I grew to affect in the world, that I

11  stood for and for decency, to then having come across Mr. Santos

12  that jeopardized all of that.

13      I don't see remorse.  I can see a sense of self from

14  Mr. Santos.  His marriage.  His family are here, and everything

15  else.  But I experienced Mr. Santos in person.  I experienced

16  the lie.

17      Thank you very much.  Thank you.

18      THE COURT:  Mr. Katz, thank you.  I appreciate your

19  being here, traveling here from Canada.

20      Plastic Bank advanced 3.5 million; is that correct?

21      MR. KATZ:  We did, sir.  Our total loss, I believe, is

22  1.6 million.  We got the first tranche.  It was a little bit of

23  a teaser.  It's, like, "Oh, no.  We're real.  We'll give you the

24  first million."

25      THE COURT:  And putting forward that three and a half

1   million, was Plastic Bank relying on Mr. Santos's

2   representations about his wealth?

3           MR. KATZ:  Without doubt.  When we needed the money,

4   we thought, "Okay.  We got the 3.5 million."  We figured it out.

5   We stopped paying people; we did all kinds of things so we could

6   try to kind of amass it, pool it.  We were enticed into that.

7   We relied upon it.  That is a fact.

8           I jeopardized the company, the livelihoods of the

9   hundreds of staff that I have and the hundreds --

10          We affect hundreds of thousands of the world's most

11  poor.  We prevent plastic from flowing into the ocean.  We serve

12  all of creation, all of life.

13          I jeopardized all of it on the promises of Mr. Santos.

14  I invited him purposefully to come to Cairo because he wasn't

15  advancing.  He kept telling us that we had not yet jumped

16  through yet one more hoop or one more of their board meetings or

17  one more other thing.  So I thought maybe I would appeal to

18  humanity -- "Come to Cairo.  See the work we're doing" -- with

19  the idea that maybe then he would give us our money back, in

20  essence.  But that didn't work.  And it was no surprise that

21  there I saw in the newspaper that he has been arrested.  No

22  surprise.

23          THE COURT:  Just to be clear, Mr. Katz, you described

24  a situation, a conversation in Cairo.  This is after you had

25  extended the money, "you" being Plastic Bank.

1          At the time you advanced the 3.5 million, were you

2     relying on statements that Mr. Santos had made about the

3     financial health of the company?

4          MR. KATZ:  Yes, Your Honor.  Absolutely.  I asked him

5     to his face.  I didn't look at any financial record, any record.

6          I looked at him and said, "Carlos, how much money do

7     you have?"

8          "Billions" was his response.

9          THE COURT:  Thank you, Mr. Katz.

10          MR. KATZ:  Thank you very much.  Thank you.

11          THE COURT:  Mr. Beeler?

12          MR. BEELER:  Your Honor, thank you.

13          I think this case is far too extensive, far too

14     complex for the Government to stand up and allocate about much

15     of anything, so --

16          And I think in typical course, Mr. Brooker and I are

17     of the school that the United States should speak through its

18     docket and its filings.

19          So unless the Court has specific questions like it

20     asked defense, we do submit on our sentencing memo and

21     sentencing summary chart.

22          THE COURT:  All right.  Thank you, Mr. Beeler.

23          Mr. Bourassa, anything before I proceed?

24          MR. BOURASSA:  Just briefly, Your Honor.

25          I may have misunderstood, but my understanding was

1   that Carlos had first met Mr. Katz in Cairo.  I could have that

2   wrong.  But when I reviewed the ROIs from Plastic Bank, I

3   didn't --

4          Today is the first I've heard reference to, like,

5   something that would have induced the placement of collateral, I

6   know the Court's questions were specifically aimed at that.

7          One feature of this, unfortunately, and one feature of

8   Carlos's dream about what Ethos could be and could do is --

9   like, Plastic Bank is sort of the mirror of the Thai Mozambique

10  deal, where he is believing he will be able to help the poorest

11  of the poor, and that means that he has hurt the most vulnerable

12  in the sense that those companies are negative now.  But it

13  wasn't -- there's certainly no world in which he's setting out

14  to exploit or target those folks benefiting from social

15  enterprises like Plastic Bank.  I think that is why he approved

16  loans like that.

17         THE COURT:  So, Mr. Bourassa, does Mr. Santos deny

18  that he defrauded Mr. Katz, or are you simply stating the

19  Government hasn't proved that Mr. Santos defrauded Mr. Katz?

20         MR. BOURASSA:  The latter, Your Honor.  On the

21  inducement front, and --

22         You know, you could see me briefly whispering with

23  Mr. Santos, but this was one that I tried to look into when we

24  were preparing for trial.  The -- I don't know --

25         You know, I could be mistaken as I stand here.  I

1    didn't anticipate Plastic Bank coming today.  But I don't know

2    of a false statement in advance of their placing collateral and

3    things like that.  But certainly undisputedly, the tranches did

4    not come on time; they were delayed.  I believe it is true that

5    there were misrepresentations about the timing of those

6    tranches, certainly.

7            My comment was really only directed at the Court's

8    questions about the inducement in the placement of the

9    collateral, which was news to me.  I don't know of any

10   inducement prior to that placement.

11           THE COURT:  All right.  Thank you, Mr. Bourassa.

12           Mr. Beeler or Mr. Brooker, does the Government have

13   any evidence apart from the statement we've heard from Mr. Katz

14   today to indicate that Mr. Santos lied to Plastic Bank before

15   Plastic Bank invested 3.5 million?

16           MR. BEELER:  Your Honor, I don't have the fact pattern

17   and timeline of Plastic Bank memorized.  I would have to go back

18   and look at the specific sequence of events.

19           But no.  No evidence to put forward today.

20           THE COURT:  Is there a case agent in the court with

21   whom can you confer on that question?

22           MR. BEELER:  Yes, Your Honor.

23           (Pause in proceedings.)

24           MR. BEELER:  Your Honor, we just did a query through

25   the case agent's inbox and could not find any documents.  We

1    looked at the victim impact statement, we looked at some

2    documents Plastic Bank had provided the Government.  We did not

3    immediately find any evidence of a representation sent prior to

4    the payment of the collateral.  So the answer is no, we cannot

5    offer any proof at this time.

6            Of course, Mr. Katz is here.  If the Court wishes to

7    hear from him under oath, that's always an option.

8            THE COURT:  All right.  So, Mr. Beeler, Mr. Katz --

9            Mr. Katz, again, I appreciate your statement.  There's

10   going to be a future restitution hearing.  With regard to your

11   restitution claim, that's going to be something where the

12   Government is going to need to offer evidence.  The evidence may

13   be your sworn testimony.  It may be a sworn statement from you;

14   it may be something else.  But I want to identify that issue for

15   down the road, but I appreciate your remarks and I take them

16   into consideration.

17           MR. KATZ:  Thank you.

18           THE COURT:  All right.  I'm going to begin by

19   addressing the presentence report objections.  There are

20   numerous of these, so I'm going to go through them one by one.

21           On April 7, 2025, at ECF No. 136, the Court entered an

22   order sustaining in part these objections, so I'm going to turn

23   to the remaining objections in order of the PSR.

24           Starting with paragraph 7, I find this objection is

25   adequately addressed by the PSR addendum.

1              Same for paragraph 9.

2              Same for 28.

3              Paragraph 29 objects to the reference to a proprietary

4    algorithm and also a reference to personal enrichment.  I've

5    overruled that objection.  I believe Mr. Diehl in describing the

6    Ethos model at the detention hearing, he may not have said a

7    "proprietary algorithm," but he did refer to Ethos's trading

8    algorithm as part of the model, and there is evidence of

9    personal enrichment through the fact that Ethos paid Mr. Santos

10   so that is overruled.

11             Paragraph 36, the defense's comments are noted.

12             Same with paragraph 38 and paragraph 43.

13             Paragraphs 46 to 48 relate to Ethos's relationship to

14   Assetvest.  Much of the language of these paragraphs are taken

15   from Count 8 of the superseding indictment to which Mr. Santos

16   did not plead guilty.  The defense challenges the factual

17   allegations here and the Government has not proven them, so the

18   objections are sustained.

19             Paragraph 60, the objections are sustained.  The

20   parties agreed Mr. Santos was a visiting assistant professor.

21             Paragraph 61, I previously sustained the objection.

22             Paragraph 62 to 64, the defense has objected that

23   these paragraphs breach the plea agreement.  I've concluded that

24   they do not.  However, I don't intend to rely on these

25   paragraphs in terms of the way in which Mr. Santos's fraud

1   impacted people's lives.  I have hundreds of pages of victim

2   impact statements.  I don't need to rely on the summary

3   statements.

4           Likewise, the generalized statements about his

5   lifestyle and the statements about his remorse are not ones that

6   I have occasion to rely on.  The objections are therefore

7   overruled as moot.

8           Paragraph 66, the defense's comments about the

9   additional seized bank account with which the Government agrees

10  are noted.

11          Paragraph 67 and 81 through 86, at the last hearing,

12  the defense agreed that I could consider these portions of the

13  presentence reports and the victim impact statements for

14  purposes of sentencing, recognizing that the defense reserves

15  the right to challenge the statements in connection with the

16  post-sentencing restitution hearing.

17          Paragraphs 79 to 80, I previously sustained the

18  defense's objection.

19          Paragraphs 81 to 86, I intend to decline to impose the

20  upward enhancements beyond those set forth in the

21  plea agreement.  I, therefore, overrule those objections as

22  moot.

23          Paragraphs 89 to 90, it's the same.  I intend to

24  impose the two-level upward enhancement that the parties are

25  jointly recommending.

1      Paragraph 114, the defense's comments about where he

2  intends to live after release from custody are noted.

3      Paragraph 122, his comments are noted.

4      Paragraph 130 is sustained for reasons previously

5  stated.  The parties agree Mr. Santos was a visiting assistant

6  professor.

7      Paragraphs 131 and 133 are adequately addressed by the

8  PSR addendum.

9      Same with 134.

10      Paragraph 135, this financial information was

11  apparently provided by Mr. Santos at the time of his arrest in

12  2023.  The objection is overruled, but the Court notes the

13  defense's statement that Mr. Santos has no assets or income.

14      Paragraph 139, the objection's overruled, but again

15  the Court notes his statements that he has no assets or income.

16      Paragraph 169 is overruled.

17      Paragraph 171, here as with paragraph 62, I have the

18  underlying victim impact statements, so I have no occasion to

19  rely on summaries.  The objection is overruled as moot.

20      Paragraph 177, objection is sustained.  These portions

21  of the paragraph to which the defense objects appear to relate

22  back to statements made by the case agents to which I have

23  sustained an objection.

24      Paragraph 182 is overruled.  The plea agreement

25  establishes that there were multiple victims in the

1    United States.

2         Before I move on to the sentence, Mr. Bourassa, is

3    there any objection which the defense made which in your view I

4    have not addressed?

5         MR. BOURASSA:  Your Honor, I tried to follow along

6    with the Court, and I didn't notice any as the Court went

7    through.  Thank you.

8         THE COURT:  Okay.  Thank you, Mr. Bourassa.

9         So beginning with the advisory sentencing guidelines,

10   here I adopt the guidelines as set forth in the plea agreement.

11        There's some indications in the record including from

12   the victim impact statements that higher guidelines should

13   apply; however, I'm going to apply the jointly recommended

14   guidelines.  This is the agreement the parties have reached,

15   including on issues that involve some factual legal nuances.

16   Although I'm not bound by the plea agreement, I give some

17   credence to the parties' joint recommendation on the guidelines,

18   and I think there's fairness in honoring it where doing so is in

19   some manner consistent with the facts.  This does not constrain

20   my consideration of evidence in determining the sentence to be

21   imposed under 3553(a).

22        So starting with Count 1, under guideline 2B1.1, the

23   base offense level is 7.

24        There's a 20-level increase for loss in the range of

25   9.5 million to 25 million; a plus 2 for sophisticated means; a

1    plus two for leadership enhancement under 3B1.1C and a minus 3

2    for acceptance of responsibility.

3           Mr. Santos does not have any criminal history points.

4           He's in a Criminal History Category I.  There are no

5    requests for downward departures.

6           So the total offense level under the guidelines is 28

7    for Count One, and his guideline range before any variances for

8    Count One is 78 to 97 months.

9           Count Seven provides for a mandatory two years in

10   prison consecutive to the term of custody imposed in Count One.

11   So the applicable guidelines range with the two years added is

12   102 to 121 months.

13          I turn now to the statutory sentencing factors under

14   18 U.S.C. § 3553(a).  Those require me to consider the nature

15   and circumstances of the offense, Mr. Santos's personal history

16   and characteristics, and the other considerations set forth in

17   the statute with which counsel and the Court are familiar.

18          Let me start with some mitigating factors.  I'll

19   address waiver of appeal first, because it's the one variance

20   that's addressed in the plea agreement.

21          Based on what I've seen, it appears to me that appeal

22   has been waived as to any sentence that's 102 months or below.

23   I've heard Mr. Bourassa articulate his position, but my

24   viewpoint -- and this may be a question for the Court of Appeals

25   to determine -- is that the defense signed this plea agreement.

1    It's accused the Government of breach; I denied the motion.  The

2    defense at no time has sought to withdraw from the

3    plea agreement.  I believe it seeks to have the Government

4    continue to comply with the plea agreement.  So, in my view, the

5    waiver of the appeal paragraph is binding on the defense.

6         So I'm going to sentence Mr. Santos as if he were, in

7    fact, waiving appeal, because I conclude that that's what he's

8    done.  So I will accept that jointly recommended downward

9    variance.

10        I think that waiver of appeal demonstrates a measure

11   of remorse and acceptance of responsibility, and in this case,

12   waiver of appeal as to the restitution judgment to be entered in

13   the future provides closure to victims.  Now, if it turns out

14   that Mr. Santos is not waiving appeal and the case comes back to

15   me on remand, then the same considerations would not necessarily

16   apply.

17        I turn next to family support, community support, and

18   letters of support.  So I reviewed the approximately 60 letters

19   of support submitted by the defense.  These are significant not

20   only as to quantity but also as to quality.

21        Mr. Bourassa said he didn't remember a case where he's

22   submitted so many letters.  I don't remember a case where I've

23   read so many letters.  I don't want it to appear that this was

24   something where parties should try to set a record.

25        What's significant about these letters, in addition to

1    their quantity, what's more significant is the quality of these

2    letters.

3            I made a similar remark, Mr. Santos, at the time of

4    your detention hearing.  You may recall there was an outpouring

5    of letters in connection with that proceeding, too, and I said

6    then, as I say now, those letters are remarkable.  They're

7    sincere; they're individualized.  They're not as if somebody

8    distributed a template and people filled it out.  They come from

9    the heart.

10           Now, some of the letters, I question whether those

11   individuals know what the people in this courtroom today know,

12   having heard from Mr. Santos's own words.  Some of them appear

13   to think that this is a technicality or Mr. Santos got in

14   trouble in the U.S. or he's being treated unfairly by being

15   prosecuted.  But even those letters that may be uninformed, they

16   nonetheless reflect a certain sentiment that I take into

17   account.

18           The letters themselves, just to give another index of

19   the breadth of those letters, there are letters in English,

20   Portuguese, Italian, Turkish, and Spanish.

21           And I mentioned the letters from the detention

22   hearing.  This is a different set of letters.  Some of the

23   writers overlap, but it's a very significant outpouring of

24   support.  On one hand, they're positive, Mr. Santos, because

25   they reflect your family and community support, which is

1   something I take into account, but they also speak to aspects of

2   your character.  Aspects of your character.  Character is

3   complicated.  In every one of us, there are elements of good and

4   elements that are not so good, but these letters understandably

5   focus on a care that you've shown for others and a generosity,

6   and I find that meaningful.

7           Of all the letters that I've read --

8           Some are from people that have known you your entire

9   life, Mr. Santos.  Those are meaningful, but perhaps the ones

10  that I found most meaningful -- and there's no need to compare

11  them, but I will identify these letters -- are ones from your

12  more recent acquaintances, and those are people -- those are

13  letters from your fellow inmates.  These are people who wrote

14  these letters that I am sure did not have the advantages that

15  you did in life, Mr. Santos.  Nonetheless, they're writing on

16  your behalf, and it's clear you helped them in a way that these

17  inmates found meaningful, and I find that meaningful, as well.

18          There are other factors that the defense has

19  identified that are mitigating, as well.  I'll address these.

20  In some cases, the mitigating factor points to or relates to

21  other facts that I would not consider mitigating.  So, here, I

22  consider the mitigating parts but also the totality of facts.

23          Thus, there's evidence of Mr. Santos's professional

24  and educational accomplishments and work history, and these are

25  positive, but of course I also note that they lead him to his

1     position as CEO of Ethos that he abused in order to defraud

2     people over an extended period of time.

3           There's also evidence of Mr. Santos's commitment to

4     the mission of Ethos and his desire to want Ethos to succeed.

5     Again, I don't believe Ethos was a mere Ponzi scheme, but it's

6     also -- it's also not a matter of ideals.  For Mr. Santos to

7     want Ethos to succeed -- he owns Ethos -- that's wanting himself

8     to success financially.  I don't think the defense is denying

9     that.  But his desire is for his own success, and he was willing

10     to lie and to defraud clients in order to achieve that success.

11           There's also evidence that Mr. Santos turned to some

12     older figures for business guidance, and they encouraged and

13     supported him in his fraud.  At the same time, he was

14     intelligent -- is and was an intelligent, adult professional.

15     The parties agree that he was a leader or organizer in the

16     fraud.  In my view, he has nobody to blame but himself.

17           There's evidence that Mr. Santos wanted to finance

18     worthwhile projects, projects that were designed to help people

19     and to help communities in need.  That is positive, but as the

20     defense has recognized, these are his very same clients that in

21     some cases he lied to and victimized.

22           I take into account Mr. Santos's statement today, also

23     what his attorneys have proffered about his efforts to make

24     assets available.

25           Until today, Mr. Santos, I hadn't really seen or heard

1    any meaningful indicia of remorse, but I take your comments to

2    heart.  I can tell that you're sorry not just for yourself but I

3    believe for what you've done.  And it impresses me, sir, that as

4    you sit here, part of what you carry on your shoulders is the

5    weight of knowing how much you've let your family down and

6    knowing how much they still love you and that, on one hand,

7    that's wonderful, but on the other hand, it's a heavy burden to

8    bear.

9         Let me address some of the other factors identified in

10   the defense's sentencing memo.  I've considered the sentence I

11   imposed on Sean Winston.  Again, one way of looking at it is

12   that it's a much lower sentence than what's at stake here.  The

13   other is that it was a high-end sentence without any downward

14   variances.  In the end, it was a different set of facts and

15   considerations that I do take into account.

16        I decline to vary downward because Mr. Santos faces

17   immigration detention or different conditions of confinement as

18   a result of being a foreign national.  I understand the

19   defense's point, but respectfully, it would, in my view, be

20   fundamentally unfair to sentence foreign nationals differently

21   than U.S. citizens.

22        Also, in this case, Mr. Santos is a sophisticated

23   individual; it's foreseeable to him that if he starts a business

24   in the United States, commits fraud in the United States, he's

25   going to end up in federal prison in the United States, and

1    following that, he's going to be in immigration detention

2    leading to his removal.

3         Let me address --

4         And I also take into account the other points that the

5    defense has made on Mr. Santos's behalf.

6         Let me address some aggravating factors.  When I say,

7    "aggravating," I do not mean that I intend to vary upward from

8    the guidelines that I have calculated, but these are the other

9    side of the coin.  I take these factors into account in

10   determining where to impose the sentence within the guidelines

11   and whether or to what degree to vary downward.

12        So here are the nature and circumstances of the

13   offense that are aggravated:  The fraud was not limited to three

14   isolated transactions with three corporate victims.  The

15   evidence before me is that the scheme of which Mr. Santos was

16   the leader took place from 2020 through 2023.  The plea

17   agreement's factual basis reflects a range of conduct that goes

18   well beyond the three transactions and the identity theft that

19   drive the guidelines in this case.

20        The $17 million loss methodology, as I stated at the

21   detention hearing, is very conservative.  It doesn't take into

22   account the promises that Mr. Santos made to the victims, the

23   harm caused to them by not getting the funding that they were

24   promised that they needed, or the time and energy it took them

25   to recover funds they paid.  Whether or not they had other

1   funding opportunities available to them, the fact that they were

2   promised something and didn't get it is something that I do

3   consider, and there's more harm here than the sum of unrecovered

4   collateral.  The victim impact statements, some of the victim

5   impact statements put a human face on the harm caused by

6   Mr. Santos.

7          Again, let me state that just because we have a victim

8   impact statement submitted does not by itself prove that that

9   person was defrauded, but in several cases, it's clear that

10  those individuals or entities were defrauded or otherwise

11  suffered harm as a direct result of Mr. Santos's criminal

12  activity.

13         For example, the statement of Ms. Thompson at sealed

14  Exhibit No. 1, Mr. Santos committed fraud in her name, and the

15  harm to her was severe.  He represented in her name that she, as

16  an accountant, was identifying assets of Ethos in the amount of

17  2.2 billion, which is orders of magnitude from the truth.

18         As Ms. Thompson's statement makes clear, she has lived

19  in fear that the victims of Mr. Santos's fraud, people to whom

20  he may have shown her accounting statements, will come after her

21  seeking some sort of retribution.  This distress drove her out

22  of her public career, her career as a public accountant.  As far

23  as I can tell, she's not even having for a cent.  She just wants

24  her voice to be heard.

25         Another example is Sector Resources at sealed

1    Exhibit No. 1.  I am aware they submitted a letter of support of

2    Mr. Santos at sentencing, but in order to try to get back their

3    lost collateral that still hasn't been repaid, they spent over

4    $400,000 in fees and interest.  Mr. Dell'Orfano, the owner, is

5    81 years old.  He states he had to use his own savings to keep

6    the company in operations.

7         Sector had to sue Mr. Santos and Ethos in federal

8    court in the Southern District of New York.  That case is still

9    pending.  In connection with that case, it appears that

10   Mr. Santos filed a false declaration, caused to be filed a false

11   balance sheet, in opposing Sector getting preliminary injunctive

12   relief.

13        A third example is TAR Airlines at sealed Exhibit 14.

14   They provided evidence that they were defrauded by Mr. Santos

15   using false and inflated financial statements and have lost

16   millions of dollars.  They're not referenced in the

17   plea agreement as far as I can tell.  The victim impact

18   statement and the correspondence reflects the games that

19   Mr. Santos and Ethos played with them, accusing them of

20   noncompliance, attacking their integrity, threatening to sue

21   them, all as a means of Ethos getting leverage to not return or

22   to delay the return of collateral.  In reviewing those

23   documents, you can read the exasperation on the part of

24   TAR Airlines in their correspondence with Ethos.

25        I also consider the comments of Mr. Katz.  They were

1    sincere and moving and meaningful.  There's a dispute as to

2    whether he was lied to in order to induce his initial

3    investment.  It's not a question of my doubting Mr. Katz's

4    veracity, but typically we establish proof through sworn

5    statements and testimony, and this hearing is not set up for

6    this.  But it is clear from what the defense concedes that lies

7    were told to Plastic Bank.  Plastic Bank suffered, and as a

8    result, its mission and the people it helps suffered, and I take

9    all those statements into account.

10          Also aggravating is Mr. Santos's again false

11   declaration filed in the Southern District of New York.  In some

12   ways, this is consistent with the modus operandi of the rest of

13   his fraud in that he's creating false documents and using the

14   courts and lawyers to avoid having to pay back what he owes,

15   somewhat similar to what was described in the Ethos model

16   text message with Mr. Achilleos in June 2020.

17          Now, Mr. Bourassa, I don't take his statements as

18   conceding that Mr. Santos committed fraud in this regard, but

19   Mr. Santos -- I'm sorry -- Mr. Bourassa very reasonably

20   speculated that Mr. Santos may have not seen a difference

21   between that sort of fraud and the other sort of fraud.  If so,

22   that's, I suppose, another indicia of how deeply Mr. Santos had

23   sunk into pervasive deception.

24          Nonetheless, from my perspective, it's surprising to

25   me that even after someone is brought into court and accused of

1    fraud in a civil lawsuit, that that person would see our federal

2    judiciary as one more entity to be taken advantage of.

3            Mr. Santos, I'm going to -- I've been speaking at

4    length.  I'm going to share some observations with you from

5    where I sit.  Some of these, you may have already acknowledged,

6    but I want to put a fine point on it, sum it up succinctly.

7            One is that your crime was reprehensible.  Having

8    heard from you today, I realize now that you do acknowledge

9    this.  You lied, you cheated, you defrauded in order to enrich

10   your company and thereby to enrich yourself.

11           Second, you've got no one to blame but yourself.

12   There are other people, too, that should be blamed, but as far

13   as your actions, as I see it, there's no one to blame but you.

14   Mr. Achilleos, Mr. Fernandes, Mr. Winston, they did things on

15   their own account, it appears, but they're not to be blamed for

16   your actions, and your clients are certainly not to be blamed.

17           Then the third point I want to emphasize, Mr. Santos,

18   is that you are -- and it's going to be hard to feel this today,

19   but you are fortunate, and some would say you're blessed in many

20   ways.  You're blessed with exceptional intellect and talent;

21   you're blessed with the upbringing you have and your background,

22   your professional background; and you're blessed with family and

23   friends who love and support you.  And I suspect their love for

24   you --

25           They're here for you today.  They've traveled from far

and wide and they've written on your behalf.  Their love, I
suspect, is unconditional.  It's unconditional.  My advice to
you, sir, is although I can see their unconditional love in some
ways makes you feel worse about yourself, you have to find a way
forward.  I heard you struggling with how to do that.  You have
to find some hope.  You have to find something to direct
yourself to.  My recommendation, Mr. Santos, is use the love
that has been so clearly manifested on your behalf.  Use that
care to reframe your life.  Struggle to honor -- to honor and
return and reflect that love, whether it's to those people who
support you, whether it's to others you come across in custody
or after custody.

        I know you have -- I know you have tremendous
potential; not just professional potential, but I know you have
tremendous potential to do good, Mr. Santos.  And I hope and it
will not surprise me if some time down the road when you're out
of custody I'm reading about the great things you've done; not
just about the monies you've made but the ways in which you've
chosen to use your energies to help the world.  I know this is a
setback on that path, but frankly, I believe you can do it and
you will do it.

        Considering the advisory sentencing guidelines and all
the statutory sentencing factors and the mitigating and
aggravating factors that I've discussed, on balance, I'm
persuaded to impose the downward variance previously discussed

1 and sentence you consistent with the Government's

2 recommendation.

3        I know you wanted less, Mr. Santos, but let me tell

4 you, there are indicia in the record that suggest you could face

5 a much, much longer sentence, a much longer sentence; I'm not

6 going to speculate what that would be, but a very significant

7 part of your adult life in prison.

8        Speaking of being blessed, I have to recognize this,

9 Mr. Santos -- and I say this for your benefit and the benefit of

10 your family -- your attorneys have done an exceptional job, an

11 exceptional job in this case.  I know you're accustomed to

12 working with attorneys, not in the criminal context.  But from

13 where I sit, they have done everything humanly possible to

14 assist your cause, and it's impressive to see that level of

15 advocacy.  So you should know that, and your family should know

16 that, as well.

17        So it's the judgment of the Court that Mr. Santos be

18 committed to the custody of the Bureau of Prisons -- this is on

19 Count One -- for a term of 63 months -- that's at the low end,

20 reflecting a two-level downward variance -- and on Count Seven,

21 24 months to run consecutive for a total of 87 months.

22        I'm going to impose a term of supervised release of

23 three years subject to the standard and mandatory terms of

24 supervision as well as this special condition:  If you're

25 deported, excluded, or allowed to voluntarily return to your

1   country of origin, you must not re-enter the U.S. illegally, and
2   you must report to the probation officer within 24 hours of any
3   re-entry into the United States.  Supervision is waived upon
4   deportation, exclusion, or voluntary departure;
5           Second, you must notify the Collections Unit of the
6   U.S. Attorney's Office of any interest in property obtained
7   directly or indirectly, including any interest obtained under
8   any other name or entity including a trust, partnership, or
9   corporation;
10          Third, you must notify the Collections Unit of the
11  U.S. Attorney's Office before transferring any interest in
12  property owned directly or indirectly, including any interest
13  held or owned under any other name or entity including a trust,
14  partnership, or corporation.
15          I'm going to impose a special assessment of $100 per
16  count.
17          With regard to a fine, I've considered holding off on
18  addressing the question of fine until we get to the restitution
19  stage; however, I think it's very likely that whatever that
20  restitution number is imposed, it will not leave anything to pay
21  a fine.  So I'm not going to impose a fine in this case.
22          We'll address restitution at a future hearing, and
23  I'll circle back to that in a moment.
24          With regard to forfeiture, the Court entered a
25  preliminary order of forfeiture on May 13th.  This was

1    previously e-mailed by the Government to chambers on April 1st.

2    As of today, that order becomes final as to Mr. Santos, and that

3    will be included in the judgment.  That order of forfeiture is

4    as to all money, funds, and credits on deposit or restrained in

5    Barclays Bank PLC in the Isle of Man in the name of

6    C.M. da Silva Santos with an account number ending in 4135.

7            Mr. Beeler or Mr. Brooker, is there any component of

8    the sentence other than restitution that remains to be addressed

9    today?

10           MR. BEELER:  I don't believe so, Your Honor.

11           THE COURT:  All right.  Let's set a restitution

12   hearing.  So I think this will be clear to the parties, but what

13   I expect in advance of this hearing is written statements, and

14   absent an agreement, I would like an indication of where that

15   hearing is going to go in terms of the evidence that's going to

16   be presented.

17           Again, the Government bears the burden of proof not

18   just that somebody sustained losses but they sustained losses as

19   a victim of the harm under the Mandatory Victim Restitution Act.

20           So what I'd like is the Government's brief and any

21   evidence that's not subject to live testimony at the hearing to

22   be presented two weeks before the hearing and the defense's

23   responding brief one week before the hearing.

24           Mr. Beeler, how much time do you need to file that

25   brief?

1          MR. BEELER:  Your Honor, I'm probably 90% done with a

2     declaration, and I just need to write the whole brief which I

3     can't imagine would be more than ten pages.  So give me 30 days

4     to research, finalize the evidence, and --

5          THE COURT:  Mr. Bourassa or Mr. Scott, as I think

6     about it, I'm not sure one week is enough time.

7          How much time would you like to respond?

8          MR. BOURASSA:  Thank you, Your Honor.

9          It is a little hard to estimate without knowing what's

10    coming, but if the Court would give us two weeks, and if we

11    needed more than that, we would reach out to the Court

12    immediately and let the Court know why we think there's good

13    cause for more time.

14         THE COURT:  So today's May 16th.  The Government's

15    brief will be due on June 16th.  Defense brief due on June 30th.

16         Let's set this for an off day.  Let's try a Thursday

17    afternoon at 1:30.

18         Loraine, could you let me know our availability

19    starting in the second half of July.

20         THE CLERK:  Thursday, July 17th.

21         THE COURT:  All right.  Thursday, July 17th.

22         Counsel, check your calendars and let me know if that

23    works.

24         MR. BOURASSA:  That works for the defense,

25    Your Honor.

1          THE COURT:  Thank you, Mr. Bourassa.

2          MR. BEELER:  Just one moment, Your Honor, please.

3          THE COURT:  All right.

4          MR. BEELER:  That's fine with the Government as

5     well.

6          THE COURT:  So that will be Thursday, July 17th, at

7     1:30 p.m.

8          Oh.  Let me also just note in connection with the

9     sentence I imposed, I also took into account the points the

10    defense brought to my attention today about Mr. Santos's efforts

11    to recover assets on behalf of victims of the offense.

12         Is there anything we should address at this time in

13    the judgment as far as a recommended investigation,

14    Mr. Bourassa?

15         MR. BOURASSA:  Yes, Your Honor.  Would the Court

16    recommend designation to Lompoc or Terminal Island?  In part,

17    those are accessible for international flights to facilitate

18    family visits, and candidly, we're trying to avoid another

19    lengthy transit cross country, because that was extremely

20    traumatic and difficult last time around.  So if the Court would

21    recommend that designation, we'd appreciate it.

22         THE COURT:  We'll make that recommendation.

23         Anything else we should address in the judgment in

24    terms of programming?

25         MR. BOURASSA:  No, Your Honor.

1          THE COURT:  Anything else we should address more

2     generally?

3          MR. BOURASSA:  I don't think so.

4          I'm looking to my colleague to see if he has anything.

5          I know at our last hearing, I had indicated to

6     Your Honor that we may be able to resolve restitution on the

7     papers or without Mr. Santos's presence, and I'll work the

8     Government to propose a different process if that seems feasible

9     or appropriate, and we'll let the Court know.

10          THE COURT:  Thank you, Mr. Bourassa.

11          If there is a restitution hearing, I believe

12     Mr. Santos should be present for it, but if there's an

13     agreement, then there may not be a need for a hearing.

14          MR. BOURASSA:  Right.  I think -- the Court may have

15     this in mind and have it correct.  I think if there is no

16     physical hearing, then there's nothing he's required to be

17     present for, and then he can be designated and moved.

18          THE COURT:  I believe so.

19          Mr. Beeler, Mr. Brooker, anything else?

20          MR. BEELER:  Not today, Your Honor.

21          THE COURT:  Is there a motion to dismiss the remaining

22     counts as to Mr. Santos?

23          MR. BEELER:  So moved.

24          THE COURT:  That motion will be granted.  Those will

25     be dismissed without prejudice.

1          Mr. Beeler, Mr. Brooker, what is your intent with

2     respect to Defendants 2, 3, and 4?

3          MR. BEELER:  Your Honor, we'll file a motion on those

4     defendants in the coming weeks.

5          THE COURT:  Very good.

6          My thanks to both counsel.  Much appreciated.

7          Mr. Santos, take care, sir.

8          (Proceedings concluded at 12:16 p.m.)

9                    -    -    -    -

10

11                        **CERTIFICATE**

12          I, Tricia Rosate, RDR, CRR, FCRR, CSR No. 10891,

13     certify that the foregoing is a correct transcript from the

14     record of proceedings in the above-entitled matter.

15
            /s/ Tricia Rosate, CSR No. 10891      Date:  May 18, 2025
16          Registered Diplomate Reporter
            Registered Merit Reporter
17          Federal Certified Realtime Reporter
            Certified Realtime Reporter
18

19

20

21

22

23

24

25