# EXHIBIT A-1

# Sills Cummis & Gross

### A Professional Corporation

**101 Park Avenue, 28th Floor**
**New York, New York 10178**
**Tel: (212) 643-7000**
**Fax (212) 643-6500**

The Legal Center
One Riverfront Plaza
Newark, NJ 07102
Tel: (973) 643-7000
Fax: (973) 643-6500

David B. Newman
Member of the Firm
Chair New York Commercial Litigation
Admitted In NY, NJ, FL
Direct Dial: 212-500-1532
Email: dnewman@sillscummis.com

222 Lakeview Avenue, Suite 800
West Palm Beach, FL 33401
Tel: (561) 693-0440
Fax: (561) 828-0142

March 26, 2025

**VIA EMAIL: Christopher.beeler@usdoj.gov**

E. Christopher Beeler, Esq.
Assistant United States Attorney
Southern District of California
880 Front Street – Room 6293
San Diego, CA 92101-8807

Re:    **United States v. Carlos Manuel Da Silva Santos**
       **Case Number:  2023R03759**
       **Court Docket Number 23-CR-02507**

Dear Mr. Beeler:

As you know, this firm represents Link Conexión Aérea, SA de CV (TAR Airlines) ("TAR"). TAR was one of the victims of the fraud perpetrated by Carlos Manuel Da Silva Santos ("Santos") and his company Ethos Asset Management, Inc. ("EAM"). This letter is submitted in order that TAR be included in the pool of victims who are entitled to restitution from the assets recovered from Santos.

Mr. Santos entered into a plea agreement on January 28, 2025. His sentencing is currently scheduled for April 18, 2025, and the restitution hearing is scheduled for ninety (90) days thereafter. At present, there are only three (3) entities scheduled to share in the restitution proceeds which are approximately $9-10 million. TAR, much like the other entities referenced in the plea agreement, was duped by the fraudulent scheme operated by Santos/EAM, to the tune of $3.9 million, as will be unequivocally demonstrated in this submission. Therefore, TAR asks that it be included amongst the entities to share in the restitution proceeds when the government makes it presentation at the restitution hearing.

12960227 v1

**Sills Cummis & Gross**
A Professional Corporation

March 26, 2025
Page 2

## BACKGROUND

TAR is a Mexican airline owned by Grupo Mafra founded in 2012, headquartered in the city of Queretaro, Queretaro, Mexico. The airline was officially launched on January 15, 2014. Currently, it has a presence in fourteen (14) airports in all regions of Mexico. The fleet consists of 12 ERJ-145 jets with coverage in 18 domestic destinations and internationally through charter services covering the USA and the Caribbean, with 26 routes and 3.5 million passengers flown. TAR initially approached Santos/Ethos to obtain financing for flight equipment and assets necessary to the operation of the airline.

As set forth below, throughout the entire process of soliciting TAR and continuing through TAR's collateral deposit of $3.9 million to effectuate the loan transaction, Santos/Ethos used false financial statements, false payment references, false proof of funds, and false press releases, among other things, to fraudulently induce TAR to enter into the loan transaction.

## FINANCIAL INFORMATION

In anticipation of the financing transaction, on May 25, 2023, EAM shared several documents by email with TAR. First, was a "Client Information Sheet" which sets forth corporate, banking and brokerage information regarding EAM. It was signed by Santos, on behalf of EAM under penalties of perjury on October 1, 2022, together with a picture of Santos' passport. *See* Ex. A (each page initialed by Santos). Second, were Financial Statements for EAM for the periods ending December, 2022 and 2021, naming Hoffman & Associates as EAM's independent auditing firm and containing an opening letter from Santos as to the "Director's Responsibilities and Approval." The annual financial statement for the year ending 2021 reflects assets of $1.796 billion and net profit of $41.472 million. *See* Ex. B. The annual financial statement for the year ending 2022 reflects assets of $2.214 billion and net profits of $16.886 million. *See* Ex. C. Third, was a series of meeting minutes of the Directors and Shareholders of EAM; the Certificate of Incorporation; Amended Bylaws of EAM; and statements of information filed with the California Secretary of State. *See* Ex. D. The only signature that appears on any of these documents on behalf of EAM is that of Santos.

It remains unclear which of these documents are authentic and which are falsified. However, given that the Financial Statements show strong liquidity that has been debunked in reality, we can now conclude, after the fact, that these were falsely represented. At the time, TAR relied on these documents to pursue the financing. Furthermore, when TAR requested the opportunity to speak with EAM's independent auditors, Hoffman & Associates on May 27, 2023, in accordance with "due diligence," the request was denied. (*See* Ex. E). Ethos responded that it was "not in our interest to carry such an opportunity cost and to engage with a counter party who is not aligned with us. ...TAR is seeking an investment, but we have no need or desire to oblige TAR to receive our money."

12960227 v1

**Sills Cummis & Gross**
A Professional Corporation

March 26, 2025
Page 3

As part of EAM's attempt to fraudulently induce TAR to enter into the transaction, at the request of TAR, EAM submitted monthly bank statements for its account at Citibank, for the periods June 23 – July 22, 2022, July 23 – August 19, 2022, August 20 – September 22, 2022 and September 23 – October 24, 2022. *See* Ex. F. These statements reflect balances between $103,102,600.58 and $105,894,802.05. Although TAR had no reason to question the balances at the time, we now know that the balances and the monthly statements were counterfeit.

During in-person interviews with EAM representatives, they claimed EAM was approximately twelve (12) years old with assets of approximately $50 billion. When challenged on this matter, they stated that the reference was to another entity within their group but insisted that additional information was unnecessary for a transaction of the scale being discussed. (*See* Ex. E). "Respectfully, we do not need to prove or justify more than $2 billion USD for a project of $50 million USD, as you will appreciate this is sufficient."

## TESTIMONIAL CALLS

On May 25, 2023, Elias Achilleos, Chief Risk Officer of EAM, facilitated contact between TAR and John Coppolino, Chief Executive Officer of Tygrus LLC, as well as Kendall Chow, Chief Executive Officer of Havo Inc. The intent was to provide first-hand testimonials regarding the integrity, professionalism, and success of transactions conducted between EAM and their respective companies. *See* Ex. G. Both interviews were conducted, and the positive feedback received from these individuals, on behalf of their companies, influenced TAR's decision to proceed with the financing transaction with EAM.

It remains unclear whether the transactions with these companies were actually carried out and whether the testimonials were genuine. Nevertheless, since both companies were part of the process that EAM used to induce prospective targets to enter into agreements, the only conclusion that can be reached is that this was part and parcel of the larger scheme to defraud.

Similarly, Roberto Suarez, an associate at EAM, offered TAR the opportunity to contact Grupo Consultor Mexicano ("GCM"), a company that allegedly received financing from EAM to execute a hospital construction project in Mexico. A personal interview was conducted with Erick Celestin Preciado, CFO of GCM, who confirmed that the financing was proceeding in accordance with the terms agreed upon with EAM. He also mentioned that entities within his business network had successfully engaged with EAM in the past. Once again, we do not know the veracity of this representation.

As an aside, to the extent that Tygrus LLC, Havo Inc. and Grupo Consular Mexicano did receive funds from EAM and are obligated to repay those funds, this could be an additional source of funds for restitution to TAR and other victims of the fraudulent conduct of EAM and Santos.

**Sills Cummis & Gross**
A Professional Corporation

March 26, 2025
Page 4

## THE TRANSACTION

Ultimately, EAM, represented by Santos, and TAR, represented by Franco, entered into an agreement, dated June 12, 2023 pursuant to which EAM was going to provide TAR with financing in an initial amount of $20 million and a secondary tranche of $31.3 million under a subsequent agreement (the "Agreement"). *See* Ex. H. Pursuant to the Agreement, in consideration for the initial phase of the financing, TAR was required to sign a Pledge Agreement and deposit into a pledge account collateral for repayment of the financing. The Pledge Agreement was signed on June 12, 2023 between EAM, represented by Santos and Miguel Franco ("Franco"), a principal of TAR, who was going to post the $3.9 million collateral on behalf of TAR (the "Pledge Agreement"). *See* Ex. I. The Agreement was amended on August 4, 2023 to revise certain banking information. *See* Ex. J.

Pursuant to the Agreement and the Pledge Agreement, the collateral, in the amount of $3.9 million, was sent by Franco by wire transfer on June 28, 2023 to EAM's bank account at Citibank. *See* Ex. K. TAR provided proof to EAM that the funds pursuant to the Pledge Agreement were sent by email dated June 27, 2023. *See* Ex. L. Nevertheless, EAM continued to play its games and said that the disbursement schedule for the loan transaction would only be calculated once the collateral funds were received, although they had already been received. *See* Ex. M. EAM finally acknowledged receipt of the funds on July 4, 2023, and Santos stated that "I will in due course provide you the disbursement schedule" for the first tranche of the loan. *See* Ex. N. It is clear that the funds were received in EAM's account on June 28, 2023. *See* Ex. N. Finally, on July 4, 2023, EAM provided TAR with a disbursement schedule with the first disbursement due on August 16, 2023, in the amount of $1,666,666.66. See Ex. O.

## PROMISSORY NOTE

In connection with the transaction, EAM executed a Promissory Note, dated June 13, 2023, signed by Santos as CEO and Member of EAM, as a guarantee by EAM for the repayment of $3.9 million provided as collateral by Miguel Franco, on behalf of TAR, "in case of the transaction of Financing (AGREEMENT NO. EAM-TAR-A-0421-2023) between Ethos Asset Management Inc. and the Project Promoter [defined as TAR] is terminated by default of Ethos Asset Management Inc. and the Margin Value Facility that was extended by the Pledgor to Ethos Asset Management, Inc. is not returned." *See* Ex. P. This document confirmed EAM and Santos' financial capacity to fulfill the payment obligation in the event of a default by EAM. Clearly, Santos/EAM failed to comply with their obligation, upon EAM's default under the Agreement.

## FALSE PRESS RELEASES

EAM made false public statements asserting that the Agreement with TAR had been successfully executed, that the operation was funded, and that EAM was "committed to providing

**Sills Cummis & Gross**
A Professional Corporation

March 26, 2025
Page 5

[TAR] significant capital infusion that will continue for several years." *See* Ex. Q. As we now know, there was no funding, no real commitment to fund, and absolutely no intention to do so. These claims were totally untrue and adversely impacted TAR's stakeholders. Upon learning about the alleged completion of the financing transaction, stakeholders of TAR demanded payments, investments, and the execution of activities related to the investment project, believing the false information to be accurate. This severely impacted the reputation and goodwill of TAR.

<u>DEFAULT</u>

It became obvious shortly after the Agreement and Pledge Agreement were fully executed and the collateral funds were sent to EAM on June 28, 2023 that EAM was not going to perform. Pursuant to the Agreement, EAM was to make its first disbursement of $1,666,666.66 on August 16, 2023. From that point forward, EAM gave TAR the royal run-around. Santos sent a series of emails continuing through mid-September, 2023 asserting every kind of excuse as to why the first disbursement was not made, including false Fed wire confirmations, reference numbers, and payment documents that were non-existent or falsified, solely for the purpose of misleading TAR into believing that EAM's funds were transferred to TAR's account in accordance with the Agreement, blaming TAR citing unfounded issues with TAR's accounts and requesting operational explanations to justify their own non-compliance with the Agreement. *See* Ex. R. By letter dated September 12, 2023, TAR confirmed, once again, its bank coordinates. *See* Ex. S. Santos even forged two Funds Transfer Requests from Signature Bank dated April 24, 2023 and September 28, 2023 referencing the Agreement. *See* Ex. T. The original account designated for receiving the funds at HSBC Bank was confirmed to be in perfect condition for the deposit by top-level bank executives. However, that account was later replaced with a different one in the United States just to satisfy EAM. Despite this change, EAM was unable to transfer the funds to either account.

After many weeks of frustration and EAM's continued breach of its obligations, TAR sent a Notice of Default on September 15, 2023. *See* Ex. U. By email dated October 17, 2023, TAR, having already sent a Notice of Default, sent an email to EAM reiterating the default under the Agreement and demanding the return of the $3.9 million collateral. Having received no response, TAR once again, on October 24, 2023, sent an email to EAM confirming that EAM had not cured its default and reiterated the termination of the Agreement and once again demanded the return of the $3.9 million of collateral funds. *See* Ex. V.

In what cannot only be described as a non-sensical response, EAM sent a letter to TAR dated October 25, 2023 claiming that it was not in default because TAR did not provide correct wire instructions for the return of the collateral, and was the subject of adverse media coverage. *See* Ex. W. As a result, EAM asserted that it was "no longer interested in continuing this transaction with a counter party whom we cannot continue to trust in a long-term financing partnership and to remain exposed to US$20, 000,000.00."

12960227 v1

**Sills Cummis & Gross**
A Professional Corporation

March 26, 2025
Page 6

Despite the foolhardy comments by EAM, it stated as follows:

> We therefore accept your repudiation of the Agreement, and we accept the release of the collateral with the return of the Margin Value Facility to allow us to amicably and this transaction without further financial losses and reputational damage.

*See* Ex. W. Clearly recognizing its exposure, EAM offered a Settlement Agreement in draft "for the process of termination."

The draft Settlement Agreement was tendered on October 25, 2023. *See* Ex. X. The draft provided, amongst other things, that EAM return the $3.9 million collateral to TAR within thirty (30) business days after signing the Settlement Agreement. TAR returned the draft on November 7, 2023 with suggested revisions, the most important being return of the collateral funds within twenty-four hours of execution of the Settlement Agreement. In usual fashion, EAM rejected this proposed revision providing a typical EAM explanation that the collateral funds were deposited into a sub account which, according to EAM, only permitted five withdrawals a month. *See* Ex. Y.

In addition to the charade regarding falsified bank information to avoid compliance with its funding obligations, EAM also attempted to damage TAR's reputation and suggested that some postings on the internet about TAR's customer service would be a compliance issue for EAM. Santos expressed concern in an email dated October 11, 2023 that a blog with ninety (90) followers was problematic because "our name is being associated with some negative practices. that potentially can put your entire operation in question." *See* Ex. Z. This resulted in TAR providing an explanation to EAM's bank, Signature, by letter dated October 11, 2023. *See* Ex. AA. Noteworthy is the fact that EAM previously provided copies of counterfeit Funds Transfer Requests to TAR on August 24, 2023, and September 28, 2023, prior to the internet issue. *See* Ex. T. Clearly, this was not a Signature Bank issue. The use of Signature Bank was a hoax and just further part of the fraud.

Having heard nothing further from EAM regarding the purported Settlement Agreement, TAR retained this firm to conclude the Settlement Agreement. By email dated November 29, 2023, I wrote to various persons at EAM indicating that TAR wanted to conclude this settlement promptly and enclosed a re-draft of the Settlement Agreement. *See* Ex. BB. No response was received. I then wrote to Signature Bank's successor on November 29, 2023 (copying Santos and EAM) to put the bank on notice that the money in EAM's account, if real at all, should be held until there was a fully executed Settlement Agreement. *See* Ex. CC. It was then that we were informed that the funds were frozen and Santos was arrested in connection with his fraudulent scheme. At that time, I wrote to you. *See* Ex. DD.

12960227 v1

**Sills Cummis & Gross**
A Professional Corporation

March 26, 2025
Page 7


This unfortunate tale of events should make it perfectly clear and obvious that TAR was a victim of the Santos/EAM scheme. EAM used false financial information, stooge references, doctored bank statements and more to induce TAR to enter into the Agreement. TAR, not knowing what it now knows, reasonably relied on this information to its detriment. TAR contends that it was a victim of this scheme and is entitled to share in the restitution funds to the same extent as other victims.

We ask that the government submit TAR's request to the Court in connection with the restitution hearing. Please confirm that the government is prepared to do this. If not, we will have no choice but to appear independently.

Please let me know whether you need any additional information.

Sincerely yours,

David B. Newman


cc. Brett Diehl, Esq. (via email at bdiehl@mckenziescott.com)

# EXHIBIT A



## CLIENT INFORMATION SHEET

Directions: This document must be completed in full. If a line item does not pertain then insert the term: "N/A" (non-applicable).

Page | 1

Corporate Information

Full Name of Corporation: Ethos Asset Management INC
Date of Incorporation: 12.22.2018
Incorporated in (City/State/Country): 4660 La Jolla Village Drive, San Diego, California, 92122
United States of America
Entity Number: C4603685
Registration Number (EIN Number): 85-1564558
Board of Directors (Name & Title): Carlos Manuel da Silva Santos

Registered Address

Street Address: 4660 La Jolla Village Drive, San Diego, California, 92122
United States of America
City: San Diego
State: California
Country: USA
Postal Code: CA, 92107

Mailing Address

Street Address: suite 100, 4660 La Jolla Village Drive, San Diego, California, 92122
United States of America
City: San Diego
State: California
Country: USA
Postal Code: CA, 92107

Office Address

Street Address: 4660 La Jolla Village Drive, San Diego, California, 92122
United States of America
City: San Diego
State: California
Country: USA
Postal Code: CA, 92107

# ETHOS ASSET
### MANAGEMENT

Contact Information (Corporation)

Telephone Number: +1 858 535 4814
Mobile Number: +1 (202) 374-5023 | +351 913 855 564
Email Address: carlos@ethosasset.com | info@ethosasset.com

Page | 2

Bank Information A)

Bank Name: CITIBANK N.A.
Bank Address: 399 PARK AVENUE WHQ, NEW YORK, NY 10022, USA

Account Name: ETHOS ASSET MANAGEMENT INC
Account Holder Address: 4660 La Jolla Village DR, San Diego, CA 92122
Account Number: 6780641032
Routing Number: 021000089
Swift Code/BIC: CITI US 33
Account Signatory: Carlos Manuel da Silva Santos

Bank Information B)

Bank Name: Comerica Bank
Bank Address: 13920 City Center Dr. Suite #4000 Chino Hills, CA 91709

Account Name: ETHOS ASSET MANAGEMENT INC
Account Holder Address: 4660 La Jolla Village DR, San Diego, CA 92122
Expense Account Number: 1895658324
Operating Account Number: 1895658316
Routing Number: 121137522
Swift Code: MNBDUS33
Account Signatory: Carlos Manuel da Silva Santos

Bank Information C)

Bank Name: SIGNATURE BANK
Bank Address: 565 FIFTH AVENUE 16TH FLOOR NEW YORK, NY 10017

Account Name: ETHOS ASSET MANAGEMENT INC
Account Holder Address: 4660 La Jolla Village DR, San Diego, CA 92122
Account Number: 1504707896
Routing Number: 026013576
Swift Code: SIGNUS33



# ETHOS ASSET
## M A N A G E M E N T

Bank Information D)

Bank Name: East West Bank
Bank Address: 9300 Flair Drive, 4th Fl., El Monte, CA 91731

Page | 3

Account Name: ETHOS ASSET MANAGEMENT INC
Account Holder Address: 4660 La Jolla Village DR, San Diego, CA 92122
Account Number: 8003236703
Routing Number: 322070381
Swift Code: EWBKUS66XXX

Bank Information E)

**Brokerage Account BTG**

Bank Name: Bank Of New York
Bank Address: 101 Barclay St – New York NY – 10286, USA

Beneficiary: Pershing LLC
Beneficiary Acct: 890-051238-5
Beneficiary's address: 1 Pershing Plz, Jersey City, NJ, USA
FFC Account #: TWW001341
FFC Account Name: ETHOS ASSET MANAGEMENT, INC
Routing Number: 021000018
Swift Code: IRVTUS3N

Bank Information F)

Beneficiary Bank: TÜRKIYE İŞ BANKASI A.Ş

Account Name: ETHOS ASSET MANAGEMENT, INC
Account Holder Address: 4660 La Jolla Village Drive, San Diego, California, 92122, United States of America

TL IBAN: TR25 0006 4000 0011 4440 0149 94
USD IBAN: TR04 0006 4000 0021 4440 0254 55
EUR IBAN: TR14 0006 4000 0021 4440 0254 69

Swift Code/BIC: ISBKTRISXXX

Bank Information G)

Bank Name: Guaranty Trust Bank Côte d'Ivoire SA
Bank Address: 11, Avenue du Sénateur LAGAROSSE Abidjan-Plateau 01 BP 13141 Abidjan 01, Côte d'Ivoire



Account Name: ETHOS ASSET MANAGEMENT INC
Account Holder Address: 4660 La Jolla Village DR, San Diego, CA 92122
Account Number: CI93 CI1630120200000024545522
BBAN: CI1630120200000024545522
Swift Code: GTBICIAB

Page | 4

Bank Information H)

Bank Name: CAIXABANK, S.A.
Bank Address: Av. Marqués del Turia 64  46005 Valencia

Account Name: ETHOS ASSET MANAGEMENT INC
Account Holder Address: 4660 La Jolla Village DR, San Diego, CA 92122
IBAN: ES06 2100 5513 4707 0050 1150
Swift Code: CAIXESBBXXX

Personal Information of Officer(s) of Corporation / Passport Information
(Please attach copy of corporate resolutions adopted by the Board of Directors appointing and authorizing said officer(s) to represent and legally bind the corporation)
*Duplicate the section below for each Director.*

Director/ CEO
First Name: Carlos Manuel
Last Name: Silva Santos
Gender: Men
Country of Citizenship: Portuguese
Languages: Portuguese, English, Spanish.

Passport Information of Officers(s) of Corporation
*Please attach copy of photo and signature page of passport*

Passport Number: CC835012
Date of Issue: 08.10.2022
Date of Expiry: 08.10.2027
Issuing Authority: SEF - Portugal



Ethos Asset Management INC

4660 La Jolla Village Drive, San Diego, California, 92122, United States of America
+1 858 535 4814 | info@ethosasset.com



# ETHOS ASSET
MANAGEMENT

I, **Carlos Manuel da Silva Santos,** hereby swear under penalty of perjury, that the information provided herein is accurate and true as of this date:
October 01, 2022.

For and on behalf of **Ethos Asset Management INC.**

Page | 5



Signature: _____

Name / Title: Member and Director – CARLOS MANUEL DA SILVA SANTOS
Company: Ethos Asset Management INC
Passport Number: CC835012
Date of Issue: 08.10.2022
Date of Expiry: 08.10.2027
Country of Issuance: Portugal





# DIRECTOR PASSAPORT

Page | 6



[01] DA SILVA SANTOS
[02] CARLOS MANUEL
[04] 1.78 m        [07] M
[05] 06.07.1994
[11] 10.08.2027

**República Portuguesa** *Portuguese Republic République Portugaise*

| Passaporte | Tipo *Type* | Código do País *Code* | Passaporte no *Passport no Passeport no* |
|---|---|---|---|
| *Passport* | PC | PRT | CC835012 |

1. Apelido(s) *surname Nom*
DA SILVA SANTOS
2. Nome(s) próprio(s) *Given names Prénoms*
CARLOS MANUEL
3. Nacionalidade *Nationality Nationalité*        4. Altura *Height Taille*
PORTUGUESA        1.78 m
5. Data de nascimento *Date of birth Date de naissance*    6. Nº de identificação pessoal *Personal no. Nº personnel*
06.07.1994        14237469
7. Sexo *Sex Sexe*    8. Local de nascimento *Place of birth Lieu de naissance*
M        LEIRIA*LEIRIA
9. Data de emissão *Date of issue Date de délivrance*    10. Autoridade *Authority Autorité*
10.08.2022        SEF - SERV ESTR E FRONTEIRAS
11. Válido até *Date of expiry Date d'expiration*    12. Assinatura do titular *Holder's signature Signature du titulaire*
10.08.2027

```
P<PRTDA<SILVA<SANTOS<<CARLOS<MANUEL<<<<<<<<<
CC835012<7PRT9407060M270810414237469<<<<<<62
```

Ethos Asset Management INC

4660 La Jolla Village Drive, San Diego, California, 92122, United States of America

+1 858 535 4814 | info@ethosasset.com

# EXHIBIT B



**ETHOS ASSET MANAGEMENT INC.**

**Registration number: 85-1564558**

**Annual Financial Statements**

**for the year ended 31 December 2021**

**ETHOS ASSET MANAGEMENT INC**
**Registration number: 85-1564558**
**Annual Financial Statements for the year ended 31 December 2021**

## INDEX

The reports and statements set out below comprise the annual financial statements presented to the directors:

| | |
|---|---|
| Index | 1 |
| General Information | 2 |
| Report of the Board | 3 |
| Director's Responsibilities and Approval | 4 |
| Statement of Financial Position | 5 |
| Statement of Comprehensive Income | 6 |
| Accounting Policies | 7 |



**ETHOS ASSET MANAGEMENT INC**
Registration number: 85-1564558

Annual Financial Statements for the year ended 31 December 2021

## GENERAL INFORMATION

| | |
|---|---|
| COUNTRY OF INCORPORATION AND DOMICILE | United States of America |
| TYPE OF COMPANY AND NATURE OF BUSINESS | Private Company, Investment Company |
| DIRECTORS | Carlos Manuel da Silva Santos |
| SHAREHOLDERS | Carlos Manuel da Silva Santos |
| REGISTERED OFFICE | 4660 La Jolla Village Drive, San Diego, California, 92122 |
| | San Diego, California |
| | CA, 92122 |
| | USA |
| BANKERS | Citibank, JP Morgan Chase, Comerica, Banco do Brasil Americas, BTG, Safra |
| INDEPENDENT AUDITORS' | Hoffman & Associates |
| SECRETARY | Carlos Manuel da Silva Santos |
| COMPANY REGISTRATION NUMBER | 85-1564558 |



**REPORT OF THE BOARD**

**To the Directors of ETHOS ASSET MANAGEMENT INC**

We have compiled the accompanying management statements based on information you have provided. These financial statements comprise the statement of financial position as at 31 December 2021, the statement of comprehensive income, the statement of changes in trust funds and the statement of cash flows for the year then ended, a summary of significant accounting policies and other explanatory information.

We performed this compilation engagement in accordance with International Standard on Related Services 4410 (Revised), Compilation Engagements.

We have applied our expertise in accounting and financial reporting to assist you in the preparation and presentation of these financial statements in accordance with International Financial Reporting Standards. We have complied with relevant ethical requirements, including principles of integrity, objectivity, professional competence and due care.

These financial statements and the accuracy and completeness of the information used to compile them are your responsibility.

Since a compilation engagement is not an assurance engagement, we are not required to verify the accuracy or completeness of the information you provided to us to compile these financial statements. Accordingly, we do not express an audit opinion or a review conclusion on whether these financial statements are prepared in accordance with IFRS.

31 March 2022

ETHOS ASSET MANAGEMENT INC
Registration number: 85-1564558
Annual Financial Statements for the year ended 31 December 2021

## DIRECTOR'S RESPONSIBILITIES AND APPROVAL

The director(s) is required to maintain adequate accounting records and is responsible for the content and integrity of the annual financial statements and related financial information included in this report. It is his responsibility to ensure that the annual financial statements satisfy the financial reporting standards as to form and content and present fairly the statement of financial position, results of operations of the trust, and explain the transactions and financial position of the business of the trust at the end of the financial year. The annual financial statements are based upon appropriate accounting policies consistently applied throughout the trust and supported by reasonable and prudent judgements and estimates.

The director acknowledges that they are ultimately responsible for the system of internal financial control established by the trust and place considerable importance on maintaining a strong control environment. To enable the director to meet these responsibilities, the directors sets standards for internal control aimed at reducing the risk of error or loss in a cost effective manner. The standards include the proper delegation of responsibilities within a clearly defined framework, effective accounting procedures and adequate segregation of duties to ensure an acceptable level of risk. These controls are monitored throughout the trust and all director are required to maintain the highest ethical standards in ensuring the trust's business is conducted in a manner that in all reasonable circumstances is above reproach.

The focus of risk management in the trust is on identifying, assessing, managing and monitoring all known forms of risk across the trust. While operating risk cannot be fully eliminated, the trust endeavours to minimise it by ensuring that appropriate infrastructure, controls, systems and ethical behaviour are applied and managed within predetermined procedures and constraints.

The director is of the opinion that the system of internal control provides reasonable assurance that the financial records may be relied on for the preparation of the annual financial statements. However, any system of internal financial control can provide only reasonable, and not absolute, assurance against material misstatement or loss. The going-concern basis has been adopted in preparing the financial statements. Based on forecasts and available cash resources the director has no reason to believe that the trust will not be a going concern in the foreseeable future. The financial statements support the viability of the trust.

The world economy experienced major fluctuations in 2021, caused by the impact and management of the SARS-CoV-2 pandemic. The multiple waves of contagion, public health measures and mobility restrictions implemented over the course of the year continued to affect business evolution. Clear signs of economic recovery were nonetheless recorded. Vaccination led to a lower spread of serious infections, which in turn enabled economic agents to recover confidence, as the overall context became more favourable for the conduct of economic activity.

The financial statements have been prepared by an independent auditing firm Hoffman & Associates, who have been given unrestricted access to all financial records and related data. The director believes that all representations made to the independent report during the accounting period were valid and appropriate.

Carlos Manuel da Silva Santos

**ETHOS ASSET MANAGEMENT INC**
**Registration number: 85-1564558**
**Annual Financial Statements for the year ended 31 December**

## STATEMENT OF FINANCIAL POSITION

| Figures in $US | 2021 | 2020 |
|---|---|---|
| **Assets** | | |
| **Non-Current Assets** | | |
| Property, plant and equipment | 188 055 | 98 288 055 |
| Loan to third parties | 1 065 266 822 | - |
| | **1 065 454 877** | **98 288 055** |
| | | |
| **Current Assets** | | |
| Cash and cash equivalents | 722 569 131 | 22 569 381 |
| Inventory | 8 558 873 | 8 558 623 |
| Loans | | 20.519.999 |
| Trade and other receivables | 144 399 | 150 713 588 |
| | **731 272 403** | **202 361 591** |
| | | |
| **Total Assets** | **1 796 727 280** | **300 649 646** |
| | | |
| **Equity and Liabilities** | | |
| **Equity** | | |
| Issued capital | 718 819 855 | 1 000 |
| Retained earnings | 224 653 153 | 183 181 145 |
| | **943 473 008** | **183 182 145** |
| | | |
| **Non-Current Liabilities** | | |
| Secured Borrowings | 211 261 126 | 1 261 126 |
| Loan from shareholder | 540 378 129 | 14 591 358 |
| Unsecured Borrowings | 38 617 042 | 38 617 042 |
| | **790 256 297** | **54 469 526** |
| | | |
| **Current Liabilities** | | |
| Trade and other payables | 41 877 116 | 41 877 116 |
| Bank overdraft | - | - |
| Current taxation liability | 20 340 222 | 20 340 222 |
| Current portion of long term liabilities | 780 637 | 780 637 |
| | **62 997 975** | **62 997 975** |
| | | |
| **Total Equity and Liabilities** | **1 796 727 280** | **300 649 646** |



**ETHOS ASSET MANAGEMENT INC**
Registration number: 85-1564558
Annual Financial Statements for the year ended 31 December

## STATEMENT OF COMPREHENSIVE INCOME

| Figures in $US | 2021 | 2020 |
|---|---|---|
| Income | 592 414 331 | 441 787 203 |
| Cost of sales | - | 223 321 223 |
| Gross profit | 592 414 331 | 218 465 980 |
| | | |
| Other income | | 1 111 090 |
| Operating costs | 521 233 121 | 179 988 102 |
| **Operating profit/(loss)** | **71 181 210** | **39 588 968** |
| | | |
| Finance income | - | - |
| Finance costs | 13 581 199 | - |
| **Profit before taxation** | **57 600 011** | **39 588 968** |
| | | |
| Distribution | - | - |
| **Profit/(loss) after distribution** | **57 600 011** | **39 588 968** |
| | | |
| Taxation expense | 16 128 003 | 11 084 911 |
| Net profit for the year | 41 472 008 | 28 504 058 |
| | | |
| **Total comprehensive income** | **41 472 008** | **28 504 058** |



Page 6

ETHOS ASSET MANAGEMENT INC

**Registration number: 85-1564558**

Annual Financial Statements for the year ended 31 December 2021

## ACCOUNTING POLICIES

**1. General Information**

ETHOS ASSET MANAGEMENT INC is a private company founded in USA. The type of business and its principal. activities is that of Investment activity.

**2. Summary of significant accounting policies**

These financial statements have been prepared in accordance with the International Financial Reporting Standards issued by the International Accounting Standards Board. The principle accounting policies applied in the preparation of these financial statements are set out below. These policies have been consistently applied to all the years presented, unless otherwise stated.

**2. Summary of significant accounting policies**

These financial statements have been prepared in accordance with the International Financial Reporting Standards issued by the International Accounting Standards Board. The principal accounting policies applied in the preparation of these financial statements are set out below. These policies have been consistently applied to all the years presented, unless otherwise stated.

These financial statements have been prepared under the historical cost convention and are presented in USA.

**2.1 Revenue recognition**

Revenue comprises the fair value of the consideration received or receivable for the sale of goods and/or services in the ordinary course of the company's activities. Revenue is shown net of value-added taxation, returns, and discounts.

The company recognises revenue when: the amount of revenue can be reliably measured; it is probable that future economic benefits will flow to the entity; and specific criteria have been met for each of the company's activities, as described below:

**2.1.1 Receivables**

Where the outcome of a construction contract can be estimated reliably, contract revenue and costs are recognised by reference to the stage of completion of the contract activity at the balance sheet date, as measured by (basis used)

When the outcome of a construction contract cannot be estimated reallably, contract revenue is recognised to the extent that contract costs incurred are recoverable. Contract costs are recognised as an expense in the period in which they are incurred.

When it is probable that total contract costs will exceed total contract revenue, the expected loss is recognised as an expense immediately.

**2.2 Income taxes**

The taxation expense for the period comprises current and deferred taxation. Tax is recognised in profit or loss, except that a change attributable to an item of income or expense recognised as other comprehensive income is also recognised directly in other comprehensive income.

The current income taxation charge is calculated on the basis of tax rates and laws that have been enacted or substantively enacted by the reporting date.

Deferred taxation is recognised on differences between the carrying amounts of assets and liabilities in the financial statements and their corresponding taxation bases (known as temporary differences). Deferred taxation liabilities are recognised for all temporary differences that are expected to increase taxable profit in the future. Deferred taxation assets are recognised for all temporary differences that are expected to reduce taxable profit in the future, and any unused taxation losses or unused taxation credits. Deferred taxation assets are measured at the highest amount that, on the basis of current or estimated future taxable profit, is more likely than not to be recovered.

The net carrying amount of deferred taxation assets is reviewed at each reporting date and is adjusted to reflect the current assessment of future taxable profits. Any adjustments are recognised in profit or loss.

Deferred taxation is calculated at the taxation rates that are expected to apply to the taxable profit/(taxation loss) of the periods in which it expects the deferred taxation asset to be realised or the deferred taxation liability to be settled, on the basis of taxation rates that have been enacted or substantively enacted by the end of the reporting period.

**2.3 Investment property**

Investment property is recognised as an asset when, and only when, it is probable that the future economic benefits will flow to the enterprise, and the cost of the investment property can be reliably measured. Investment property is property held to earn rentals or for capital appreciation or both, rather than for use in the production or supply of goods or services, for administrative purposes, or for sale in the ordinary course of business.



Investment property is initially recognised at cost. Transaction costs are included in the initial measurement.

Costs include costs incurred initially and costs incurred subsequently to add to, or to replace a part of, or service a property. If a replacement part is recognised in the carrying amount of the investment property, the carrying amount of the replaced part is derecognised.

After initial recognition, investment property whose fair value can be measured reliably without undue cost or effort shall be measured at fair value at each reporting period with changes in fair value recognised in profit or loss. If the fair value cannot be determined without undue cost and effort, the investment property is classified to property, plant and equipment.

**2.4 Property, plant and equipment**

Items of property, plant and equipment are measured at cost less accumulated depreciation and any accumulated impairment losses.

Costs include costs incurred initially to acquire or construct an item of property, plant and equipment and costs incurred subsequently to add to, replace part of, or service it. If a replacement cost is recognised in the carrying amount of an item of property, plant and equipment, the carrying amount of the replaced part is derecognised.

Depreciation is charged so as to allocate the cost of assets less their residual values over their estimated useful lives, using the straight-line method. The following rates are used for the depreciation of property, plant and equipment:

**2.5 Trade and other receivables**

Trade receivables are recognised initially at the transaction price. They are subsequently measured at amortised cost using the effective interest rate method, less provision for impairment. A provision for impairment of trade receivables is established when there is objective evidence that the company will not be able to collect all amounts due according to the original terms of the receivables.

**2.7 Cash and cash equivalents**

Cash and cash equivalents includes cash on hand, demand deposits and other short-term highly liquid investments with original maturities of three months or less. Bank overdrafts are shown in current liabilities on the statement of financial position.

**2.8 Share capital and retained earnings**

All funds of a capital nature received by the company are accounted for directly to the company capital account. This includes the original donation received by the companyees to establish the company, as well as all donations received by the company since the company's inception. This excludes capital gains and losses realised by the company in the normal course of its business activities. company capital is reduced by any capital distributed by the companyees to any capital beneficiary.

Retained earnings consists of all revenues, capital gains and capital losses retained by the company after payment of all expenses, taxes and distributions of income and capital gains to beneficiaries.

**2.9 Borrowing costs**

Borrowings are recognised initially at the transaction price (that is, the present value of cash payable to the bank, including transaction costs). Borrowings are subsequently stated at amortised cost. Interest expense is recognised on the basis of the effective interest rate method and is included in finance costs.

Borrowings are classified as current liabilities unless the company has an unconditional right to defer settlement of the liability for at least 12 months after the reporting date.

**2.10 Trade payables**

Trade payables are recognised initially at the transaction price and subsequently measured at amortised cost using the effective interest rate method.

**2.12 Bank loans and overdrafts**

Interest expense is recognised on the basis of the effective interest rate method and is included in finance costs.

**8. Approval of annual financial statements**

These financial statements were approved by the company



# EXHIBIT C



ETHOS ASSET MANAGEMENT INC.

Registration number: 85-1564558

Annual Financial Statements

for the year ended 31 December 2022

**ETHOS ASSET MANAGEMENT INC**
Registration number: 85-1564558
Annual Financial Statements for the annual ended 31 December 2022

## INDEX

The reports and statements set out below comprise the annual financial statements presented to the directors:

| | |
|---|---|
| Index | 1 |
| General Information | 2 |
| Report of the Board | 3 |
| Director's Responsibilities and Approval | 4 |
| Statement of Financial Position | 5 |
| Statement of Comprehensive Income | 6 |
| Accounting Policies | 7 |



**ETHOS ASSET MANAGEMENT INC**
Registration number: 85-1564558

**Annual Financial Statements for the annual ended 31 December 2022**

## GENERAL INFORMATION

| | |
|---|---|
| **COUNTRY OF INCORPORATION AND DOMICILE** | United States of America |
| **TYPE OF COMPANY AND NATURE OF BUSINESS** | Private Company, Investment Company |
| **DIRECTORS** | Carlos Manuel da Silva Santos |
| **SHAREHOLDERS** | Carlos Manuel da Silva Santos |
| **REGISTERED OFFICE** | 4660 La Jolla Village Drive, San Diego, California, 92122 |
| | San Diego, California |
| | CA, 92122 |
| | USA |
| **BANKERS** | Citibank, JP Morgan Chase, Comerica, BTG, Isbank, Signature Bank, EWB Bank, Oanda, BTG, Mellon Bank, Morgan Stanley. |
| **INDEPENDENT AUDITORS'** | Hoffman & Associates |
| **SECRETARY** | Carlos Manuel da Silva Santos |
| **COMPANY REGISTRATION NUMBER** | 85-1564558 |

## REPORT OF THE BOARD

**To the Directors of ETHOS ASSET MANAGEMENT INC**

We have compiled the accompanying management statements based on information you have provided. These financial statements comprise the statement of financial position as at 31 December 2022, the statement of comprehensive income, the statement of changes in trust funds and the statement of cash flows for the year then ended , a summary of significant accounting policies and other explanatory information.

We performed this compilation engagement in accordance with International Standard on Related Services 4410 (Revised), Compilation Engagements.

We have applied our expertise in accounting and financial reporting to assist you in the preparation and presentation of these financial statements in accordance with International Financial Reporting Standards. We have complied with relevant ethical requirements, including principles of integrity, objectivity, professional competence and due care.

These financial statements and the accuracy and completeness of the information used to compile them are your responsibility.

Since a compilation engagement is not an assurance engagement, we are not required to verify the accuracy or completeness of the information you provided to us to compile these financial statements. Accordingly, we do not express an audit opinion or a review conclusion on whether these financial statements are prepared in accordance with IFRS.

**30 January 2023**

**ETHOS ASSET MANAGEMENT INC**
Registration number: 85-1564558
Annual Financial Statements for the annual ended 31 December 2022

## DIRECTOR'S RESPONSIBILITIES AND APPROVAL

The director(s) is required to maintain adequate accounting records and is responsible for the content and integrity of the annual financial statements and related financial information included in this report. It is his responsibility to ensure that the annual financial statements satisfy the financial reporting standards as to form and content and present fairly the statement of financial position, results of operations of the trust, and explain the transactions and financial position of the business of the trust at the end of the financial year. The annual financial statements are based upon appropriate accounting policies consistently applied throughout the trust and supported by reasonable and prudent judgements and estimates.

The director acknowledges that they are ultimately responsible for the system of internal financial control established by the trust and place considerable importance on maintaining a strong control environment. To enable the director to meet these responsibilities, the directors sets standards for internal control aimed at reducing the risk of error or loss in a cost effective manner. The standards include the proper delegation of responsibilities within a clearly defined framework, effective accounting procedures and adequate segregation of duties to ensure an acceptable level of risk. These controls are monitored throughout the trust and all director are required to maintain the highest ethical standards in ensuring the trust's business is conducted in a manner that in all reasonable circumstances is above reproach.

The focus of risk management in the trust is on identifying, assessing, managing and monitoring all known forms of risk across the trust. While operating risk cannot be fully eliminated, the trust endeavours to minimise it by ensuring that appropriate infrastructure, controls, systems and ethical behaviour are applied and managed within predetermined procedures and constraints.

The director is of the opinion that the system of internal control provides reasonable assurance that the financial records may be relied on for the preparation of the annual financial statements. However, any system of internal financial control can provide only reasonable, and not absolute, assurance against material misstatement or loss. The going-concern basis has been adopted in preparing the financial statements. Based on forecasts and available cash resources the director has no reason to believe that the trust will not be a going concern in the foreseeable future. The financial statements support the viability of the trust.

The outlook for the world economy at the beginning of 2022 was one of optimism based on the positive impact of measures to contain the pandemic and the gradual normalisation of global imbalances, particularly in regard to supply chains. During the first six months, however, several challenges arose. The first was the aftermath of Russia's invasion of Ukraine. This was followed by the impact of the restrictive measures implemented by the Chinese authorities in response to new outbreaks of Covid-19. At the same time, production and consumption prices continued to rise month after month, delaying the expected turnaround in the overall economic trend. Global supply chains were affected by persistent difficulties. Europe suffered an energy crisis, while emerging economies, especially those of the more fragile countries in Africa and Asia, were beset by food shortages. Higher interest rates, the prospect of increased monetary tightening, less favourable financial conditions, the depreciation of risky assets, increased volatility and risk aversion characterised financial markets. The US dollar became the preferred safe haven currency. The US economy will have registered in the second quarter, registering a continuous six months of negative economic growth. A reduction in residential construction, a fall in business stocks and a decrease in goods consumption appear to have been the underlying causes of this drop, which contrasted with the increase in imports at the beginning of the year.
The financial statements have been prepared by an independent auditing firm Hoffman & Associates, who have been given unrestricted access to all financial records and related data. The director believes that all representations made to the independent report during the accounting period were valid and appropriate.

Carlos Manuel da Silva Santos

**ETHOS ASSET MANAGEMENT INC**
Registration number: 85-1564558
Annual Financial Statements for the annual ended 31 December

## STATEMENT OF FINANCIAL POSITION

| Figures in $US | 2022 | 2021 |
|---|---|---|
| **Assets** | | |
| **Non-Current Assets** | | |
| Property, plant and equipment | 188 055 | 188 055 |
| Loan to third parties | 1 154 488 399 | 1 065 266 822 |
| | 1 154 676 454 | 1 065 454 |
| | | |
| **Current Assets** | | |
| Cash and cash equivalents | 1 050 929 612 | 722 569 131 |
| Inventory | 8 558 873 | 8 558 873 |
| Loans | | |
| Trade and other receivables | 144 399 | 144 399 |
| | 859 565 947 | 731 272 403 |
| | | |
| **Total Assets** | 2 214 309 338 | 1 796 727 280 |
| | | |
| **Equity and Liabilities** | | |
| **Equity** | | |
| Issued capital | 950 000 000 | 718 819 855 |
| Retained earnings | 224 653 153 | 224 653 153 |
| Net Income of the period | 16 886 042 | 0 |
| | 1 191 539 195 | 943 473 008 |
| | | |
| **Non-Current Liabilities** | | |
| Secured Borrowings | 271 155 126 | 211 261 126 |
| Loan from shareholder | 650 000 000 | 540 378 129 |
| Unsecured Borrowings | 38 617 042 | 38 617 042 |
| | 959 772 168 | 790 256 297 |
| | | |
| **Current Liabilities** | | |
| Trade and other payables | 41 877 116 | 41 877 116 |
| Bank overdraft | - | - |
| Current taxation liability | 20 340 222 | 20 340 222 |
| Current portion of long term liabilities | 780 637 | 780 637 |
| | 62 997 975 | 62 997 975 |
| | | |
| **Total Equity and Liabilities** | 2 214 309 338 | 1 796 727 280 |



**ETHOS ASSET MANAGEMENT INC**

Registration number: 85-1564558

Annual Financial Statements for the annual ended 31 December

## STATEMENT OF COMPREHENSIVE INCOME

| Figures in $US | 2022 | 2021 |
|---|---|---|
| Income | 231 114 997 | 592 414 331 |
| Cost of sales | - | – |
| Gross profit | 231 114 997 | 592 414 331 |
| | | |
| Other income | | |
| Operating costs | 199 063 969 | 521 233 121 |
| Operating profit/(loss) | 32 051 028 | 71 181 210 |
| | | |
| Finance income | - | - |
| Finance costs | 8 598 193 | 13 581 199 |
| Profit before taxation | 23 452 835 | 57 600 011 |
| | | |
| Distribution | - | - |
| Profit/(loss) after distribution | 23 452 835 | 57 600 011 |
| | | |
| Taxation expense | 6 566 794 | 16 128 003 |
| Net profit for the year | 16 886 041 | 41 472 008 |
| | | |
| Total comprehensive income | 16 886 042 | 41 472 008 |



ETHOS ASSET MANAGEMENT INC
**Registration number: 85-1564558**

Annual Financial Statements for the annual ended 31 December 2022

## ACCOUNTING POLICIES

**1. General Information**

ETHOS ASSET MANAGEMENT INC is a private company founded in USA. The type of business and its principal. activities is that of investment activity.

**2. Summary of significant accounting policies**

These financial statements have been prepared in accordance with the International Financial Reporting Standards issued by the International Accounting Standards Board. The principle accounting policies applied in the preparation of these financial statements are set out below. These policies have been consistently applied to all the years presented, unless otherwise stated.

**2. Summary of significant accounting policies**

These financial statements have been prepared in accordance with the International Financial Reporting Standards issued by the International Accounting Standards Board. The principal accounting policies applied in the preparation of these financial statements are set out below. These policies have been consistently applied to all the years presented, unless otherwise stated.

These financial statements have been prepared under the historical cost convention and are presented in USA.

**2.1 Revenue recognition**

Revenue comprises the fair value of the consideration received or receivable for the sale of goods and/or services in the ordinary course of the company's activities. Revenue is shown net of value-added taxation, returns, and discounts.

The company recognises revenue when: the amount of revenue can be reliably measured; it is probable that future economic benefits will flow to the entity; and specific criteria have been met for each of the company's activities, as described below:

**2.1.1 Receivables**

Where the outcome of a construction contract can be estimated reliably, contract revenue and costs are recognised by reference to the stage of completion of the contract activity at the balance sheet date, as measured by (basis used)

When the outcome of a construction contract cannot be estimated realiably, contract revenue is recognised to the extent that contract costs incurred are recoverable. Contract costs are recognised as an expense in the period in which they are incurred.

When it is probable that total contract costs will exceed total contract revenue, the expected loss is recognised as an expense immediately.

**2.2 Income taxes**

The taxation expense for the period comprises current and deferred taxation. Tax is recognised in profit or loss, except that a change attributable to an item of income or expense recognised as other comprehensive income is also recognised directly in other comprehensive income.

The current income taxation charge is calculated on the basis of tax rates and laws that have been enacted or substantively enacted by the reporting date.

Deferred taxation is recognised on differences between the carrying amounts of assets and liabilities in the financial statements and their corresponding taxation bases (known as temporary differences). Deferred taxation liabilities are recognised for all temporary differences that are expected to increase taxable profit in the future.. Deferred taxation assets are recognised for all temporary differences that are expected to reduce taxable profit in the future, and any unused taxation losses or unused taxation credits. Deferred taxation assets are measured at the highest amount that, on the basis of current or estimated future taxable profit, is more likely than not to be recovered.

The net carrying amount of deferred taxation assets is reviewed at each reporting date and is adjusted to reflect the current assessment of future taxable profits. Any adjustments are recognised in profit or loss.

Deferred taxation is calculated at the taxation rates that are expected to apply to the taxable profit/(taxation loss) of the periods in which it expects the deferred taxation asset to be realised or the deferred taxation liability to be settled, on the basis of taxation rates that have been enacted or substantively enacted by the end of the reporting period.

**2.3 Investment property**

Investment property is recognised as an asset when, and only when, it is probable that the future economic benefits will flow to the enterprise, and the cost of the investment property can be reliably measured. Investment property is property held to earn rentals or for capital appreciation or both, rather than for use in the production or supply of goods or services, for administrative purposes, or for sale in the ordinary course of business.



Investment property is initially recognised at cost. Transaction costs are included in the initial measurement.

Costs include costs incurred initially and costs incurred subsequently to add to, or to replace a part of, or service a property. If a replacement part is recognised in the carrying amount of the investment property, the carrying amount of the replaced part is derecognised.

After initial recognition, investment property whose fair value can be measured reliably without undue cost or effort shall be measured at fair value at each reporting period with changes in fair value recognised in profit or loss. If the fair value cannot be determined without undue cost and effort, the investment property is classified to property, plant and equipment.

**2.4 Property, plant and equipment**

Items of property, plant and equipment are measured at cost less accumulated depreciation and any accumulated impairment losses.

Costs include costs incurred initially to acquire or construct an item of property, plant and equipment and costs incurred subsequently to add to, replace part of, or service it. If a replacement cost is recognised in the carrying amount of an item of property, plant and equipment, the carrying amount of the replaced part is derecognised.

Depreciation is charged so as to allocate the cost of assets less their residual values over their estimated useful lives, using the straight-line method. The following rates are used for the depreciation of property, plant and equipment:

**2.5 Trade and other receivables**

Trade receivables are recognised initially at the transaction price. They are subsequently measured at amortised cost using the effective interest rate method, less provision for impairment. A provision for impairment of trade receivables is established when there is objective evidence that the company will not be able to collect all amounts due according to the original terms of the receivables.

**2.7 Cash and cash equivalents**

Cash and cash equivalents includes cash on hand, demand deposits and other short-term highly liquid investments with original maturities of three months or less. Bank overdrafts are shown in current liabilities on the statement of financial position.

**2.8 Share capital and retained earnings**

All funds of a capital nature received by the company are accounted for directly to the company capital account. This includes the original donation received by the companyees to establish the company, as well as all donations received by the company since the company's inception. This excludes capital gains and losses realised by the company in the normal course of its business activities. company capital is reduced by any capital distributed by the companyees to any capital beneficiary.

Retained earnings consists of all revenues, capital gains and capital losses retained by the company after payment of all expenses, taxes and distributions of income and capital gains to beneficiaries.

**2.9 Borrowing costs**

Borrowings are recognised initially at the transaction price (that is, the present value of cash payable to the bank, including transaction costs). Borrowings are subsequently stated at amortised cost. Interest expense is recognised on the basis of the effective interest rate method and is included in finance costs.

Borrowings are classified as current liabilities unless the company has an unconditional right to defer settlement of the liability for at least 12 months after the reporting date.

**2.10 Trade payables**

Trade payables are recognised initially at the transaction price and subsequently measured at amortised cost using the effective interest rate method.

**2.12 Bank loans and overdrafts**

Interest expense is recognised on the basis of the effective interest rate method and is included in finance costs.

**8. Approval of annual financial statements**

These financial statements were approved by the company



# EXHIBIT D

## MINUTES OF SPECIAL MEETING OF THE DIRECTORS OF
## ETHOS ASSET MANAGEMENT, INC., A CALIFORNIA CORPORATION

A Special Meeting of the Directors of **Ethos Asset Management, Inc.**, a California corporation (the "Corporation") was held at the offices of the Corporation on December 31, 2021. The Special Meeting was called pursuant to the Bylaws of the Corporation permitting Special Meetings to be held without notice if all Directors sign a written waiver of said notice. Said notice is contained at the end of these Minutes of Special Meeting.

The purpose of this Special Meeting is to authorize the stock issuance of twenty and 20/100 (20.2) shares of the Corporation's issued and outstanding shares to **Ethos Ticari Danismanlik Anonim Sirket**. Such shares issued to **Ethos Ticari Danismanlik Anonim Sirket** will represent one percent (1%) of the total issued and outstanding shares of the Corporation's stock. The effective date of this stock issuance is January 1, 2022.

After full discussion, the Directors of the Corporation unanimously adopted the following resolutions on the 31st day of December, 2021:

**NOW, THEREFORE, BE IT RESOLVED,** that the Directors approve the stock issuance of twenty and 20/100 (20.2) shares of the Corporation's stock to **Ethos Ticari Danismanlik Anonim Sirket**, a Turkish legal entity.

**FURTHER RESOLVED,** a copy of the updated Stock Ledger for the Corporation is attached hereto.

**FURTHER RESOLVED,** that the Officers of the Corporation are hereby authorized to take any and reasonably necessary action to implement the Resolutions outlined herein.

There being no further business to come before the Directors, this Special Meeting was adjourned.

Respectfully Submitted,

Carlos Manuel Da Silva Santos, Secretary

This is to certify that the signature on the present document
appertains to Mr. Carlos Manuel Da Silva Santos to the best
of my knowledge and belief
Att. Meryem Ipeklioglu Orhan
Istanbul Bar Association - 31222 Registry Number

MINUTES OF SPECIAL MEETING OF THE DIRECTORS OF
ETHOS ASSET MANAGEMENT, INC., A CALIFORNIA CORPORATION

1

The undersigned, constituting all the Directors of **Ethos Asset Management, Inc.,** hereby waive notice and consent to the December 31, 2021 Special Meeting of the Directors and approve the Minutes as set forth hereinabove.

Carlos Manuel Da Silva Santos

This is to certify that the signature on the present document appertains to Mr. Carlos Manuel Da Silva Santos to the best of my knowledge and belief
Att. Meryem Ipeklioglu Orhan
Istanbul Bar Association - 31222 Registry Number

MINUTES OF SPECIAL MEETING OF THE DIRECTORS OF
ETHOS ASSET MANAGEMENT, INC., A CALIFORNIA CORPORATION

2

**Attachment**

Updated Stock Ledger as of January 1, 2022

MINUTES OF SPECIAL MEETING OF THE DIRECTORS OF
ETHOS ASSET MANAGEMENT, INC., A CALIFORNIA CORPORATION

3

## STOCK LEDGER FOR ETHOS ASSET MANAGEMENT, INC., A CALIFORNIA CORPORATION, AS OF JANUARY 1, 2022

| Cert. # | Shareholder | Shares | Date Issued | Date Cancelled/Transferred |
|---|---|---|---|---|
| 1 | Paloma Dina Marco Allen | 1,000 | 6/30/2020 | 6/30/2021 as to 1,000 shares transferred to Carlos Manuel Da Silva Santos as evidenced by Stock Certificate #3 on 7/1/2021 |
| 2 | Carlos Manuel Da Silva Santos | 1,000 | 6/30/2020 | 6/30/2021 as to 1,000 shares and reissued to Carlos Manuel Da Silva Santos as evidenced by Stock Certificate #3 on 7/1/2021 |
| 3 | Carlos Manuel Da Silva Santos | 2,000 | 7/1/2021 | Open |
| 4 | Ethos Ticari Danismanlik Anonim Sirket | 20.2 | 12/31/2021 | Open |
| 5 | Blank | | | |

Total Ownership of Shares as of January 1, 2022

| Shareholders | Shares | Percentage Ownership |
|---|---|---|
| Carlos Manuel Da Silva Santos | 2,000 | 99% |
| Ethos Ticari Danismanlik Anonim Sirket | 20.2 | 1% |
| Total | 2,020.2 | 100% |

STOCK LEDGER FOR ETHOS ASSET MANAGEMENT, INC., A CALIFORNIA CORPORATION, AS OF JANUARY 1, 2022

## MINUTES OF SPECIAL MEETING OF THE SHAREHOLDERS OF ETHOS ASSET MANAGEMENT, INC., A CALIFORNIA CORPORATION

A Special Meeting of the Shareholders of **Ethos Asset Management, Inc.**, a California corporation (the "Corporation") was held at the offices of the Corporation on December 31, 2021. The Special Meeting was called pursuant to the Bylaws of the Corporation permitting Special Meetings to be held without notice if all Shareholders sign a written waiver of said notice. Said notice is contained at the end of these Minutes of Special Meeting of the Shareholders.

The purpose of this Special Meeting is to authorize the stock issuance of twenty and 20/100 (20.2) shares of the Corporation's issued and outstanding shares to **Ethos Ticari Danismanlik Anonim Sirket**. Such shares issued to **Ethos Ticari Danismanlik Anonim Sirket** will represent one percent (1%) of the total issued and outstanding shares of the Corporation's stock. The effective date of this stock issuance is January 1, 2022. **Carlos Manuel Da Silva Santos** is owned by the Corporation's current sole Shareholder.

After full discussion, the Shareholders of the Corporation unanimously adopted the following resolutions on the 31st day of December, 2021:

**NOW, THEREFORE, BE IT RESOLVED**, that the Shareholders approve the stock issuance of twenty and 20/100 (20.2) shares of the Corporation's stock to **Ethos Ticari Danismanlik Anonim Sirket**, a Turkish legal entity.

**FURTHER RESOLVED**, that the Directors of the Corporation are hereby authorized to take any and reasonably necessary action to implement the Resolutions outlined herein.

There being no further business to come before the Shareholders, this Special Meeting of the Shareholders was adjourned.

Respectfully Submitted,

**Carlos Manuel Da Silva Santos, Secretary**

This is to certify that the signature on the present document appertains to Mr. Carlos Manuel Da Silva Santos to the best of my knowledge and belief
Att. Meryem Ipeklioglu Orhan
Istanbul Bar Association - 31222 Registry Number

MINUTES OF SPECIAL MEETING OF THE SHAREHOLDERS OF
ETHOS ASSET MANAGEMENT, INC., A CALIFORNIA CORPORATION

1

The undersigned, constituting all the Shareholders of **Ethos Asset Management, Inc.,** hereby waive notice and consent to the December 31, 2021 Special Meeting of the Shareholders and approve the Minutes as set forth hereinabove.

Carlos Manuel Da Silva Santos

This is to certify that the signature on the present document appertains to Mr. Carlos Manuel Da Silva Santos to the best of my knowledge and belief
Att. Meryem Ipeklioglu Orhan
Istanbul Bar Association - 31222 Registry Number

MINUTES OF SPECIAL MEETING OF THE SHAREHOLDERS OF
ETHOS ASSET MANAGEMENT, INC., A CALIFORNIA CORPORATION

2



INCORPORATED UNDER THE LAWS OF THE STATE OF CALIFORNIA

JUNE 12, 2020

ETHOS ASSET MANAGEMENT, INC.

AUTHORIZED 100,000 SHARES COMMON STOCK
NO PAR VALUE

This Certifies that

registered holder of

Ethos Ticari Danismanlik Anonim Sirket, a Turkish
Legal Entity

Twenty and 20/100 Shares

is the

ETHOS ASSET MANAGEMENT, INC.

transferable on the books of the Corporation by the holder hereof in person or by attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed this _____ day of _____ A.D. 20__

Carlos Manuel BDa Silva Santos

PRESIDENT

Carlos Manuel Da Silva Santos

SECRETARY



MINUTES OF SPECIAL MEETING OF BOARD OF DIRECTORS OF
ETHOS ASSET MANAGEMENT, INC A CALIFORNIA CORPORATION

A Special Meeting of the Directors of **Ethos Asset Management, Inc.** a California corporation ( 'the Corporation') was held at the offices of the Corporation on December 31, 2021.
The Special Meeting was called pursuant to the Bylaws of the Corporation of the permitting Special Meetings to be held without notice if all Directors sign a written waiver of said notice. Said notice is contained at the end of these Minutes of Special Meeting of the Directors.

The purpose of this Special Meeting is to authorize the issuance of twenty and 20/100 (20.2) shares of the Corporation's issued and outstanding Group B shares to **Ethos Ticari Danışmanlık Anonim Şirket**. Such shares issued to **Ethos Ticari Danışmanlık Anonim Şirket** will represent one (1%) of the total issued and outstanding Group B shares of the Corporation's stock and are valued at USD 15,000,000.00 (fifteen million US Dollars). The effective date of this stock issuance is January 1,2022.

After full discussion, the Directors of the Corporation unanimously adopted the following resolutions on December 31, 2021:

**NOW AND THEREFORE, IT BE RESOLVED,** that the Directors approve the stock issuance of twenty and 20/100 (20.2) of outstanding Group B shares of the Corporation's stock, valued at USD 15,000,000.00 (fifteen million US Dollars), to **Ethos Ticari Danışmanlık Anonim Şirket**, a Turkish legal entity.

**FURTHER RESOLVED,** a copy of the updated Stock Ledger for Corporation is attached hereto.

**FURTHER RESOLVED,** that the Officers of the Corporation are hereby authorized to take and any reasonably necessary actions to implement the Resolutions outlined herein.

There being no further business to come before the Directors, this Special Meeting of the Directors was adjourned.

Respectfully submitted

Carlos Manuel da Silva Santos, Secretary
This is to certify that the signature on the present document
appertains to Mr. Carlos Manuel Da Silva Santos to the best
of my knowledge and belief
Att. Meryem Ipekhogli Orhan
Istanbul Bar Association - 31222 Registry Number

MINUTES OF SPECIAL MEETING OF BOARD OF DIRECTORS OF
ETHOS ASSET MANAGEMENT, INC
1/3

The undersigned, constituting all the Directors of **Ethos Asset Management, Inc.** hereby waive notice and consent to the December 31, 2021, Special Meeting of the Directors and approve the Minutes as set forth hereinabove.

Carlos Manuel da Silva Santos

This is to certify that the signature on the present document appertains to Mr. Carlos Manuel Da Silva Santos to the best of my knowledge and belief
Att. Meryem Ipek%oglu Orhan
Istanbul Bar Association - 31222 Registry Number



MINUTES OF SPECIAL MEETING OF BOARD OF DIRECTORS OF
ETHOS ASSET MANAGEMENT, INC
2/3

**STOCK LEDGER FOR ETHOS ASSET MANAGEMENT, INC., A CALIFORNIA CORPORATION, AS OF JANUARY 1, 2022**

| Cert. # | Shareholder | Shares | Date Issued | Date Cancelled/Transferred |
|---|---|---|---|---|
| 1 | Paloma Dina Marco Allen | 1,000 | 6/30/2020 | 6/30/2021 as to 1,000 shares transferred to Carlos Manuel Da Silva Santos as evidenced by Stock Certificate #3 on 7/1/2021 |
| 2 | Carlos Manuel Da Silva Santos | 1,000 | 6/30/2020 | 6/30/2021 as to 1,000 shares and reissued to Carlos Manuel Da Silva Santos as evidenced by Stock Certificate #3 on 7/1/2021 |
| 3 | Carlos Manuel Da Silva Santos | 2,000 | 7/1/2021 | Open |
| 4 | Ethos Ticari Danismanlik Anonim Sirket | 20.2 | 12/31/2021 | Open |
| 5 | Blank | | | |

Total Ownership of Shares as of January 1, 2022

| Shareholders | Shares | Percentage Ownership |
|---|---|---|
| Carlos Manuel Da Silva Santos | 2,000 | 99% |
| Ethos Ticari Danismanlik Anonim Sirket | 20.2 | 1% |
| Total | 2,020.2 | 100% |

MINUTES OF SPECIAL MEETING OF BOARD OF DIRECTORS OF
ETHOS ASSET MANAGEMENT, INC
3/3

MINUTES OF SPECIAL MEETING OF SHAREHOLDERS OF
ETHOS ASSET MANAGEMENT, INC A CALIFORNIA CORPORATION

A Special Meeting of the Shareholders of **Ethos Asset Management, Inc.** a California corporation ( 'the Corporation') was held at the offices of the Corporation on December 31, 2021.
The Special Meeting was called pursuant to the Bylaws of the Corporation of the permitting Special Meetings to be held without notice if all Shareholders sign a written waiver of said notice. Said notice is contained at the end of these Minutes of Special Meeting of the Shareholders.

The purpose of this Special Meeting is to authorize the issuance of twenty and 20/100 (20.2) shares of the Corporation's issued and outstanding Group B shares to **Ethos Ticari Danışmanlık Anonim Şirket**. Such shares issued to **Ethos Ticari Danışmanlık Anonim Şirket** will represent one (1%) of the total issued and outstanding Group B shares of the Corporation's stock and are valued at USD 15,000,000.00 (fifteen million US Dollars). The effective date of this stock issuance is January 1,2022.

After full discussion, the Shareholders of the Corporation unanimously adopted the following resolutions on December 31, 2021:

NOW AND THEREFORE, IT BE RESOLVED, that the Shareholders approve the stock issuance of twenty and 20/100 (20.2) of outstanding Group B shares of the Corporation's stock, valued at USD 15,000,000.00 (fifteen million US Dollars), to **Ethos Ticari Danışmanlık Anonim Şirket**, a Turkish legal entity.

FURTHER RESOLVED, that the Directors of the Corporation are hereby authorized to take and any reasonably necessary actions to implement the Resolutions outlined herein.

There being no further business to come before the Shareholders, this Special Meeting of the Shareholders was adjourned.

Respectfully submitted

Carlos Manuel da Silva Santos, Secretary
This is to certify that the signature on the present document appertains to Mr. Carlos Manuel Da Silva Santos to the best of my knowledge and belief
Att. Meryem İpeklioğlu Orhan
Istanbul Bar Association - 31222 Registry Number

MINUTES OF SPECIAL MEETING THE SHAREHOLDERS OF
ETHOS ASSET MANAGEMENT, INC
1/2

The undersigned, constituting all the Shareholders of **Ethos Asset Management, Inc.** hereby waive notice and consent to the December 31, 2021, Special Meeting of the Shareholders and approve the Minutes as set forth hereinabove.

Carlos Manuel da Silva Santos

This is to certify that the signature on the present document appertains to Mr. Carlos Manuel Da Silva Santos to the best of my knowledge and belief
Att. Meryem Ipeklioglu Orhan
Istanbul Bar Association - 31222 Registry Number



MINUTES OF SPECIAL MEETING THE SHAREHOLDERS OF
ETHOS ASSET MANAGEMENT, INC
2/2

## AMENDED AND RESTATED BYLAWS OF
## ETHOS ASSET MANAGEMENT, INC.,
## A CALIFORNIA CORPORATION

### ARTICLE I
### OFFICES

Section 1.     PRINCIPAL OFFICE. The principal office for the transaction of business of the corporation is hereby fixed and located at 4660 La Jolla Village Drive, San Diego, CA 92122. The location may be changed by approval of a majority of the authorized Directors, and additional offices may be established and maintained at such other place or places, either within or without California, as the Board of Directors may from time to time designate.

Section 2.     OTHER OFFICES. Branch or subordinate offices may at any time be established by the Board of Directors at any place or places where the corporation is qualified to do business.

### ARTICLE II
### DIRECTORS - MANAGEMENT

Section 1.     RESPONSIBILITY OF BOARD OF DIRECTORS. Subject to the provisions of the General Corporation Law and to any limitations in the Articles of Incorporation of the corporation relating to action required to be approved by the Shareholders, as that term is defined in Section 153 of the California Corporations Code, or by the outstanding shares, as that term is defined in Section 152 of the Code, the business and affairs of the corporation shall be managed and all corporate powers shall be exercised by or under the direction of the Board of Directors. The Board may delegate the management of the day-to-day operation of the business of the corporation to a management company or other person, provided that the business and affairs of the corporation shall be managed and all corporate powers shall be exercised under the ultimate direction of the Board.

Section 2.     STANDARD OF CARE. Each Director shall perform the duties of a Director, including the duties as a member of any committee of the Board upon which the Director may serve, in good faith, in a manner such Director believes to be in the best interests of the corporation, and with such care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances. (Section 309)

Section 3.     EXCEPTION FOR CLOSE CORPORATION. Notwithstanding the provisions of Section 1, in the event that this corporation shall elect to become a close corporation as defined in Section 158, its Shareholders may enter into a Shareholders' Agreement as defined in Section 186. Said Agreement may provide for the exercise of corporate powers and the management of the business and affairs of this corporation by the Shareholders, provided, however, such agreement shall, to the extent and so long as the discretion or the powers of the Board in its management of corporate affairs is controlled by such agreement, impose upon each Shareholder who is a party thereof, liability for managerial acts performed or omitted by such person pursuant thereto otherwise imposed upon the Directors as provided in Section 300(d); and the Directors shall be relieved to that extent from such liability.

Section 4.    NUMBER AND QUALIFICATION OF DIRECTORS.    The authorized number of Directors shall be one (1), until changed by a duly adopted amendment to the Articles of Incorporation, or by an amendment to this bylaw adopted by the vote or written consent of holders of a majority of the outstanding shares entitled to vote, as provided in Section 212.

Section 5.    ELECTION AND TERM OF OFFICE OF DIRECTORS.    Directors shall be elected at each annual meeting of the Shareholders to hold office until the next annual meeting. Each Director, including a Director elected to fill a vacancy, shall hold office until the expiration of the term for which elected and until a successor has been elected and qualified.

Section 6.    VACANCIES.    Vacancies in the Board of Directors may be filled by a majority of the remaining Directors, though less than a quorum, or by a sole remaining Director; except that a vacancy created by the removal of a Director by the vote or written consent of the Shareholders or by court order may be filled only by the vote of a majority of the shares entitled to vote represented at a duly held meeting at which a quorum is present, or by the written consent of holders of a majority of the outstanding shares entitled to vote. Each Director so elected shall hold office until the next annual meeting of the Shareholders and until a successor has been elected and qualified.

A vacancy or vacancies in the Board of Directors shall be deemed to exist in the event of the death, resignation, or removal of any Director, or if the Board of Directors by resolution declares vacant the office of a Director who has been declared of unsound mind by an order of court or convicted of a felony, or if the authorized number of Directors is increased, or if the shareholders fail, at any meeting of shareholders at which any Director or Directors are elected, to elect the number of Directors to be voted for at that meeting.

The Shareholders may elect a Director or Directors at any time to fill any vacancy or vacancies not filled by the Directors, but any such election by written consent shall require the consent of a majority of the outstanding shares entitled to vote.

No reduction of the authorized number of Directors shall have the effect of removing any Director before that Director's term of office expires.

Section 7.    REMOVAL OF DIRECTORS.    The entire Board of Directors or any individual Director may be removed from office as provided by Sections 302, 303 and 304 of the Corporations Code of the State of California. In such case, the remaining Board members may elect a successor Director to fill such vacancy for the remaining unexpired term of the Director so removed.

Section 8.    NOTICE, PLACE AND MANNER OF MEETINGS.    Meetings of the Board of Directors may be called by the Chairman of the Board, or the President, or any Vice President, or the Secretary, or any two (2) Directors, if more than one, and shall be held at the principal executive office of the corporation, unless some other place is designated in the notice of meeting. Members of the Board may participate in a meeting through use of a conference telephone or similar communications equipment so long as all members participating in such a meeting can hear one another. Accurate minutes of any meeting of the Board, or any committee thereof, shall be maintained as required by Section 1500 of the Code by the Secretary or other Officer designated for that purpose.

Section 9.     ORGANIZATION MEETINGS.  The organization meetings of the Board of Directors shall be held immediately following the adjournment of the annual meetings of the Shareholders.

Section 10.     OTHER REGULAR MEETINGS.  Regular meetings of the Board of Directors shall be held at the corporate offices, or such other place as may be designated by the Board of Directors, as follows:

Time of Regular Meeting: 2:00 p.m.
Date of Regular Meeting: Every Fourth Tuesday in June

If said day shall fall upon a holiday, such meetings shall be held on the next succeeding business day thereafter.  No notice needs to be given of such regular meetings.

Section 11.     SPECIAL MEETINGS - NOTICES - WAIVERS.  Special meetings of the Board may be called at any time by any of the aforesaid officers, i.e., by the Chairman of the Board or the President or any Vice President or the Secretary or any two (2) Directors, if more than one.

At least forty-eight (48) hours notice of the time and place of special meetings shall be delivered personally to the Directors or personally communicated to them by a corporate officer by telephone or telegraph.  If the notice is sent to a Director by letter, it shall be addressed to him or her at his or her address as it is shown upon the records of the corporation, or if it is not so shown on such records or is not readily ascertainable, at the place in which the meetings of the Directors are regularly held.  In case such notice is mailed, it shall be deposited in the United States mail, postage prepaid, in the place in which the principal executive office of the corporation is located at least four (4) days prior to the time of the holding of the meeting.  Such mailing, telegraphing, telephoning or delivery as provided above shall be due, legal, and personal notice to such Director.

When all of the Directors are present at any Directors meeting, however called or noticed, and either (i) sign a written consent thereto on the records of such meeting, or, (ii) if a majority of the Directors are present and if those not present sign a waiver of notice of such meeting or a consent to holding the meeting or an approval of the minutes thereof, whether prior to or after the holding of such meeting, which said waiver, consent or approval shall be filed with the Secretary of the corporation, or, (iii) if a Director attends to a meeting without notice but without protesting, prior thereto or at its commencement, the lack of notice, then the transactions thereof are as valid as if had at a meeting regularly called and noticed.

Section 12.     SOLE DIRECTOR PROVIDED BY ARTICLES OF INCORPORATION OR BYLAWS.  In the event only one (1) Director is required by the By-laws or Articles of Incorporation, then any reference herein to notices, waivers, consents, meetings or other actions by a majority or quorum of the Directors shall be deemed to refer to such notice, waiver, etc., by such sole Director, who shall have all the rights and duties and shall be entitled to exercise all of the powers and shall assume all the responsibilities otherwise herein described as given to a Board of Directors.

BYLAWS
3

Section 13.    DIRECTOR'S ACTION BY UNANIMOUS WRITTEN CONSENT.  Any action required or permitted to be taken by the Board of Directors may be taken without a meeting and with the same force and effect as if taken by a unanimous vote of Directors, if authorized by a writing signed individually or collectively by all members of the Board.  Such consent shall be filed with the regular minutes of the Board.

Section 14.    QUORUM.  A majority of the number of Directors as fixed by the Articles of Incorporation or Bylaws shall be necessary to constitute a quorum for the transaction of business, and the action of a majority of the Directors present at any meeting at which there is a quorum, when duly assembled, is valid as a corporate act; provided that a minority of the Directors, in the absence of a quorum, may adjourn from time to time, but may not transact any business.  A meeting at which a quorum is initially present may continue to transact business, notwithstanding the withdrawal of Directors, if any action taken is approved by a majority of the required quorum for such meeting.

Section 15.    NOTICE OF ADJOURNMENT.  Notice of the time and place of holding an adjourned meeting need not be given to absent Directors if the time and place be fixed at the meeting adjourned and held within twenty-four (24) hours, but if adjourned more than twenty-four (24) hours, notice shall be given to all Directors not present at the time of adjournment.

Section 16.    COMPENSATION OF DIRECTORS.  Directors, as such, shall not receive any stated salary for their services, but by resolution of the Board a fixed sum and expense of attendance, if any, may be allowed for attendance at each regular and special meeting of the Board; provided that nothing herein contained shall be construed to preclude any Director from serving the corporation in any other capacity and receiving compensation therefor.

Section 17.    COMMITTEES.  Committees of the Board may be appointed by resolution passed by a majority of the whole Board.  Committees shall be composed of two (2) or more members of the Board, and shall have such powers of the Board as may be expressly delegated to it by resolution of the Board of Directors, except those powers expressly made non-delegate by Section 311.

Section 18.    ADVISORY DIRECTORS.  The Board of Directors from time to time may elect one or more persons to be Advisory Directors who shall not by such appointment be members of the Board of Directors.  Advisory Directors shall be available from time to time to perform special assignments specified by the President, to attend meetings of the Board of Directors upon invitation and to furnish consultation to the Board.  The period during which the title shall be held may be prescribed by the Board of Directors.  If no period is prescribed, the title shall be held at the pleasure of the Board.

Section 19.    RESIGNATIONS.  Any Director may resign effective upon giving written notice to the Chairman of the Board, the President, the Secretary or the Board of Directors of the corporation, unless the notice specifies a later time for the effectiveness of such resignation.  If the resignation is effective at a future time, a successor may be elected to take office when the resignation becomes effective.

BYLAWS
4

## ARTICLE III
## OFFICERS

Section 1.     OFFICERS.  The Officers of the corporation shall be a President, a Secretary, and a Chief Financial Officer.  The corporation may also have, at the discretion of the Board of Directors, a Chairman of the Board, one or more Vice Presidents, one or more Assistant Secretaries, one or more Assistant Treasurers, and such other Officers as may be appointed in accordance with the provisions of Section 3 of this Article III.  Any number of offices may be held by the same person.

Section 2.     ELECTION.  The Officers of the corporation, except such Officers as may be appointed in accordance with the provisions of Section 3 or Section 5 of this Article, shall be chosen annually by the Board of Directors, and each shall hold office until he or she shall be removed or otherwise disqualified to serve, or a successor shall be elected and qualified.

Section 3.     SUBORDINATE OFFICERS, ETC.  The Board of Directors may appoint such other Officers as the business of the corporation may require, each of whom shall hold office for such period, have such authority and perform such duties as are provided in the Bylaws or as the Board of Directors may from time to time determine.

Section 4.     REMOVAL AND RESIGNATION OF OFFICERS.  Subject to the rights, if any, of an Officer under any contract of employment, any Officer may be removed, either with or without cause, by the Board of Directors, at any regular or special meeting to the Board, or, except in case of an officer chosen by the Board of Directors, by any Officer upon whom such power of removal be conferred by the Board of Directors.

Any Officer may resign at any time by giving written notice to the corporation.  Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective.  Any resignation is without prejudice to the rights, if any, of the corporation under any contract to which the Officer is a party.

Section 5.     VACANCIES.  A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in the Bylaws for regular appointments to that office.

Section 6.     CHAIRMAN OF THE BOARD.  The Chairman of the Board, if such an officer be elected, shall, if present, preside at meetings of the Board of directors and exercise and perform such other powers and duties as may be from time to time assigned by the Board of Directors or prescribed by the Bylaws.  If there is no President, the Chairman of the Board shall, in addition, be Chief Executive Officer of the corporation and shall have the powers and duties prescribed in Section 7 of this Article III.

Section 7.     PRESIDENT.  Subject to such supervisory powers, if any, as may be given by the Board of Directors to the Chairman of the Board, if there be such an officer, the President shall be the Chief Executive Officer of the corporation and shall, subject to the control of the Board of Directors, have general supervision, direction and control of the business and Officers of the corporation.  He or she shall

preside at all meetings of the Shareholders and in the absence of the Chairman of the Board, or if there be none, at all meetings of the Board of Directors. The President shall be ex officio a member of all the standing committees, including the Executive Committee, if any, and shall have the general powers and duties of management usually vested in the office of President of a corporation, and shall have such other powers and duties as may be prescribed by the Board of Directors or the Bylaws.

Section 8.    VICE PRESIDENT.    In the absence or disability of the President, the Vice Presidents, if any, in order of their rank as fixed by the Board of Directors, or if not ranked, the Vice President designated by the Board of Directors, shall perform all the duties of the President, and when so acting shall have all the powers of, and be subject to, all the restrictions upon, the President. The Vice Presidents shall have such other powers and perform such other duties as from time to time may be prescribed for them respectively by the Board of Directors or the Bylaws.

SECTION 9.    SECRETARY.    The Secretary shall keep, or cause to be kept, a book of minutes at the principal office or such other place as the Board of Directors may order, of all meetings of Directors and Shareholders, with the time and place of holding, whether regular or special, and if special, how authorized, the notice thereof given, the names of those present at Directors' meetings, the number of shares present or represented at Shareholders' meetings and the proceedings thereof.

The Secretary shall keep, or cause to be kept, at the principal office or at the office of the corporation's transfer agent, a share register, or duplicate share register, showing the names of the shareholders and their addresses; the number and classes of shares held by each; the number and date of certificates issued for the same; and the number and date of cancellation of every certificate surrender for cancellation.

The Secretary shall give, or cause to be given, notice of all meetings of the Shareholders and of the Board of Directors required by the Bylaws or by law to be given. He or she shall keep the seal of the corporation in safe custody, and shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or by the Bylaws.

Section 10.    CHIEF FINANCIAL OFFICER.    The Chief Financial Officer shall keep and maintain, or cause to be kept and maintained in accordance with generally accepted accounting principles, adequate and correct accounts of the properties and business transaction of the corporation, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, earnings (or surplus) and shares. The books of account shall at all reasonable times be open to inspection by any Director.

This Officer shall deposit all moneys and other valuables in the name and to the credit of the corporation with such depositories as may be designated by the Board of Directors. He or she shall disburse the funds of the corporation as may be ordered by the Board of Directors, shall render to the President and Directors, whenever they request it, an account of all of his or transactions and of the financial condition of the corporation, and shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or the Bylaws.

## ARTICLE IV
## SHAREHOLDERS' MEETINGS

Section 1.     PLACE OF MEETINGS.  All meetings of the Shareholders shall be held at the principal executive office of the corporation unless some other appropriate and convenient location be designated for that purpose from time to time by the Board of Directors.

Section 2.     ANNUAL MEETINGS.  The annual meetings of the Shareholders shall be held, each year, at the time and on the day following:

Time of Meeting:     10:00 a.m.
Date of Meeting:     Every Fourth Tuesday in June

If this day shall be a legal holiday, then the meeting shall be held on the next succeeding business day, at the same hour.  At the annual meting, the Shareholders shall elect a Board of Directors, consider reports of the affairs of the corporation and transact such other business as may be properly brought before the meeting.

Section 3.     SPECIAL MEETINGS.  Special meetings of the Shareholders may be called at any time by the Board of Directors, the Chairman of the Board, the President, a Vice President, the Secretary, or by one or more Shareholders holding not less than one-tenth (1/10) of the voting power of the corporation.  Except as next provided, notice shall be given as for the annual meeting.

Upon receipt of a written request addressed to the Chairman, President, Vice President, or Secretary, mailed or delivered personally to such Officer by any person (other than the Board) entitled to call a special meeting of Shareholders, such Officer shall cause notice to be given, to the Shareholders entitled to vote, that a meeting will be held at a time requested by the person or persons calling the meeting, not less than thirty-five (35) nor more than sixty (60) days after the receipt of such request.  If such notice is not given within twenty (20) days after receipt of such request, the persons calling the meetings may give notice thereof in the manner provided by these Bylaws or apply to the Superior Court as provided in Section 305(c).

Section 4.     NOTICE OF MEETINGS - REPORTS.  Notice of meetings, annual or special, shall be given in writing not less than ten (10) nor more than sixty (60) days before the date of the meeting to Shareholders entitled to vote thereat.  Such notice shall be given by the Secretary or the Assistant Secretary, or if there be no such Officer, or in the case of his or her neglect or refusal, by any Director or Shareholder.

Such notices or any reports shall be given personally or by mail or other means of written communication as provided in Section 601 of the Code and shall be sent to the Shareholder's address appearing on the books of the corporation, or supplied by him or her to the corporation for the purpose of notice, and in the absence thereof, as provided in Section 601 of the Code.

Notice of any meeting of Shareholders shall specify the place, the day and the hour of meeting, and (1) in the case of a special meeting, the general nature of the business to be transacted and no other

BYLAWS
7

business may be transacted, or (2) in the case of an annual meeting, those matters which the Board at date of mailing, intends to present for action by the Shareholders. At any meetings where Directors are to be elected, notice shall include the names of the nominees, if any, intended at date of notice to be presented by management for election.

If a Shareholder supplies no address, notice shall be deemed to have been given if mailed to the place where the principal executive office of the corporation, in California is situated, or published at least once in some newspaper of general circulation in the County of said principal office.

Notice shall be deemed given at the time it is delivered personally or deposited in the mail or sent by other means of written communication. The Officer giving such notice or report shall prepare and file an affidavit or declaration thereof.

When a meeting is adjourned for forty-five (45) days or more, notice of the adjourned meeting shall be given as in case of an original meeting. Save, as aforesaid, it shall not be necessary to give any notice of adjournment or of the business to be transacted at an adjourned meeting other than by announcement at the meeting at which such adjournment is taken.

Section 5.    WAIVER OF NOTICE OR CONSENT BY ABSENT SHAREHOLDERS. The transactions of any meeting of Shareholders, however called and noticed, shall be valid as though had at a meeting duly held after regular call and notice, if a quorum be present either in person or by proxy, and if, either before or after the meeting, each of the Shareholders entitled to vote, not present in person or by proxy, sign a written waiver of notice, or a consent to the holding of such meeting or an approval of the minutes thereof. All such waivers, consents or approvals shall be filed with the corporate records or made a part of the minutes of the meetings. Attendance shall constitute a waiver of notice, unless objection shall be made as provided in Section 601(e).

Section 6.    SHAREHOLDERS ACTING WITHOUT A MEETING - DIRECTORS. Any action which may be taken at a meeting of the Shareholders, may be taken without a meeting or notice of meeting if authorized by a writing signed by all of the Shareholders entitled to vote at a meeting for such purpose, and filed with the Secretary of the corporation, provided, further, that while ordinarily Directors can only be elected by unanimous written consent under Sec 603(d), if the Directors fail to fill a vacancy, then a Director to fill that vacancy may be elected by the written consent of persons holding a majority of shares entitled to vote for the election of Directors.

Section 7.    OTHER ACTIONS WITHOUT A MEETING. Unless otherwise provided in the California Corporations Code or the Article, any action which may be taken at any annual or special meeting of Shareholders may be taken without a meeting and without prior notice, if a consent in writing, setting forth the action so taken, signed by the holder of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

Unless the consents of all Shareholders entitled to vote have been solicited in writing:

(1)    Notice of any Shareholder approval pursuant to Sections 310, 317, 1201, or 2007 without a

BYLAWS

8

meeting by less than unanimous written consent shall be given at least ten (10) days before the consummation of the action authorized by such approval, and

(2)    Prompt notice shall be given of the taking of any other corporate action approved by Shareholders without a meeting by less than unanimous written consent, to each of those Shareholders entitled to vote who have not consented in writing.

Any Shareholder giving a written consent, or the Shareholder's proxyholders, or a transferee of the shares of a personal representative of the Shareholder or their respective proxyholders, may revoke the consent by a writing received by the corporation prior to the time that written consents of the number of shares required to authorize the proposed action have been filed with the Secretary of the corporation, but may not do so thereafter. Such revocation is effective upon its receipt by the Secretary of the corporation.

Section 8.    QUORUM. The holders of a majority of the shares entitled to vote thereat, present in person, or represented by proxy, shall constitute a quorum at all meetings of the Shareholders for the transaction of business except as otherwise provided by law, by the Article of Incorporation, or by these Bylaws. If, however, such majority shall not be present or represented at any meeting of the Shareholders, the Shareholders entitled to vote thereat, present in person, or by proxy, shall have the power to adjourn the meeting from time to time, until the requisite amount of voting shares shall be present. At such adjourned meeting at which the requisite amount of voting shares shall be represented, any business may be transacted which might have been transacted at a meeting as originally notified.

If a quorum be initially present, the Shareholders may continue to transact business until adjournment, notwithstanding the withdrawal of enough Shareholders to leave less than a quorum, if any action taken is approved by a majority of the Shareholders required to initially constitute a quorum.

Section 9.    VOTING. Only persons in whose names shares entitled to vote stand on the stock records of the corporation on the day of any meeting of Shareholders, unless some other day be fixed by the Board of Directors for the determination of Shareholders of record, and then on such other day, shall be entitled to vote at such meeting.

Provided the candidate's name has been placed in nomination prior to the voting and one or more Shareholder has given notice at the meeting prior to the voting of the Shareholder's intent to cumulate the Shareholder's votes, every Shareholder entitled to vote at any election for Directors of any corporation for profit may cumulate their votes and given one candidate a number of votes equal to the number of Directors to be elected multiplied by the number of votes to which his or her shares are entitled, or distribute his or her votes on the same principle among as many candidates as he or she thinks fit.

The candidates receiving the highest number of votes up to the number of Directors to be elected are elected.

The Board of Directors may fix a time in the future not exceeding sixty (60) days preceding the date of any meeting of Shareholders or the date fixed for the payment of any dividend or distribution, or for the allotment or rights, or when any changes or conversion or exchange of shares shall go into effect, as a record date for the determination of the Shareholders entitled to notice of and to vote at any such

meeting, or entitled to receive any such dividend or distribution, or any allotment of rights, or to exercise the rights in respect to any such changes, conversion or exchange of shares. In such case only Shareholders of record on the date so fixed shall be entitled to notice of and to vote at such meeting, or to receive such dividends, distribution or allotment of rights, or to exercise such rights, as the case may be notwithstanding any transfer of any share on the books of the corporation after any record date fixed as aforesaid. The Board of Directors may close the books of the corporation against transfers of shares during the whole or any part of such period.

Section 10.     PROXIES. Every Shareholder entitled to vote, or to execute consents, may do so, either in person or by written proxy, executed in accordance with the provisions of Sections 604 and 705 of the Code and filed with the Secretary of the corporation.

Section 11.     ORGANIZATION. The President, or in the absence of the President, any Vice President, shall call the meeting of the Shareholders to order, and shall act as chairman of the meeting. In the absence of the President and all of the Vice Presidents, Shareholders shall appoint a chairman for such meeting. The Secretary of the corporation shall act as Secretary of all meetings of the Shareholders, but in the absence of the Secretary at any Meeting of the Shareholders, the presiding Officer may appoint any person to act as Secretary of the meeting.

Section 12.     INSPECTORS OF ELECTION. In advance of any meeting of Shareholders the Board of Directors may, if they so elect, appoint inspectors of election to act at such meeting or any adjournment thereof. If inspectors of election be not so appointed, or if any persons so appointed fail to appear or refuse to act, the chairman of any such meeting may, and on the request of any Shareholder or his or her proxy, shall make such appointment at the meeting in which case the number of inspectors shall be either one (1) or three (3) as determined by a majority of the Shareholders represented at the meeting.

Section 13.     (A) SHAREHOLDERS' AGREEMENTS. Notwithstanding the above provisions, in the event this corporation elects to become a close corporation, an agreement between two (2) or more Shareholders

thereof, if in writing and signed by the parties thereof, may provide that in exercising any voting rights the shares held by them shall be voted as provided therein or in Section 706, and may otherwise modify these provisions as to Shareholders' meetings and actions.

(B)     EFFECT OF SHAREHOLDERS' AGREEMENTS. Any Shareholders' Agreement authorized by Section 300(b), shall only be effective to modify the terms of these Bylaws if this corporation elects to become a close corporation with appropriate filing of or amendment to its Articles as required by a close corporation. Such an agreement cannot waive or alter Sections 158 (defining close corporations), 202 (requirements of Articles of Incorporation), 500 and 501 (relative to distributions), 111 (merger), 1201(e) (reorganization), or Chapters 15 (Records and Reports) or 16 (Rights of Inspection), 18 (Involuntary Dissolution) or 22 (Crimes and Penalties). Any other provisions of the Code or these Bylaws may be altered or waived thereby, but to the extent they are not so altered or waived, these Bylaws shall be applicable.

BYLAWS
10

## ARTICLE V
## CERTIFICATES AND TRANSFER OF SHARES

Section 1.     CERTIFICATES FOR SHARES.  Certificates for shares shall be of such form and device as the Board of Directors may designate and shall state the name of the record holder of the shares represented thereby; its number; date of issuance; the number of shares for which it is issued; a statement of the rights, privileges, preferences and restrictions, if any; a statement as to the redemption or conversion, if any; a statement of liens or restrictions upon transfer or voting, if any; if the shares be assessable or, if assessments are collectible by personal action, a plain statement of such facts.

All certificates shall be signed in the name of the corporation by the Chairman of the Board or Vice Chairman of the Board or the President or Vice President and by the Chief Financial Officer or an Assistant Treasurer or the Secretary or any Assistant Secretary, certifying the number of shares and the class or series of shares owned by the Shareholder.

Any or all of the signatures on the certificate may be facsimile.  In case any Officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed on a certificate shall have ceased to be that Officer, transfer agent, or registrar before that certificate is issued, it may be issued by the corporation with the same effect as if that person were an Officer, transfer agent, or registrar at the date of issue.

Section 2.     TRANSFER ON THE BOOKS.  Upon surrender to the Secretary or transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

Section 3.     LOST OR DESTROYED CERTIFICATES.  Any person claiming a certificate of stock to be lost or destroyed shall make an affidavit or affirmation of the fact and shall, if the Directors so require, give the corporation a bond of indemnity, in form and with one or more sureties satisfactory to the Board, in at least double the value of the stock represented by said certificate, whereupon a new certificate may be issued in the same tenor and for the same number of shares as the one alleged to be lost or destroyed.

Section 4.     TRANSFER AGENTS AND REGISTRARS.  The Board of Directors may appoint one or more transfer agents or transfer clerks, and one or more registrars, which shall be an incorporated bank or trust company, either domestic or foreign, who shall be appointed at such times and places as the requirements of the corporation may necessitate and the Board of Directors may designate.

Section 5.     CLOSING STOCK TRANSFER BOOKS - RECORD DATE.  In order that the corporation may determine the Shareholders entitled to notice of any meeting or to vote or entitled to receive payment of any dividend or other distribution or allotment of any rights or entitled to exercise any rights in respect of any other lawful action, the Board may fix, in advance, a record date, which shall not

be more than sixty (60) nor less then ten (10) days prior to the date of such meeting nor more than sixty (60) days prior to any other action.

If no record date is fixed, the record date for determining Shareholders entitled to notice of or to vote at a meeting of Shareholders shall be at the close of business on the business day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held. The record date for determining Shareholders entitled to give consent to corporate action in writing without a meeting, when no prior action by the Board is necessary, shall be the day on which the first written consent is given.

The record date for determining Shareholders for any other purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto, or the sixtieth (60th) day prior to the date of such other action, whichever is later.

Section 6.     LEGEND CONDITION.  In the event any shares of this corporation are issued pursuant to a permit or exemption therefrom requiring the imposition of a legend condition, the person or persons issuing or transferring said shares shall make sure said legend appears on the certificate and shall not be required to transfer any shares free of such legend unless an amendment to such permit or a new permit be first issued so authorizing such a deletion.

Section 7.     CLOSE CORPORATION CERTIFICATES.  All certificates representing shares of this corporation in the event it shall elect to become a close corporation, shall contain the legend required by Section 418(c).

Section 8.     PROVISION RESTRICTING TRANSFER OF SHARES.  Before there can be a valid sale or transfer of any of the shares of this corporation by the holders thereof, the holder of the shares to be sold or transferred shall first give notice in writing to the Secretary of this corporation of his or her intention to sell or transfer such shares.  Said notice shall specify the number of shares to be sold or transferred, the price per share and the terms upon which such holder intends to make such sale or transfer.  The Secretary shall, within five (5) days thereafter, mail or deliver a copy of said notice to each of the other Shareholders of record of this corporation.  Such notice may be delivered to such Shareholders personally or may be mailed to the last known addresses of such Shareholders, as the same may appear on the books of this corporation.  Within thirty (30) days after the mailing or delivery of said notices to such Shareholders, any such Shareholder or Shareholders desiring to acquire any part or all of the shares referred to in said notice shall deliver by mail or otherwise to the Secretary of this corporation a written offer or offers to purchase a specified number or numbers of such shares at the price and upon the terms stated in said notice.

If the total number of shares specified in such offers exceeds the number of shares referred to in said notice, each offering Shareholder shall be entitled to purchase such proportion of the shares referred to in said notice to the Secretary, as the number of shares of this corporation, which he or she holds bears to the total number of shares held by all Shareholders desiring to purchase the shares referred to in said notice to the Secretary.

If all of the shares referred to in said notice to the Secretary are not disposed of under such

BYLAWS
12

apportionment, each Shareholder desiring to purchase shares in a number in excess of his or her proportionate share, as provided above, shall be entitled to purchase such proportion of those shares which remain thus undisposed of, as the total number of shares which he or she holds bears to the total number of shares held by all of the Shareholders desiring to purchase shares in excess of those to which they are entitled under such apportionment.

The aforesaid right to purchase the shares referred to in the aforesaid notice to the Secretary shall apply only if all of the shares referred to in said notice are purchased. Unless all of the shares referred to in said notice to the Secretary are purchased, as aforesaid, in accordance with offers made within said thirty (30) days, the Shareholder desiring to sell or transfer may dispose of all shares of stock referred to in said notice to the Secretary to any person or persons whomsoever; provided, however, that he or she shall not sell or transfer such shares at a lower price or on terms more favorable to the purchaser or transferee than those specified in said notice to the Secretary.

Any sale or transfer, or purported sale or transfer, of the shares of said corporation shall be null ad void unless the terms, conditions and provisions of this section are strictly observed and followed.

Section 9.    PLEDGED OR HYPOTHECATED SHARES.    Any Shareholder desiring to borrow money on or hypothecate any or all of the shares of stock held by such Shareholder shall first mail notice in writing to the Secretary of this corporation of his or intention to do so. Said notice shall specify the number of shares to be pledged or hypothecated, the amount to be borrowed per share, the terms, rate of interest, and other provisions upon which each Shareholder intends to make such loan or hypothecation. The Secretary shall, within five (5) days thereafter, mail or deliver a copy of said notice to each of the other Shareholder of record of this corporation. Such notice may be delivered to such Shareholder personally, or may be mailed to the last known addresses of such Shareholders as the same may appear on the books of this corporation. Within fifteen (15) days after the mailing or delivering of said notice to said Shareholders, any such Shareholder or Shareholders desiring to lend any part or all of the amount sought to be borrowed, as set forth in said notice, at the terms therein specified, shall deliver by mail, or otherwise, to the Secretary of this corporation a written offer or offers to lend a certain amount of money for the term, at the rate of interest, and upon the other provisions specified in said notice.

If the total amount of money subscribed in such offers exceeds the amount sought to be borrowed, specified in said notice, each offering Shareholder shall be entitled to lend such proportion of the amount sought to be borrowed, as set forth in said notice, as the number of shares which he or she holds bears to the total number of shares held by all such Shareholders desiring to lend all or part of the amount specified in said notice.

If the entire amount of monies sought to be borrowed, as specified in said notice, is not subscribed as set forth in the preceding paragraphs, each Shareholder desiring to lend an amount in excess of his or her proportionate share, as specified in the preceding paragraph, shall be entitled to lend such proportion of the subscribed amount as the total number of shares which he or she holds bears to the total number of shares held by all of the Shareholders desiring to lend an amount in excess of that to which they are entitled under such apportionment. If there be but one Shareholder so desiring to lend, such Shareholder shall be entitled to lend up to the full amount sought to be borrowed.

BYLAWS
13

If none, or only a part of the amount sought to be borrowed, as specified in said notice, is subscribed as aforesaid, in accordance with offers made within said fifteen (15) day period, the Shareholder desiring to borrow may borrow from any person or persons he or she may so desire as to any or all shares of stock held by him or her which have not been covered by lending Shareholders; provided, however, that said Shareholders shall not borrow any lesser amount, or any amount on terms less favorable to the borrower, than those specified in said notice to the Secretary.

Any pledge or hypothecation, or other purported transfer as security for a loan of the shares of this corporation, shall be null and void unless the terms, conditions and provisions of these Bylaws are strictly observed and followed.

Section 10.     TRANSFER OF SHARES SUBJECT TO OTHER AGREEMENTS.  In addition to the restrictions on a Shareholder transferring shares of the corporation contained herein, any buy-sell agreement or other shareholder agreement shall further control to the extent permitted by law regarding the transfer, assignment, hypothecation, or other sale of any shares owned by the shareholders of the corporation.

## ARTICLE VI
## RECORDS - REPORTS - INSPECTION

Section 1.     RECORDS.  The corporation shall maintain, in accordance with generally accepted accounting principles, adequate and correct accounts, books and records of its business and properties.  All of such books, records and accounts shall be kept at its principal executive office in the State of California, as fixed by the Board of Directors from time to time.

Section 2.     INSPECTION OF BOOKS AND RECORDS.  All books and records provided for in Section 1500 shall be open to inspection of the Directors and Shareholders from time to time and in the manner provided in said Section 1600 - 1602.

Section 3.     CERTIFICATION AND INSPECTION OF BYLAWS.  The original or a copy of these Bylaws, as amended or otherwise altered to date, certified by the Secretary, shall be kept at the corporation's principal executive office and shall be open to inspection by the Shareholders of the corporation at all reasonable times during office hours, as provided in Sec 213 of the Corporations Code.

Section 4.     CHECKS, DRAFTS, ETC.  All checks, drafts, or other orders for payment of money, notes or other evidences of indebtedness, issued in the name of or payable to the corporation, shall be signed or endorsed by such person or persons and in such manner as shall be determined from time to time by resolution of the Board of Directors.

Section 5.     CONTRACTS, ETC. – HOW EXECUTED.  The Board of Directors, except as in the Bylaws otherwise provided, may authorize any Officer or Officers, agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the corporation. Such authority may be general or confined to specific instances.  Unless so authorized by the Board of Directors, no Officer, agent or employee shall have any power or authority to bind the corporation by any contract or agreement, or to pledge its credit, or to render it liable for any purpose or to any amount, except as provided in Section 313 of the Corporations Code.

BYLAWS
14

## ARTICLE VII
## ANNUAL REPORTS

Section 1.     REPORT TO SHAREHOLDERS, DUE DATE.   The Board of Directors shall cause an annual report to be sent to the Shareholders not later than one hundred twenty (120) days after the close of the fiscal or calendar year adopted by the corporation.  This report shall be sent at least fifteen (15) days before the annual meeting of Shareholders to be held during the next fiscal year and in the manner specified in Section 4 of Article IV of these Bylaws for giving notice to Shareholders of the corporation.  The annual report shall contain a balance sheet as of the end of the fiscal year and an income statement and statement of changes in financial position for the fiscal year, accompanied by any report of independent accountants or, if there is no such report, the certificates of an authorized Officer of the corporation that the statements were prepared without audit from the books and records of the corporation.

Section 2.     WAIVER.  The annual report to Shareholders referred to in Section 1501 of the California General Corporation Law is expressly dispensed with so long as this corporation shall have less than one hundred (100) Shareholders.  However, nothing herein contained shall be interpreted as prohibiting the Board of Directors from issuing annual or other periodic reports to the Shareholders of the corporation as they consider appropriate.

## ARTICLE VIII
## AMENDMENTS TO BYLAWS

Section 1.     AMENDMENT BY SHAREHOLDERS.  New Bylaws may be adopted or these Bylaws may be amended or repealed by the vote or written consent of holders of a majority of the outstanding shares entitled to vote; provided, however, that if the Articles of Incorporation of the corporation set forth the number of authorized Directors of the corporation, the authorized number of Directors may be changed only by an amendment of the Article of Incorporation.

Section 2.     POWERS OF DIRECTORS.  Subject to the right of the Shareholders to adopt, amend or repeal Bylaws, as provided in Section 1 of this Article VIII, and the limitations of Section 204(a)(5) and Section 212, the Board of Directors may adopt, amend, or repeal any of these Bylaws other than a Bylaw or amendment thereof changing the authorized number of Directors.

Section 3.     RECORD OF AMENDMENTS.  Whenever an amendment or new Bylaw is adopted, it shall be copied in the book of Bylaws with the original Bylaws, in the appropriate place.  If any Bylaw is repealed, the fact of repeal with the date of the meeting at which the repeal was enacted or written assent was filed shall be stated in said book.

## ARTICLE IX
## CORPORATE SEAL

The corporate seal shall be circular in form, and shall have inscribed thereon the name of the corporation, the year or date of its incorporation, and the word "California."

BYLAWS
15

## ARTICLE X
## MISCELLANEOUS

Section 1.    REFERENCES TO CODE SECTIONS.    "Sec." references herein refer to the equivalent Sections of the California Corporations Code effective January 1, 1977, as amended.

Section 2.    REPRESENTATION OF SHARES IN OTHER CORPORATIONS.    Shares of other corporations standing in the name of this corporation may be voted or represented and all incidents thereto may be exercised on behalf of the corporation by the Chairman of the Board, the President or any Vice President and the Secretary or an Assistant Secretary.

Section 3.    SUBSIDIARY CORPORATIONS.    Shares of this corporation owned by a subsidiary shall not be entitled to vote on any matter.    A subsidiary for these purposes is defined as a corporation, the shares of which possessing more than 25% of the total combined voting power of all classes of shares entitled to vote, are owned directly or indirectly through one (1) or more subsidiaries.

Section 4.    INDEMNIFICATION AND LIABILITY.    The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California law.

The corporation is authorized to provide indemnification of agents (as defined in Section 317 of the California Corporations Code) for breach of duty to the corporation and shareholders through bylaw provisions or through agreements with the agents, or both, in excess of the indemnification otherwise permitted by Section 317 of the California Corporations Code; subject to the limited on such excess indemnification set forth in Section 204 of the California Corporations Code.

Section 5.    ACCOUNTING YEAR.    The accounting year of the corporation shall be fixed by resolution of the Board of Directors.

## CERTIFICATE OF SECRETARY

I DO HEREBY CERTIFY AS FOLLOWS:

That I am the duly elected, qualified and acting Secretary of the above-referenced corporation, that the foregoing Bylaws were adopted as the Bylaws of said corporation on the date set forth above by the person(s) named in the Articles of Incorporation as the Incorporator(s) or First Director(s) of said corporation.

**IN WITNESS WHEREOF,** I have hereunto set my hand and affixed the corporate seal on March 20 , 2023

Carlos Manuel Santos, Secretary

## CERTIFICATE BY SECRETARY OF ADOPTION BY SHAREHOLDERS' VOTE

THIS IS TO CERTIFY:

That I am the duly elected, qualified and acting Secretary of the above-referenced corporation and that the above and foregoing Amended and Restated Bylaws was submitted to the Shareholders at their first meeting and recorded in the minutes thereof, was ratified by the vote of Shareholders entitled to exercise the majority of the voting power of said corporation.

**IN WITNESS WHEREOF,** I have hereunto set my hand on March 20 , 2023.

Carlos Manuel Santos, Secretary

This is to certify that the signature on the present document appertains to Mr. Carlos Manuel Da Silva Santos to the best of my knowledge and belief
Att. Meryem Ipeklıoglu Orhan
Istanbul Bar Association - 31222 Registry Number

BYLAWS
17

MINUTES OF SPECIAL MEETING OF THE SHAREHOLDERS

OF ETHOS ASSET MANAGEMENT, INC.,

A CALIFORNIA CORPORATION

This Special Meeting was held pursuant to the Bylaws, which permit such Special Meetings to be held without notice if all Shareholders sign a written waiver of notice. Said notice is contained at the end of these Minutes.

The purpose of this Special Meeting is to approve the Amended and Restated Bylaws to the Corporation's Bylaws.

After full discussion, the Shareholders of the Corporation unanimously adopted the following resolutions on the _10_ day of March, 2023:

NOW, THEREFORE, BE IT RESOLVED, that the Shareholders approve the adoption of the Amended and Restated Bylaws of the Corporation.

FURTHER RESOLVED the following individuals were elected Directors of the Corporation:

CARLOS MANUEL SANTOS

FURTHER RESOLVED, that the Directors of the Corporation are hereby authorized to take any and all necessary steps to carry out the intent and purpose of the foregoing Resolutions.

There being no further business to come before this Special Meeting, the same was adjourned.

Respectfully submitted,

CARLOS MANUEL SANTOS, Secretary

This is to certify that the signature on the present document appertains to Mr. Carlos Manuel Da Silva Santos to the best of my knowledge and belief
Att. Meryem Ɵeklıoglu Orhan
Istanbul Bar Association - 31222 Registry Number

1

# Form SS-4
(Rev. January 2010)

Department of the Treasury
Internal Revenue Service

## Application for Employer Identification Number

(For use by employers, corporations, partnerships, trusts, estates, churches, government agencies, Indian tribal entities, certain individuals, and others.)

▶ See separate instructions for each line.    ▶ Keep a copy for your records.

OMB No. 1545-0003

EIN

85-1564558

| 1 | Legal name of entity (or individual) for whom the EIN is being requested |
|---|---|
| | ETHOS ASSET MANAGEMENT |

| 2 | Trade name of business (if different from name on line 1) | 3 | Executor, administrator, trustee, "care of" name |
|---|---|---|---|

| 4a | Mailing address (room, apt., suite no. and street, or P.O. box) | 5a | Street address (if different) (Do not enter a P.O. box.) |
|---|---|---|---|
| | 46+60 La Jolla Village Drive | | |
| 4b | City, state, and ZIP code (if foreign, see instructions) | 5b | City, state, and ZIP code (if foreign, see instructions) |
| | SAN DIEGO, CA 92122 | | |

| 6 | County and state where principal business is located |
|---|---|
| | SAN DIEGO COUNTY, CALIFORNIA |

| 7a | Name of responsible party | 7b | SSN, ITIN, or EIN |
|---|---|---|---|
| | Carlos Manuel Santos | | |

| 8a | Is this application for a limited liability company (LLC) (or a foreign equivalent)? ☐ Yes ☑ No | 8b | If 8a is "Yes," enter the number of LLC members ▶ |
|---|---|---|---|

| 8c | If 8a is "Yes," was the LLC organized in the United States? ☐ Yes ☐ No |
|---|---|

**9a** Type of entity (check only one box). Caution. If 8a is "Yes," see the instructions for the correct box to check.

☐ Sole proprietor (SSN) _____
☐ Partnership
☑ Corporation (enter form number to be filed) ▶ 1120S
☐ Personal service corporation
☐ Church or church-controlled organization
☐ Other nonprofit organization (specify) ▶
☐ Other (specify) ▶

☐ Estate (SSN of decedent) _____
☐ Plan administrator (TIN)
☐ Trust (TIN of grantor)
☐ National Guard    ☐ State/local government
☐ Farmers' cooperative    ☐ Federal government/military
☐ REMIC    ☐ Indian tribal governments/enterprises
Group Exemption Number (GEN) if any ▶

| 9b | If a corporation, name the state or foreign country (if applicable) where incorporated | State | California | Foreign country | |
|---|---|---|---|---|---|

**10** Reason for applying (check only one box)

☑ Started new business (specify type) ▶ management consulting services
☐ Hired employees (Check the box and see line 13.)
☐ Compliance with IRS withholding regulations
☐ Other (specify) ▶

☐ Banking purpose (specify purpose) ▶
☐ Changed type of organization (specify new type) ▶
☐ Purchased going business
☐ Created a trust (specify type) ▶
☐ Created a pension plan (specify type) ▶

| 11 | Date business started or acquired (month, day, year). See instructions. | 12 | Closing month of accounting year |
|---|---|---|---|
| | June 12, 2020 | | December |

**13** Highest number of employees expected in the next 12 months (enter -0- if none).

If no employees expected, skip line 14.

| Agricultural | Household | Other |
|---|---|---|
| 0 | 0 | 0 |

**14** If you expect your employment tax liability to be $1,000 or less in a full calendar year and want to file Form 944 annually instead of Forms 941 quarterly, check here. (Your employment tax liability generally will be $1,000 or less if you expect to pay $4,000 or less in total wages.) If you do not check this box, you must file Form 941 for every quarter. ☐

**15** First date wages or annuities were paid (month, day, year). Note. If applicant is a withholding agent, enter date income will first be paid to nonresident alien (month, day, year) . . . . . . . . . . . ▶

**16** Check one box that best describes the principal activity of your business.

☐ Construction    ☐ Rental & leasing    ☐ Transportation & warehousing    ☐ Health care & social assistance    ☐ Wholesale-agent/broker
☐ Real estate    ☐ Manufacturing    ☐ Finance & insurance    ☐ Accommodation & food service    ☐ Wholesale-other    ☐ Retail
☑ Other (specify) ▶ Consulting

**17** Indicate principal line of merchandise sold, specific construction work done, products produced, or services provided.
Management Consulting Services

| 18 | Has the applicant entity shown on line 1 ever applied for and received an EIN? ☐ Yes ☑ No |
|---|---|
| | If "Yes," write previous EIN here ▶ |

| Third Party Designee | Complete this section only if you want to authorize the named individual to receive the entity's EIN and answer questions about the completion of this form. | | |
|---|---|---|---|
| | Designee's name | Designee's telephone number (include area code) | |
| | David C. /jarvis/Sandi Smykowski | ( 619 ) 692-9200 | |
| | Address and ZIP code | Designee's fax number (include area code) | |
| | 1011 Camino del Rio South, Ste. 210, San Diego, CA 92108 | ( 619 ) 296-5508 | |

Under penalties of perjury, I declare that I have examined this application, and to the best of my knowledge and belief, it is true, correct, and complete.

Name and title (type or print clearly) ▶ Carlos Manuel Santos, President

Applicant's telephone number (include area code)
( 619 ) 692-9200

Signature ▶ _[signature]_    Date ▶ 3. 20. 2021

Applicant's fax number (include area code)
( 619 ) 296-5508

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.    Cat. No. 16055N    Form SS-4 (Rev. 1-2010)

This is to certify that the signature on the present document
appertains to Mr. Carlos Manuel Da Silva Santos to the best
of my knowledge and belief
Att. Meryem Ipeklioglu Orhan
Istanbul Bar Association - 31222 Registry Number

**IRS** DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI   OH   45999-0023

Date of this notice:   06-23-2020

Employer Identification Number:
85-1564558

Form:   SS-4

Number of this notice:   CP 575 A

ETHOS ASSET MANAGEMENT INC
4954 DEL MONTE AVE
SAN DIEGO, CA  92107

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.

WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

Thank you for applying for an Employer Identification Number (EIN). We assigned you
EIN 85-1564558. This EIN will identify you, your business accounts, tax returns, and
documents, even if you have no employees. Please keep this notice in your permanent
records.

When filing tax documents, payments, and related correspondence, it is very important
that you use your EIN and complete name and address exactly as shown above. Any variation
may cause a delay in processing, result in incorrect information in your account, or even
cause you to be assigned more than one EIN. If the information is not correct as shown
above, please make the correction using the attached tear off stub and return it to us.

Based on the information received from you or your representative, you must file
the following form(s) by the date(s) shown.

        Form 1120                              04/15/2021

If you have questions about the form(s) or the due date(s) shown, you can call us at
the phone number or write to us at the address shown at the top of this notice. If you
need help in determining your annual accounting period (tax year), see Publication 538,
*Accounting Periods and Methods*.

We assigned you a tax classification based on information obtained from you or your
representative. It is not a legal determination of your tax classification, and is not
binding on the IRS. If you want a legal determination of your tax classification, you may
request a private letter ruling from the IRS under the guidelines in Revenue Procedure
2004-1, 2004-1 I.R.B. 1 (or superseding Revenue Procedure for the year at issue). Note:
Certain tax classification elections can be requested by filing Form 8832, *Entity
Classification Election*. See Form 8832 and its instructions for additional information.

IMPORTANT INFORMATION FOR S CORPORATION ELECTION:

If you intend to elect to file your return as a small business corporation, an
election to file a Form 1120-S must be made within certain timeframes and the
corporation must meet certain tests. All of this information is included in the
instructions for Form 2553, *Election by a Small Business Corporation*.

(IRS USE ONLY)    575A        06-23-2020  ETHD  B  9999999999  SS-4

If you are required to deposit for employment taxes (Forms 941, 943, 940, 944, 945, CT-1, or 1042), excise taxes (Form 720), or income taxes (Form 1120), you will receive a Welcome Package shortly, which includes instructions for making your deposits electronically through the Electronic Federal Tax Payment System (EFTPS). A Personal Identification Number (PIN) for EFTPS will also be sent to you under separate cover. Please activate the PIN once you receive it, even if you have requested the services of a tax professional or representative. For more information about EFTPS, refer to Publication 966, *Electronic Choices to Pay All Your Federal Taxes*. If you need to make a deposit immediately, you will need to make arrangements with your Financial Institution to complete a wire transfer.

The IRS is committed to helping all taxpayers comply with their tax filing obligations. If you need help completing your returns or meeting your tax obligations, Authorized e-file Providers, such as Reporting Agents (payroll service providers) are available to assist you. Visit the IRS Web site at www.irs.gov for a list of companies that offer IRS e-file for business products and services. The list provides addresses, telephone numbers, and links to their Web sites.

To obtain tax forms and publications, including those referenced in this notice, visit our Web site at www.irs.gov. If you do not have access to the Internet, call 1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

IMPORTANT REMINDERS:

* Keep a copy of this notice in your permanent records. This notice is issued only one time and the IRS will not be able to generate a duplicate copy for you. You may give a copy of this document to anyone asking for proof of your EIN.

* Use this EIN and your name exactly as they appear at the top of this notice on all your federal tax forms.

* Refer to this EIN on your tax-related correspondence and documents.

If you have questions about your EIN, you can call us at the phone number or write to us at the address shown at the top of this notice. If you write, please tear off the stub at the bottom of this notice and send it along with your letter. If you do not need to write us, do not complete and return the stub.

Your name control associated with this EIN is ETHD. You will need to provide this information, along with your EIN, if you file your returns electronically.

Thank you for your cooperation.

MINUTES OF ANNUAL MEETING

OF BOARD OF DIRECTORS OF

ETHOS ASSET MANAGEMENT, INC., A CALIFORNIA CORPORATION

The annual meeting of directors of **ETHOS ASSET MANAGEMENT, INC.** was held on February 28, 2023 at 10:00 a.m., pursuant to Article II, Section 11 of the Bylaws permitting meetings to be held without notice if all directors sign a written waiver of said notice. Such notice is contained at the end of these Minutes. Said meeting was held at the offices of the corporation.

The following resolutions were unanimously adopted by the Board of Directors:

**NOW, THEREFORE, BE IT RESOLVED**, that the following individuals are hereby elected to the positions indicated to serve until their successors are elected and duly qualified:

CARLOS MANUEL DA             President (Chief Executive Officer),
SILVA SANTOS                 Secretary and Treasurer (Chief Financial
                             Officer)

There being no further business to come before the meeting, the same was adjourned.

Respectfully Submitted,

**CARLOS MANUEL DA SILVA SANTOS**, Secretary

This is to certify that the signature on the present document appertains to Mr. Carlos Manuel Da Silva Santos to the best of my knowledge and belief
Att. Meryem Ipeklioglu Orhan
Istanbul Bar Association - 31222 Registry Number

MINUTES OF ANNUAL MEETING

1

The undersigned, constituting the directors of **ETHOS ASSET MANAGEMENT, INC.**, hereby waive notice and consent to the February 28, 2023, holding of the annual meeting of Directors and approves the minutes set forth hereinabove.

_____

**CARLOS MANUEL DA SILVA SANTOS**

This is to certify that the signature on the present document appertains to Mr. Carlos Manuel Da Silva Santos to the best of my knowledge and belief
Att. Meryem Ipekiroglu Orhan
Istanbul Bar Association - 31222 Registry Number

MINUTES OF ANNUAL MEETING

2

MINUTES OF ANNUAL MEETING
OF SHAREHOLDERS OF

**ETHOS ASSET MANAGEMENT, INC., A CALIFORNIA CORPORATION**

The regular annual meeting of shareholders of **ETHOS ASSET MANAGEMENT, INC.**, called for in the Bylaws of the corporation was held on February 28, 2023, at 2:00 p.m. at the principal office of the corporation. The meeting was held without notice pursuant to Article IV, Section 5, which allows a meeting if all shareholders sign a written waiver. Such waiver is contained at the end of these Minutes.

**CARLOS MANUEL DA SILVA SANTOS**, constituting the shareholders of the corporation were present at said meeting.

**CARLOS MANUEL DA SILVA SANTOS** acted as Chairman and Secretary of the meeting.

The election of directors was considered whereupon the following individuals were unanimously elected to serve as directors of **ETHOS ASSET MANAGEMENT, INC.**, until the next annual meeting of the shareholders, or until their successors are elected:

    **CARLOS MANUEL DA SILVA SANTOS**    Director

The general conduct of the business of the corporation the past year was discussed, and thereafter the following resolution was made, seconded and unanimously adopted:

    **NOW, THEREFORE, BE IT RESOLVED**, that all of the acts taken for, on behalf of or in the name of **ETHOS ASSET MANAGEMENT, INC.**, by the officers, directors and/or management thereof are hereby ratified, approved, confirmed and adopted as the lawful acts of the corporation from the date of the last annual meeting until the present date.

There being no further business to come before the meeting, the meeting was adjourned.

    Respectfully Submitted,

    CARLOS MANUEL DA SILVA SANTOS, Secretary

MINUTES OF ANNUAL MEETING

3

This is to certify that the signature on the present document appertains to Mr. Carlos Manuel Da Silva Santos to the best of my knowledge and belief
Att. Meryem Ipeklioglu Orhan
Istanbul Bar Association - 31222 Registry Number

4603685

**Secretary of State**

**Articles of Incorporation with Statement of Conversion --**

**California Limited Liability Company to a California Stock Corporation**

CONV LLC-GS

FILED
Secretary of State
State of California

JUN 1 2 2020

IMPORTANT — Read Instructions before completing this form.

Filing Fee   – $150.00

Copy Fees   – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00

Note: Most corporations have to pay a minimum $800 tax to the California Franchise Tax Board each year. For more information, go to https://www.ftb.ca.gov.

This Space For Office Use Only

1.  **Name of Converted California Corporation** (Go to www.sos.ca.gov/business/be/name-availability for general corporate name requirements and restrictions.)

The name of the converted California corporation is _____ ETHOS ASSET MANAGEMENT, INC.

2.  **Business Addresses of the Converted California Corporation** (Enter the complete business addresses.)

| a. Initial Street Address of Corporation - Do not list a P.O. Box. | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 4954 DEL MONTE AVE | SAN DIEGO | CA | 92107 |
| b. Initial Mailing Address of Corporation, if different than Item 2a. | City (no abbreviations) | State | Zip Code |
| 4954 DEL MONTE AVE | SAN DIEGO | CA | 92107 |

3.  **Service of Process** (Must provide either Individual OR Corporation.)

INDIVIDUAL — Complete Items 3a and 3b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation). | Middle Name | Last Name | Suffix |
|---|---|---|---|
| MEGHAN | K | DESPAIN | |
| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box. | City (no abbreviations) | State | Zip Code |
| 1011 CAMINO DEL RIO SOUTH #210 | SAN DIEGO | CA | 92108 |

CORPORATION — Complete Item 3c. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 3a or 3b. |
|---|
| |

4.  **Shares** (Enter the number of shares the corporation is authorized to issue. Do not leave blank or enter zero (0).)

This corporation is authorized to issue only one class of shares of stock.
The total number of shares which this corporation is authorized to issue is _____ 100,000

- CONTINUE ON NEXT PAGE -

(Page 1 of 2)

CONV LLC-GS (REV 04/2019)

2019 California Secretary of State
bizfile.sos.ca.gov

Articles of Incorporation with Statement of Conversion
California Limited Liability Company to a California Stock Corporation
(Page 2 of 2)

4603685

5. Purpose Statement (Do not alter the Purpose Statement.)

The purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

6. Statement of Conversion for the California Limited Liability Company

6a. The name of the converting California limited liability company is  ETHOS ASSET MANAGMENT LLC

6b. The limited liability company's California Secretary of State file number is  201835610204

6c. The principal terms of the plan of conversion were approved by a vote of the members, which equaled or exceeded the vote required under California Corporations Code section 17710.03. There is one class of members entitled to vote and the percentage vote required is a majority in interest of the members. The limited liability company is converting into a California stock corporation.

7. Read, Declare and Sign Below. Do not use computer generated signature. (See instructions for signature requirements.)

Additional article provisions set forth on attached pages, if any, are incorporated herein by reference and made part of this Form CONV LLC-GS. (All attachments should be 8 ½ x 11, one-sided, legible and clearly marked as an attachment to this Form CONV LLC-GS.)

I declare that I am the person who signed this instrument, which is my act and deed.

_Paloma [signature]_                    Paloma Dinamarco Allen          Member or Manager of
Signature of Member or Manager           Type or Print Name

ETHOS ASSET MANAGEMENT LLC                                               and Incorporator.
                          Enter Name of converting California LLC

_[signature]_                           Carlos Manuel Da Silva Santos    Member or Manager of
Signature of Member or Manager           Type or Print Name

ETHOS ASSET MANAGEMENT LLC                                               and Incorporator.
                          Enter Name of converting California LLC

This is to certify that the signature on the present document appertains to Mr. Carlos Manuel Da Silva Santos to the best of my knowledge and belief
Att. Maryem Ipeklioglu Orhan
Istanbul Bar Association - 31222 Registry Number

2019 California Secretary of State
bizfile.sos.ca.gov

CONV LLC-GS (REV 06/2019)

 **California Secretary of State**
Electronic Filing



## Corporation - Statement of Information

Entity Name:   ETHOS ASSET MANAGEMENT, INC.

Entity (File) Number:   C4603685
File Date:   04/05/2021
Entity Type:   Corporation
Jurisdiction:   CALIFORNIA
Document ID:   GS30637

**Detailed Filing Information**

1. Entity Name:

   ETHOS ASSET MANAGEMENT, INC.

2. Business Addresses:
   a. Street Address of Principal Office in California:

      4660 La Jolla Village Drive
      San Diego, California 92122
      United States of America

   b. Mailing Address:

      4660 La Jolla Village Drive
      San Diego, California 92122
      United States of America

   c. Street Address of Principal Executive Office:

      4660 La Jolla Village Drive
      San Diego, California 92122
      United States of America

3. Officers:
   a. Chief Executive Officer:

      Carlos Manuel Santos
      Rua Do Barnolo, 250
      Lisboa, Lisboa 2410858
      Portugal

   b. Secretary:

      Paloma Dinamarco Allen
      4660 La Jolla Village Drive
      San Diego, California 92122
      United States of America

Document ID: GS30637

*Use bizfile.sos.ca.gov for online filings, searches, business records, and resources.*

# California Secretary of State
## Electronic Filing

Officers (cont'd):

c.  Chief Financial Officer:

Carlos Manuel Santos
Rua Do Barrolo, 2502
Lisboa, Lisboa 2410858
Portugal

4.  Director:

Paloma Dinamarco Allen
4660 La Jolla Village Drive
San Diego, California 92122
United States of America

Number of Vacancies on the Board of
Directors:

0

5.  Agent for Service of Process:

Meghan K DeSpain
1011 Camino Del Rio South, Ste 210
San Diego, California 92108
United States of America

6.  Type of Business:

Management consulting services

By signing this document, I certify that the information is true and correct and that I am authorized by
California law to sign.

Electronic Signature:    Carlos Manuel Santos

*Use bizfile.sos.ca.gov for online filings, searches, business records, and resources.*

Document ID: GS30637

**California Secretary of State**
Electronic Filing

## Corporation - Attachment to Statement of Information

**List of Additional Directors:**

1.   Carlos Manuel Santos
     Rua Do Barrolo, 250
     Lisboa, Lisboa 2410858
     Portugal

2.

3.

4.

5.

6.

7.

Document ID: GS30637



**California Secretary of State**
Electronic Filing

FILED
Secretary of State
State of California

## Corporation - Statement of Information

Entity Name: ETHOS ASSET MANAGEMENT, INC.

Entity (File) Number: C4603685
File Date: 06/24/2021
Entity Type: Corporation
Jurisdiction: CALIFORNIA
Document ID: GU29259

**Detailed Filing Information**

1. Entity Name:

ETHOS ASSET MANAGEMENT, INC.

2. Business Addresses:
   a. Street Address of Principal
      Office in California:

4660 La Jolla Village Dr.
San Diego, California 92122
United States of America

   b. Mailing Address:

4660 La Jolla Village Dr.
San Diego, California 92122
United States of America

   c. Street Address of Principal
      Executive Office:

4660 La Jolla Village Dr.
San Diego, California 92122
United States of America

3. Officers:
   a. Chief Executive Officer:

Carlos Manuel Santos
4660 La Jolla Village Dr.
San Diego, California 92122
United States of America

   b. Secretary:

Carlos Manuel Santos
4660 La Jolla Village Dr.
San Diego, California 92122
United States of America

Document ID: GU29259



**California Secretary of State**
Electronic Filing

Officers (cont'd):

    c. Chief Financial Officer:

                    Carlos Manuel Santos
                    4660 La Jolla Village Dr.
                    San Diego, California 92122
                    United States of America

4. Director:

                    Carlos Manuel Santos
                    4660 La Jolla Village Dr.
                    San Diego, California 92122

    Number of Vacancies on the Board of         United States of America
    Directors:                                      0

5. Agent for Service of Process:

                    David C. Jarvis II
                    1011 Camino Del Rio S. #210
                    San Diego, California 92108
                    United States of America

6. Type of Business:                  Management Consulting Services

By signing this document, I certify that the information is true and correct and that I am authorized by
California law to sign.

Electronic Signature:    Carlos Santos

*Use bizfile.sos.ca.gov for online filings, searches, business records, and resources.*

Document ID: GU29259



# Secretary of State
## Certificate of Status

I, SHIRLEY N. WEBER, PH.D., California Secretary of State, hereby certify:

| | |
|---|---|
| **Entity Name:** | ETHOS ASSET MANAGEMENT, INC. |
| **Entity No.:** | 4603685 |
| **Registration Date:** | 12/22/2018 |
| **Entity Type:** | Stock Corporation - CA - General |
| **Formed In:** | CALIFORNIA |
| **Status:** | Active |

The above referenced entity is active on the Secretary of State's records and is authorized to exercise all its powers, rights and privileges in California.

This certificate relates to the status of the entity on the Secretary of State's records as of the date of this certificate and does not reflect documents that are pending review or other events that may impact status.

No information is available from this office regarding the financial condition, status of licenses, if any, business activities or practices of the entity.



**IN WITNESS WHEREOF**, I execute this certificate and affix the Great Seal of the State of California this day of March 16, 2023.

**SHIRLEY N. WEBER, PH.D.**
**Secretary of State**

**Certificate No.:** 091949335

To verify the issuance of this Certificate, use the Certificate No. above with the Secretary of State Certification Verification Search available at bizfileOnline.sos.ca.gov.

# EXHIBIT E

**Alberto Chávez**

| | |
|---|---|
| **De:** | Elias Achilleos <elias@ethosasset.com> |
| **Enviado el:** | sábado, 27 de mayo de 2023 3:55 a. m. |
| **Para:** | Ricardo Baston; Roberto Suarez Espinoza |
| **CC:** | Hans Kastensmith; Hans Kastensmith; 'MIGUEL FRANCO'; achavez@tarmexico.com; Carlos Santos; Leandro Fernandes; Ricardo Trindade; Claudio Nuñez Sánchez de la Barquera |
| **Asunto:** | Re: Ethos | TAR . KYC Pack |

Dear Ricardo,

Thank you for your email and update.

If I may set out expectations clearly so we are all clear on the next steps.

Our Due Diligence package was defined from the beginning of the submission process and signed by you as acceptable. Respectfully, we do not need to prove or justify more than 2Bn USD for a project of 50M USD, as you will appreciate, this is sufficient.

Regarding introducing you to Hoffman, we don't do this either, because Ethos files as a C Corp which means that we have no legal obligation to produce audited financials or even produce them at all.

The simple obligation of Ethos by USA law is to file tax returns. The responsibility for the accounts presented to you, despite being compiled by Hoffman, is Ethos', as are any other financials compiled (as per art 52 from USA commercial law).

Our Due Diligence process has a maximum time window of 3 days as per our submission timeline process. We issue the Agreements and from the first day we set aside the funds for investing in projects.

Please note, if this process is not concluded by the end of the US business day on Tuesday, May 30th, we will terminate the transaction as it is not in our interest to carry such an opportunity cost and to engage with a counter party who is not aligned with us.

We invest in select clients where the right project meets the right type of financing model. TAR is seeking an investment, but we have no need or desire to oblige TAR to receive our money. We accept that not all clients are able to engage.

Please read this as a final note regarding our timeline for the conclusion of our deal.

Kind regards,

Elias

Elias Achilleos
Chief Risk Officer
Ethos Asset Management Inc.
UK Office - London
Email: elias@ethosasset.com
UK +44 793 254 3008

1



**ETHOS ASSET**
M A N A G E M E N T

4660 La Jolla Village Drive, San Diego, California, 92122
United States of America

Internal Use Only

################
Visit our website at https://ethosasset.com/

The content of this message and any attachments may be confidential, privileged or otherwise sensitive in nature and is intended solely for the recipient. If you are not the intended recipient, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose or otherwise act upon any part of this email communication or its attachments. Any unauthorized dissemination, copying or use of this message or its contents is strictly prohibited and may be in violation of law. In accordance with industry standards and regulatory requirements, Ethos Asset Management Inc. ("Ethos") may retain email communications for a period of time. Ethos reserves the right to monitor and archive all email communications in accordance with applicable law and may disclose such communications as required by law.

**From:** Ricardo Baston <rbaston@tarmexico.com>
**Sent:** 27 May 2023 4:27 AM
**To:** Elias Achilleos <elias@ethosasset.com>; Roberto Suarez Espinoza <rse@bucephalus.mx>
**Cc:** Hans Kastensmith <hck@attributedholdings.com>; Hans Kastensmith <hans@ethosasset.com>; 'MIGUEL FRANCO' <mfranco@tarmexico.com>; Achavez@tarmexico.com <achavez@tarmexico.com>; Carlos Santos <carlos@ethosasset.com>; Leandro Fernandes <leandro@ethosasset.com>; Ricardo Trindade <ricardo@ethosasset.com>; Claudio Nuñez Sánchez de la Barquera <claudionunez@nscasesores.com>
**Subject:** Re: Ethos | TAR . KYC Pack

Dear Elias and Roberto.

Thank you very much for the information sent to us in the email below. It is certainly helpful to continue our Due Diligence.

On this regard, would it be too much of a problem if you can share with us the Financial information related to the company that Carlos mentioned during our Wednesday meeting in London, please? I am taking about the company that Carlos referred to and that has been in business for ~12 years and it is worth ~US$50bn. On the other hand, would it be also possible to get the contact details of a person at your independent auditors: Hoffman & Associates, so we can reach out to them?

Finally, as you might have seen in the email exchange, I sent invitations to both of the companies that can share their testimonials on their financing schemes. Mr. Kendall already answered and proposed a time slot at 1am EST of Tuesday May 30th; date which I have already confirmed. As for John C., I am awaiting for his reply.

Thank again and look forward to receiving your reply.

Ricardo

**From:** Roberto Suarez Espinoza <rse@bucephalus.mx>
**Date:** Thursday, May 25, 2023 at 03:12

2

**To:** Ricardo Baston <rbaston@tarmexico.com>, Alberto Chavez <achavez@tarmexico.com>, Miguel Franco <mfranco@tarmexico.com>
**Cc:** Hans Kastensmith <hck@attributedholdings.com>, Hans Kastensmith <hans@ethosasset.com>
**Subject:** Ethos | TAR . KYC Pack

Good morning everybody, hope you guys arrived well in México.
I appreciate your trip and everything you've done to get to this point.

We have sent out the documents for signature and your review. They are the versions we assessed in London.
Please find attached, as accorded:

1. CIS Ethos
2. KYC Sheet
3. Ethos Financials for the years 22, & 21

Please note that Ethos does not audit the financials for public or third party use, however, Hoffman & Associates is the firm that works with Ethos to elaborate and validate these financials.

Fuerte abrazo desde Londres.

Roberto Suárez Espinoza
Bucephalus, Asesores Financieros
+52 442 445 4593
rse@bucephalus.mx

Zapopan, Jalisco

3

# EXHIBIT F

Citibank CBO Services     022
P O Box 6201
Sioux Falls, SD 57117-6201

CITIBANK, N A
**Account**
**6780641032**
**Statement Period**
**Jun 23 - Jul 22, 2022**
**Relationship Manager**
Citibusiness Service Center
(877) 528-0990
Page 1 of 3

ETHOS ASSET MANAGEMENT, INC.
4660 LA JOLLA VILLAGE DR   Suite 100
SAN DIEGO          CA 92122

## CitiBusiness® ACCOUNT AS OF JULY 22, 2022

**Relationship Summary:**

| | |
|---|---|
| Checking | $104,334,879.05 |
| Savings | |
| Checking Plus | |

## SUGGESTIONS AND RECOMMENDATIONS

IMPORTANT NOTIFICATION: Effective immediately and until further notice, Citibank is accepting no new enrollments for Zero Balance Accounts (ZBA). Please contact a Citibank Business Specialist with any questions.

## SERVICE CHARGE SUMMARY FROM JUNE 1, 2022 THRU JUNE 30, 2022

| Type of Charge | No./Units | Price/Unit | Amount |
|---|---|---|---|
| STREAMLINED CHECKING # 6780641032 | | | |
| Average Daily Collected Balance | | | $104,204,146.90 |
| DEPOSIT SERVICES | | | |
| CHECKS, DEP ITEMS/TICKETS, ACH **WAIVE | 2 | .4500 | 0.90 |
| Total Charges for Services | | | $0.00 |
| Net Service Charge | | | $0.00 |

## CHECKING ACTIVITY

**CitiBusiness Streamlined Checking**

| 6780641032 | | | | |
|---|---|---|---|---|
| | | | **Beginning Balance:** | $104,234,147.61 |
| | | | **Ending Balance:** | $104,334,879.05 |

| Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 06/27 | FUNDS TRANSFER<br>WIRE FROM MODALI TY MEDICAL SERVICES LTD  Jun 27 | | 796,122.02 | 105,030,269.63 |
| 06/28 | CBUSOL INTERNATIONAL WIRE OUT | 8,734.04 | | 105,021,535.59 |
| 06/28 | CBUSOL INTERNATIONAL WIRE OUT | 62,462.35 | | 104,959,073.24 |
| 06/28 | SERVICE CHARGES<br>FEE FOR INTERNATIONAL FUNDS TRANSFER | 27.00 | | 104,959,046.24 |
| 06/28 | SERVICE CHARGES<br>FEE FOR INTERNATIONAL FUNDS TRANSFER | 27.00 | | 104,959,019.24 |
| 07/01 | CBUSOL INTERNATIONAL WIRE OUT | 1,500.00 | | 104,957,519.24 |
| 07/01 | CBUSOL INTERNATIONAL WIRE OUT | 3,197.40 | | 104,954,321.84 |
| 07/01 | CBUSOL INTERNATIONAL WIRE OUT | 3,409.28 | | 104,950,912.56 |
| 07/01 | CBUSOL INTERNATIONAL WIRE OUT | 5,000.00 | | 104,945,912.56 |
| 07/01 | SERVICE CHARGES<br>FEE FOR DOMESTIC FUNDS TRANSFER | 17.00 | | 104,945,895.56 |

| CHECKING ACTIVITY | | | Continued |
|---|---|---|---|

Statement Period: Jun 23 - Jul 22 2022

| Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 07/01 | SERVICE CHARGES | 27.00 | | 104,945,868.56 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/01 | SERVICE CHARGES | 27.00 | | 104,945,841.56 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/01 | SERVICE CHARGES | 27.00 | | 104,945,814.56 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/01 | SERVICE CHARGES | 27.00 | | 104,945,787.56 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/01 | CBUSOL TRANSFER DEBIT | 7,000.00 | | 104,938,787.56 |
| | WIRE TO Pya Cope | | | |
| 07/01 | ACH DEBIT | 84,110.15 | | 104,854,677.41 |
| | AMEX EPAYMENT   ACH PMT   COP000005169857 Jul 01 | | | |
| 07/05 | CBUSOL INTERNATIONAL WIRE OUT | 632.63 | | 104,854,044.78 |
| 07/05 | CBUSOL INTERNATIONAL WIRE OUT | 2,900.00 | | 104,851,144.78 |
| 07/05 | CBUSOL INTERNATIONAL WIRE OUT | 6,149.50 | | 104,844,995.28 |
| 07/05 | CBUSOL INTERNATIONAL WIRE OUT | 6,159.16 | | 104,838,836.12 |
| 07/05 | CBUSOL INTERNATIONAL WIRE OUT | 7,645.68 | | 104,831,190.44 |
| 07/05 | CBUSOL INTERNATIONAL WIRE OUT | 7,650.87 | | 104,823,539.57 |
| 07/05 | TRANSFER DEBIT | 10,000.00 | | 104,813,539.57 |
| | TRANSFER TO CHECKING          Jul 05 | | | |
| | VIA CBUSOL       REFERENCE # 007440 | | | |
| 07/05 | CBUSOL INTERNATIONAL WIRE OUT | 61,164.95 | | 104,752,374.62 |
| 07/05 | CBUSOL INTERNATIONAL WIRE OUT | 300,000.00 | | 104,452,374.62 |
| 07/05 | SERVICE CHARGES | 17.00 | | 104,452,357.62 |
| | FEE FOR DOMESTIC FUNDS TRANSFER | | | |
| 07/05 | SERVICE CHARGES | 27.00 | | 104,452,330.62 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/05 | SERVICE CHARGES | 27.00 | | 104,452,303.62 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/05 | SERVICE CHARGES | 27.00 | | 104,452,276.62 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/05 | SERVICE CHARGES | 27.00 | | 104,452,249.62 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/05 | SERVICE CHARGES | 27.00 | | 104,452,222.62 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/05 | SERVICE CHARGES | 27.00 | | 104,452,195.62 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/05 | SERVICE CHARGES | 27.00 | | 104,452,168.62 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/05 | SERVICE CHARGES | 27.00 | | 104,452,141.62 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/05 | CBUSOL TRANSFER DEBIT | 6,000.00 | | 104,446,141.62 |
| | WIRE TO Ricardo Gomes Trindede | | | |
| 07/05 | ACH DEBIT | 63,785.62 | | 104,382,356.00 |
| | AMERICAN EXPR   ACH PMT   W1020       Jul 06 | | | |
| 07/07 | CBUSOL INTERNATIONAL WIRE OUT | 500,000.00 | | 103,882,356.00 |
| 07/07 | SERVICE CHARGES | 27.00 | | 103,882,329.00 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/08 | CBUSOL INTERNATIONAL WIRE OUT | 867.01 | | 103,881,461.99 |
| 07/08 | CBUSOL INTERNATIONAL WIRE OUT | 6,500.00 | | 103,874,961.99 |
| 07/08 | CBUSOL INTERNATIONAL WIRE OUT | 10,000.00 | | 103,864,961.99 |
| 07/08 | SERVICE CHARGES | 17.00 | | 103,864,944.99 |
| | FEE FOR DOMESTIC FUNDS TRANSFER | | | |
| 07/08 | SERVICE CHARGES | 27.00 | | 103,864,917.99 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/08 | SERVICE CHARGES | 27.00 | | 103,864,890.99 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/08 | SERVICE CHARGES | 27.00 | | 103,864,863.99 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/08 | CBUSOL TRANSFER DEBIT | 6,500.00 | | 103,858,363.99 |
| | WIRE TO RCV Management Corp | | | |
| 07/12 | CBUSOL INTERNATIONAL WIRE OUT | 60,550.00 | | 103,797,813.99 |
| 07/12 | SERVICE CHARGES | 27.00 | | 103,797,786.99 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/18 | CBUSOL INTERNATIONAL WIRE OUT | 9,776.94 | | 103,788,010.05 |
| 07/18 | CBUSOL INTERNATIONAL WIRE OUT | 42,000.00 | | 103,746,010.05 |
| 07/18 | SERVICE CHARGES | 27.00 | | 103,745,983.05 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/18 | SERVICE CHARGES | 27.00 | | 103,745,956.05 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/19 | CBUSOL INTERNATIONAL WIRE OUT | 61,050.00 | | 103,684,906.05 |
| 07/19 | SERVICE CHARGES | 27.00 | | 103,684,879.05 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/21 | ELECTRONIC CREDIT | | 650,000.00 | 104,334,879.05 |
| | Currency Cloud   Muhammad G       Jul 21 | | | |

ETHOS ASSET MANAGEMENT, INC.    Account 07000410002    Page 0 of 0
Statement Period: Jun 23 - Jul 22, 2022

## CHECKING ACTIVITY                                                    Continued

| Date | Description | Debits | Credits | Balance |
|------|-------------|--------|---------|---------|
| | Total Debits/Credits | 1,345,390.58 | 1,446,122.02 | |

## CUSTOMER SERVICE INFORMATION

| IF YOU HAVE QUESTIONS ON: | YOU CAN CALL: | YOU CAN WRITE: |
|---|---|---|
| Checking | 877-528-0990 (For Speech and Hearing Impaired Customers Only TTY: 800-945-0258) | CitiBusiness 100 Citibank Drive San Antonio, TX 78245-9966 |

For change in address, call your account officer or visit your branch.

© 2022 Citigroup Inc. Citibank, N.A. Member FDIC
Citibank with Arc Design and CitiBusiness are registered service marks of Citigroup Inc.

CITIBANK, N. A.
Account
6780641032
Statement Period
Jul 23 - Aug 19, 2022
Relationship Manager
Citibusiness Service Center
(877) 528-0990
Page 1 of 3

ETHOS ASSET MANAGEMENT, INC.
4660 LA JOLLA VILLAGE DR  Suite 100
SAN DIEGO          CA 92122

---

## CitiBusiness® ACCOUNT AS OF AUGUST 19, 2022

### Relationship Summary:

| | |
|---|---|
| Checking | $105,894,802.05 |
| Savings | ——— |
| Checking Plus | ——— |

> As a reminder, for transactions made outside of the United States and its territories: International Transaction Charge. We will apply a foreign exchange fee equal to 2% of the transaction amount (including credit and reversals) for each debit card purchase or ATM withdrawal transaction (including those at Proprietary Citibank ATMs) made in a currency other than U.S. Dollars when the transaction is conducted outside the 50 United States and its territories.

---

## SERVICE CHARGE SUMMARY FROM JULY 1, 2022 THRU JULY 31, 2022

| Type of Charge | No./Units | Price/Unit | Amount |
|---|---|---|---|
| STREAMLINED CHECKING # 6780641032 | | | |
| Average Daily Collected Balance | | | $104,049,499.81 |
| DEPOSIT SERVICES | | | |
| CHECKS, DEP ITEMS/TICKETS, ACH | 3 | .4500 | 1.35 |
| **WAIVE | | | |
| Total Charges for Services | | | $0.00 |
| Net Service Charge | | | $0.00 |

---

## CHECKING ACTIVITY

### CitiBusiness Streamlined Checking
6780641032

**Beginning Balance:** $104,334,879.05
**Ending Balance:** $105,894,802.05

| Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 07/26 | CBUSOL INTERNATIONAL WIRE OUT | 2,516.08 | | 104,332,362.97 |
| 07/26 | CBUSOL INTERNATIONAL WIRE OUT | 9,807.74 | | 104,322,555.23 |
| 07/26 | TRANSFER DEBIT | 10,000.00 | | 104,312,555.23 |
| | TRANSFER TO CHECKING        Jul 26 VIA CBUSOL        REFERENCE # 092276 | | | |
| 07/26 | CBUSOL INTERNATIONAL WIRE OUT | 61,017.35 | | 104,251,537.88 |
| 07/26 | SERVICE CHARGES | 17.00 | | 104,251,520.88 |
| | FEE FOR DOMESTIC FUNDS TRANSFER | | | |
| 07/26 | SERVICE CHARGES | 27.00 | | 104,251,493.88 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/26 | SERVICE CHARGES | 27.00 | | 104,251,466.88 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/26 | SERVICE CHARGES | 27.00 | | 104,251,439.88 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/26 | CBUSOL TRANSFER DEBIT | 333,333.00 | | 103,918,106.88 |
| | WIRE TO Assisted Care Facility | | | |
| 07/27 | CBUSOL INTERNATIONAL WIRE OUT | 10,000.00 | | 103,908,106.88 |

ETHOS ASSET MANAGEMENT, INC.
Case 3:23-cr-02507-RSH    Document 169-4    Filed 07/14/25    PageID.3279    Page 91
of 187
Account 0750041052
Statement Period Jul 23 - Aug 19 2023
Page 2 of 6

## CHECKING ACTIVITY — Continued

| Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 07/27 | SERVICE CHARGES | 27.00 | | 103,908,079.88 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 07/29 | SERVICE CHARGES | 17.00 | | 103,908,062.88 |
| | FEE FOR DOMESTIC FUNDS TRANSFER | | | |
| 07/29 | CBUSOL TRANSFER DEBIT | 333,333.00 | | 103,574,729.88 |
| | WIRE TO FAITHFUL CAPITAL LLC | | | |
| 08/01 | FUNDS TRANSFER | | 750,000.00 | 104,324,729.88 |
| | WIRE FROM TIKAE TAKAKI          Aug 01 | | | |
| 08/01 | CBUSOL INTERNATIONAL WIRE OUT | 4,204.40 | | 104,320,525.48 |
| 08/01 | SERVICE CHARGES | 17.00 | | 104,320,508.48 |
| | FEE FOR DOMESTIC FUNDS TRANSFER | | | |
| 08/01 | SERVICE CHARGES | 27.00 | | 104,320,481.48 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 08/01 | CBUSOL TRANSFER DEBIT | 10,000.00 | | 104,310,481.48 |
| | WIRE TO ANTOINETTE R WOODS | | | |
| 08/02 | INCOMING WIRE TRAN FEE | 15.00 | | 104,310,466.48 |
| | INCOMING WIRE FEE      F01221308F2F01 Aug 02 | | | |
| 08/03 | CBUSOL INTERNATIONAL WIRE OUT | 510,000.00 | | 103,800,466.48 |
| 08/03 | SERVICE CHARGES | 27.00 | | 103,800,439.48 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 08/04 | CBUSOL INTERNATIONAL WIRE OUT | 630.74 | | 103,799,808.74 |
| 08/04 | CBUSOL INTERNATIONAL WIRE OUT | 1,671.35 | | 103,798,137.39 |
| 08/04 | CBUSOL INTERNATIONAL WIRE OUT | 4,013.80 | | 103,794,123.59 |
| 08/04 | SERVICE CHARGES | 17.00 | | 103,794,106.59 |
| | FEE FOR DOMESTIC FUNDS TRANSFER | | | |
| 08/04 | SERVICE CHARGES | 17.00 | | 103,794,089.59 |
| | FEE FOR DOMESTIC FUNDS TRANSFER | | | |
| 08/04 | SERVICE CHARGES | 27.00 | | 103,794,062.59 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 08/04 | SERVICE CHARGES | 27.00 | | 103,794,035.59 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 08/04 | SERVICE CHARGES | 27.00 | | 103,794,008.59 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 08/04 | CBUSOL TRANSFER DEBIT | 10,000.00 | | 103,784,008.59 |
| | WIRE TO Soltero Sapire Murrell PLLC | | | |
| 08/04 | CBUSOL TRANSFER DEBIT | 24,391.00 | | 103,759,617.59 |
| | WIRE TO MEHMET KARAMEHMET | | | |
| 08/05 | CBUSOL INTERNATIONAL WIRE OUT | 750.00 | | 103,758,867.59 |
| 08/05 | CBUSOL INTERNATIONAL WIRE OUT | 1,500.00 | | 103,757,367.59 |
| 08/05 | CBUSOL INTERNATIONAL WIRE OUT | 1,717.87 | | 103,755,649.72 |
| 08/05 | CBUSOL INTERNATIONAL WIRE OUT | 9,318.92 | | 103,746,330.80 |
| 08/05 | CBUSOL INTERNATIONAL WIRE OUT | 23,082.55 | | 103,723,248.25 |
| 08/05 | SERVICE CHARGES | 27.00 | | 103,723,221.25 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 08/05 | SERVICE CHARGES | 27.00 | | 103,723,194.25 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 08/05 | SERVICE CHARGES | 27.00 | | 103,723,167.25 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 08/05 | SERVICE CHARGES | 27.00 | | 103,723,140.25 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 08/05 | SERVICE CHARGES | 27.00 | | 103,723,113.25 |
| | FEE FOR INTERNATIONAL FUNDS TRANSFER | | | |
| 08/05 | ACH DEBIT | 93,354.28 | | 103,629,758.97 |
| | AMEX EPAYMENT   ACH PMT   COP000005204169 Aug 05 | | | |
| 08/08 | CBUSOL INTERNATIONAL WIRE OUT | 6,418.72 | | 103,623,340.25 |
| 08/08 | CBUSOL TRANSFER DEBIT | 5,000.00 | | 103,618,340.25 |
| | WIRE TO Paulo Rogerio Cotta Trindade | | | |
| 08/08 | ACH DEBIT | 14,931.00 | | 103,603,409.25 |
| | AMERICAN EXPR   ACH PMT   M9582       Aug 08 | | | |
| 08/11 | FUNDS TRANSFER | | 650,685.00 | 104,254,094.25 |
| | WIRE FROM HOMELA ND CONSERV ATION ALLIANCE Aug 11 | | | |
| 08/12 | TRANSFER DEBIT | 10,000.00 | | 104,244,094.25 |
| | TRANSFER TO CHECKING  REFERENCE # 0202 Aug 12 | | | |
| 08/12 | CBUSOL INTERNATIONAL WIRE OUT | 123,260.00 | | 104,120,834.25 |
| 08/12 | CBUSOL INTERNATIONAL WIRE OUT | 500,000.00 | | 103,620,834.25 |
| 08/16 | CBUSOL INTERNATIONAL WIRE OUT | 6,000.00 | | 103,614,834.25 |
| 08/16 | CBUSOL INTERNATIONAL WIRE OUT | 10,000.00 | | 103,604,834.25 |
| 08/16 | CBUSOL INTERNATIONAL WIRE OUT | 10,394.00 | | 103,694,440.25 |
| 08/17 | FUNDS TRANSFER | | 650,000.00 | 104,244,440.25 |
| | WIRE FROM U.S. C ONSUMER BU YING SERVICES L Aug 17 | | | |
| 08/17 | FUNDS TRANSFER | | 3,150,000.00 | 107,394,440.25 |
| | WIRE FROM RICARD O CEZAR CA RLOS ROCHA    Aug 17 | | | |
| 08/17 | CBUSOL INTERNATIONAL WIRE OUT | 16,000.00 | | 107,378,440.25 |
| 08/17 | CBUSOL INTERNATIONAL WIRE OUT | 200,000.00 | | 107,178,440.25 |

## CHECKING ACTIVITY                                                     Continued

| Date | Description | Debits | Credits | Balance |
|------|-------------|--------|---------|---------|
| 08/17 | CBUSOL INTERNATIONAL WIRE OUT | 280,500.00 | | 106,897,940.25 |
| 08/17 | CBUSOL INTERNATIONAL WIRE OUT | 403,520.00 | | 106,494,420.25 |
| 08/17 | CBUSOL TRANSFER DEBIT | 20,508.50 | | 106,473,911.75 |
| | WIRE TO Baker & McKenzie LLP | | | |
| 08/17 | CBUSOL TRANSFER DEBIT | 45,250.23 | | 106,428,661.52 |
| | WIRE TO Baker & McKenzie LLP | | | |
| 08/17 | CBUSOL TRANSFER DEBIT | 45,816.50 | | 106,382,845.02 |
| | WIRE TO Baker & McKenzie LLP | | | |
| 08/17 | CBUSOL TRANSFER DEBIT | 200,000.00 | | 106,182,845.02 |
| | WIRE TO AssetVest Corp | | | |
| 08/17 | ACH DEBIT | 38,042.97 | | 106,144,802.05 |
| | AMERICAN EXPR   ACH PMT   M9122        Aug 17 | | | |
| 08/18 | CBUSOL INTERNATIONAL WIRE OUT | 250,000.00 | | 105,894,802.05 |
| | **Total Debits/Credits** | **3,640,762.00** | **5,200,685.00** | |

## CUSTOMER SERVICE INFORMATION

IF YOU HAVE QUESTIONS ON:        YOU CAN CALL:                    YOU CAN WRITE:

Checking                         877-528-0990                     CitiBusiness
                                 (For Speech and Hearing          100 Citibank Drive
                                 Impaired Customers Only          San Antonio, TX 78245-9966
                                 TTY: 800-945-0258)

For change in address, call your account officer or visit your branch.

© 2022 Citigroup Inc  Citibank, N.A. Member FDIC.
Citibank with Arc Design and CitiBusiness are registered service marks of Citigroup Inc.

CITIBANK, N.A.
**Account**
**6780641032**
**Statement Period**
**Aug 20 - Sep 22, 2022**
**Relationship Manager**
Citibusiness Service Center
(877) 528-0990
Page 1 of 3

ETHOS ASSET MANAGEMENT, INC.
4660 LA JOLLA VILLAGE DR  Suite 100
SAN DIEGO          CA 92122

## CitiBusiness® ACCOUNT AS OF SEPTEMBER 22, 2022

### Relationship Summary:

| | |
|---|---|
| Checking | $103,856,762.48 |
| Savings | ----- |
| Checking Plus | ----- |

As a reminder, for transactions made outside of the United States and its territories: International Transaction Charge. We will apply a foreign exchange fee equal to 2% of the transaction amount (including credit and reversals) for each debit card purchase or ATM withdrawal transaction (including those at Proprietary Citibank ATMs) made in a currency other than U.S. Dollars when the transaction is conducted outside the 50 United States and its territories.

## SUGGESTIONS AND RECOMMENDATIONS

Wire transfers in Croatian Kuna (HRK) will be discontinued November 13, 2022, as the country will replace HRK with the Euro (EUR) as its official legal tender. After this date you may send wire transfers to Croatia in Euros (EUR). Please contact your beneficiary to confirm their account has been converted to EUR before setting up a new payee. Please refer to your Account Documentation for any applicable wire fees and other terms.

## SERVICE CHARGE SUMMARY FROM AUGUST 1, 2022 THRU AUGUST 31, 2022

| Type of Charge | No./Units | Price/Unit | Amount |
|---|---|---|---|
| **STREAMLINED CHECKING # 6780641032** | | | |
| Average Daily Collected Balance | | | $104,610,215.84 |
| DEPOSIT SERVICES | | | |
| CHECKS, DEP ITEMS/TICKETS, ACH | 3 | .4500 | 1.35 |
| **WAIVE | | | |
| CITIBUSINESS ONLINE | | | |
| CBOL - OUT. DOMESTIC WIRE TXFR | 7 | 17.0000 | 119.00 |
| CBOL-OUT. INTERNAT'L WIRE TXFR | 20 | 27.0000 | 540.00 |
| CBOL-OUT. INTERNAT'L WIRE TXFR | 8 | 27.0000 | 216.00 |
| **WAIVE | | | |
| TRANSFER SERVICES | | | |
| INCOMING WIRE TRANSFER | 4 | .0000 | 0.00 |
| **WAIVE | | | |
| **Total Charges for Services** | | | **$659.00** |
| **Net Service Charge** | | | **$659.00** |

Charges debited from account # 6780641032

## CHECKING ACTIVITY

**CitiBusiness Streamlined Checking**
**6780641032**

Beginning Balance: $105,894,802.05
Ending Balance: $103,856,762.48

| Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 08/23 | CBUSOL INTERNATIONAL WIRE OUT | 59,724.90 | | 105,835,077.15 |
| 08/23 | CBUSOL INTERNATIONAL WIRE OUT | 70,533.53 | | 105,764,543.62 |
| 08/23 | CBUSOL INTERNATIONAL WIRE OUT | 119,217.20 | | 105,645,326.42 |
| 08/23 | CBUSOL TRANSFER DEBIT | 350,876.84 | | 105,294,449.58 |
| | WIRE TO HAVO INC | | | |
| 08/24 | CBUSOL TRANSFER DEBIT | 25,175.00 | | 105,269,274.58 |
| | WIRE TO Hans C. Kastensmith | | | |
| 08/29 | CBUSOL INTERNATIONAL WIRE OUT | 1,135.80 | | 105,268,138.78 |
| 08/29 | CBUSOL INTERNATIONAL WIRE OUT | 3,333.00 | | 105,264,805.78 |
| 08/29 | CBUSOL INTERNATIONAL WIRE OUT | 4,812.33 | | 105,259,993.45 |
| 08/29 | CBUSOL INTERNATIONAL WIRE OUT | 59,585.00 | | 105,200,408.45 |
| 08/29 | CBUSOL INTERNATIONAL WIRE OUT | 118,850.00 | | 105,081,558.45 |
| 08/30 | FUNDS TRANSFER | | 100,000.00 | 105,181,558.45 |
| | WIRE FROM RICARD O CEZAR CA RLOS ROCHA   Aug 30 | | | |
| 09/02 | CBUSOL INTERNATIONAL WIRE OUT | 1,682.18 | | 105,179,876.27 |
| 09/02 | CBUSOL INTERNATIONAL WIRE OUT | 2,200.00 | | 105,177,676.27 |
| 09/06 | CBUSOL INTERNATIONAL WIRE OUT | 1,598.15 | | 105,176,078.12 |
| 09/06 | CBUSOL INTERNATIONAL WIRE OUT | 10,000.00 | | 105,166,078.12 |
| 09/06 | CBUSOL INTERNATIONAL WIRE OUT | 10,000.00 | | 105,156,078.12 |
| 09/06 | CBUSOL INTERNATIONAL WIRE OUT | 58,695.00 | | 105,097,383.12 |
| 09/06 | CBUSOL INTERNATIONAL WIRE OUT | 117,090.00 | | 104,980,293.12 |
| 09/06 | CBUSOL TRANSFER DEBIT | 3,555.00 | | 104,976,738.12 |
| | WIRE TO Ricardo Gomes Trindade | | | |
| 09/06 | CBUSOL TRANSFER DEBIT | 4,000.00 | | 104,972,738.12 |
| | WIRE TO Paulo Rogerio Cotta Trindade | | | |
| 09/07 | CBUSOL INTERNATIONAL WIRE OUT | 2,500.00 | | 104,970,238.12 |
| 09/07 | CBUSOL INTERNATIONAL WIRE OUT | 6,211.70 | | 104,964,026.42 |
| 09/07 | CBUSOL INTERNATIONAL WIRE OUT | 9,000.00 | | 104,955,026.42 |
| 09/07 | CBUSOL INTERNATIONAL WIRE OUT | 15,000.00 | | 104,940,026.42 |
| 09/07 | CBUSOL INTERNATIONAL WIRE OUT | 20,000.00 | | 104,920,026.42 |
| 09/07 | CBUSOL INTERNATIONAL WIRE OUT | 20,253.46 | | 104,899,772.96 |
| 09/07 | CBUSOL TRANSFER DEBIT | 14,200.00 | | 104,885,572.96 |
| | WIRE TO Hans C. Kastensmith | | | |
| 09/07 | ACH DEBIT | 85,121.52 | | 104,800,451.44 |
| | AMEX EPAYMENT  ACH PMT  COP000005236707 Sep 07 | | | |
| 09/08 | CBUSOL INTERNATIONAL WIRE OUT | 23,582.00 | | 104,776,869.44 |
| 09/08 | CBUSOL INTERNATIONAL WIRE OUT | 506,830.00 | | 104,270,039.44 |
| 09/08 | CBUSOL TRANSFER DEBIT | 10,015.00 | | 104,260,024.44 |
| | WIRE TO Spilero Sapire Murrell PLLC | | | |
| 09/08 | SERVICE CHARGE | 659.00 | | 104,259,365.44 |
| | ACCT ANALYSIS DIRECT DB | | | |
| 09/09 | CBUSOL INTERNATIONAL WIRE OUT | 10,000.00 | | 104,249,365.44 |
| 09/09 | CBUSOL TRANSFER DEBIT | 507,295.00 | | 103,742,070.44 |
| | WIRE TO THUNDER VALLEY COMMUNITY DEVELOPME | | | |
| 09/13 | FUNDS TRANSFER | | 1,400,000.00 | 105,142,070.44 |
| | WIRE FROM BEYOND  LIMITS, INC   Sep 13 | | | |
| 09/13 | CBUSOL INTERNATIONAL WIRE OUT | 5,643.00 | | 105,136,427.44 |
| 09/13 | CBUSOL INTERNATIONAL WIRE OUT | 59,556.70 | | 105,076,870.74 |
| 09/13 | CBUSOL INTERNATIONAL WIRE OUT | 59,566.85 | | 105,017,303.89 |
| 09/13 | CBUSOL INTERNATIONAL WIRE OUT | 197,011.04 | | 104,820,292.85 |
| 09/14 | CBUSOL INTERNATIONAL WIRE OUT | 10,000.00 | | 104,810,292.85 |
| 09/14 | CBUSOL INTERNATIONAL WIRE OUT | 10,308.66 | | 104,799,984.19 |
| 09/14 | CBUSOL INTERNATIONAL WIRE OUT | 12,000.00 | | 104,787,984.19 |
| 09/14 | TRANSFER DEBIT | 20,500.00 | | 104,767,484.19 |
| | TRANSFER TO CHECKING   Sep 14 | | | |
| | VIA CBUSOL   REFERENCE # 001551 | | | |
| 09/14 | CBUSOL TRANSFER DEBIT | 12,000.00 | | 104,755,484.19 |
| | WIRE TO PricewaterhouseCoopers LLP | | | |
| 09/14 | CBUSOL TRANSFER DEBIT | 177,020.00 | | 104,578,464.19 |
| | WIRE TO Saxum Strategic Communications | | | |
| 09/15 | CBUSOL INTERNATIONAL WIRE OUT | 182,628.00 | | 104,395,836.19 |
| 09/15 | CBUSOL TRANSFER DEBIT | 57,939.86 | | 104,337,896.33 |
| | WIRE TO Baker & McKenzie LLP | | | |
| 09/15 | CBUSOL TRANSFER DEBIT | 316,666.35 | | 104,021,229.98 |
| | WIRE TO HAVO INC | | | |
| 09/16 | CBUSOL TRANSFER DEBIT | 6,500.00 | | 104,014,729.98 |
| | WIRE TO RCV Management Corp | | | |
| 09/19 | CBUSOL INTERNATIONAL WIRE OUT | 6,074.28 | | 104,008,655.70 |

ETHOS ASSET MANAGEMENT, INC.                  Account  6780841032           Page 3 of 3
                                              Statement Period Jul 1, 2020 - Sep 22, 2022

## CHECKING ACTIVITY                                                                        Continued

| Date | Description | Debits | Credits | Balance |
|------|-------------|-------:|--------:|--------:|
| 09/19 | CBUSOL INTERNATIONAL WIRE OUT | 50,000.00 | | 103,958,655.70 |
| 09/19 | CBUSOL TRANSFER DEBIT<br>WIRE TO Baker & McKenzie LLP | 44,297.87 | | 103,914,357.83 |
| 09/22 | CBUSOL INTERNATIONAL WIRE OUT | 57,595.35 | | 103,856,762.48 |
| | **Total Debits/Credits** | **3,538,039.57** | **1,500,000.00** | |

## CUSTOMER SERVICE INFORMATION

| IF YOU HAVE QUESTIONS ON: | YOU CAN CALL: | YOU CAN WRITE: |
|---|---|---|
| Checking | 877-528-0990<br>(For Speech and Hearing<br>Impaired Customers Only<br>TTY: 800-945-0258) | CitiBusiness<br>100 Citibank Drive<br>San Antonio, TX 78245-9966 |

For change in address, call your account officer or visit your branch.

© 2022 Citigroup Inc. Citibank, N.A  Member FDIC.
Citibank with Arc Design and CitiBusiness are registered service marks of Citigroup Inc

P.O. Box 6201
Sioux Falls, SD 57117-6201

ETHOS ASSET MANAGEMENT, INC.
4660 LA JOLLA VILLAGE DR Suite 100
SAN DIEGO          CA 92122

CITIBANK, N.A.
**Account**
**6780641032**
**Statement Period**
**Sep 23 - Oct 24, 2022**
Relationship Manager
Citibusiness Service Center
(877) 528-0990
Page 1 of 2

## CitiBusiness® ACCOUNT AS OF OCTOBER 24, 2022

**Relationship Summary:**

| | |
|---|---|
| Checking | $103,102,600.58 |
| Savings | |
| Checking Plus | |

## SERVICE CHARGE SUMMARY FROM SEPTEMBER 1, 2022 THRU SEPTEMBER 30, 2022

| Type of Charge | No./Units | Price/Unit | Amount |
|---|---|---|---|
| STREAMLINED CHECKING # 6780641032 | | | |
| Average Daily Collected Balance | | | $104,180,898.76 |
| DEPOSIT SERVICES | | | |
| CHECKS, DEP ITEMS/TICKETS, ACH | 1 | .4500 | 0.45 |
| **WAIVE | | | |
| CITIBUSINESS ONLINE | | | |
| CBOL - OUT. DOMESTIC WIRE TXFR | 15 | 17.0000 | 255.00 |
| CBOL-OUT. INTERNAT'L WIRE TXFR | 27 | 27.0000 | 729.00 |
| CBOL-OUT. INTERNAT'L WIRE TXFR | 4 | 27.0000 | 108.00 |
| **WAIVE | | | |
| TRANSFER SERVICES | | | |
| INCOMING WIRE TRANSFER | 2 | .0000 | 0.00 |
| **WAIVE | | | |
| Total Charges for Services | | | $984.00 |
| Net Service Charge | | | $984.00 |

Charges debited from account # 6780641032

## CHECKING ACTIVITY

**CitiBusiness Streamlined Checking**

| 6780641032 | | Beginning Balance: | $103,856,762.48 |
|---|---|---|---|
| | | Ending Balance: | $103,102,600.58 |

| Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 09/23 | CBUSOL TRANSFER DEBIT WIRE TO William Watson Group, LLC | 6,000.00 | | 103,850,762.48 |
| 09/23 | CBUSOL TRANSFER DEBIT WIRE TO Mario Silva | 6,500.00 | | 103,844,262.48 |
| 09/23 | CBUSOL TRANSFER DEBIT WIRE TO EAG Investment Group | 6,666.66 | | 103,837,595.82 |
| 09/27 | CBUSOL INTERNATIONAL WIRE OUT | 36,000.00 | | 103,801,595.82 |
| 09/27 | CBUSOL INTERNATIONAL WIRE OUT | 600,000.00 | | 103,201,595.82 |
| 09/27 | CBUSOL TRANSFER DEBIT WIRE TO Baker & McKenzie LLP | 63,280.00 | | 103,138,315.82 |
| 09/28 | CBUSOL INTERNATIONAL WIRE OUT | 5,000.00 | | 103,133,315.82 |

## CHECKING ACTIVITY
Continued

| Date | Description | Debits | Credits | Balance |
|------|-------------|--------|---------|---------|
| 09/30 | FUNDS TRANSFER | | 1,592,500.00 | 104,725,615.82 |
| | WIRE FROM IZAR INVESTMENT GROUP LTD    Sep 30 | | | |
| 09/30 | CBUSOL INTERNATIONAL WIRE OUT | 11,296.86 | | 104,714,518.96 |
| 10/03 | CBUSOL INTERNATIONAL WIRE OUT | 1,507.55 | | 104,713,011.41 |
| 10/03 | CBUSOL INTERNATIONAL WIRE OUT | 1,583.09 | | 104,711,428.32 |
| 10/03 | CBUSOL INTERNATIONAL WIRE OUT | 1,658.30 | | 104,709,770.02 |
| 10/03 | CBUSOL INTERNATIONAL WIRE OUT | 3,180.00 | | 104,706,590.02 |
| 10/03 | CBUSOL INTERNATIONAL WIRE OUT | 5,000.00 | | 104,701,590.02 |
| 10/03 | CBUSOL INTERNATIONAL WIRE OUT | 11,438.18 | | 104,690,151.84 |
| 10/03 | CBUSOL INTERNATIONAL WIRE OUT | 99,783.70 | | 104,590,368.14 |
| 10/03 | CBUSOL INTERNATIONAL WIRE OUT | 312,000.00 | | 104,278,368.14 |
| 10/03 | CBUSOL INTERNATIONAL WIRE OUT | 340,000.00 | | 103,938,368.14 |
| 10/04 | CBUSOL INTERNATIONAL WIRE OUT | 23,384.00 | | 103,914,984.14 |
| 10/04 | CBUSOL INTERNATIONAL WIRE OUT | 58,410.00 | | 103,856,574.14 |
| 10/04 | CBUSOL TRANSFER DEBIT | 3,333.00 | | 103,853,241.14 |
| | WIRE TO Hans C. Kastensmith | | | |
| 10/04 | CBUSOL TRANSFER DEBIT | 350,000.00 | | 103,503,241.14 |
| | WIRE TO ACCESS Bank | | | |
| 10/06 | CBUSOL TRANSFER DEBIT | 1,000.00 | | 103,502,241.14 |
| | WIRE TO Nixon Strategic Consulting LLC | | | |
| 10/06 | CBUSOL TRANSFER DEBIT | 4,000.00 | | 103,498,241.14 |
| | WIRE TO PricewaterhouseCoopers LLP | | | |
| 10/06 | CBUSOL TRANSFER DEBIT | 5,000.00 | | 103,493,241.14 |
| | WIRE TO Paulo Rogerio Cotta Trindade | | | |
| 10/07 | CBUSOL INTERNATIONAL WIRE OUT | 2,500.00 | | 103,490,741.14 |
| 10/07 | CBUSOL INTERNATIONAL WIRE OUT | 3,000.00 | | 103,487,741.14 |
| 10/07 | CBUSOL TRANSFER DEBIT | 2,433.50 | | 103,485,307.64 |
| | WIRE TO Soltero Sapire Murrell PLLC | | | |
| 10/07 | CBUSOL TRANSFER DEBIT | 13,500.00 | | 103,471,807.64 |
| | WIRE TO RCV Management Corp | | | |
| 10/11 | CBUSOL INTERNATIONAL WIRE OUT | 6,925.00 | | 103,464,882.64 |
| 10/11 | CBUSOL INTERNATIONAL WIRE OUT | 10,158.28 | | 103,454,724.36 |
| 10/11 | CBUSOL INTERNATIONAL WIRE OUT | 107,905.79 | | 103,346,818.57 |
| 10/11 | SERVICE CHARGE | 984.00 | | 103,345,834.57 |
| | ACCT ANALYSIS DIRECT DB | | | |
| 10/13 | CBUSOL INTERNATIONAL WIRE OUT | 2,000.00 | | 103,343,834.57 |
| 10/13 | CBUSOL INTERNATIONAL WIRE OUT | 12,000.00 | | 103,331,834.57 |
| 10/17 | CBUSOL TRANSFER DEBIT | 13,500.00 | | 103,318,334.57 |
| | WIRE TO Roberto Nuzzi | | | |
| 10/17 | CBUSOL TRANSFER DEBIT | 40,000.00 | | 103,278,334.57 |
| | WIRE TO Hans C. Kastensmith | | | |
| 10/19 | CBUSOL TRANSFER DEBIT | 13,304.54 | | 103,265,030.03 |
| | WIRE TO Baker & McKenzie LLP | | | |
| 10/19 | CBUSOL TRANSFER DEBIT | 26,051.13 | | 103,238,978.90 |
| | WIRE TO Baker & McKenzie LLP | | | |
| 10/19 | CBUSOL TRANSFER DEBIT | 105,583.29 | | 103,133,395.61 |
| | WIRE TO Baker & McKenzie LLP | | | |
| 10/21 | ACH DEBIT | 21,795.03 | | 103,111,600.58 |
| | AMEX EPAYMENT   ACH PMT   COP000005281827 Oct 21 | | | |
| 10/24 | CBUSOL INTERNATIONAL WIRE OUT | 9,000.00 | | 103,102,600.58 |
| | **Total Debits/Credits** | **2,346,661.90** | **1,592,500.00** | |

## CUSTOMER SERVICE INFORMATION

| IF YOU HAVE QUESTIONS ON: | YOU CAN CALL: | YOU CAN WRITE: |
|---|---|---|
| Checking | 877-528-0990 | CitiBusiness |
| | (For Speech and Hearing | 100 Citibank Drive |
| | Impaired Customers Only | San Antonio, TX 78245-9966 |
| | TTY: 800-945-0258) | |

For change in address, call your account officer or visit your branch.

© 2022 Citigroup Inc. Citibank, N.A. Member FDIC.
Citibank with Arc Design and CitiBusiness are registered service marks of Citigroup Inc.

# EXHIBIT G

**Alberto Chávez**

| | |
|---|---|
| **De:** | Ricardo Baston <rbaston@tarmexico.com> |
| **Enviado el:** | sábado, 27 de mayo de 2023 8:17 p. m. |
| **Para:** | John Coppolino |
| **CC:** | rse@bucephalus.mx; Carlos Santos; Leandro Fernandes; Ricardo Trindade; Hans Kastensmith; Cristiana Dias; mfranco@tarmexico.com; Alberto Chávez; 'Ignacio Vazquez'; Elias Achilleos |
| **Asunto:** | Re: TESTIMONIAL CALL REQUEST: TAR Airlines, Mexico / TYGRUS LLC, USA |

Hey John, thank you.

Let's lock it at 11h00 EDST of Tuesday.

Have a great long weekend.

Best,

Ricardo

**From:** John Coppolino <jcoppolino@tygrus.com>
**Date:** Saturday, May 27, 2023 at 19:10
**To:** Ricardo Baston <rbaston@tarmexico.com>, Elias Achilleos <elias@ethosasset.com>
**Cc:** Roberto Suarez Espinoza <rse@bucephalus.mx>, Carlos Santos <carlos@ethosasset.com>, Leandro Fernandes <leandro@ethosasset.com>, Ricardo Trindade <ricardo@ethosasset.com>, Hans Kastensmith <hans@ethosasset.com>, Cristiana Dias <cristiana@ethosasset.com>, Miguel Franco <mfranco@tarmexico.com>, Alberto Chavez <achavez@tarmexico.com>, Ignacio Vazquez <ivazquez@tarmexico.com>
**Subject:** Re: TESTIMONIAL CALL REQUEST: TAR Airlines, Mexico / TYGRUS LLC, USA

Ricardo,

How about Tuesday, May 30th anytime between 9:00 AM and 11:00 AM EDST?

All the best,

John

**From:** Ricardo Baston <rbaston@tarmexico.com>
**Date:** Friday, May 26, 2023 at 10:58 PM
**To:** Elias Achilleos <elias@ethosasset.com>, John Coppolino <jcoppolino@tygrus.com>
**Cc:** rse@bucephalus.mx <rse@bucephalus.mx>, Carlos Santos <carlos@ethosasset.com>, Leandro Fernandes <leandro@ethosasset.com>, Ricardo Trindade <ricardo@ethosasset.com>, Hans Kastensmith <hans@ethosasset.com>, Cristiana Dias <cristiana@ethosasset.com>, mfranco@tarmexico.com <mfranco@tarmexico.com>, Alberto Chávez <achavez@tarmexico.com>, 'Ignacio Vazquez' <ivazquez@tarmexico.com>
**Subject:** Re: TESTIMONIAL CALL REQUEST: TAR Airlines, Mexico / TYGRUS LLC, USA

Dear John.

I hope this email finds you doing well.

1

@Elias, thank you for your kind introduction.

Further to Elias Achilleos email, I would like to kindly ask to have a brief conference call related the Ethos financing scheme. Since you are based out of MI, I believe that scheduling something for this coming Monday May 29th, may be challenging, as it is Memorial Day. Nonetheless, I will leave this window open and I will await for you response. Should you have to propose a different date, we can accommodate any other day of this coming week at 12h30 EST.

John, thank you in advance for your consideration to this email.

I look forward to hearing from you.

All the best,



**Ricardo Bastón**
**CEO | TAR Aerolíneas**
**+52 55 2193 2888**
**rbaston@tarmexico.com**

---

**From:** Elias Achilleos <elias@ethosasset.com>
**Date:** Thursday, May 25, 2023 at 11:09
**To:** John Coppolino <jcoppolino@tygrus.com>
**Cc:** Roberto Suarez Espinoza <rse@bucephalus.mx>, Carlos Santos <carlos@ethosasset.com>, Leandro Fernandes <leandro@ethosasset.com>, Ricardo Trindade <ricardo@ethosasset.com>, Hans Kastensmith <hans@ethosasset.com>, Cristiana Dias <cristiana@ethosasset.com>, Ricardo Baston <rbaston@tarmexico.com>, Miguel Franco <mfranco@tarmexico.com>, Alberto Chavez <achavez@tarmexico.com>, Ignacio Vazquez <ivazquez@tarmexico.com>
**Subject:** TESTIMONIAL CALL REQUEST: TAR Airlines, Mexico / TYGRUS LLC, USA

Dear John,

I hope that you are well and in good health.

I'm writing to you to kindly request your assistance with a testimonial request from a very important Mexico client of ours about to enter into an Agreement with Ethos for financing.

Our client is TAR Airlines. With nine years of experience since March 14th, 2014, TAR is a regional carrier based in Queretaro, Mexico, (about 200 km north from Mexico City). The fleet consists of 12 ERJ-145 jets with coverage in 18 destinations with 26 routes and 3.5 M passengers already flown and part of TAR's history.

2

The call will be with Mr. Ricardo Bastón, CEO, who has 36 years direct experience in the aviation industry and Mr. Miguel Angel Franco Hernandez, Chairman, Founder and owner of TAR Airlines. When convenient for you, please make contact with Ricardo. Or alternatively, Ricardo, please feel free to communicate directly with Mr John Coppolino, Chief Executive Officer, Tygrus LLC., and keep us all copied in all communications.

May I thank you all, in advance for taking the time to do this.

**A little background on Tygrus LLC:**

Tygrus is a Life Science, Research & Development, and Licensing Company that manufactures and/or formulates its trade secret and patented chemistries. The Company's disruptive platform technology has numerous applications across a wide variety of industries. The Tygrus chemistries have indicated effectiveness as a replacement for many harmful incumbent industrial chemicals. In addition, third party tests indicate that Tygrus' formulated products provide innovative solutions in sectors such as agriculture, leather processing, food and beverage, healthcare, cosmetics, personal care, and industrial cleaning.

If you have any questions, please do not hesitate to contact me.

Kind regards,

Elias

Elias Achilleos
Chief Risk Officer
Ethos Asset Management Inc.
UK Office - London
Email: elias@ethosasset.com
UK +44 793 254 3008



ETHOS ASSET
M A N A G E M E N T

4660 La Jolla Village Drive, San Diego, California, 92122

United States of America

3

Internal Use Only

###############

Visit our website at https://ethosasset.com/

The content of this message and any attachments may be confidential, privileged or otherwise sensitive in nature and is intended solely for the recipient. If you are not the intended recipient, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose or otherwise act upon any part of this email communication or its attachments. Any unauthorized dissemination, copying or use of this message or its contents is strictly prohibited and may be in violation of law. In accordance with industry standards and regulatory requirements, Ethos Asset Management Inc. ("Ethos") may retain email communications for a period of time. Ethos reserves the right to monitor and archive all email communications in accordance with applicable law and may disclose such communications as required by law.

John Coppolino
Chief Executive Officer
Email: jcoppolino@tygrus.com
Phone: +1 (201) 563-1773
Fax: +1 (248) 592-7325

Tygrus. Better Everything.
www.tygrus.com

This message contains confidential information and is intended only for the individual(s) addressed in the message. If you are not the named addressee, you should not disseminate, distribute, or copy this email. If you are not the intended recipient, you are notified that disclosing, distributing, or copying this email is strictly prohibited.

**Alberto Chávez**

| | |
|---|---|
| **De:** | Ricardo Baston <rbaston@tarmexico.com> |
| **Enviado el:** | viernes, 26 de mayo de 2023 9:00 p. m. |
| **Para:** | Kendall Chow |
| **Asunto:** | Re: TESTIMONIAL CALL REQUEST: TAR Airlines, Mexico / HAVO INC., USA |

Thanks again for your prompt reply.

Tuesday 1am to 2am EST works for me.

Safe travels,

Ricardo

**From:** Kendall Chow <ktc@havo.global>
**Date:** Friday, May 26, 2023 at 20:54
**To:** Ricardo Baston <rbaston@tarmexico.com>
**Subject:** Re: TESTIMONIAL CALL REQUEST: TAR Airlines, Mexico / HAVO INC., USA

Hi Ricardo,

I am traveling all next week. However Tuesday 1am-2am EST I can do a call. Sorry I know that might be a very difficult time for you. The following week I am much more flexible.

Look forward to connecting.

Thanks,
Kendall

Book a meeting with me

**From:** Ricardo Baston <rbaston@tarmexico.com>
**Sent:** Friday, May 26, 2023 7:43:25 PM
**To:** Kendall Chow <ktc@havo.global>; Elias Achilleos <elias@ethosasset.com>
**Cc:** rse@bucephalus.mx <rse@bucephalus.mx>; Carlos Santos <carlos@ethosasset.com>; Leandro Fernandes <leandro@ethosasset.com>; Ricardo Trindade <ricardo@ethosasset.com>; Hans Kastensmith <hans@ethosasset.com>; Cristiana Dias <cristiana@ethosasset.com>; mfranco@tarmexico.com <mfranco@tarmexico.com>; Alberto Chávez <achavez@tarmexico.com>; 'Ignacio Vazquez' <ivazquez@tarmexico.com>
**Subject:** Re: TESTIMONIAL CALL REQUEST: TAR Airlines, Mexico / HAVO INC., USA

Dear Kendall.

Thank you very much for your prompt attention to this request.

@Elias, thank you kind introduction.

Would it be possible to talk on Monday May 29th at 11h30 EST?  of course, if Monday (US Memorial day) is a non-working day for you.

1

I promise to be brief and concise.

I look forward to hearing your confirmation.

Best regards,


**Ricardo Bastón**
**CEO | TAR Aerolíneas**
**+52 55 2193 2888**
**rbaston@tarmexico.com**

---

**From:** Kendall Chow <ktc@havo.global>
**Date:** Friday, May 26, 2023 at 16:25
**To:** Elias Achilleos <elias@ethosasset.com>
**Cc:** Roberto Suarez Espinoza <rse@bucephalus.mx>, Carlos Santos <carlos@ethosasset.com>, Leandro Fernandes <leandro@ethosasset.com>, Ricardo Trindade <ricardo@ethosasset.com>, Hans Kastensmith <hans@ethosasset.com>, Cristiana Dias <cristiana@ethosasset.com>, Ricardo Baston <rbaston@tarmexico.com>, Miguel Franco <mfranco@tarmexico.com>, Alberto Chavez <achavez@tarmexico.com>, Ignacio Vazquez <ivazquez@tarmexico.com>
**Subject:** Re: TESTIMONIAL CALL REQUEST: TAR Airlines, Mexico / HAVO INC., USA

Hi Elias,

Great to hear from you, we are well, and I hope you and your family/team are well as well!
I would be more than happy to discuss and answer any questions with TAR Airlines.

Mr. Ricardo Baston, very nice to meet you. Please feel free to schedule a time with my scheduling link below. I look forward to speaking.

Thanks,
Kendall

Book a meeting with me

---

**From:** Elias Achilleos <elias@ethosasset.com>
**Date:** Thursday, May 25, 2023 at 10:19 AM
**To:** Kendall Chow <ktc@havo.global>
**Cc:** rse@bucephalus.mx <rse@bucephalus.mx>, Carlos Santos <carlos@ethosasset.com>, Leandro Fernandes <leandro@ethosasset.com>, Ricardo Trindade <ricardo@ethosasset.com>, Hans Kastensmith <hans@ethosasset.com>, Cristiana Dias <cristiana@ethosasset.com>, Ricardo Baston <rbaston@tarmexico.com>, mfranco@tarmexico.com <mfranco@tarmexico.com>, Alberto Chávez <achavez@tarmexico.com>, 'Ignacio Vazquez' <ivazquez@tarmexico.com>
**Subject:** TESTIMONIAL CALL REQUEST: TAR Airlines, Mexico / HAVO INC., USA

Dear Kendall,

I hope that you are well and in good health.

I'm writing to you to kindly request your assistance with a testimonial request from a very important Mexico client of ours about to enter into an Agreement with Ethos for financing.

2

Our client is TAR Airlines. With nine years of experience since March 14th, 2014, TAR is a regional carrier based in Queretaro, Mexico, (about 200 km north from Mexico City). The fleet consists of 12 ERJ-145 jets with coverage in 18 destinations with 26 routes and 3.5 M passengers already flown and part of TAR's history.

The call will be with Mr. Ricardo Bastón, CEO, who has 36 years direct experience in the aviation industry and Mr. Miguel Angel Franco Hernandez, Chairman, Founder and owner of TAR Airlines. When convenient for you, please make contact with Ricardo. Or alternatively, Ricardo, please feel free to communicate directly with Mr Kendall Chow, CEO and Founder, Havo Inc., and keep us all copied in all communications.

May I thank you all, in advance for taking the time to do this.

**A little background on Havo Inc:**

Havo Inc., is a closely held transportation company building sustainable last-mile commercial electric vehicles (EVs). Founded in 2021 and based in San Francisco, Havo helps customers achieve their carbon neutrality and zero emission goals, including Environmental, Social and Governance (ESG) objectives. The company is working with leading suppliers, contract manufacturers, commercial vehicle design and engineering firms.

If you have any questions, please do not hesitate to contact me.

Kind regards,

Elias



4660 La Jolla Village Drive, San Diego, California, 92122

United States of America

Internal Use Only

################
Visit our website at https://ethosasset.com/

The content of this message and any attachments may be confidential, privileged or otherwise sensitive in nature and is intended solely for the recipient. If you are not the intended recipient, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose or otherwise act upon any part of this email communication or its attachments. Any unauthorized dissemination, copying or use of this message or its contents is strictly prohibited and may be in violation of law. In accordance with industry

standards and regulatory requirements, Ethos Asset Management Inc. ("Ethos") may retain email communications for a period of time. Ethos reserves the right to monitor and archive all email communications in accordance with applicable law and may disclose such communications as required by law.

# EXHIBIT H

## AGREEMENT № EAM-TAR-A-0421-2023

## PROJECT

## "TAR MÉXICO - EXPANSIÓN"

This Agreement ("Agreement"), dated **June 12th, 2023**, is between **ETHOS ASSET MANAGEMENT INC.**, a corporation, incorporated under the laws of the USA, having its principal place of business at 4660 La Jolla Village Drive, San Diego, California, 92122, United States of America, herein represented by **Mr. CARLOS MANUEL DA SILVA SANTOS** ("Party A" or "EAM"), and **LINK CONEXIÓN AÉREA SA DE CV,** having its principal place of business at Blvd. Bernardo Quintana CS-9800 A-701C Colonia Centro Sur, Querétaro, Querétaro, México, 76090, represented by **Miguel Ángel Franco Hernández** ("Party B" or **TAR**).

Party A and Party B are herein referred to individually as a "Party" and collectively as the "Parties."

### Background

This Agreement sets forth the desire between the Parties to enter in a mutually beneficial relationship, involving the exchange of resources in order to develop the Project, as specified herein.

TAR requires USD$51,300,000 USD in total financing in two phases of A) $20,000,000 (Twenty Million USD, covered by this agreement and B) $31,300,000 (Thirty-One Million Three Hundred Thousand USD) covered under a subsequent agreement.

Accordingly, in consideration of the mutual covenants herein contained, the Parties hereto, intending to be legally bound hereby, agree as follows:

### Article 1 Definitions

Terms defined in the preamble and the recitals of this Agreement have their assigned meanings, and the following terms have the meanings assigned to them:

1.1     **"Agreement"** has the meaning set forth in the Background.

1.2     **"Closing"** means the consummation of the transactions that this Agreement contemplates. The consummation of said transactions (the "Closing") shall take place on the first date after Party A satisfies the conditions precedent, that means the collateral to be issued and validated as set forth in section. 3.3. The closing takes place after all conditions precedent to the Closing, especially the one stated in Sections 3.3 and 3.6, have been satisfied or waived in writing by the Parties.

1.3     **"Effective Date"** means **June 12th, 2023**. The Effective Date shall take place online by way of the exchange of executed/ signed documents, or at such other time, date and place as may be agreed in writing by the Parties.

1.4     **"Full Repayment Date"** means the due date of the last installment payment by Party B, as set forth in Section 3.3 and 3.6.

1.5     **"Project"** means "TAR MEXICO - EXPANSION". A detailed Project description is available in Exhibit C.

## Article 2   Project

2.1     **Formation and Purpose**. The Parties agree to join efforts in this Project in accordance with the terms of this Agreement for the purpose of developing the Project as set forth in Exhibit C. Notwithstanding the foregoing, nothing contained in this Agreement or in the agreements referenced herein is intended or is to be construed to create a partnership, joint venture, employment relationship, agency relationship, or any relationship similar to the foregoing relationships between Party A and Party B.

2.2     **Engage in other activities**. Party B shall exclusively use the funds provided by Party A to develop the Project and, under no circumstances shall Party B engage in business or activities outside of what is described in Exhibit C using the funds provided by Party A, or nominee. Unless the changes are mutually agreed by the Parties and that, those changes are aimed to comply with the objectives originally established in the Project as it is described in Exhibit C.

2.3     **No Liability**. The debts, obligations and liabilities of either Party, whether arising in contract, tort or otherwise, and in connection with the Project, shall be solely the debts, obligations and liabilities of either Party A or Party B – as the case may be – nor its members shall be obligated in its financial capacity for any such debt, obligation or liability solely by reason of being a Party of this Agreement. And each Party shall indemnify the other Party pursuant to section 3.9 or 3.10 as applicable.

2.4     **Intent**. Neither Party shall take any action inconsistent with the purpose of the Project and the expressed intent of the Parties as set forth in this Agreement.

2.5     **Payments of Individual Obligations**. The funds provided by Party A shall be used by Party B solely for the benefit of the Project, and no asset that is produced by the Project shall be transferred or encumbered for, or in payment of, any individual obligation of any member of Party B.

2.6     **Status and Expenditure Compliance.** The Parties agree that Party B shall provide to Party A periodic updates of the status of the Project, and additionally supporting documents and records reasonably requested by Party A.

(i)     The parties agree that Party B shall provide updated monthly accounting reports, monthly copies of bank statements showing the movements of the disbursed funds, and any other relevant status reports of the Project to Party A including summary of work performed and costs incurred substantially in the form reflected in Exhibit C and Trimester Financials. Such a report will be provided approximately 15 Business Days after the end of each month or trimester. Should any doubts arise from the regular Party B internal reporting system, Party A will have the right to request additional information and documentation. Party A has the right to audit the use of funds by Party B at any time.

(ii)    Party A will have the right to perform an audit of the Project, solely to determine whether or not proceeds from the financing were spent in accordance with the Project Plan. The audit will be performed by Party A, or

an entity of recognized standing chosen by Party A and Party A shall notify
Party B 10 banking days in advance.

## Article 3   Funds, Collateral and Payment

**3.1    Funds**. Subject to the terms and conditions of this Agreement, Party A shall provide
funds for **PHASE A** of the Project in the principal amount of **USD$ 20,000,000.00 (TWENTY
MILLION US DOLLARS)** (the "**Funds**").

**3.2    Securities regulation exempt**. The Parties acknowledge that the transaction involved
in this Agreement shall not be interpreted as a securities transaction as defined by the Securities Act
of 1933 or by the Security Exchange Act of 1934 of the United States of America, or any other laws
of any other nation related to securities transactions. This Agreement and the transaction herein are
exempted from the securities laws and would not be required to be registered with any authority or
with any government body.

**3.3    Collateral**. In consideration for the funds for **PHASE A** provided by Party A, or its
nominee, Party B shall deposit into a pledge account with the bank set forth in Exhibit A, the (the
"**Depositary Bank**") with a total amount of **USD$5,000,000.00, (FIVE MILLION US DOLLARS)**
pledge in a dedicated account ("**Pledge Account**") of Party B (the "**Pledged Funds**") , which shall
cover **25%** of the financing of the Project to secure Party B's obligation to make repayment of the
Funds pursuant to the terms of this Agreement as described in Exhibit B.

(i)    Party B shall sign a Pledge Agreement ("**Pledge Agreement**") pursuant to
which Party A will have certain rights to draw funds from the Pledge Account
upon a default by Party B under the terms of this Agreement.

(ii)    In no event shall Party A have any rights in the Pledged Funds, except as
specifically provided in the Pledge Agreement, in Exhibit A, upon a default by
Party B.

(iii)    The Pledged Funds shall be maintained in the Pledge Account until the date
that all Funds are repaid pursuant to Section 3.4(i) and Exhibit B (the
"**Expiration Date**") and serve as security for the repayment of the Funds
described in Section 3.5 and under the conditions described in Exhibit B (the
"**Pre-Approval Conditions of Funds Disbursement and Repayment**").

(iv)    The balance required to be maintained in the Pledge Account shall be
decreased each year of the Term, as defined herein, that the Funds remain
outstanding beginning on the **fourth anniversary date** of this Agreement until
the date all Funds are completely paid to Party A and are no longer subject to
any claim from Party A, as defined below. Beginning on the **fourth
anniversary date** of this Agreement and continuing on each anniversary date
of this Agreement thereafter, Party B shall be entitled to withdraw a cash
amount of Pledged Funds from the Pledge Account equal to **25%** of the
amount of principal paid to Party A in repayment of Funds, which are not
subject to good faith claims for an alleged Event of Default by Party B as
defined in this Agreement, made by Party A against the Pledge Funds that
remain unresolved ("**Pledge Fund Claims**").

(v)    Both Parties shall provide written instructions as necessary to the Depositary
Bank, to release the Pledged Funds in an amount that equals the amount of

Principal repaid by Party B to Party A in the previous year and any amounts for previous years for which Party B may have elected, for any reason, not to withdraw from the Pledge Account, minus any Pledge Fund Claims. As soon as each Pledge Fund Claim is resolved to the mutual satisfaction of the Parties, the Parties shall deliver written instruction to the Depositary Bank that the amount being held in the Pledge Account on account of a Pledge Fund Claim has been resolved by the Parties, and directing the Depositary Bank to deliver such Pledge Funds immediately to Party B. When the balance of Funds remaining in the Pledge Account equals or exceeds the remaining amount of Funds to be repaid by Party B to Party A, the Parties agree that Party B shall have the right to credit the Pledged Funds remaining that are not subject to any Pledge Fund Claims to reduce the amount of the Funds required to be repaid to Party A, including the full repayment of the Funds to Party A.

3.4    **Repayment**.

(i)    Party B shall repay Party A (the "**Repayment**") the full amount of funds provided by Party A to Party B, paying off the financing mentioned in this Agreement on time (pursuant to the payment schedule set forth in Exhibit B) and in full, and in compliance with all the obligations accepted by Party B, and in accordance with the General Repayment Data set forth in Exhibit B and described in Section 3.7.

(ii)    **Cancellation Upon Repayment.** With the exception of the cancellation criteria described in Section 7, the Pledge Agreement shall be cancelled upon full Repayment in accordance with Section 3.4 (i). Promptly after the full Repayment of the funds by Party B, but in no later than ten (10) business days after such Repayment, Party A shall authorize Party B to direct the Depositary Bank to refund to Party B all remaining funds held by the Depositary Bank in the Pledge Account. All remaining funds held by the Depositary Bank shall be the property of Party B.

3.5    **Condition for Funds.** Party A will provide funds for the Project, if Party B issues the agreed financial instrument as a collateral, and if the collateral is issued, delivered, and verified, in accordance with the instructions provided by Party A and under the terms stated in Section 3.3 and Article 4.

3.6    **Funds Disbursement Schedule**. In accordance with the terms and provisions set forth herein, Party A will provide funds for the Project as stated in Section 3.1 in the form of disbursements to Party B with a maturity period of **12-years**, subject to the grace period set forth on Exhibit B (the "**Disbursement Schedule**"). The Disbursement Schedule includes the pre-approval of the conditions for the disbursement of funds, approved and signed by the Parties as established in Exhibit B of this Agreement.

3.7    **Repayment period**. In accordance with the terms of this Agreement, Party B shall repay the full amount of funds plus interest payment in a period of **12-years** from the Disbursement Date in accordance with the repayment schedule set forth on Exhibit B. **Disbursement Date** means the date of the first disbursement of the principal amount of the Funds to Party B, or any portion of it and shall be interpreted as of the date in which Party B receives the respective amount in its bank account or at a bank designated by Party B.

3.8    **Prepayment**. Funds received and accrued interest may be prepaid only with Party A's concurrence.

3.9     **Indemnification by Party A**. Party A agrees to indemnify and hold harmless Party B against any losses, claims, damages or liabilities, joint or several, to which Party B may become subject, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) are caused by (i) any untrue statement or alleged untrue statement of a material fact made by Party A, (ii) any breach by Party A of any of its representations, warranties or covenants contained herein, or (iii) the omission or alleged omission by Party A to state a material fact required to be stated herein or necessary to make the statements herein, in light of the circumstances under which they were made, not misleading; and will repay Party B for any legal or other expenses reasonably incurred by Party B in connection with investigating or defending any such loss, claim, damage, liability or action, whether arising out of an action between Party B and a third party provided that such loss, claim, damage or liability is found ultimately to arise out of or be based upon any of the facts set forth in items (i) through (iii) in this Section 3.9

3.10     **Indemnification by Party B**. Party B agrees to indemnify and hold harmless Party A against any losses, claims, damages or liabilities, joint or several, to which Party A may become subject, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) are caused by (i) any untrue statement or alleged untrue statement of a material fact made by Party B, (ii) any breach by Party B of any of its representations, warranties or covenants contained herein, or (iii) the omission or alleged omission by Party B to state a material fact required to be stated herein or necessary to make the statements herein, in light of the circumstances under which they were made, not misleading; and will repay Party A for any legal or other expenses reasonably incurred by Party A in connection with investigating or defending any such loss, claim, damage, liability or action, whether arising out of an action between Party A and a third party provided that such loss, claim, damage or liability is found ultimately to arise out of or be based upon any of the facts set forth in items (i) through (iii) in this Section 3.10

3.11     **Taxes, Duties and Fees**. Each Party, individually and separately, will be responsible for its own taxes or fees attributable to such Party, that may arise from this Agreement in connection with the development of the Project,

      (i)    <u>Operational Fee</u>. Party B shall pay to Party A an Operational fee equal to 3% of the Funds with such fee to be paid based upon the amount of each disbursement per the Disbursement Schedule. Party B authorizes Party A to deduct such Operational Fee from each disbursement tranche of the Funds made per the Disbursement Schedule

      (ii)    <u>Intermediary Fee</u>. Party B shall be responsible for paying an "**Intermediary Fee**" in connection with the transactions contemplated by this Agreement based upon onboarding process, developing, submitting and managing documentation, assisting in closing the financing, conducting follow-up and support during all phases of the operation, Party B and any other person or entity (an "**Intermediary**"). The Intermediary Fee equal to 2% of the Funds with such Intermediary Fee to be paid based upon the amount of each disbursement per the Disbursement Schedule. Party B authorizes Party A to pay directly to **Bucephalus, Asesores Financieros** the "Intermediary Fee" due such Intermediary with respect to each disbursement tranche of the Funds made per the Disbursement Schedule.

3.12     **Confidential Information**. All information contained herein constitutes confidential information between the Parties and shall be kept confidential and shall not be disclosed by the Parties. In addition, Party A, and its owners, officers, managers, and employees shall not disclose or

otherwise make available "Confidential Information" of Party B to any third party. **"Confidential Information"** means any and all information of a Party that is treated as confidential by such Party.

## Article 4  Pledge Procedure

4.1     The process for making the pledge of Pledged Funds shall be as follows:

(i)     Party B executes this Agreement, including approval of the draft of the Pledge Agreement.

(ii)    Party B, within a reasonable time, shall open the Pledge Account at the Depositary Bank selected by Party B and subject to Party A approval and deposit the Pledged Funds. For that purpose, Party A may be a facilitator to this process with the written consent of Party B,

(iii)   Within a reasonable time, Party B shall execute the Pledge Agreement with the Depositary Bank,

(iv)    Within a maximum of ten banking days following execution of the Pledge Agreement, Party B shall deposit the Pledged Funds into the Pledge Account,

(v)     Party B shall buy a portfolio of securities in accordance with the asset allocation presented in Exhibit A.

(vi)    Party B shall request to the Depositary Bank against such asset allocation to extend a margin value/credit line.

(vii)   Party B shall wire the defined part of the margin value/credit line to Party A following the percentages defined in Exhibit A.

(viii)  After the margin value funds are received by Party A, Party A shall make the disbursement of the funds, in accordance with the tranche schedule detailed in <u>Exhibit B</u>.

4.2     **Bank Coordinates**. The issuance and delivery of the financial instrument shall be performed under Party A instructions and under the following bank coordinates:

### 4.2.1 **Party B's Bank Information/ Depositary Bank**

BANK: Banque Pictet & Cie

ADDRESS: Route des Acacias 60, 1211 Geneva 73. Switzerland

ACCOUNT NAME: Miguel Angel Franco

ACCOUNT HOLDER ADDRESS:  Blvd. Bernardo Quintana cs-9800 A-701C Col. Centro Sur Querétaro, Querétaro México 76090

ACCOUNT NUMBER: 133203

SWIFT CODE: PICTCHGG

ROUTING NUMBER = IBAN NUMBER: CH4508755013320300100

4.2.2 **Party A's Beneficiary Bank Information**

Bank Name:

Bank Address:

Account Name: ETHOS ASSET MANAGEMENT INC

Account Holder Address: 4660 La Jolla Village DR, San Diego, CA 92122

Account Number:

Routing Number:

Swift Code/BIC:

Account Signatory (1): Carlos Manuel da Silva Santos

4.2.3 **Party B's Funds Disbursement Receiving Bank Information**

BANK: BBVA BANCOMER, SA INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO BBVA BANCOMERADDRESS: BERNARDO QUINTANA 9800 B-706, CENTRO SUR, QUERETARO, QUERETARO, MEXICO C.P. 76090

ACCOUNT NAME: LINK CONEXION AEREA SA DE CV

ACCOUNT HOLDER ADDRESS: SUCURSAL 0828AV. CONSTITUYENTES 120 PTE COL. EL CARRIZAL, QUERETARO, QUERETARO, MEXICO C.P. 76030

ACCOUNT NUMBER: 0197981740

SWIFT CODE: BCMRMXMM

## Article 5   Representations and Warranties

5.1    Party A represents and warrants that as of the Effective Date:

(i)    Party A is a duly formed and in good standing Corporation under the laws of the State of California, USA, with full power and authority to perform its obligations herein.

(ii)    This Agreement has been duly authorized, executed, and delivered by Party A and, upon due authorization, execution and delivery by Party B, will constitute a valid and legally binding Agreement.

(iii)    Neither Party A nor any Affiliate of Party A , nor any director, officer, agent, employee or other person acting on behalf of Party A or any Affiliate thereof has, in the course of its, his, or her actions for or on behalf of Party A, used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; violated or is in violation of any provision of the U.S.

Foreign Corrupt Practices Act of 1977, as amended; or made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee. Without limiting the generality of the foregoing, Party A and/ or its Affiliates have not, directly, or indirectly, made or agreed to make (whether or not said payment is lawful) any payment to obtain, or with respect to, sales other than usual and regular compensation to its or their employees and sales representatives with respect to such sales.

(iv)     Party A has  not, nor has any Affiliate of Party A violated or is in violation of any applicable laws relating to terrorism or money laundering, including, without limitation, the USA Patriot Act, or has not been engaged in or engages in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of offenses designated in any applicable law, regulation or other binding measure implementing the 40 Recommendations and the IX Special Recommendations published by the Organization for Economic Cooperation and Development's Financial Action Task Force on Money Laundering.  This Agreement, the financing provided herein, and the terms and conditions set forth in this Agreement, do not violate any applicable law or regulation of the United States, the agencies thereof, or any state in the United States.

(v)      Party A voluntarily signed this Agreement, free from any influence, enforcement or misrepresentation of any kind.

(vi)     Party A has all licenses, consents, authorizations and approvals, and has made all governmental filings, necessary for the conduct of its business, including providing the financing contemplated by this Agreement.

5.2     The Party B represents and warranties that as of the Effective Date:

(i)      Party B is a duly formed and validly existing corporation under the laws of the United States of Mexico, with full power and authority to perform its obligations herein.

(ii)     This Agreement has been duly authorized, executed, and delivered by Party B and, upon due authorization, execution, and delivery by Party A, will constitute the valid and legally binding Agreement.

(iii)    All information contained in the documents submitted to Party A by Party B are true in all material respects.

(iv)     Neither Party B nor any of its Affiliates acting on behalf of Party B or any Affiliate has in the course of its, his or her actions for or on behalf of Party B, used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.  Without limiting the generality of the foregoing, Party B and its subsidiaries have not directly or indirectly made or agreed to make (whether or not said payment is lawful) any payment to obtain, or with respect to, sales other than usual and regular

compensation to its or their employees and sales representatives with respect to such sales.

(v)    Party B, it has not violated or is in violation of any applicable laws relating to terrorism or money laundering, including, without limitation, the USA Patriot Act, or has not been engaged in or engages in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of offenses designated in any applicable law, regulation or other binding measure implementing the 40 Recommendations and the IX Special Recommendations published by the Organization for Economic Cooperation and Development's Financial Action Task Force on Money Laundering.

(vi)    Party B voluntarily signed this Agreement, free from any influence, enforcement, or misrepresentation of any kind.

5.3    For the purposes of this Agreement "**Affiliate**" of a "**Person**" means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

For the purposes of this Agreement "**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a limited liability company, a limited liability partnership, a trust, a joint venture, an unincorporated organization, proprietorship, or any similar business enterprise or organization, or a governmental entity or any department, agency, or political subdivision thereof.

## Article 6  Warranties and Covenants

6.1    Party A is obligated to consummate the transaction contemplated by this Agreement only if each of the following conditions has been satisfied or waived on or before the Closing Date:

(i)    **Representations and Warranties**. The representations and warranties of Party B set forth herein must be true as of the Closing Date.

(ii)    **Covenants**. Party B shall have performed all its obligations and agreements and complied with all its covenants contained in this Agreement to be performed and complied with Party B prior to the Closing Date.

6.2    Party B is obligated to consummate the transaction contemplated by this Agreement only if each of the following conditions has been satisfied or waived on or before the Closing Date

(i)    **Representations and Warranties**. The representations and warranties of Party A set forth herein must be true as of the Closing Date.

(ii)    **Covenants**. Party A shall have performed all its obligations and agreements and complied with all its covenants contained in this Agreement to be performed and complied with Party A prior to the Closing Date.

# Article 7 Events of Default

7.1    **Event of Default by Party B**. An Event of Default by Party B will occur if any of the following occurs:

      (i)    Party B fails to pay Party A any amount due pursuant to this Agreement on the due date and after Party A sends written notice (a "Notice") fails to remedy such failure within 10 (ten) business days.

      (ii)    Party B breaches any obligations, conditions, representations, and warranties, stated in this Agreement or any other agreement it has entered into with Party A, if such obligation, condition, representation or warranty is capable of being remedied, and Party B fails to remedy it within 20 (twenty) business days after written Notice from Party A.

      (iii)    Party B abandons or suspends the development of the Project for a period of more than 6 (six) months and after Party A sends written Notice Party B fails to remedy it within 20 (twenty) business days.

7.2    **Upon an Event of Default by Party B**, under Section 7.1, the unpaid portion of the principal amount will bear simple interest from the date of the Event of Default to the payment date at a rate equal to two percent (2.00%) per annum, for the duration of such Event of Default.

7.3    **Execution of the Collateral by Party A.** Following an Event of Default by Party B under Section 7.1, Party A will be entitled to execute up to the outstanding Pledged Funds to mitigate the damages caused by the default. Under no circumstances, other than default by Party B may Party A execute the outstanding Pledged Funds.

      7.3.1  In the event that the default by Party B is under Section 7.1. (i) the execution of the Pledged Funds shall go up to the default amount, that corresponds to the amount due for lack of repayment. Party A may terminate the Agreement, being its sole and exclusive option.

      7.3.2  In the event that the default by Party B is under Section 7.1. (ii) or (iii) the execution of the Pledged Funds shall go up to the outstanding financing amount.

7.4    **Event of Default by Party A.** An Event of Default by Party A will occur if any of the following occurs:

      (i)    Party A fails to pay Party B any amount due pursuant to this Agreement on the due date and after Party B sends written Notice fails to remedy such failure within 20 (twenty) business days.

      (ii)    Party A breaches any obligations, conditions, representations and warranties, stated in this Agreement or any other agreement it has entered into with Party B, if such obligation, condition, representation or warranty is capable of being remedied, and Party A fails to remedy it within 20 (twenty) business days after written Notice of receipt of written demand from Party B.

7.5    **Upon an Event of Default by Party A**, under 7.4, the unpaid portion of the principal amount due to Party B will bear simple interest payable to Party B from the date of the Event of Default to the payment date at a rate equal to two percent (2.00%) per annum, for the duration of such Event of Default.

7.6    **Cancelation of the Collateral.** In the Event of Default by Party A, under 7.4, Party B shall notify Party A and cancel the Pledged Funds and the Agreement shall be automatically terminated, and Party A shall immediately repay the amount of the margin value/credit line provided by Party B to Party A under Section 4.1.

## Article 8   Termination

8.1    **Term**. The term of this Agreement (the **"Term"**) and the rights and obligations set forth herein shall commence on the Effective Date and terminate on the Full Repayment Date, unless terminated earlier in accordance with Sections 8.2 and 8.3.

8.2    **Termination for default by Party A**. This Agreement shall terminate if any of the events of default mentioned in Section 7.4 occurs. In this case, Party B shall retain all the funds disbursed by Party A and Party A must release the Collateral. This Agreement is automatically terminated if Party A defaults for non-disbursement in line with Section 7.4(i). The terms set forth in Section 9.3 and Section 9.4 shall apply in case of termination for default by any of the Parties.

8.3    **Termination for default by Party B**. Party A may terminate this Agreement if any of the events of default mentioned in Section 7.1 occurs. In this case, Party A will instruct Party B to execute the Collateral and Party B shall repay the remaining balance of all the funds disbursed by Party A within 30 business days. The terms set forth in Section 9.3 and Section 9.4 shall apply in case of termination for default by any of the Parties.

8.4    **Termination**. If Party B issues collateral which does not fulfil the conditions stated in Section 3.3 (regarding **"Collateral"**), Party A may terminate this Agreement at any time and without any prior written notice to Party B. In this case, Party A shall be entitled to a refund of the full amount of Funds transferred or disbursed to Party B, which shall not include the Pledged Funds that shall be refunded to Party B.

8.5    **Effect of Termination**. Upon termination or expiration of this Agreement, each Party shall promptly return to the other Party all relevant records and materials in its possession or control containing or comprising the other Party's Confidential Information and to which the Party does not retain rights hereunder; provided, however, that each Party shall be entitled to retain copies of the other Party's Confidential Information to the extent necessary to comply with applicable regulatory obligations and shall be entitled to retain one copy of the other Party's Confidential Information for archival purposes.  Notwithstanding the foregoing, all Confidential Information of either Party shall remain confidential and shall be safeguarded by the Party that retains the Confidential Information. The obligations to safeguard and not to disclose the Confidential Information of the other Party shall survive such termination this Agreement.  Upon termination all Pledged Funds remaining in the Pledge Account after all disbursements are made for the Pledge Account as required by this Agreement shall be refunded immediately to Party B.

8.6    **Survival**. In the event of the expiration or early termination of this Agreement, the provisions of Sections 3.9, 3.10 and 8.4 (to the extent related to an action or claim originating before such expiration or termination), and Article 9 and such other provisions that by their terms should reasonably be judged to survive expiration or termination, shall survive for the period specified therein or, in the absence of such specification, indefinitely.

## Article 9   Miscellaneous

9.1    **Amendments and Waivers**.  This Agreement shall not be amended, modified or waived in any manner except by an agreement in writing duly executed and delivered by each of the

Parties. No failure or delay of any Party to exercise any right or remedy given to such Party under this Agreement or otherwise available to such Party, or to insist upon strict compliance by any other Party with its or his obligations hereunder, no single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, and no custom or practice of the Parties in variance with the terms hereof, shall constitute a waiver of any Party's right to demand exact compliance with the terms hereof. Any written waiver shall be limited to those items specifically waived therein and shall not be deemed to waive any future breaches or violations or other non-specified breaches or violations unless, and to the extent, expressly set forth therein.

9.2 **Force Majeure.** This Agreement shall be subject to the International Chamber of Commerce ("**ICC**") Force Majeure Clause 2003. Neither Party hereto shall bear any responsibility for the full or partial non-fulfilment of its contractual obligations if this non-fulfilment is due to Force Majeure circumstances, as stated by the ICC latest edition, arisen after the signature of the present Agreement. The fulfilment term of the contractual obligations of either Party hereto shall accordingly be postponed for the period during which such circumstances remain. Either Party hereto shall be obliged to immediately inform the other Party about the beginning, probable duration and cessation of the Force Majeure circumstances. The non-notification about the Force Majeure circumstances shall cancel the right of either Party hereto to make reference to them under the present Agreement.

9.3 **Confidentiality.** Each Party agrees that it shall keep the terms, amount, circumstances, data, documentation, company information and facts of this Agreement, and information of the Parties related or not related with this Agreement, completely confidential, and that it will not hereafter disclose any information concerning this Agreement or about both Parties to anyone. Each Party shall not make any comments, recommendations or express any opinions to any third party neither voluntarily nor if approached whether related or not related to this Agreement provided, however, that such Parties may make such disclosure to their professional representatives (e.g., attorneys), if any, all of whom will be informed of and agree to be bound by this confidentiality clause, or other such disclosures required by law or legal process. If any Party receives an inquiry about this Agreement, such Party shall communicate such approach to the other party and shall agree with the other party an answer to provide. In such answer the Party cannot mention or refer to the other Party in any negative or derogatory way. Further, the Parties shall not post or otherwise disclose or reveal, or cause to be disclosed or revealed, to any person or entity any of the Confidential Information on the Internet or any other media outlet or platform, including but not limited to websites, newspapers, email, text, Facebook, Instagram, LinkedIn, and Twitter. Disclosure of information and facts about this Agreement, and information of the Parties related or not related to this Agreement may be used in media like Press Releases, Interviews or any other type with the exclusive consent of the Parties. Nothing in this Agreement shall, however, be deemed to interfere with the Parties' respective obligations to report transactions with appropriate governmental, taxing and/or registering agencies. It is understood and agreed that this Agreement may be offered into evidence to enforce its terms. If a Party receives an order from a court, a subpoena, or other lawful command to produce this Agreement, the Party receiving such order, subpoena or command shall notify the other Party prior to producing this Agreement to anyone. In response to that notification, a Party may (but does not have to) pursue whatever legal action they deem necessary to preserve the confidentiality of this Agreement. This Section 9.3 shall survive the termination of this Agreement and remain in force and effect as of the Effective Date.

9.4 **Non-Disparagement.** The Parties shall not disparage any of the other Parties, or any of their affiliates, parents, subsidiaries, and their respective shareholders, directors, officers, employees, agents, members, advisors or attorneys, or otherwise take any action that could reasonably be expected to affect adversely the professional or personal reputation of the Parties or any of their affiliates, parents, subsidiaries, and their respective shareholders, directors, officers, employees, agents , members, advisors or attorneys. Each Party agrees and covenants that they will not, and will

use reasonable efforts to cause its officers and directors not to, at any time, directly or indirectly, make, publish, or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning any other Party or its businesses, or any of its their affiliates, parents, subsidiaries, and their respective shareholders, directors, officers, employees, agents , members, advisors or attorneys. The Parties shall promptly provide written notice of any such order to each other applicable Party. This Section 9.4 shall survive the termination of this Agreement and remain in force and effect as of the Effective Date.

9.5     **Merger**. Any corporation or entity into which the Parties may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion, or consolidation to which the Parties will be a party, or any corporation or entity succeeding to the business of the Parties will be the successor of the Parties hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

9.6     **Counterparts.**  This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement.  This Agreement and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of electronic transmission of .pdf files or other image files via e-mail, cloud-based transfer or file transfer protocol, or use of a facsimile machine, shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.   The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Acts except in respect to any non-US entity, whereby originals can be required by the Party A.

9.7     **Assignment and Delegation**. No Party may assign any right or delegate any duty under this Agreement without the prior written consent of the other Party. All assignments of rights are prohibited, whether they are voluntary or involuntary, by merger, consolidation, dissolution, operation of law, or any other manner. A purported assignment or purported delegation in violation of this Section 9.7 is void.

9.8     **Notices.**  Any notice permitted or required hereunder shall be in writing in English and may be sent by (i) secure file transfer or (ii) electronic mail with a scanned attachment thereto of an executed notice or instruction, and shall be effective upon actual receipt by the Parties in accordance with the terms hereof.  Each of the appointed directors and individuals have full power and authority to execute any notices or instructions, to amend, modify or waive any provisions of this Agreement, and to take any and all other actions permitted under this Agreement, all without further consent or direction from, or notice to, it or any other party.  Any notice or instruction must originate from a corporate domain.  The Parties agree that the above security procedures are commercially reasonable.

**If to ETHOS ASSET MANAGEMENT INC.**

CARLOS MANUEL DA SILVA SANTOS
CEO
4660 La Jolla Village Drive, San Diego, California, 92122, United States of America
carlos@ethosasset.com

**If to Link Conexión Aérea SA de CV**

Miguel Ángel Franco Hernández
Chairman
Blvd. Bernardo Quintana CS-9800 A-701C Colonia Centro Sur, Querétaro, Querétaro, México, 76090
mfranco@tarmexico.com

    9.9  **Exhibits**. Attached hereto and incorporated herein by this reference are the following exhibits: Exhibit A, Exhibit B and Exhibit C.

    9.10  **Severability**. If any provision of this Agreement is illegal or unenforceable, that provision is severed from this Agreement and the other provisions remain in force.

    9.11  **Non-Circumvention and Non-Disclosure**. This Agreement incorporates the rules of Non-Circumvention and Non-Disclosure established by the ICC, which rules are made a part hereof by this reference. This Section 9.12 shall survive the termination of this Agreement and remain in force and effect as of the Effective Date.

    9.12  **English Language.** All documentation and information related to this Agreement shall be conducted in English.

    9.13  **Arbitration**. In the event of any dispute arising out of or in connection with the present Agreement, the Parties shall first refer the dispute to proceedings under the ICC Mediation Rules. The place of mediation shall be New York City, New York. If the dispute has not been settled pursuant to the said Rules within 60 days following the filing of a Request for Mediation or within such other period as the Parties may agree in writing, such dispute shall thereafter be finally settled under the Rules of Arbitration of the ICC by three arbitrators appointed in accordance with the said Rules of Arbitration. The place of Arbitration shall be New York City, New York. The language of the arbitration shall be English. The arbitration shall be the sole and exclusive forum for resolution of any dispute, and the award shall be in writing, state the reasons for the award and be final and binding. Judgment thereon may be entered in any court of competent jurisdiction. The Parties shall keep any mediation and/or arbitration confidential and shall not disclose to any person other than those necessary to the conduct of those proceedings (i) the existence of the mediation and/or arbitration, (ii) any document, testimony, transcripts or other information submitted, exchanged or created for the arbitration, or (iii) any decisions, orders, or awards, unless such disclosure is (A) required by law or a governmental or regulatory body, (B) necessary for a Party to seek legal, accounting or other professional services, or (C) for the purpose of making an application to any competent court relating to any aspect of a mediation and /or arbitration, including motions to recognize, enforce or challenge an award or interim measure, provided that, in all of the circumstances (A) to (C) above, the producing Party takes reasonable measures to ensure that the recipient preserves the confidentiality of the information provided. The prevailing Party, as determined by the arbitrators, shall be entitled to recover its reasonable costs and attorneys' fees from the non-prevailing Party.

9.14   **Governing Law.** This Agreement is subject to the Uniform Rules of ICC. In all matters this Agreement is governed by and shall be construed and interpreted in accordance with the laws of the State of New York without giving effect to the conflict of laws principles thereof.

9.15   **Waiver of Right to Jury Trial**. Each party hereby irrevocably waives all right to trial by jury in any proceeding or counterclaim (whether based on contract, tort, statute or otherwise) arising out of or relating to this agreement, the transactions contemplated hereby or the actions of such party in the negotiation, administration, performance, and enforcement hereof.  Each party further waives any right to seek to consolidate any proceeding in which a jury trial has been waived with any other proceeding in which a jury trial cannot or has not been waived.  Each party certifies and acknowledges that (i) no representative, agent or attorney of any other party has represented or warranted, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver, (ii) each party understands and has considered the implications of this waiver, (iii) each party makes this waiver voluntarily and (iv) each party has been induced to enter into this agreement by, among other things, the mutual waivers and certifications in this section 9.15.

[THIS SECTION INTENTIONALLY LEFT BLANK]

To evidence the Parties' agreement to this Agreement, each party has executed and delivered it on the date stated in the preamble.

The electronic version of a copy signed by both Parties shall be deemed legally binding and enforceable and is valid until full execution.

**ETHOS ASSET MANAGEMENT INC.**

By: _Carlos Manuel da Silva Santos (Jun 13, 2023 15:21 GMT+3)_
CARLOS MANUEL DA SILVA SANTOS
CEO

**Link Conexión Aérea SA de CV.**

By: _Miguel Angel Franco Hernandez (Jun 13, 2023 15:32 CDT)_
MIGUEL ANGEL FRANCO HERNANDEZ
CHAIRMAN

AGREEMENT № EAM-TAR-A-0421-2023 v.final

## EXHIBIT A

## PLEDGE AGREEMENT

**(Attached Separately – EXHIBIT A PLEDGE AGREEMENT № EAM-TAR-0421-2023 )**

# EXHIBIT B

## CONDITIONS OF FUNDS DISBURSEMENT AND REPAYMENT

**Basic information about the Parties to the Agreement:**

| | |
|---|---|
| Financial Partner "PARTY A" | ETHOS ASSET MANAGEMENT INC |
| Project Manager "PARTY B" | Link Conexión Aérea SA de CV |
| Guarantor "PARTY B" | Miguel Ángel Franco Hernández |
| Collateral | PLEDGE – USD$ 5,000,000.00 |
| Underwriting Bank | Banque Pictet & Cie SA |

**All the amounts described in this table ARE GROSS VALUES.**
**The actual amount to be transferred to PARTY B will be net values, i.e the gross values less the deduction of the Operational Fee of 3 % of the tranche charged by Party A, established in 3.11-i). Depending on agreement with Intermediary PARTY A will also deduct the Intermediary Fee established in 3.11-ii).**

| DESCRIPTIVE OF THE FINANCING PHASES | | |
|---|---|---|
| AMOUNT TO BE FUNDED | US$ 20, 000,000.00 | |
| FIRST TRANCHE OF FINANCING SHALL BE EXECUTED WITHIN 30 BANKING DAYS AFTER PARTY A RECEIVES THE MARGIN VALUE IN BANK ACCOUNT | | |
| TRANCHE #01 - IN 30 BANKING DAYS AFTER PARTY A RECEIVES THE MARGIN VALUE IN BANK ACCOUNT | 8.333% | US$ 1,666,666.66 |
| TRANCHE #02 - IN 30 BANKING DAYS AFTER TRANCHE #01 | 8.333% | US$ 1,666,666.66 |
| TRANCHE #03 - IN 60 BANKING DAYS AFTER TRANCHE #01 | 8.333% | US$ 1,666,666.66 |
| TRANCHE #04 - IN 90 BANKING DAYS AFTER TRANCHE #01 | 8.333% | US$ 1,666,666.66 |
| TRANCHE #05 - IN 120 BANKING DAYS AFTER TRANCHE #01 | 8.333% | US$ 1,666,666.66 |
| TRANCHE #06 - IN 150 BANKING DAYS AFTER TRANCHE #01 | 8.333% | US$ 1,666,666.66 |
| TRANCHE #07 - IN 180 BANKING DAYS AFTER TRANCHE #01 | 8.333% | US$ 1,666,666.66 |
| TRANCHE #08 - IN 210 BANKING DAYS AFTER TRANCHE #01 | 8.333% | US$ 1,666,666.66 |
| TRANCHE #09 - IN 240 BANKING DAYS AFTER TRANCHE #01 | 8.333% | US$ 1,666,666.66 |
| TRANCHE #10 - IN 270 BANKING DAYS AFTER TRANCHE #01 | 8.333% | US$ 1,666,666.66 |
| TRANCHE #11 - IN 300 BANKING DAYS AFTER TRANCHE #01 | 8.333% | US$ 1,666,666.66 |
| TRANCHE #12 - IN 330 BANKING DAYS AFTER TRANCHE #01 | 8.333% | US$ 1,666,666.66 |
| TOTAL AMOUNT OF FINANCING | US$ 20,000,000.00 | |

AGREEMENT № EAM-TAR-A-0421-2023 v.Final

| General Repayment Data | | | | | | |
|---|---|---|---|---|---|---|
| Amount USD | 20,000,000.00 | Maturity | 12-years | Interest Rate (Fixed)(Simple) | 4% | Pledge shall be in force for **12-years** – Renewing every 1-year and 1-day subject to reduction as set forth in Section 3.3 |
| Grace Period | 3-years | Repayment Installments | 9 | Currency | USD | |
| Date of First Tranche | TBD | Date of First Installment | | | | |

## REPAYMENT SCHEDULE:

| Tranche | Date of Payment | Initial Balance USD | Principal Payment USD | Interest Payment USD | Total Payment USD | Ending Balance USD | Anchor Value | Anchor Release |
|---|---|---|---|---|---|---|---|---|
| 1 | 2023-N+1-31 | $20,000,000.00 | $0.00 | $0.00 | $0.00 | $20,000,000.00 | $5,000,000.00 | $0.00 |
| 2 | 2024-N+1-31 | $20,000,000.00 | $0.00 | $0.00 | $0.00 | $20,000,000.00 | $5,000,000.00 | $0.00 |
| 3 | 2025-N+1-31 | $20,000,000.00 | $0.00 | $0.00 | $0.00 | $20,000,000.00 | $5,000,000.00 | $0.00 |
| 4 | 2026-N+1-31 | $20,000,000.00 | $2,222,222.22 | $800,000.00 | $3,022,222.22 | $17,777,777.78 | $4,444,444.44 | $555,555.56 |
| 5 | 2027-N+1-31 | $17,777,777.78 | $2,222,222.22 | $711,111.11 | $2,933,333.33 | $15,555,555.56 | $3,888,888.89 | $555,555.56 |
| 6 | 2028-N+1-31 | $15,555,555.56 | $2,222,222.22 | $622,222.22 | $2,844,444.44 | $13,333,333.33 | $3,333,333.33 | $555,555.56 |
| 7 | 2029-N+1-31 | $13,333,333.33 | $2,222,222.22 | $533,333.33 | $2,755,555.56 | $11,111,111.11 | $2,777,777.78 | $555,555.56 |
| 8 | 2030-N+1-31 | $11,111,111.11 | $2,222,222.22 | $444,444.44 | $2,666,666.67 | $8,888,888.89 | $2,222,222.22 | $555,555.56 |
| 9 | 2031-N+1-31 | $8,888,888.89 | $2,222,222.22 | $355,555.56 | $2,577,777.78 | $6,666,666.67 | $1,666,666.67 | $555,555.56 |
| 10 | 2032-N+1-31 | $6,666,666.67 | $2,222,222.22 | $266,666.67 | $2,488,888.89 | $4,444,444.44 | $1,111,111.11 | $555,555.56 |
| 11 | 2033-N+1-31 | $4,444,444.44 | $2,222,222.22 | $177,777.78 | $2,400,000.00 | $2,222,222.22 | $555,555.56 | $555,555.56 |
| 12 | 2034-N+1-31 | $2,222,222.22 | $2,222,222.22 | $88,888.89 | $2,311,111.11 | $0.00 | $0.00 | $555,555.56 |

AGREEMENT № EAM-TAR-A-0421-2023 v.Final

EXHIBIT C

## EXHIBIT C

## PROJECT SUMMARY

**(Attached Separately – EXHIBIT C  Document 5.0 TAR Summary of Project  April 21, 2023
REVISED June 6, 2023 )**

# AGREEMENT_EAM-TAR-A-0421-2023 v.Final

Final Audit Report                                                                2023-06-13

| Created: | 2023-06-13 |
|---|---|
| By: | Hans Kastensmith (hck@attributedholdings.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA-geP4k8Ph32_IAzCH4a8N0qnZH1uL3tr |

## "AGREEMENT_EAM-TAR-A-0421-2023 v.Final" History

Document created by Hans Kastensmith (hck@attributedholdings.com)
2023-06-13 - 12:14:18 PM GMT- IP address: 72.66.17.83

Document emailed to carlos@ethosasset.com for signature
2023-06-13 - 12:19:58 PM GMT

Email viewed by carlos@ethosasset.com
2023-06-13 - 12:20:39 PM GMT- IP address: 82.222.99.105

Signer carlos@ethosasset.com entered name at signing as Carlos Manuel da Silva Santos
2023-06-13 - 12:20:59 PM GMT- IP address: 82.222.99.105

Document e-signed by Carlos Manuel da Silva Santos (carlos@ethosasset.com)
Signature Date: 2023-06-13 - 12:21:01 PM GMT - Time Source: server- IP address: 82.222.99.105

Document emailed to mfranco@tarmexico.com for signature
2023-06-13 - 12:21:02 PM GMT

Email viewed by mfranco@tarmexico.com
2023-06-13 - 12:21:09 PM GMT- IP address: 66.249.89.168

Signer mfranco@tarmexico.com entered name at signing as Miguel Angel Franco Hernandez
2023-06-13 - 8:32:39 PM GMT- IP address: 107.222.111.97

Document e-signed by Miguel Angel Franco Hernandez (mfranco@tarmexico.com)
Signature Date: 2023-06-13 - 8:32:41 PM GMT - Time Source: server- IP address: 107.222.111.97

Agreement completed.
2023-06-13 - 8:32:41 PM GMT


Powered by
Adobe
Acrobat Sign

# EXHIBIT I

Pledge AGREEMENT № EAM-TAR-A-0421-2023
*v.Final*

EXHIBIT A
№ EAM-TAR-A-0421-2023
<u>PLEDGE AGREEMENT</u>

**PLEDGE AGREEMENT** (this **"Agreement"**) dated as of **June 12th, 2023,** between Miguel Angel Franco Hernandez, having its principal place of business at Blvd. Bernardo Quintana CS-9800 A-701C Colonia Centro Sur, Querétaro, Querétaro, México, 76090, represented by **Miguel Ángel Franco Hernández** (the **"Pledgor"**) and ETHOS ASSET MANAGEMENT Inc, having its principal place of business at 4660 La Jolla Village Drive, San Diego, California, 92122, United States of America, herein represented by Mr. CARLOS MANUEL DA SILVA SANTOS, acting in its capacity as secured party (the **"Secured Party"**).

PRELIMINARY STATEMENTS:

**WHEREAS**, the Secured Party has issued, has been requested to issue and/or will issue certain extensions of credit (**"Financing"**), including but not limited to a financing to Link Conexión Aérea SA de CV a company incorporated in the United States of Mexico (the **"Project Promoter)**.

**WHEREAS,** Banque Pictet & Cie, a national banking association organized and existing under the laws of the Swiss Confederation ("PICTET BANK") and acting through itself and without any legal or commercial responsibility in this Agreement but being the bank where the funds of the Pledgor are deposit (the **"Depository Bank"**).

**WHEREAS**, the Pledgor will deposit and maintain securities in a brokerage account (the "Account") with Depository Bank the name of the Pledgor as collateral for a Financing made by the Secured Party to the Project Promoter.

**WHEREAS,** the Pledgor and the Secured Party enter into this Agreement in order to provide a collateral for the Financing to be provided by the Secured Party to the Pledgor.

**WHEREAS,** it is a condition precedent to the issuance of the Financing by the Secured Party that the Pledgor shall have executed and delivered this Agreement. The Pledgor will derive substantial direct and indirect benefit from the transactions contemplated by the Financing.

**NOW THEREFORE,** in consideration of the premises and in order to induce the Secured Party to issue the Financing, the Pledgor hereby agrees as follows:

1. <u>Pledge and Assignment.</u>

(a)    The Pledgor hereby pledges and assigns to the Secured Party, as guarantee for the payment obligations of the Project Promoter, on the basis of the AGREEMENT № EAM-TAR-A-0421-2023 , by and between the Secured Party and the Project Promoter,  and grants to the Secured Party a collateral in case of Default following art. 7.1 and 7.2 at AGREEMENT № EAM-TAR-A-0421-2023, and express right of setoff against, all of the right, title and interest of the Pledgor in, to and under the following property,

whether now owned or existing or hereafter from time to time acquired or coming into existence defined in the AGREEMENT № EAM-TAR-A-0421-2023 as the "**Pledge Account**" (collectively, the **"Collateral"**):

      (i) the Account, all funds held therein or credited thereto, all rights to renew or withdraw the same, and all certificates and instruments, if any, from time to time representing or evidencing the Account with **25%** of the financing amount in debt subject to reduction as provided in the AGREEMENT № EAM-TAR-A-0421-2023;

      (ii) any notes, certificates of deposit, instruments, financial assets (as defined in Section 8-102(9) of the UCC) or investment property evidencing or arising out of investment of any funds held in or credited to the Account pursuant to this Agreement or otherwise held in the Account with **25%** of the financing amount in debt subject to reduction as provided in the AGREEMENT № EAM-TAR-A-0421-2023; and

      (iii) any interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the then existing Collateral;

    (b)    The Pledgor and the Secured Party agree that the Secured Party may request that the Pledgor pay in case of the Project Promoter's default as provided in art. 7.1. and 7.2. of AGREEMENT № EAM-TAR-A-0421-2023. The Pledgor has the sole control and power to demand the payment, provided that any such control and power is exercised solely pursuant to the terms and conditions of the AGREEMENT № EAM-TAR-A-0421-2023.

    2.  Guarantee for Obligations.  This Agreement guarantees the payment of all obligations of the Pledgor now or hereafter existing under and in connection with each application or request for a Financing (an **"Application"**) expressed in AGREEMENT № EAM-TAR-A-0421-2023, whether for reimbursement of amounts drawn under the Financing, interest, fees, expenses (including without limitation the fees and expenses of counsel) or otherwise, and all obligations of the Pledgor now or hereafter existing under this Agreement (all such obligations of the Pledgor being collectively the **"Obligations"**). Without limiting the generality of the foregoing, this Agreement guarantees the payment of all amounts which constitute part of the Obligations and would be owed by the Pledgor to the Secured Party under and in connection with each Application and Financing but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving the Pledgor.

    3.  Delivery of Collateral.  All certificates or instruments, if any, representing or evidencing the Collateral or any portion thereof will be delivered to the Depository Bank per demand of the Pledgor in the event of Default of the Project Promoter expressed in AGREEMENT № EAM-TAR-A-0421-2023 art. 7.1. and 7.2. The Depository Bank, at the direction of the Pledgor transfers to or registers in the name of the Secured Party or any of its nominees any or all of the Collateral. The Collateral can be wired in the form of cash after selling the securities or the securities can be directly transferred via DTC or Automated Customer Account Transfer Service (ACAT), depending of the demand of the Secured Party.

4. The Account.

(a)      The Depository Bank has an Account in the form of a "brokerage account" (as defined in Section 8-501(a) of the UCC) and a "deposit account" (as such term is defined in Section 9-102(29) of the UCC).

(b)      The Depository Bank (i) needs to have powers to act as a "securities intermediary" (as defined in Section 8-102 of the UCC) with respect to the Account as a "brokerage account" and all financial assets credited thereto and (ii) act as a "bank" (as defined in Section 9-102(8) of the UCC) with respect to the Account as a "deposit account" and all funds on deposit therein.

(c)      The Pledgor will comply with all written notifications it receives authorized by the Secured Party, and jointly with the Project Promoter if a different entity to the Pledgor, directing the transfer, redemption or disposition of any assets in the Account, in case of Default, substantially in the form set forth in Exhibit A attached hereto.

5. Investing of Amounts in the Account.

(a)      Initially, the Pledgor shall direct the Depository Bank to invest the Collateral in securities suggested by the Depository Bank and with the consent and agreement of the Secured Party. The Pledgor shall invest the funds with the Depository Bank received into the Account on the date of deposit, provided such funds are received on or before 11:00 A.M. (EST). Any funds received by the Depository Bank after 11:00 A.M. (EST) time shall be treated as if received on the following Business Day.  For purposes of this Agreement "*Business Day*" shall mean any day that the Depository Bank is open for business.

(b)      The Collateral shall be invested in an asset allocation of **80 % of treasuries and 20 % of Corporate Bonds and/or ETFs,** based in a proposal made by the Depository Bank with the consent and agreement of the Secured Party.  All earnings in the Account to the Pledgor belongs to the Pledgor and can be used in an annual basis.

(c) All costs of management of the account and margin value/ credit line costs related to the transaction are supported by the Pledgor and the earning generated in the account shall be used to cover totally such costs.

6. Priority of Secured Party's Collateral.  The Pledgor subordinates in favor of the Secured Party, with first priority,  any interest, lien or right of setoff it may have, now or in the future, against the Account or assets in the Account, in case of Pledgor Default.

7. Statements, Confirmations and Notices.  The Pledgor shall send, monthly, copies of all statements and confirmations for the Account simultaneously to the Secured Party and Project Promoter.

8. Tax Matters.

(a)      The Pledgor and the Secured Party agree that any earnings or proceeds received on or distributions of earnings or proceeds from the Collateral, during a calendar year period shall be treated as

the income of the Pledgor and shall be reported on an annual basis by the Depository Bank or directly by the Pledgor.

(b)    The Pledgor shall upon the execution of this Agreement provide the Secured Party with a duly completed and properly executed IRS Form W-9 or applicable Form W-8, in case of a non-U.S. person, for each payee, together with any other documentation and information requested by the Depository Bank in connection with the Depository Bank's tax reporting obligations under the Code and the regulations thereunder.

9. Representations and Warranties.  The Pledgor represents and warrants as follows:

(a)    The Pledgor holds the Collateral for the benefit of the Secured Party for purposes of security for the Financing to the Project Promoter in accordance with the terms and conditions of the AGREEMENT № EAM-TAR-A-0421-2023.  The Collateral is free and clear of any lien, security interest, option or other charge or encumbrance.

(b)    The pledge of the Collateral pursuant to this Agreement creates a valid and perfected first priority right in the Collateral, securing the payment of the Obligations, present in the AGREEMENT № EAM-TAR-A-0421-2023.

(c)    No consent of any other person or entity and no authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required (i) for the pledge by the Pledgor of the Collateral pursuant to this Agreement or for the execution, delivery or performance of this Agreement by the Pledgor, (ii) for the perfection or maintenance of the collateral created hereby or (iv) for the exercise by the Secured Party of its rights and remedies hereunder.

(d)    The Pledgor is a individual, Chairman and majority shareholder of the Project Promoter (Link Conexión Aérea) and resident of the United States of Mexico.

(e)    The execution, delivery and performance by the Pledgor of this Agreement and the transactions contemplated hereby are within the Pledgor's powers, and do not (i) violate any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award to which the Pledgor is subject, or (ii) conflict with or result in the breach of, or constitute a default under, any material contract binding on or affecting the Pledgor or any of its properties.

(f)    This Agreement is the legal, valid and binding obligation of the Pledgor, enforceable against the Pledgor in accordance with its terms, except that such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, liquidation, or other similar laws affecting the enforcement of creditor's rights generally, and by general principles of equity.

(g)    The Pledgor has, independently and without reliance upon the Secured Party and based upon such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(h) The Pledgor will receive a margin application from the Depository Bank. The Pledgor will extend a Margin Value to the Secured Party based on the Pledge Account with an amount equivalent to

**78%** of the Pledge Account ("the Margin Value Facility"). **Execution Date** means the date at which the Margin Value Facility is available in Secured Party bank account. The Secured Party is liable and responsible for this margin value and its repayment.

10. <u>Further Assurances</u>.  The Pledgor agrees that at any time and from time to time, at the expense of the Pledgor, the Pledgor will promptly execute and deliver all further instruments and documents, and take all further actions, that may be necessary or desirable, or that the Secured Party may reasonably request in writing, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral.

11. <u>Transfers and Other Liens</u>.  The Pledgor agrees that it will not (a) sell, assign (by operation of law or otherwise), or otherwise dispose of, or grant any option with respect to, any of the Collateral, or (b) create or permit to exist any lien, security interest, option or other charge or encumbrance upon or with respect to any of the Collateral, except for the collateral under this Agreement.

12. <u>Activation of the Pledge Account / Control Agreement</u>.  The Pledgor will: (a) open a Brokerage Account with the Depository Bank, (b) deposit the Pledged Funds, as defined in the AGREEMENT № EAM-TAR-A-0421-2023, in the Brokerage Account, and (c) give instructions to the Depository Bank to buy the Securities. The Secured Party shall provide the Pledgor with  a Promissory Note, dated the same date of this Agreement, in the same value of the Margin Value Facility, and deliver it in favor and for the benefit of Pledgor to secure this liability and responsibility for the Margin Value Facility and its repayment to the Pledgor.

Until the latter of (i) first disbursement of the financing agreed under the Agreement No. EAM-TAR-A-0421-2023 or (ii) sixty(60) banking days from the Execution Date, the Secured Party shall (a) keep amounts equivalent to the Margin Value Facility deposited in an account (b) not to transfer, assign, invest in securities or in any manner dispose of the Margin Value Facility without the prior and express approval of the Pledgor, (investment in CDs or non-risk assets like treasuries are acceptable) (c) provide a Bank Statement to the Pledgor with the confirmation of the existence of an amount equivalent to the Margin Value Facility per request of the Pledgor.

13. <u>The Margin Value Facility.</u> The Pledgor acknowledges that, subsequent to the activation of the Pledge Account, the Depository Bank will extend margin value to the Pledgor for the benefit of the Secured Party On this basis, after the margin value extended to the Pledgor, the Pledgor will wire to the Secured Party, from the Margin Value extended, the value equivalent to **78%** of the Pledge Amount. The liability for this Margin Value Facility is completely assumed by the Secured Party and guaranteed by the Secured Party as set forth in Section 9(h).  The Secured Party shall guarantee that the Depository Bank is not required to set-off or access the Pledge Account in the event of a default by the Secured Party on the Margin Value Facility.

When the Project Promoter starts to repay the Financing amount, the Secured Party shall wire the proportional part of the Margin Value, corresponding to the proportional part of the Pledged Funds this proportional part would be 11.11% per year of the initial pledged amount, to the checking account of the Pledgor and from there the Pledgor shall close the respective Margin Value and release the proportional

Pledged Funds. In case of an Event of Default by the Secured Party the respective release of the Pledged Funds shall happen with a wire from the Secured Party to the checking account of the Pledgor and from there the Pledgor shall wire to the brokerage account to close the Margin Value and released the proportional part of Pledged Funds.

14. <u>Remedies</u>. If the Project Promoter fails to pay any of the Obligations when due, then the Secured Party shall have all rights and remedies available to it under applicable law, including the right to apply the amount on deposit in the Account to satisfy the Obligations and the right to foreclose on the Collateral subject to all rights of the Project Promoter in the Collateral as provided in the AGREEMENT № EAM-TAR-A-0421-2023.

15. <u>Compensation, Expense Reimbursement and Indemnification</u>.

(a)     <u>Compensation</u>. The Pledgor covenants and agrees to pay the Depository Bank's compensation. The Pledgor covenants and agrees to pay to the Depository Bank all out-of-pocket expenses incurred by the Depository Bank in the performance of its role under this Agreement (including, but not limited to, any attorney's fees incurred in connection with the preparation and negotiation of this Agreement, which shall be due and payable upon the execution of this Agreement).

(b)     <u>Security and Offset</u>. The Pledgor and the Secured Party declare that any execution of the deposit is dependent of the demand of the Pledgor subject to the provisions governing the Pledged Funds set forth in AGREEMENT № EAM-TAR-A-0421-2023.

(c)     <u>Indemnification to Depository Bank</u>. Each of the Pledgor and the Secured Party covenants and agrees, jointly and severally, to indemnify the Depository Bank, and its employees, officers, directors, affiliates, and agents (each, an **"Indemnified Party"**) for, hold each Indemnified Party harmless from, and defend each Indemnified Party against any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party, arising out of or in connection with this Agreement or with the administration of its duties hereunder, including but not limited to attorney's fees, costs and expenses, except to the extent such loss, liability, damage, cost or expense shall have been resulted solely from the Indemnified Party's own gross negligence or willful misconduct. The foregoing indemnification and agreement to hold harmless shall survive the termination of this Agreement and the resignation or removal of the Depository Bank.

(d)     The Parties agree that each Party will  indemnify the other Party, and its employees, officers, directors, affiliates, and agents (each, an "Indemnified Party") for, hold each Indemnified Party harmless from, and defend each Indemnified Party against any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party, arising out of or in connection with the Margin Value Facility, any trading activity therein, or with the administration of Depository Bank's duties relating to the Margin Value Facility, including, but not limited to, attorney's fees, costs and expenses, except to the extent such loss, liability, damage, cost or expense shall have been finally adjudicated by a court of competent jurisdiction to have resulted from the Indemnified Party's own gross negligence or willful misconduct. The foregoing indemnification and agreement to hold harmless shall survive the termination of this Agreement.

16. <u>Collateral Absolute.</u>

(a)    The obligations of the Pledgor under this Agreement are independent of the Obligations, and a separate action or actions may be brought and prosecuted against the Pledgor to enforce this Agreement, irrespective of whether any action is brought against the Pledgor or whether the Pledgor is joined in any such action or actions. All rights of the Secured Party and collateral hereunder, and all obligations of the Pledgor hereunder, will be absolute and unconditional irrespective of:

(i)  The Secured Party must disburse the Financing only as provided in the AGREEMENT № EAM-TAR-A-0421-2023. Any default in this matter will oblige the Secured Party to allow the Pledgor to cancel the Pledge Agreement.

(ii)  any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or consent to depart from each Application or Financing, including without limitation, any increase in the Obligations resulting from the extension of additional financing to the Pledgor or any of its subsidiaries or otherwise;

(iii)  any manner of application of collateral, or proceeds thereof, to all or any of the Obligations, or any manner of sale or other disposition of any collateral for all or any of the Obligations or any other assets of the Pledgor or its subsidiaries;

(iv)  any change, restructuring or termination of the corporate structure of the Pledgor or any of its subsidiaries; or

(v)  any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Pledgor.

(vi)  The Pledgor must allow and transfer the rights and obligation of the potential Credit Facility activated by the Depository Bank to the Secured Party.

(b)    The Pledgor hereby agrees that until the payment and satisfaction in full of all Obligations it will not exercise any right or remedy arising by reason of the application of any Collateral to the payment of the Obligations or the performance of the Pledgor of any of its obligations hereunder, whether by subrogation or otherwise, against the Pledgor or any guarantor of any of the Obligations or any other security for any of the Obligations.

17. <u>Amendments.</u>  Any amendment of this Agreement shall be binding only if evidenced by a writing signed by each of the parties to this Agreement. No waiver of any provision hereof shall be effective unless expressed in writing and signed by the party to be charged.

18. <u>Notices: Instructions.</u>

(a)    Any notice permitted or required hereunder shall be in writing in English and may be sent by (i) secure file transfer or (ii) electronic mail with a scanned attachment thereto of an executed notice or

instruction and shall be effective upon actual receipt by the Secured Party in accordance with the terms
hereof. Each of the appointed directors and individuals have full power and authority to execute any
notices or instructions, to amend, modify or waive any provisions of this Agreement, and to take any and
all other actions permitted under this Agreement, all without further consent or direction from, or notice
to, it or any other party. Any notice or instruction must originate from a corporate domain. The Pledgor
and the Secured Party agree that the above security procedures are commercially reasonable.

**If to Pledgor:**

MIGUEL ANGEL FRANCO HERNANDEZ
CHAIRMAN
Blvd. Bernardo Quintana CS-9800 A-701C Colonia Centro Sur, Querétaro, Querétaro, México,
76090
mfranco@tarmexico.com

**If to the Secured Party:**

Mr. CARLOS MANUEL DA SILVA SANTOS
MEMBER AND CEO
4660 La Jolla Village Drive, San Diego, California, 92122, USA
carlos@ethosasset.com

19. <u>Continuing Guarantee; Assignments under Application</u>. This Agreement will create a
continuing guarantee in the Collateral and will (a) remain in full force and effect until the payment in full of
the Obligations and all other amounts payable under this Agreement and the expiry of the Financing, (b) be
binding upon the Pledgor, its successors and assigns, and (c) inure to the benefit of, and be enforceable by,
the Secured Party and its successors, transferees and assigns. Upon the payment in full of the Obligations
and all other amounts payable under this Agreement and the expiry of the Financing, the guarantee granted
hereby will terminate and all rights to the Collateral will revert to the Pledgor. Upon any such termination,
the Depository Bank will, upon an Authorized Person of Secured Party's signed, written direction and at the
Pledgor's expense, return to the Pledgor such of the Collateral as will not have been sold or otherwise applied
pursuant to the terms hereof, close the Account, and execute and deliver to the Pledgor such documents as
the Pledgor will reasonably request to evidence such termination.

20 <u>Confidentiality.</u> Each Party agrees that it shall keep the terms, amount, circumstances, data,
documentation, company information and facts of this Agreement, and information of the Parties related or
not related with this Agreement, completely confidential, and that it will not hereafter disclose any
information concerning this Agreement or about both Parties to anyone. Each Party shall not make any
comments, recommendations or express any opinions to any third party neither voluntarily nor if approached
whether related or not related to this Agreement provided, however, that such Parties may make such
disclosure to their professional representatives (e.g., attorneys), if any, all of whom will be informed of and
agree to be bound by this confidentiality clause, or other such disclosures required by law or legal process.

If any Party receives an inquiry about this Agreement, such Party shall communicate such approach to the other party and shall agree with the other party an answer to provide. In such answer the Party can not mention or refer to the other Party in any negative or derogatory way. Further, the Parties shall not post or otherwise disclose or reveal, or cause to be disclosed or revealed, to any person or entity any of the Confidential Information on the Internet or any other media outlet or platform, including but not limited to websites, newspapers, email, text, Facebook, Instagram, LinkedIn, and Twitter. Disclosing of information and facts about this Agreement, and information of the Parties related or not related with this Agreement may be used in media like Press Releases, Interviews, or any other type with the exclusive consent of the Parties. Nothing in this Agreement shall, however, be deemed to interfere with the Parties' respective obligations to report transactions with appropriate governmental, taxing and/or registering agencies. It is understood and agreed that this Agreement may be offered into evidence to enforce its terms. If a Party receives an order from a court, a subpoena, or other lawful command to produce this Agreement, the Party receiving such order, subpoena or command shall notify the other Party prior to producing this Agreement to anyone. In response to that notification, a Party may (but does not have to) pursue whatever legal action they deem necessary to preserve the confidentiality of this Agreement. This Section 9.3 shall survive the termination of this Agreement and remain in force and effect as of the Effective Date.

**21** Non-Disparagement. The Parties shall not disparage any of the other Parties, or any of their affiliates, parents, subsidiaries, and their respective shareholders, directors, officers, employees, agents , members, advisors or attorneys, or otherwise take any action that could reasonably be expected to affect adversely the professional or personal reputation of the Parties or any of their affiliates, parents, subsidiaries, and their respective shareholders, directors, officers, employees, agents , members, advisors or attorneys. Each Party agrees and covenants that they will not, and will use reasonable efforts to cause its officers and directors not to, at any time, directly or indirectly, make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning any other Party or its businesses, or any of its their affiliates, parents, subsidiaries, and their respective shareholders, directors, officers, employees, agents , members, advisors or attorneys . The Parties shall promptly provide written notice of any such order to each other applicable Party. This Section 9.4 shall survive the termination of this Agreement and remain in force and effect as of the Effective Date.

22. Arbitration. In the event of any dispute arising out of or in connection with the present Agreement, the Parties shall first refer the dispute to proceedings under the ICC Mediation Rules. The place of mediation shall be New York City, New York. If the dispute has not been settled pursuant to the said Rules within 60 days following the filing of a Request for Mediation or within such other period as the Parties may agree in writing, such dispute shall thereafter be finally settled under the Rules of Arbitration of the ICC by three arbitrators appointed in accordance with the said Rules of Arbitration. The place of Arbitration shall be New York City, New York. The language of the arbitration shall be English. The arbitration shall be the sole and exclusive forum for resolution of any dispute, and the award shall be in writing, state the reasons for the award and be final and binding. Judgment thereon may be entered in any court of competent jurisdiction. The Parties shall keep any mediation and/or arbitration confidential and shall not disclose to any person other than those necessary to the conduct of those proceedings (i) the existence of the mediation and/or arbitration, (ii) any document, testimony, transcripts or other information submitted, exchanged or created for the arbitration, or (iii) any decisions, orders, or awards, unless such disclosure is (A) required by law or a governmental or regulatory body, (B) necessary for a Party to seek legal, accounting or other professional services, or (C) for the purpose of making an

application to any competent court relating to any aspect of a mediation and /or arbitration, including motions to recognize, enforce or challenge an award or interim measure, provided that, in all of the circumstances (A) to (C) above, the producing Party takes reasonable measures to ensure that the recipient preserves the confidentiality of the information provided. The prevailing Party, as determined by the arbitrators, shall be entitled to recover its reasonable costs and attorneys' fees from the non-prevailing Party.

23.   <u>Governing Law.</u> This Agreement is subject to the Uniform Rules of ICC. In all matters this Agreement is governed by and shall be construed and interpreted in accordance with the laws of the State of New York without giving effect to the conflict of laws principles thereof.

24.   <u>Ambiguity</u>. In the event of any ambiguity or uncertainty hereunder or in any notice, instruction or other communication received by the Pledgor hereunder, the Pledgor may, in its sole discretion, refrain from taking any action other than retain possession of the Collateral, unless the Pledgor receives written instructions, signed by the Secured Party, which eliminates such ambiguity or uncertainty.

25.   <u>Entire Agreement, No Third Party Beneficiaries</u>.  This Agreement constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Pledgor with respect to the Collateral.  This Agreement is for the exclusive benefit of the parties to this Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever.  No party may assign any of its rights or obligations under this Agreement without the prior written consent of the other parties.

26.   <u>Mergers and Conversions</u>.  Any corporation or entity into which the Pledgor may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Pledgor will be a party, or any corporation or entity succeeding to the business of the Pledgor will be the successor of the Pledgor hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

27.   <u>Counterparts</u>.  This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. This Agreement and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of electronic transmission of .pdf files or other image files via e-mail, cloud-based transfer or file transfer protocol, or use of a facsimile machine, shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the

Uniform Electronic Transactions Act except in respect to any non-US entity, whereby originals can be required by both Parties.

**IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first written above.**

MIGUEL ÁNGEL FRANCO HERNÁNDEZ , **in its capacity as the Pledgor**

By _Miguel Ángel Franco Hernandez_
Miguel Ángel Franco Hernandez (Jun 13, 2023 15:33 CDT)
Name:  MIGUEL ÁNGEL FRANCO
HERNÁNDEZ

**ETHOS ASSET MANAGEMENT Inc., in its capacity as the Secured Party**

By _____
Carlos Santos (Jun 13, 2023 20:25 GMT+3)
Name: CARLOS SANTOS
Title: Member and CEO

11/12

# EXHIBIT A

## FORM OF INSTRUCTION

**VIA EMAIL: Pledgor email**

Pledgor data **June 12ᵗʰ, 2023**

Pursuant to the Pledge Agreement dated as of **June 12ᵗʰ, 2023**, between Link Conexión Aérea SA de CV, (the "Pledgor"), and ETHOS ASSET MANAGEMENT Inc (the "<u>Secured Party</u>"), we hereby instruct you of the following:

The Secured Party hereby notifies you that from and after the receipt of this notice until you receive further instruction from the Secured Party, you are hereby directed to retain and hold all funds in the Account (as defined in the Pledge Agreement referred to above) without any additional lien or encumbrances different from the margin value and not to invest or disburse the same to any party whatsoever, other than as instructed by the Secured Party.

ETHOS ASSET MANAGEMENT Inc
as Secured Party

By: _____
    Carlos Santos (Jun 13, 2023 20:25 GMT+3)

    Name: CARLOS SANTOS
    Title: Member and CEO

# EXHIBIT A - Pledge WW AGREEMENT № EAM-TAR-A-0421-2023 v.Final 2

Final Audit Report                                                        2023-06-13

| Created: | 2023-06-13 |
|---|---|
| By: | Hans Kastensmith (hck@attributedholdings.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAi6sIXSrfsztKAPDkZu3j_BHq7aQQmVQI |

## History

📄 Document created by Hans Kastensmith (hck@attributedholdings.com)
2023-06-13 - 5:14:28 PM GMT- IP address: 72.66.17.83

📧 Document emailed to carlos@ethosasset.com for signature
2023-06-13 - 5:15:26 PM GMT

📄 Email viewed by carlos@ethosasset.com
2023-06-13 - 5:24:37 PM GMT- IP address: 82.222.99.105

✍ Signer carlos@ethosasset.com entered name at signing as Carlos Santos
2023-06-13 - 5:25:00 PM GMT- IP address: 82.222.99.105

✍ Document e-signed by Carlos Santos (carlos@ethosasset.com)
Signature Date: 2023-06-13 - 5:25:02 PM GMT - Time Source: server- IP address: 82.222.99.105

📧 Document emailed to mfranco@tarmexico.com for signature
2023-06-13 - 5:25:03 PM GMT

📄 Email viewed by mfranco@tarmexico.com
2023-06-13 - 5:43:05 PM GMT- IP address: 66.102.6.41

✍ Signer mfranco@tarmexico.com entered name at signing as Miguel Angel Franco Hernandez
2023-06-13 - 8:31:43 PM GMT- IP address: 107.222.111.97

✍ Document e-signed by Miguel Angel Franco Hernandez (mfranco@tarmexico.com)
Signature Date: 2023-06-13 - 8:31:45 PM GMT - Time Source: server- IP address: 107.222.111.97

✔ Agreement completed.
2023-06-13 - 8:31:45 PM GMT



Powered by
**Adobe**
**Acrobat Sign**

# EXHIBIT J

## AMENDMENT #1 TO
## AGREEMENT NO. EAM-TAR-A-0421-2023
## PROJECT
## "TAR MÉXICO - EXPANSIÓN"

This Amendment ("Amendment#1"), dated **August 4, 2023**, is made to the AGREEMENT NO. EAM-TAR-A-0421-2023 ("Agreement"), dated June 12th, 2023, between ETHOS ASSET MANAGEMENT INC., a corporation, incorporated under the laws of California, having its principal place of business at 4660 La Jolla Village Drive, San Diego, California, 92122, USA, herein represented by Mr. CARLOS MANUEL DA SILVA SANTOS ("EAM", "Lender" or "Party A"), and LINK CONEXIÓN AÉREA SA DE CV, having its principal place of business at Blvd. Bernardo Quintana CS-9800 A-701C Colonia Centro Sur, Querétaro, Querétaro, México, 76090, represented by Miguel Ángel Franco Hernández ("TAR" or "Party B"), and collectively with EAM, each a "Party").

Party A and Party B are herein referred to individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

### Background

This Amendment#1 codifies the desire between the Parties to amend AGREEMENT NO. EAM-TAR-A-0421-2023 with regard to:

- Changing TAR Receiving Bank Information for Tranche Disbursement

**Section 4.2 Bank Coordinates – 4.2.2 Party B's Funds Disbursement Receiving Bank Information**

BANK: HSBC MEXICO, S.A. INSTITUCIÓN DE BANCA MÚLTIPLE GRUPO.

ADDRESS: Paseo de la Reforma No. 347 Col. Cuauhtemoc CP 06500
Alcaldia Cuauhtemoc Mexico, Ciudad de Mexico

ACCOUNT NAME: LINK CONEXIÓN AEREA S.A. DE C.V.

ACCOUNT HOLDER ADDRESS: Blvd. Bernardo Quintana CS-9800 A-701C Colonia Centro Sur, Querétaro, Querétaro, México, 76090

ACCOUNT NUMBER: 7003861085

STANDARDIZED BANK CODE: 021680070038610859

SWIFT CODE: BIMEMXMM

CURRENCY: US DOLLARS

All terms and conditions of AGREEMENT NO. EAM-TAR-A-0421-2023 dated June 12, 2023, that have not been expressly amended by this Amendment#1 remain in full force and effect and are applicable to this Amendment#1 as if they were fully written herein.

Accordingly, in consideration of the mutual covenants contained within the Agreement, the Parties hereto, intending to be legally bound hereby, agree to amend the following conditions:

### Agreement

Except as expressly set forth herein, this Amendment (a) shall not, by implication or otherwise, limit, impair, constitute a waiver of or otherwise affect the rights and remedies of TAR or EAM under the Agreement or any other document contemplated thereby and (b) shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Agreement or any other document contemplated thereby, all of which are ratified and affirmed in all respects and shall continue in full force and effect. From and after this Amendment#1 Effective Date, references in the Agreement and the other documents contemplated thereby to the Agreement shall be deemed to be references to the Agreement as amended hereby.

### Electronic Transmission

The electronic version of a copy signed by the Parties shall be deemed legally binding and enforceable and is valid upon full execution.

To evidence the Parties' agreement to this Agreement, each party has executed and delivered it on the date stated in the preamble.

Date: **August 4, 2023**

**ETHOS ASSET MANAGEMENT INC.**

By: Carlos Santos (Aug 4, 2023 16:19 GMT+3)
Mr. CARLOS MANUEL DA SILVA SANTOS
CEO

**Link Conexión Aérea SA de CV.**

By: *Miguel Angel Franco Hernandez*
Miguel Angel Franco Hernandez (Aug 7, 2023 11:48 MDT)
MIGUEL ANGEL FRANCO HERNANDEZ
CHAIRMAN

# AMENDMENT N1 - AGREEMENT NO. EAM-TAR-A-0421-2023 v.Final

Final Audit Report                                                                    2023-08-07

| | |
|---|---|
| Created: | 2023-08-04 |
| By: | Hans Kastensmith (hck@attributedholdings.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAw64R546MQGkosUd5njNZnJm-Y2prjEKE |

## "AMENDMENT N1 - AGREEMENT NO. EAM-TAR-A-0421-2023 v.Final" History

📄 Document created by Hans Kastensmith (hck@attributedholdings.com)
2023-08-04 - 1:17:53 PM GMT- IP address: 72.66.17.83

📤 Document emailed to carlos@ethosasset.com for signature
2023-08-04 - 1:18:59 PM GMT

📄 Email viewed by carlos@ethosasset.com
2023-08-04 - 1:19:21 PM GMT- IP address: 82.222.99.103

✍️ Signer carlos@ethosasset.com entered name at signing as Carlos Santos
2023-08-04 - 1:19:40 PM GMT- IP address: 82.222.99.103

✍️ Document e-signed by Carlos Santos (carlos@ethosasset.com)
Signature Date: 2023-08-04 - 1:19:42 PM GMT - Time Source: server- IP address: 82.222.99.103

📤 Document emailed to mfranco@tarmexico.com for signature
2023-08-04 - 1:19:44 PM GMT

📄 Email viewed by mfranco@tarmexico.com
2023-08-04 - 5:38:22 PM GMT- IP address: 172.225.14.204

✍️ Signer mfranco@tarmexico.com entered name at signing as Miguel Angel Franco Hernandez
2023-08-07 - 5:48:06 PM GMT- IP address: 38.49.159.82

✍️ Document e-signed by Miguel Angel Franco Hernandez (mfranco@tarmexico.com)
Signature Date: 2023-08-07 - 5:48:08 PM GMT - Time Source: server- IP address: 38.49.159.82

✅ Agreement completed.
2023-08-07 - 5:48:08 PM GMT



Powered by
Adobe
Acrobat Sign

# EXHIBIT K

```
RFK: 230628PN28750754              PCO.JMS.TO.ARCHIVING/2023-06-28 12:36:40/Page 1
TRN: 881162182/M103               UETR: 951339e6-96f7-4dcf-a4e8-3163a5f6613a
-------------------------------------------------------------------------------
* Outgoing *
         MT: 103 Single Customer Credit Transfer
     Sender: PICTCHGGXXX
             BANQUE PICTET ET CIE SA
             GENEVA / SWITZERLAND
   Receiver: CITIUS33XXX
             CITIBANK N.A.
             NEW YORK / UNITED STATES OF AMERICA
Data Owner: CHGG-VIR                          Internal Priority: Urgent
      Stage: FinalSentOK  TransRef:230628PICTCHGGAXXX9578144252
      Input: 9578/144252/2023-06-28 12:36:40
    FINCopy:
        MUR: 881162182/M103
-------------------------------------------------------------------------------
Single Customer Credit Transfer:
:20 :Sender's Reference:              881162182/M103
:23B:Type:                           CRED
:32A:Value Date/Currency/Interbank Settl./Date - Currency - Amount:
     Date:                           230628
     Currency:                       USD
     Amount:                         3'900'015,0
:33B:Currency/Instructed Amount/Currency - Amount:
     Currency:                       USD
     Amount:                         3'900'000,0
:50F:Ordering Customer/Party Identifier - Number/Name and .:
     Account:                        CH4508755013320300100
     Number:                         1
     Details:                        EDUARDO MIGUEL FRANCO ALVAREZ,
     Number:                         1
     Details:                        MIGUEL ANGEL FRANCO HERNANDEZ
     Number:                         3
     Details:                        MX
     Number:                         6
     Details:                        CH/PICTET ET CIE SA/01PCO009PFY
:53B:Sender's Correspondent/Party Identifier - Location:
     Party Identifier:               /10938027
:57A:Account With Institution/Party Identifier - Identifier Code:
     Identifier Code:                SIGNUS33
:59 :Beneficiary Customer/Account - Name and Address:
     Account:                        1504707896
     Line:                           ETHOS ASSET MANAGEMENT INC
:71A:Code:                           OUR
:71G:Receiver's Charges/Currency - Amount:
     Currency:                       USD
     Amount:                         15,0
--------------------------- E N D  M E S S A G E ---------------------------
```

# EXHIBIT L

**From:** Ricardo Baston
**Sent:** Tuesday, June 27, 2023 8:31 PM
**To:** Elias Achilleos
**Cc:** Hans Kastensmith; Claudionunez; Alberto Chávez; Carlos Santos; Leandro Fernandes; rse@bucephalus.mx;
mfranco@tarmexico.com
**Subject:** Margin value transfer
**Importance:** High

Dear Elias,

Per my yesterday's email, please find attached the information related to the transfer of the
Margin Value from the Pledge Account.

Would you please confirm to us the date in which the first disbursement by Ethos to Link
shall be performed?

Thank you in advance.

Ricardo

10

## Order information

| | | | |
|---|---|---|---|
| Order type | ◆ Payment | IPI form | |
| Payment method | Payment | Payment code | |
| Payment Scheme | | Category Purpose Code | |
| Medium | Electronic | Blocking code | |
| Currency | USD | Amount | 3'900'000 |

## Instructing party

| | |
|---|---|
| Business Partner | 1 3 3 2 0 3 00000888-PAS |
| Container | 133203.001 / O-133203.001 UGA OD00 |
| Money account | 133203.001.00.USD/USD/Ordinaire |
| Customer Authorisation Status | |

## Code line

| | |
|---|---|
| Code line | |

## Beneficiary

| | |
|---|---|
| IBAN | |
| Account/Passport | 1504707896 |
| Name | ETHOS ASSET MANAGEMENT INC |
| Text (information) | |
| Payment ref. no. | |
| Mark for learning | ☐ |

## Beneficiary BP

| | |
|---|---|
| Business Partner | |
| Container (internal) | |
| MACC (internal) | |

## Calculation

Espero que esto le sirva al cliente.

Saludos,
Juan Antonio

_____

**Juan Antonio GOMEZ GONZALEZ**
Tel. +41 58 323 3771
Fax +41 58 323 2324
jgomez@pictet.com

 PICTET

Banque Pictet & Cie SA
Route des Acacias 60
1211 Geneva 73 - Switzerland
Tel. +41 58 323 2323
Fax. +41 58 323 2324
pictet.com

---

This message is not intended for persons who are citizens of, domiciled or resident in, or entities registered in a country or jurisdiction in which its distribution, publication, provision or use would violate current laws and regulations. The content of this message is confidential and may be read and/or used only by the recipient of this message. For information about personal data protection, please refer to the Pictet Group's Privacy Notice available at www.group.pictet/privacynotice. If you have received this e-mail message in error, please destroy it and delete it from your computer. The Pictet Group may not be held liable for the use, transmission or treatment of the content of this message. The recipient of this message remains solely liable for any form of reproduction, copying, disclosure, modification and/or publication of the content. No liability whatsoever will be incurred by the Pictet Group. The recipient of this message agrees to comply with the applicable laws and regulations in the jurisdictions where they use the information contained herein.

# EXHIBIT M

4660 La Jolla Village Drive, San Diego, California, 92122
United States of America

Internal Use Only

###############

Visit our website at https://ethosasset.com/

The content of this message and any attachments may be confidential, privileged or otherwise sensitive in nature and is intended solely for the recipient. If you are not the intended recipient, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose or otherwise act upon any part of this email communication or its attachments. Any unauthorized dissemination, copying or use of this message or its contents is strictly prohibited and may be in violation of law. In accordance with industry standards and regulatory requirements, Ethos Asset Management Inc. ("Ethos") may retain email communications for a period of time. Ethos reserves the right to monitor and archive all email communications in accordance with applicable law and may disclose such communications as required by law.

**From:** Ricardo Baston <rbaston@tarmexico.com>
**Sent:** Thursday, August 31, 2023 8:39:25 PM
**To:** Carlos Santos <carlos@ethosasset.com>
**Cc:** Elias Achilleos <elias@ethosasset.com>; Leandro Fernandes <leandro@ethosasset.com>; rse@bucephalus.mx <rse@bucephalus.mx>; Hans Kastensmith <hans@ethosasset.com>; Alberto Chavez <achavez@tarmexico.com>; Miguel Franco <mfranco@tarmexico.com>
**Subject:** RE: Bank Account Confirmation

Dear Carlos,

I really really appreciate your patience and time invested to reply.
Nevertheless, I am sorry to report that HSBC has not been able to track the transfer.

In order to ease the request, can you (or your bank) share with us the form MT103 (attached). This is the same form that we shared with you – and the whole Ethos team – last June 29th (email below), when we made the margin value transfer.

I have taken the liberty to highlight in yellow the UTR or EUTR code (within the form), for your quick reference. This reference code is composed by 36 alpha-numeric positions, separated by "dashes" for example: a58769dd-836248bc-9aca-xe8c988a2534; and HSBC has mentioned that with this form they can guarantee that they can track the transfer.

Thank you in advance.

Best,

Ricardo

**From:** Ricardo Baston <rbaston@tarmexico.com>
**Date:** Thursday, June 29, 2023 at 08:38
**To:** Carlos Santos <carlos@ethosasset.com>, Elias Achilleos <elias@ethosasset.com>
**Cc:** Hans Kastensmith <hans@ethosasset.com>, Claudionunez <claudionunez@nscasesores.com>, Alberto Chavez <achavez@tarmexico.com>, Leandro Fernandes <leandro@ethosasset.com>, Roberto Suarez Espinoza <rse@bucephalus.mx>, Miguel Franco <mfranco@tarmexico.com>
**Subject:** Re: Margin value transfer

Dear Carlos,

Thank you for your email.

Please find the swift number of the transfer. Would you please confirm if the transfer has reached your account?

Best regards,

Ricardo

**From:** Carlos Santos <carlos@ethosasset.com>
**Date:** Tuesday, June 27, 2023 at 18:49
**To:** Ricardo Baston <rbaston@tarmexico.com>, Elias Achilleos <elias@ethosasset.com>
**Cc:** Hans Kastensmith <hans@ethosasset.com>, Claudionunez <claudionunez@nscasesores.com>, Alberto Chavez <achavez@tarmexico.com>, Leandro Fernandes <leandro@ethosasset.com>, Roberto Suarez Espinoza <rse@bucephalus.mx>, Miguel Franco <mfranco@tarmexico.com>
**Subject:** RE: Margin value transfer

Dear Ricardo,

The disbursement schedule will be calculate as soon as the marign value arrive at our account and we are able to have the collateral in place.

This is an international wire from Switzerland will for sure take more then 24 hours.

But we are with an eye on it and we will let you know.

Kind regards,
Carlos Santos
President and Chief Executive Officer
Ethos Asset Management Inc.
PT +351 913 855 564
USA +1 (202) 374-5023



ETHOS ASSET
M A N A G E M E N T

4660 La Jolla Village Drive, San Diego, California, 92122
United States of America

Internal Use Only

###############
Visit our website at https://ethosasset.com/

The content of this message and any attachments may be confidential, privileged or otherwise sensitive in nature and is intended solely for the recipient. If you are not the intended recipient, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose or otherwise act upon any part of this email communication or its attachments. Any unauthorized dissemination, copying or use of this message or its contents is strictly prohibited and may be in violation of law. In accordance with industry standards and regulatory requirements, Ethos Asset Management Inc. ("Ethos") may retain email communications for a period of time. Ethos reserves the right to monitor and archive all email communications in accordance with applicable law and may disclose such communications as required by law.

9

# EXHIBIT N

**David B. Newman**

| | |
|---|---|
| **From:** | Carlos Santos <carlos@ethosasset.com> |
| **Sent:** | Tuesday, July 4, 2023 11:11 AM |
| **To:** | Ricardo Baston; Elias Achilleos |
| **Cc:** | Hans Kastensmith; Claudionunez; Alberto Chávez; Leandro Fernandes; rse@bucephalus.mx; mfranco@tarmexico.com |
| **Subject:** | Re: Margin value transfer |

Richard,

The funds arrive yes! I will in due course provide you the disbursement schedule.

Kind regards,
Carlos Santos
Member and Chief Executive Officer
Ethos Asset Management Inc.
PT +351 913 855 564
USA +1 (202) 374-5023



4660 La Jolla Village Drive, San Diego, California, 92122
United States of America

Internal Use Only

################
Visit our website at https://ethosasset.com/

The content of this message and any attachments may be confidential, privileged or otherwise sensitive in nature and is intended solely for the recipient. If you are not the intended recipient, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose or otherwise act upon any part of this email communication or its attachments. Any unauthorized dissemination, copying or use of this message or its contents is strictly prohibited and may be in violation of law. In accordance with industry standards and regulatory requirements, Ethos Asset Management Inc. ("Ethos") may retain email communications for a period of time. Ethos reserves the right to monitor and archive all email communications in accordance with applicable law and may disclose such communications as required by law.

From: Ricardo Baston <rbaston@tarmexico.com>
Sent: Tuesday, July 4, 2023 5:55:58 PM
To: Carlos Santos <carlos@ethosasset.com>; Elias Achilleos <elias@ethosasset.com>
Cc: Hans Kastensmith <hans@ethosasset.com>; Claudionunez <claudionunez@nscasesores.com>; Alberto Chávez <achavez@tarmexico.com>; Leandro Fernandes <leandro@ethosasset.com>; rse@bucephalus.mx <rse@bucephalus.mx>; mfranco@tarmexico.com <mfranco@tarmexico.com>
Subject: Re: Margin value transfer

Good afternoon Carlos.

I hope you are doing well.

1

Would you please confirm, if the transfer has reached your account? And if so, can you please share with us the disbursement schedule?

Best regards,

Ricardo

---

**From:** Carlos Santos <carlos@ethosasset.com>
**Date:** Thursday, June 29, 2023 at 13:04
**To:** Ricardo Baston <rbaston@tarmexico.com>, Elias Achilleos <elias@ethosasset.com>
**Cc:** Hans Kastensmith <hans@ethosasset.com>, Claudionunez <claudionunez@nscasesores.com>, Alberto Chavez <achavez@tarmexico.com>, Leandro Fernandes <leandro@ethosasset.com>, Roberto Suarez Espinoza <rse@bucephalus.mx>, Miguel Franco <mfranco@tarmexico.com>
**Subject:** RE: Margin value transfer

Dear Ricardo

Not yet. Shall be credit tomorrow.

We will let you know as soon as it is.

Kind regards,
Carlos Santos
President and Chief Executive Officer
Ethos Asset Management Inc.
PT +351 913 855 564
USA +1 (202) 374-5023



ETHOS ASSET MANAGEMENT

4660 La Jolla Village Drive, San Diego, California, 92122
United States of America

Internal Use Only

################
Visit our website at https://ethosasset.com/

The content of this message and any attachments may be confidential, privileged or otherwise sensitive in nature and is intended solely for the recipient. If you are not the intended recipient, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose or otherwise act upon any part of this email communication or its attachments. Any unauthorized dissemination, copying or use of this message or its contents is strictly prohibited and may be in violation of law. In accordance with industry standards and regulatory requirements, Ethos Asset Management Inc. ("Ethos") may retain email communications for a period of time. Ethos reserves the right to monitor and archive all email communications in accordance with applicable law and may disclose such communications as required by law.

**From:** <u>Ricardo Baston</u>
**Sent:** Thursday, June 29, 2023 5:39 PM
**To:** <u>Carlos Santos</u>; <u>Elias Achilleos</u>
**Cc:** <u>Hans Kastensmith</u>; <u>Claudionunez</u>; <u>Alberto Chávez</u>; <u>Leandro Fernandes</u>; <u>rse@bucephalus.mx</u>; <u>mfranco@tarmexico.com</u>
**Subject:** Re: Margin value transfer

Dear Carlos,

Thank you for your email.

Please find the swift number of the transfer. Would you please confirm if the transfer has reached your account?

Best regards,

Ricardo

---

**From:** Carlos Santos <carlos@ethosasset.com>
**Date:** Tuesday, June 27, 2023 at 18:49
**To:** Ricardo Baston <rbaston@tarmexico.com>, Elias Achilleos <elias@ethosasset.com>
**Cc:** Hans Kastensmith <hans@ethosasset.com>, Claudionunez <claudionunez@nscasesores.com>, Alberto Chavez <achavez@tarmexico.com>, Leandro Fernandes <leandro@ethosasset.com>, Roberto Suarez Espinoza <rse@bucephalus.mx>, Miguel Franco <mfranco@tarmexico.com>
**Subject:** RE: Margin value transfer

Dear Ricardo,

The disbursment schedule will be calculate as soon as the marign value arrive at our account and we are able to have the collateral in place.

This is an international wire from Switzerland will for sure take more then 24 hours.

But we are with an eye on it and we will let you know.

Kind regards,
Carlos Santos
President and Chief Executive Officer
Ethos Asset Management Inc.
PT +351 913 855 564
USA +1 (202) 374-5023



ETHOS ASSET
M A N A G E M E N T
4660 La Jolla Village Drive, San Diego, California, 92122
United States of America

3

Internal Use Only

###############
Visit our website at https://ethosasset.com/

The content of this message and any attachments may be confidential, privileged or otherwise sensitive in nature and is intended solely for the recipient. If you are not the intended recipient, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose or otherwise act upon any part of this email communication or its attachments. Any unauthorized dissemination, copying or use of this message or its contents is strictly prohibited and may be in violation of law. In accordance with industry standards and regulatory requirements, Ethos Asset Management Inc. ("Ethos") may retain email communications for a period of time. Ethos reserves the right to monitor and archive all email communications in accordance with applicable law and may disclose such communications as required by law.

**From:** Ricardo Baston
**Sent:** Tuesday, June 27, 2023 8:31 PM
**To:** Elias Achilleos
**Cc:** Hans Kastensmith; Claudionunez; Alberto Chávez; Carlos Santos; Leandro Fernandes; rse@bucephalus.mx; mfranco@tarmexico.com
**Subject:** Margin value transfer
**Importance:** High

Dear Elias,

Per my yesterday's email, please find attached the information related to the transfer of the Margin Value from the Pledge Account.

Would you please confirm to us the date in which the first disbursement by Ethos to Link shall be performed?

Thank you in advance.

Ricardo

4

## Order information

| | | | |
|---|---|---|---|
| Order type | ◆ Payment | IPI form | |
| Payment method | Payment | Payment code | |
| Payment Scheme | | Category Purpose Code | |
| Medium | Electronic | Blocking code | |
| Currency | 🏦 USD | Amount | 3'900'000 |

### Instructing party

| | |
|---|---|
| Business Partner | 🏠 1 3 3 2 0 3 00000888-PAS |
| Container | 🗄 133203.001 / O-133203.001 UGA OD00 |
| Money account | ✳ 133203.001.00.USD/USD/Ordinaire |
| Customer Authorisation Status | |

### Code line

| | |
|---|---|
| Code line | |

### Beneficiary

| | |
|---|---|
| IBAN | |
| Account/Passport | 1504707896 |
| Name | ETHOS ASSET MANAGEMENT INC |
| Text (information) | |
| Payment ref. no. | |
| Mark for learning | ☐ |

### Beneficiary BP

| | |
|---|---|
| Business Partner | |
| Container (internal) | |
| MACC (internal) | |

### Calculation

| | | | |
|---|---|---|---|
| Fees | 59.7 ... | Exchange rate | |
| Charging option | OUR: All charges debited ... ✎ | Net in acc. ccy | 3'900'059.7 |

### Debit text

| | |
|---|---|
| Template | Paiement bancaire ou postal (défaut) |
| Text for Acc. Stmt. | Pago |
| Text for advice | |

5

Espero que esto le sirva al cliente.

Saludos,
Juan Antonio

Juan Antonio GOMEZ GONZALEZ
Tel. +41 58 323 3771
Fax +41 58 323 2324
jgomez@pictet.com

 PICTET

Banque Pictet & Cie SA
Route des Acacias 60
1211 Geneva 73 - Switzerland
Tel. +41 58 323 2323
Fax. +41 58 323 2324
pictet.com

This message is not intended for persons who are citizens of, domiciled or resident in, or entities registered in a country or jurisdiction in which its distribution, publication, provision or use would violate current laws and regulations. The content of this message is confidential and may be read a used only by the recipient of this message. For information about personal data protection, please refer to the Pictet Group's Privacy Notice availabl www.group.pictet/privacynotice. If you have received this e-mail message in error, please destroy it and delete it from your computer. The Pictet G may not be held liable for the use, transmission or treatment of the content of this message. The recipient of this message remains solely liable for form of reproduction, copying, disclosure, modification and/or publication of the content. No liability whatsoever will be incurred by the Pictet Group recipient of this message agrees to comply with the applicable laws and regulations in the jurisdictions where they use the information contained h

# EXHIBIT O

**David B. Newman**

| | |
|---|---|
| **From:** | Carlos Santos <carlos@ethosasset.com> |
| **Sent:** | Tuesday, July 4, 2023 11:43 AM |
| **To:** | Ricardo Baston; Elias Achilleos |
| **Cc:** | Hans Kastensmith; Claudionunez; Alberto Chávez; Leandro Fernandes; rse@bucephalus.mx; mfranco@tarmexico.com |
| **Subject:** | RE: Margin value transfer |

Here is the disbursment plan:

| | |
|---|---|
| Wednesday, August 16, 2023 | 1,666,666.66 |
| Thursday, September 28, 2023 | 1,666,666.66 |
| Monday, November 13, 2023 | 1,666,666.66 |
| Wednesday, December 27, 2023 | 1,666,666.66 |
| Friday, February 9, 2024 | 1,666,666.66 |
| Monday, March 25, 2024 | 1,666,666.66 |
| Monday, May 6, 2024 | 1,666,666.66 |
| Tuesday, June 18, 2024 | 1,666,666.66 |
| Thursday, August 1, 2024 | 1,666,666.66 |
| Friday, September 13, 2024 | 1,666,666.66 |
| Monday, October 28, 2024 | 1,666,666.66 |
| Wednesday, December 11, 2024 | 1,666,666.74 |
| **USD** | **20,000,000.00** |

**TAR MEXICO 5TH JULY 2023**

Kind regards,
Carlos Santos
President and Chief Executive Officer
Ethos Asset Management Inc.
PT +351 913 855 564
USA +1 (202) 374-5023



ETHOS ASSET
M A N A G E M E N T
4660 La Jolla Village Drive, San Diego, California, 92122
United States of America

Internal Use Only

################
Visit our website at https://ethosasset.com/

1

The content of this message and any attachments may be confidential, privileged or otherwise sensitive in nature and is intended solely for the recipient. If you are not the intended recipient, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose or otherwise act upon any part of this email communication or its attachments. Any unauthorized dissemination, copying or use of this message or its contents is strictly prohibited and may be in violation of law. In accordance with industry standards and regulatory requirements, Ethos Asset Management Inc. ("Ethos") may retain email communications for a period of time. Ethos reserves the right to monitor and archive all email communications in accordance with applicable law and may disclose such communications as required by law.

**From:** Carlos Santos
**Sent:** Tuesday, July 4, 2023 6:10 PM
**To:** Ricardo Baston; Elias Achilleos
**Cc:** Hans Kastensmith; Claudionunez; Alberto Chávez; Leandro Fernandes; rse@bucephalus.mx; mfranco@tarmexico.com
**Subject:** Re: Margin value transfer


Richard,

The funds arrive yes! I will in due course provide you the disbursement schedule.

> Kind regards,
> Carlos Santos
> Member and Chief Executive Officer
> Ethos Asset Management Inc.
> PT +351 913 855 564
> USA +1 (202) 374-5023



4660 La Jolla Village Drive, San Diego, California, 92122
United States of America

Internal Use Only

################
Visit our website at https://ethosasset.com/

The content of this message and any attachments may be confidential, privileged or otherwise sensitive in nature and is intended solely for the recipient. If you are not the intended recipient, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose or otherwise act upon any part of this email communication or its attachments. Any unauthorized dissemination, copying or use of this message or its contents is strictly prohibited and may be in violation of law. In accordance with industry standards and regulatory requirements, Ethos Asset Management Inc. ("Ethos") may retain email communications for a period of time. Ethos reserves the right to monitor and archive all email communications in accordance with applicable law and may disclose such communications as required by law.

**From:** Ricardo Baston <rbaston@tarmexico.com>
**Sent:** Tuesday, July 4, 2023 5:55:58 PM
**To:** Carlos Santos <carlos@ethosasset.com>; Elias Achilleos <elias@ethosasset.com>
**Cc:** Hans Kastensmith <hans@ethosasset.com>; Claudionunez <claudionunez@nscasesores.com>; Alberto Chávez

<achavez@tarmexico.com>; Leandro Fernandes <leandro@ethosasset.com>; rse@bucephalus.mx
<rse@bucephalus.mx>; mfranco@tarmexico.com <mfranco@tarmexico.com>
**Subject:** Re: Margin value transfer

Good afternoon Carlos.

I hope you are doing well.

Would you please confirm, if the transfer has reached your account? And if so, can you please share with us the disbursement schedule?

Best regards,

Ricardo

---

**From:** Carlos Santos <carlos@ethosasset.com>
**Date:** Thursday, June 29, 2023 at 13:04
**To:** Ricardo Baston <rbaston@tarmexico.com>, Elias Achilleos <elias@ethosasset.com>
**Cc:** Hans Kastensmith <hans@ethosasset.com>, Claudionunez <claudionunez@nscasesores.com>, Alberto Chavez <achavez@tarmexico.com>, Leandro Fernandes <leandro@ethosasset.com>, Roberto Suarez Espinoza <rse@bucephalus.mx>, Miguel Franco <mfranco@tarmexico.com>
**Subject:** RE: Margin value transfer

Dear Ricardo

Not yet. Shall be credit tomorrow.

We will let you know as soon as it is.

Kind regards,
Carlos Santos
President and Chief Executive Officer
Ethos Asset Management Inc.
PT +351 913 855 564
USA +1 (202) 374-5023



ETHOS ASSET
MANAGEMENT
4660 La Jolla Village Drive, San Diego, California, 92122
United States of America

Internal Use Only

################
Visit our website at https://ethosasset.com/

The content of this message and any attachments may be confidential, privileged or otherwise sensitive in nature and is intended solely for the recipient. If you are not the intended recipient, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose or otherwise act upon any part of this email communication or its attachments. Any unauthorized dissemination, copying or use of this message or its contents is strictly prohibited and may be in violation of law. In accordance with industry standards and regulatory requirements, Ethos Asset Management Inc. ("Ethos") may retain email communications for a period of time. Ethos reserves the right to monitor and archive all email communications in accordance with applicable law and may disclose such communications as required by law.

**From:** Ricardo Baston
**Sent:** Thursday, June 29, 2023 5:39 PM
**To:** Carlos Santos; Elias Achilleos
**Cc:** Hans Kastensmith; Claudionunez; Alberto Chávez; Leandro Fernandes; rse@bucephalus.mx; mfranco@tarmexico.com
**Subject:** Re: Margin value transfer

Dear Carlos,

Thank you for your email.

Please find the swift number of the transfer.  Would you please confirm if the transfer has reached your account?

Best regards,

Ricardo

---

**From:** Carlos Santos <carlos@ethosasset.com>
**Date:** Tuesday, June 27, 2023 at 18:49
**To:** Ricardo Baston <rbaston@tarmexico.com>, Elias Achilleos <elias@ethosasset.com>
**Cc:** Hans Kastensmith <hans@ethosasset.com>, Claudionunez <claudionunez@nscasesores.com>, Alberto Chavez <achavez@tarmexico.com>, Leandro Fernandes <leandro@ethosasset.com>, Roberto Suarez Espinoza <rse@bucephalus.mx>, Miguel Franco <mfranco@tarmexico.com>
**Subject:** RE: Margin value transfer

Dear Ricardo,

The disbursment schedule will be calculate as soon as the marign value arrive at our account and we are able to have the collateral in place.

This is an international wire from Switzerland will for sure take more then 24 hours.

But we are with an eye on it and we will let you know.

Kind regards,
Carlos Santos
President and Chief Executive Officer
Ethos Asset Management Inc.
PT +351 913 855 564
USA +1 (202) 374-5023

4



## ETHOS ASSET
### M A N A G E M E N T

4660 La Jolla Village Drive, San Diego, California, 92122
United States of America

Internal Use Only

###############
Visit our website at https://ethosasset.com/

The content of this message and any attachments may be confidential, privileged or otherwise sensitive in nature and is intended solely for the recipient. If you are not the intended recipient, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose or otherwise act upon any part of this email communication or its attachments. Any unauthorized dissemination, copying or use of this message or its contents is strictly prohibited and may be in violation of law. In accordance with industry standards and regulatory requirements, Ethos Asset Management Inc. ("Ethos") may retain email communications for a period of time. Ethos reserves the right to monitor and archive all email communications in accordance with applicable law and may disclose such communications as required by law.

**From:** Ricardo Baston
**Sent:** Tuesday, June 27, 2023 8:31 PM
**To:** Elias Achilleos
**Cc:** Hans Kastensmith; Claudionunez; Alberto Chávez; Carlos Santos; Leandro Fernandes; rse@bucephalus.mx; mfranco@tarmexico.com
**Subject:** Margin value transfer
**Importance:** High

Dear Elias,

Per my yesterday's email, please find attached the information related to the transfer of the Margin Value from the Pledge Account.

Would you please confirm to us the date in which the first disbursement by Ethos to Link shall be performed?

Thank you in advance.

Ricardo

## Order information

| | | | |
|---|---|---|---|
| Order type | ◆ Payment | IPI form | |
| Payment method | Payment | Payment code | |
| Payment Scheme | | Category Purpose Code | |
| Medium | Electronic | Blocking code | |
| Currency | 📠 USD | Amount | 3'900'000 |

### Instructing party

| | |
|---|---|
| Business Partner | 🏢 1 3 3 2 0 3 00000888-PAS |
| Container | 🗄 133203.001 / O-133203.001 UGA OD00 |
| Money account | ✱ 133203.001.00.USD/USD/Ordinaire |
| Customer Authorisation Status | |

### Code line

| | |
|---|---|
| Code line | |

### Beneficiary

| | |
|---|---|
| IBAN | |
| Account/Passport | 1504707896 |
| Name | ETHOS ASSET MANAGEMENT INC |
| Text (information) | |
| Payment ref. no. | |
| Mark for learning | ☐ |

### Beneficiary BP

| | |
|---|---|
| Business Partner | |
| Container (internal) | |
| MACC (internal) | |

### Calculation

| | | | |
|---|---|---|---|
| Fees | 59.7 | Exchange rate | |
| Charging option | OUR: All charges debited ... ☑ | Net in acc. ccy | 3'900'059.7 |

### Debit text

| | |
|---|---|
| Template | Paiement bancaire ou postal (défaut) |
| Text for Acc. Stmt. | Pago |
| Text for advice | |

6

Espero que esto le sirva al cliente.

Saludos,
Juan Antonio

**Juan Antonio GOMEZ GONZALEZ**
Tel. +41 58 323 3771
Fax +41 58 323 2324
jgomez@pictet.com

 PICTET

Banque Pictet & Cie SA
Route des Acacias 60
1211 Geneva 73 - Switzerland
Tel. +41 58 323 2323
Fax. +41 58 323 2324
pictet.com

This message is not intended for persons who are citizens of, domiciled or resident in, or entities registered in a country or jurisdiction in which its distribution, publication, provision or use would violate current laws and regulations. The content of this message is confidential and may be read used only by the recipient of this message. For information about personal data protection, please refer to the Pictet Group's Privacy Notice availab www.group.pictet/privacynotice. If you have received this e-mail message in error, please destroy it and delete it from your computer. The Pictet Gr may not be held liable for the use, transmission or treatment of the content of this message. The recipient of this message remains solely liable for form of reproduction, copying, disclosure, modification and/or publication of the content. No liability whatsoever will be incurred by the Pictet Group recipient of this message agrees to comply with the applicable laws and regulations in the jurisdictions where they use the information contained he

# EXHIBIT P



**PROMISSORY NOTE**

| Guarantor: | ETHOS ASSET MANAGEMENT INC  (the "Guarantor") |
|---|---|
| Project Promoter: | Link Conexión Aérea SA de CV (the "Project Promoter") |
| Pledgor: | Miguel Ángel Franco Hernández (the "Pledgor") |
| Principal Amount: | USD$ 3,900,000 (THREE MILLION NINE HUNDRED THOUSAND US DOLLARS) |
| Effective Date: | June 12th, 2023 / SAN DIEGO, CALIFORNIA, USA |

1. <u>Guarantee Repayment:</u> I, in consideration of the pledge and extension of Margin Value Facility of USD$ 3,900,000 (THREE MILLION NINE HUNDRED THOUSAND US DOLLARS), the Guarantor promises to pay to the Pledgor, the principal sum of USD3,900,000 (Margin Value Facility) in case that the transaction of Financing (AGREEMENT NO. EAM-TAR-A-0421-2023) between Ethos Asset Management Inc., and the Project Promoter is terminated by default of Ethos Asset Management Inc. and the Margin Value Facility that was extended by the Pledgor to Ethos Asset Management Inc., is not returned. This Promissory Note aims to place a secondary liability for the Margin Value Facility on the Guarantor in case that Ethos Asset Management Inc., fails to honor its obligation to return it, according to EXHIBIT A - Pledge AGREEMENT № EAM-TAR-A-0421-2023.

2. <u>Purpose and Start Date:</u> As stated in AGREEMENT N. EAM-TAR-A-0421-2023, the Project Promoter agrees to use the funds provided by Ethos Asset Management Inc. to develop the Project and under no circumstances shall the Project Promoter engage in business or activities outside of what is described in the Agreement. Start Date shall mean the date when the Margin Value Facility extended by the Pledgor is received and is available in Ethos Asset Management Inc's designated account.

3. <u>Security:</u> This Promissory Note is guaranteed by the principal cash deposit in the accounts of the Guarantor. The Guarantor agrees not to invest a part of its funds equivalent to the margin value and to not borrow against or encumber the cash for any other purpose. The Guarantor agrees to provide such financial statements, bank statements and other information as the Pledgor may reasonably request from time to time evidencing the Guarantor's ability to repay the Margin Value Facility.



**PROMISSORY NOTE**

4. <u>Guarantor Representations:</u> The Guarantor is not registered as a broker or dealer with the U.S Securities & Exchange Commission ("SEC") and is not acting as a broker or dealer under this Promissory Note. The Guarantor is not registered as an investment advisor under the Investment Advisers Act of 1940, as amended, and the Guarantor is not acting as an investment advisor to the Company hereunder.

5. <u>Arbitration.</u> In the event of any dispute arising out of or in connection with the present Promissory Note, the Parties shall first refer the dispute to proceedings under the ICC Mediation Rules. The place of mediation shall be New York City, New York. If the dispute has not been settled pursuant to the said Rules within 60 days following the filing of a Request for Mediation or within such other period as the Parties may agree in writing, such dispute shall thereafter be finally settled under the Rules of Arbitration of the ICC by three arbitrators appointed in accordance with the said Rules of Arbitration. The place of Arbitration shall be New York City, New York. The language of the arbitration shall be English. The arbitration shall be the sole and exclusive forum for resolution of any dispute, and the award shall be in writing, state the reasons for the award and be final and binding. Judgment thereon may be entered in any court of competent jurisdiction. The Parties shall keep any mediation and/or arbitration confidential and shall not disclose to any person other than those necessary to the conduct of those proceedings (i) the existence of the mediation and/or arbitration, (ii) any document, testimony, transcripts or other information submitted, exchanged or created for the arbitration, or (iii) any decisions, orders, or awards, unless such disclosure is (A) required by law or a governmental or regulatory body, (B) necessary for a Party to seek legal, accounting or other professional services, or (C) for the purpose of making an application to any competent court relating to any aspect of a mediation and /or arbitration, including motions to recognize, enforce or challenge an award or interim measure, provided that, in all of the circumstances (A) to (C) above, the producing Party takes reasonable measures to ensure that the recipient preserves the confidentiality of the information provided. The prevailing Party, as determined by the arbitrators, shall be entitled to recover its reasonable costs and attorneys' fees from the non-prevailing Party.

6. <u>Governing Law.</u> This Promissory Note is subject to the Uniform Rules of ICC. In all matters this Agreement is governed by and shall be construed and interpreted in accordance with the laws of the State of New York without giving effect to the conflict of laws principles thereof.



## PROMISSORY NOTE

7. <u>Guarantor:</u> ETHOS ASSET MANAGEMENT INC. (Address: 4660 La Jolla Village Drive, San Diego, California, 92122, USA) hereby guarantees to pay the Pledgor's Margin Value Facility in the event that Ethos Asset Management Inc., (Address: 4660 La Jolla Village Drive, San Diego, California, 92122, United States of America) default's in accordance with AGREEMENT NO. EAM-TAR-A-0421-2023 and this is terminated and the Margin Value Facility that was extended by the Pledgor to Ethos Asset Management Inc. is not returned according to EXHIBIT A - Pledge AGREEMENT № EAM-TAR-A-0421-2023.

8. The parties agree that the electronic signature of a party to this Promissory Note shall be as valid as an original signature of such party and shall be effective to bind such party to this Promissory Note

[SIGNATORY PAGE FOLLOWS]

[REMAINING PART OF THIS SECTION LEFT IN BLANK INTENTIONALLY]



# PROMISSORY NOTE

IN WITNESS WHEREOF the parties have duly affixed their signatures under seal on this May 24, 2023, SAN DIEGO, CALIFORNIA, USA.

| GUARANTOR: | ETHOS ASSET MANAGEMENT INC |
|---|---|
| Signature: | Carlos Santos (Jun 13, 2023 20:26 GMT+3) |
| Representative Name: | CARLOS MANUEL DA SILVA SANTOS |
| Title: | CEO AND MEMBER |
| Date: | Jun 13, 2023 |

| PROJECT PROMOTER: | Link Conexión Aérea SA de CV |
|---|---|
| Signature: | Miguel Angel Franco Hernandez (Jun 13, 2023 15:30 CDT) |
| Representative Name: | Miguel Ángel Franco Hernández |
| Title: | CHAIRMAN |
| Date: | Jun 13, 2023 |

| Pledgor: | Miguel Ángel Franco Hernández |
|---|---|
| Signature: | Miguel Angel Franco Hernandez (Jun 13, 2023 15:30 CDT) |
| Representative Name: | Miguel Ángel Franco Hernández |
| Title: | INDIVIDUAL |
| Date: Jun 13, 2023 | Jun 13, 2023 |

# Promissory Note EAM PLEDGE Agreement N. EAM-TAR-A-0421-2023 v.Final 2

Final Audit Report                                   2023-06-13

| | |
|---|---|
| Created: | 2023-06-13 |
| By: | Hans Kastensmith (hck@attributedholdings.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAZ8FNStTHZxCmiK4exBWkbQKK2dojffJw |

## "Promissory Note EAM PLEDGE Agreement N. EAM-TAR-A-0421-2023 v.Final 2" History

🗎 Document created by Hans Kastensmith (hck@attributedholdings.com)
2023-06-13 - 5:16:33 PM GMT- IP address: 72.66.17.83

✉ Document emailed to carlos@ethosasset.com for signature
2023-06-13 - 5:17:15 PM GMT

🗎 Email viewed by carlos@ethosasset.com
2023-06-13 - 5:25:09 PM GMT- IP address: 82.222.99.105

✍ Signer carlos@ethosasset.com entered name at signing as Carlos Santos
2023-06-13 - 5:26:24 PM GMT- IP address: 82.222.99.105

✍ Document e-signed by Carlos Santos (carlos@ethosasset.com)
Signature Date: 2023-06-13 - 5:26:26 PM GMT - Time Source: server- IP address: 82.222.99.105

✉ Document emailed to mfranco@tarmexico.com for signature
2023-06-13 - 5:26:27 PM GMT

🗎 Email viewed by mfranco@tarmexico.com
2023-06-13 - 5:42:39 PM GMT- IP address: 66.102.6.41

✍ Signer mfranco@tarmexico.com entered name at signing as Miguel Angel Franco Hernandez
2023-06-13 - 8:30:19 PM GMT- IP address: 107.222.111.97

✍ Document e-signed by Miguel Angel Franco Hernandez (mfranco@tarmexico.com)
Signature Date: 2023-06-13 - 8:30:21 PM GMT - Time Source: server- IP address: 107.222.111.97

✓ Agreement completed.
2023-06-13 - 8:30:21 PM GMT


Powered by
Adobe
Acrobat Sign

# EXHIBIT Q

**Alberto Chávez**

| | |
|---|---|
| **De:** | Elias Achilleos <elias@ethosasset.com> |
| **Enviado el:** | martes, 18 de julio de 2023 6:39 a. m. |
| **Para:** | Carlos Santos; Mayra Fonseca Couto; Uwe Biermann; Leandro Fernandes; Ricardo Trindade; Cristiana Dias; Iolanda Mota; hemasteele@gmail.com; Michael Steele; Margarida Ferraz Joao; Mike Starvis; James Young; Alice Hungwane; Hans Kastensmith; Julien Brice Sounigo; craig beasley; Craig Freeman; Zachary Kaplan; Ivo Pimentel; Mafalda Costa; Maria Pimentel; Ricardo Baston; Miguel Franco; rse@bucephalus.mx; direcciongeneral@tarmexico.com; Alberto Chávez; Angel Garcia Colin; 'Ignacio Vazquez' |
| **Asunto:** | PR Newswire: Press Release Distribution Confirmation for Ethos Asset Management Inc. / TAR Aerolíneas, MEXICO |
| **Importancia:** | Alta |

Congratulations to all! Let's fly!

Ethos Asset Management Inc., USA, Announces Deal with Mexican Airline, TAR Aerolíneas, to Develop a Major Expansion Project (prnewswire.com)



## Ethos Asset Management Inc., USA, Announces Deal with Mexican Airline, TAR Aerolíneas, to Develop a Major Expansion Project

/PRNewswire/ -- ETHOS ASSET MANAGEMENT INC USA, announced a new long-term financing partnership with TAR Aerolíneas and has committed to providing significant...

www.prnewswire.com

Elias Achilleos
Chief Risk Officer
Ethos Asset Management Inc.
UK Office - London
Email: elias@ethosasset.com
UK +44 793 254 3008

ΛETHOS ASS
M A N A G E M E N
4660 La Jolla Village Drive, San Diego, California, 92122
United States of America

1

Internal Use Only

################
Visit our website at https://ethosasset.com/

The content of this message and any attachments may be confidential, privileged or otherwise sensitive in nature and is intended solely for the recipient. If you are not the intended recipient, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose or otherwise act upon any part of this email communication or its attachments. Any unauthorized dissemination, copying or use of this message or its contents is strictly prohibited and may be in violation of law. In accordance with industry standards and regulatory requirements, Ethos Asset Management Inc. ("Ethos") may retain email communications for a period of time. Ethos reserves the right to monitor and archive all email communications in accordance with applicable law and may disclose such communications as required by law.

---

**From:** Elias Achilleos <elias@ethosasset.com>
**Sent:** 20 June 2023 3:34 PM
**To:** Carlos Santos <carlos@ethosasset.com>; Mayra Fonseca Couto <mayra@ethosasset.com>; Uwe Biermann <uwe@ethosasset.com>; Leandro Fernandes <leandro@ethosasset.com>; Ricardo Trindade <ricardo@ethosasset.com>; Cristiana Dias <cristiana@ethosasset.com>; Iolanda Mota <iolanda@ethosasset.com>; hemasteele@gmail.com <hemasteele@gmail.com>; Michael Steele <michael@ethosasset.com>; Margarida Ferraz Joao <margarida@ethosasset.com>; Alice Hungwane <alice@ethosasset.com>; Hans Kastensmith <hans@ethosasset.com>; Julien Brice Sounigo <julien@ethosasset.com>; craig beasley <chipocket@yahoo.com>; Craig Freeman <craigfreeman@ethosasset.com>; Zachary Kaplan <zach@ethosasset.com>; William Dell'Orfano <william.dellorfano@sectorcapitalgroup.com>; Esmeralda Lopez <esmeralda.lopez@sectorcapitalgroup.com>; Brian W. Dell'Orfano <brian.dellorfano@sectorcapitalgroup.com>; alaor@multiplusbusinessbureau.com <alaor@multiplusbusinessbureau.com>
**Subject:** PR Newswire: Press Release Distribution Confirmation for Ethos Asset Management Inc. / Sector Resources Ltd

Congratulations all!

Ethos Asset Management Inc., USA, Announces Deal with Sector Resources Ltd., a Mining Company Operating in Colombia and Canada (prnewswire.com)

| | |
|---|---|
| SECTOR RESOURCES LTD | Ethos Asset Management Inc., USA, Announces Deal with Sector Resources Ltd., a Mining Company Operating in Colombia and Canada |
| | /PRNewswire/ -- ETHOS ASSET MANAGEMENT INC USA, announced a new long-term financing partnership with Sector Resources Ltd., founded in 1995 to focus on the... |
| | www.prnewswire.com |

Elias Achilleos
Chief Risk Officer
Ethos Asset Management Inc.
UK Office - London
Email: elias@ethosasset.com

2

UK +44 793 254 3008



4660 La Jolla Village Drive, San Diego, California, 92122
United States of America

Internal Use Only

###############
Visit our website at https://ethosasset.com/

The content of this message and any attachments may be confidential, privileged or otherwise sensitive in nature and is intended solely for the recipient. If you are not the intended recipient, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose or otherwise act upon any part of this email communication or its attachments. Any unauthorized dissemination, copying or use of this message or its contents is strictly prohibited and may be in violation of law. In accordance with industry standards and regulatory requirements, Ethos Asset Management Inc. ("Ethos") may retain email communications for a period of time. Ethos reserves the right to monitor and archive all email communications in accordance with applicable law and may disclose such communications as required by law.

# Ethos Asset Management Inc., USA, Announces Deal with Mexican Airline, TAR Aerolíneas, to Develop a Major Expansion Project



NEWS PROVIDED BY
**Ethos Asset Management Inc.; TAR Aerolíneas MEXICO →**
Jul 18, 2023, 08:24 ET

**Partnership Provides Long Term Financing** to TAR Aerolíneas (parent company, Link Conexión Aérea SA de CV) a Mexican regional airline based in the city of Querétaro, the capital city of the homonymous state.

SAN DIEGO, July 18, 2023 /PRNewswire/ — **ETHOS ASSET MANAGEMENT INC USA**, announced a new long-term financing partnership with TAR Aerolíneas and has committed to providing significant capital infusion that will continue for several years.

**Carlos Santos, CEO of Ethos Asset Management Inc,** stated,

Continue Reading

˅



Link Conexión Aérea, S.A. de C.V d/b/a TAR Aerolíneas is a 100% Mexican equity ownership regional airline; which started commercial operations in March 2014, currently operating 18 domestic destinations; and internationally, through charter services covering the USA and the Caribbean. For more

Information, please visit www.tarmexico.com

"It's an absolute honor to be partnering with an innovative company from Mexico's aviation industry where the domestic regional market presents a double-digit growth opportunity. With little competition in the domestic regional market, the regional market is attractive, underserved and difficult for other operators to access. The gap between supply and demand in the regional market is large and has widened as a result of the pandemic. With more 150-seat aircraft and a highly concentrated market, there is a gap in the strategy of major airlines that regional airlines can fill. Taking advantage of market opportunities led TAR to be the fastest growing airline and the leader in the regional market. The team from TAR Aerolíneas led by dynamic CEO, Ricardo Baston, an experienced aviation sector professional and Miguel Angel Franco Hernandez, Chairman of the Board, were very impressive with their expertise, vision and achievements to date that our decision to invest in their next phase of growth was sealed."

**Ricardo Baston, CEO, TAR Aerolíneas,** stated,

"We, at TAR, are very pleased to be partnering with solid financial entity such as Ethos Asset Management, to address the opportunity that the Mexican regional aviation market presents; via a loan facility which will enable TAR to strengthen its market position and providing the financial by resources to expand TAR's footprint in the market.  This partnership represents a major boost in the future of our airline, and I am confident that it will be a success.

Ethos Asset Management as leading investment firm, with a strong track record of success, in supporting the expansion of entities in a diverse industry base business.  There is no doubt that Ethos expertise in their field, together with a robust business understanding of aviation make them our partner of choice, when looking at achieving our goals and growth objectives.

We are excited about the potential of this partnership, and I look forward to working with Ethos Asset Management to help us achieve our goals. Together, we can make a difference in the future of aviation in México.

I am confident that this partnership will be a success, and I look forward to seeing our airline continue to grow and prosper."

**Hans Kastensmith, Executive Director, North and Central America, Ethos Asset Management Inc., stated,**

"I am very pleased to see the Mexican market for Ethos come alive with such an impressive partnership between Ethos and TAR. Mexico figures greatly into our growth strategy in the region and we see great things on the horizon in the coming weeks, months, and years". I would like to thank both the Ethos and TAR teams for their dedication in making this deal a reality."

**Roberto Suarez Espinoza, Associate, Mexico, Ethos Asset Management Inc., stated,**

"It is an absolute joy to have the opportunity to work with great people and good friends: I am grateful to have been able to be part of this transaction. The Mexican airline industry needs a consolidated 4th player to engage in further competition and bring greater health to a starved market. I'd like to thank Miguel, Ricardo and Alberto at TAR for their trust in me and Ethos for their financing needs: as well as Carlos and Hans within Ethos in all their support and trust during this process."

**About Ethos Asset Management Inc:**

**Ethos Asset Management (Ethos)** is an independent, US-based company with global reach in resource mobilization and project financing.

For more information, please visit **https://www.ethosasset.com**

**About TAR Aerolíneas:**

Link Conexión Aérea, S.A. de C.V d/b/a TAR Aerolíneas is a 100% Mexican equity ownership regional airline; which started commercial operations in March 2014, currently operating 18 domestic destinations; and internationally, through charter services covering the USA and the Caribbean.

For more information, please visit **www.tarmexico.com**

**Contacts:**

**Ricardo Baston, CEO, TAR Aerolíneas:**

Email **direcciongeneral@tarmexico.com**

**Roberto Suarez Espinoza, Associate, Mexico, Ethos Asset Management Inc:**

Email **rse@bucephalus.mx**

**Ethos USA:**

Ethos Asset Management INC: Press

Office **362357@email4pr.com**

+18585354814

SOURCE Ethos Asset Management Inc.; TAR Aerolíneas MEXICO

WANT YOUR COMPANY'S NEWS

# FEATURED ON PRNEWSWIRE.COM?

# GET STARTED

**440k+**
**Newsrooms &**
**Influencers**

**9k+**
**Digital Media**
**Outlets**

**270k+**
**Journalists**
**Opted In**

Economía
Mercados
Nacional        Opinión
Televisión
Fox Sports México
Estados

Síguenos

De Jefes

# ETHOS invertirá cerca de 300 mdd en México

La compañía fijó su mira en México para que se convierta en uno de sus mercados prioritarios para invertir 300 mdd en los próximos dos años.






De jefes .

septiembre 12, 2023 | 13:09 hrs

sus mercados prioritarios para invertir cerca de 300 millones de dólares, o alrededor de 5 mil millones de pesos, en los próximos dos años en proyectos de los sectores de manufactura, textil, automotriz, química, energía y turismo.

Desde su creación, en 2012, ETHOS ha financiado en el mundo más de 88 proyectos por un monto total que supera los mil 150 millones de dólares, y en México ya tiene una inversión comprometida de 116 millones de dólares para finales de este año. En julio de este año la compañía inyectó un capital superior a los 15 millones en TAR Aerolíneas.

La empresa de origen estadounidense y que tiene sus oficinas centrales en San Diego, California, busca llevar nuevas propuestas de financiación a México y ampliar su alcance en esta región, en la cual ve un gran potencial debido al rápido crecimiento del déficit de financiamiento de diversos planes en los últimos años.

PUBLICIDAD



## Argonaut Gold podrá volver a operar minas en Durango

La minera canadiense Argonaut Gold alcanzó un acuerdo con 400 familias en Durango, con quienes mantuvo un conflicto durante seis años por una deuda que reclamaban por presuntos daños ocasionados por sus operaciones, por lo que ahora la empresa podrá

"Logramos resolver este conflicto que nos permitirá continuar con las operaciones de las minas ubicadas en este núcleo agrario: Mina El Castillo, que está en fase de restauración y Mina San Agustín, que por ahora tiene al menos tres años de vida útil, pero que se puede prolongar por más tiempo a medida que continuemos con el proceso de exploración en el complejo", explicó Alfredo Phillips, director de Argonaut Gold México.

El conflicto data de 2017, cuando la minera firmó un convenio con los ejidatarios y pequeños propietarios de San Juan del Río para el pago reparatorio que cubría bienes distintos a la tierra y las afectaciones ocasionadas por la extracción; aunque los recursos se liquidaron durante 2018 y 2019, después de ese año la empresa dejó de cubrir el pago a pequeños propietarios.

"Esta situación fue resultado de una controversia en torno al reclamo de pago de los bienes distintos a la tierra, establecidos en el artículo 55 del Reglamento de la Ley Minera, donde se atienden los casos de ocupaciones temporales o forzosas; sin embargo, nosotros, junto con la Secretaría de Economía, habíamos pactado un acuerdo que dejó de respetarse", comentó el directivo.

Explicó que el acuerdo previo permitió que un juez resolviera como improcedente la queja de las comunidades; no obstante, dijo, lo que permitió resolver el conflicto fue el cambio de visión de las comunidades sobre la minería.

"La solución se da en un formato que nosotros le llamamos 'reseteo' en el que buscamos transformar la cultura de las comunidades ejidales para que deje de ser la cultura fomentada por las empresas y el gobierno, de estirar la mano y pedir y si no, te bloqueo", destacó Phillips.

### Baubap cumple su primer lustro en el país

› Baubap, la plataforma de micropréstamos enfocada en la población desatendida por la

**Roberto Salcedo,** destacó que la empresa busca no solo brindar servicios de micropréstamos, sino también impulsar la educación financiera a través de su aplicación móvil y la iniciativa "Va de Vuelta", que reembolsa un porcentaje de los intereses pagados como incentivo para el pago puntual.

Actualmente, la firma, que cuenta con registro en el Sistema de Registro de Prestadores de Servicios Financieros (SIPRES), otorga más de 300 mil créditos al mes y tiene como objetivo otorgar más de medio millón de créditos mensuales para principios de 2024.

Además, Baubap planea lanzar un nuevo producto enfocado en el pago de bienes duraderos a principios de 2024, lo que ampliará sus servicios financieros. El CEO de la empresa registrada ante la Comisión Nacional para la Protección y Defensa de los Usuarios de Servicios Financieros (Condusef) señala que su mayor desafío es llevar estos servicios a las 30 millones de personas en México que son subatendidas por la banca tradicional.

**0 comentarios**     Ordenar por  Más antiguos

Agrega un comentario...

Plugin de comentarios de Facebook

**COLUMNAS ANTERIORES**

06:52 am

**Natura franquiciará su negocio en México**

06/12/24

› Alsea va no es el "Uno" en España

ETHOS Invertirá cerca de 300 mdd en México – El Financiero

Las expresiones aquí vertidas son responsabilidad de quien firma esta columna de opinión y no necesariamente reflejan la postura editorial de El Financiero.

Recibe tu Plata Card en menos de 24 horas y disfruta de los beneficios que...
Transforma tu manera de manejar el dinero hoy
Plata Card | Sponsored

Solicitar Ahora

Recibe tu Plata Card en menos de 24 horas
No pagues anualidad.
Plata Card | Sponsored

Solicitar Ahora

Solicita tu Plata Card con hasta 200 mil pesos de crédito
Sin anualidad
Plata Card | Sponsored

Solicitar Ahora

Invierte en Amazon CFD con solo $100 y comienza a obtener un segundo...
¡El 2024 está terminando! Prepárate para 2025 con las mejores opciones en CFDs hoy.
INVMXI | Sponsored

Conoce más

Haz que tu dinero trabaje para ti Invirtiendo en Amazon CFD desde $100.
¿Tienes más de treinta? Aprovecha esta oportunidad de inversión
INVMXI | Sponsored

Reservar ahora

Compra hoy Ashwagandha Root Powder B Life®
Formulación de 100% natural de 1000 mg por porción.
B Life | Sponsored

Comprar ahora

---

ETHOS Invertirá cerca de 300 mdd en México – El Financiero

La información, opinión y análisis contenido en este portal digital es responsabilidad de los autores, salvo error de apreciación de su parte.

© Copyright, Grupo Multimedia Lauman, SAPI de CV

**EL FINANCIERO**

¿Quiénes somos?  •  Directorio  •  Suscripciones  •  Aviso de Privacidad